# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

VERIFIED COMPLAINT

Index # 13120/07

Plaintiff, by his attorneys BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP, as and for a cause of action allege upon information and belief as follows:

K?L 1. That this action is brought pursuant to the provisions of the New York State Comprehensive Motor Vehicle Insurance Reparations Act and plaintiff has complied with all of the conditions thereof.

D 2. That plaintiff sustained serious injuries as defined in §5102(d) of the Insurance Law of the State of New York.

D?L 3. That by reason of the foregoing, plaintiff is entitled to recover for non-economic losses as are not included within the definition of "basic economic loss" as set forth in §5102(a) of the Insurance Law of the State of New York.

D?L 4. That plaintiff is a "covered person" as defined in §5102(j) of the Insurance Law of the State of New York.

K?L 5. That this action falls within one or more of the exceptions as set forth in CPLR §1602.

K 6. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant was the owner of a certain motor vehicle bearing State of Connecticut license plate No. 551UAV.

7. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant controlled the aforesaid motor vehicle.

8. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant maintained the aforesaid motor vehicle.

9. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant operated the aforesaid motor vehicle.

10. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant was operating the aforesaid motor vehicle with the knowledge, permission and consent of the owner thereof.

11. That at all of the times and places hereinafter mentioned, plaintiff was operating a certain motor vehicle bearing State of New York plate number 62109LA.

12. That at all times and places hereinafter mentioned, 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, were public roadways and/or thoroughfares.

13. That on or about August 6, 2006, at or about the intersection of 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, there was contact between the defendant's motor vehicle and plaintiff's motor vehicle.

14. That the said accident and the injuries and damages to the plaintiff resulting therefrom were caused solely and wholly by reason of the negligence, carelessness and recklessness of the defendant in the ownership, operation and control of his motor vehicle, in that he failed to have and keep the same under reasonable and proper control; in that he caused, allowed and permitted his said motor vehicle to run into and violently collide with the rear of plaintiff's stationary motor vehicle; in that he failed to observe and/or heed the presence of

plaintiff's stationary motor vehicle lawfully stopped upon the public roadway pursuant to a red traffic signal light; in that he failed to observe and/or heed the traffic signals and/or controls then and there in operation; in that he failed to bring his motor vehicle under control in time to avoid the collision; in that he failed to have his attention before him; in that he failed to look; in that he failed to see; in that he operated and controlled his motor vehicle at a fast and excessive rate of speed under the circumstances and conditions then and there prevailing; in that he failed to provide and/or make prompt and timely use of adequate and efficient brakes and steering mechanisms; in failing to apply the brakes of his motor vehicle or to take other proper and appropriate evasive action in time to avoid running into and violently colliding with the plaintiff's motor vehicle; in operating the aforesaid motor vehicle in an unreasonable and imprudent manner; in that he operated and controlled his motor vehicle in reckless disregard for the safety of others, and the plaintiff in particular; in that he violated the statutes, ordinances, rules and regulations in the cases made and provided; in that he was inattentive to his duties wherein had he been attentive to his duties the accident and ensuing injuries could have and would have been avoided; in that he failed to act as a reasonable and prudent person could have and would have under the circumstances and conditions then and there prevailing; in that he operated and controlled his motor vehicle in such a willful, wanton and grossly culpable manner as to be liable for damages and punitive damages; in that he acted in reckless disregard for the safety of others, and the plaintiff in particular; and in that he failed to take all necessary and proper means and precautions to avoid the said accident.

D 15. That as a result of the negligence of the defendant, plaintiff sustained injuries to various parts of his head, body, limbs and nervous system and, upon information and belief,

some of his said injuries are of a permanent and/or protracted nature; that by reason thereof, he was confined to hospital, bed and home and prevented from attending to his usual business and/or occupation, and has sustained a loss of earnings thereby; and he was required and will be required to obtain medical aid and attention in an effort to cure and alleviate his said injuries, and incurred obligations therefore.

WHEREFORE, plaintiff demands judgment against the defendant in an amount that exceeds the jurisdictional limits of all of the lower Courts; together with interest, and the costs and disbursements of this action.

Dated: New York, New York
March 12, 2007

Yours, etc.

ADAM S. BERNSTEIN, ESQ.
BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
Office and P.O. Address
112 Madison Avenue, 2nd Floor
New York, New York 10016-7416
(212) 696-5500
Our File # Y8236;JC

Claim # 20874 011 2015

VERIFICATION

The undersigned, being an attorney duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury:

That I am one of the attorneys for the plaintiff in the within action; that I have read and know the contents of the foregoing complaint, and that the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters I believe it to be true.

This verification is made by affirmation and not by plaintiff herein because the plaintiff is not presently within the county wherein affirmant maintains an office.

This verification is based on information furnished by plaintiff in this action and information contained in affirmant's file.

Dated: New York, New York
March 12, 2007

[signature]
ADAM S. BERNSTEIN

Claim # 041874511501 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-------------------------------------------------------------------X

ABOUBACAR JALLOH,

Index #13120/07

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

-------------------------------------------------------------------X

SIRS:

PLEASE TAKE NOTICE, that pursuant to the provisions of Section 253 and/or 254 of the Vehicle and Traffic Law of the State of New York, a copy of the summons and complaint in the above action was served upon the Secretary of State of the State of New York, at his office at 123 William Street, New York, New York on MAY 3, 2007, with a fee of $10.00.

PLEASE TAKE FURTHER NOTICE, that we are sending you herewith, by certified/registered mail, return receipt requested, a copy of the summons and complaint in this action.

Dated: New York, New York
May 4, 2007

Yours, etc.,

Alice Kupferberg

ALICE KUPFERBERG
BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff(s)
112 Madison Avenue
New York, New York 10016
(212)696-5500 / File Number: Y8236

TO: Thomas P. Wendel
120 Main Street
Danbury, CT 06810

Claim # 21894311 3015

Index No. 13120/07
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

SUMMONS AND VERIFIED COMPLAINT

**Budin, Reisman, Kupferberg & Bernstein, LLP**
*Attorneys for Plaintiff(s)*
*112 Madison Avenue*
*New York, New York 10016*
*212-696-5500*
*Our File No. Y8236*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

**VERIFIED ANSWER**

-against-

**DEFENDANT DEMANDS TRIAL BY JURY**

THOMAS P. WENDEL,

Defendants.

---X

Defendant, THOMAS P. WENDEL, by and through his attorneys, the Law Offices of Patrick J. Maloney, as and for an answer to the complaint of the plaintiff, alleges as follows upon information and belief:

**FIRST**: Denies each and every allegation contained in Paragraphs "2", "14" and "15" of the Complaint.

**SECOND**: Denies each and every allegation contained in Paragraphs"3" and "4" and respectfully refers all questions of law therein to the Court for resolution.

**THIRD**: Denies knowledge or information sufficient to form a belief as to each and every allegation contained in Paragraphs "6", "7", "8", "9", "10", "11", "12" and "13" of the complaint.

**FOURTH**: Denies knowledge or information sufficient to form a belief as to each and every allegation contained in Paragraphs "1" and "5" and respectfully refers all questions of law therein to the Court for resolution.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

**FIFTH**: The amount of any judgment or award against this answering defendant shall be reduced by the amount of plaintiff's comparative fault and the comparative fault of any adverse party.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

**SIXTH:** Service of process was improper and as a consequence of the foregoing, the complaint should be dismissed in all respects.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE**

**SEVENTH:** That any damages otherwise recoverable by the plaintiff shall be diminished in the proportion which the failure of the plaintiff(s) to wear seat belts bears to the culpable conduct which caused the damages and/or injuries alleged.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE**

**EIGHTH:** The action is barred by reason of the plaintiff's failure to sustain a serious personal injury as defined by Section 5102 of Article 51 of the Insurance Law.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**

**NINTH:** That in the event of any judgment or verdict on behalf of the plaintiff, the defendant is entitled to a set-off verdict with respect to the amounts of any payments made to the plaintiff for medical and other expenses prior thereto.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**

**TENTH:** That plaintiff assumed the risk of any injuries which plaintiff may have sustained at the time and place set forth in the Complaint herein.

**WHEREFORE,** defendant demands judgment of this court dismissing the complaint in all respects and granting defendant such other, further or different relief as the Court may deem just and proper.

Dated: New York, New York
May 21, 2007

Yours, etc.

LAW OFFICES OF PATRICK J. MALONEY

By:______________________________
Mark A. Solomon
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

TO: BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, New York 10016
(212) 696-5500
File Number: Y8236

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

**ATTORNEY'S VERIFICATION**

-against-

THOMAS P. WENDEL,

Defendants.

---X

Mark A. Solomon, an attorney duly admitted to practice law before the Courts of New York State, hereby affirms under the penalties of perjury pursuant to CPLR 2106:

I am an associate of the firm of the LAW OFFICES OF PATRICK J. MALONEY, attorneys for defendant, THOMAS P. WENDEL.

I submit the following statement upon information and belief, based upon an inspection of the records maintained by this office, which records I believe to be true.

That I have read the contents of the attached Verified Answer and believe it to be true based on information available or maintained by this firm. I make this verification because this defendant is not located in New York County.

Dated: New York, New York
May 21, 2007

Mark A. Solomon

**CERTIFICATE OF SERVICE**

**MARK A. SOLOMON, ESQ**. affirms the following under the penalties of perjury under the law of the United States and the State of New York:

I am an attorney at law admitted to practice before the Courts of the State of New York and this Honorable Court.

I am an associate of the firm of the Law Offices of Patrick J. Maloney, the attorneys of record for the defendant, THOMAS P. WENDEL, in this action. I am over the age of eighteen and not a party to the action.

On May 21, 2007, I served the within VERIFIED ANSWER upon:

TO: BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, New York 10016
(212) 696-5500

by depositing a true copy thereof enclosed in a properly addressed postpaid envelop in a mail depository under the exclusive control of the United States Postal Service in the State of New York.

Dated: New York, New York
May 21, 2007

Mark A. Solomon

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---------------------------------------------------------------X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendants.

---------------------------------------------------------------X

**VERIFIED ANSWER**

**LAW OFFICES OF PATRICK J. MALONEY**
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

# EXHIBIT "B"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ABOUBACAR JALLOH,

Plaintiff,

vs. No. 07 Civ 4091 (NRB)

THOMAS P. WENDEL,

Defendant.

---

ORIGINAL

DEPOSITION OF ABOUBACAR JALLOH

New York, New York

Friday, February 8th, 2008

Reported by:
Jeremy Frank, MPM
JOB NO. 672356a

February 8th, 2008

10:41 a.m.

Deposition of ABOUBACAR JALLOH, held at the offices of Budin, Reisman, Kupferberg & Bernstein, LLP, 112 Madison Avenue, New York, New York, pursuant to Order, before Jeremy Frank, a Notary Public of the State of New York.

A P P E A R A N C E S:

BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, NY 10016
BY: PETER McCABE, ESQ., of counsel

LAW OFFICES OF PATRICK J. MALONEY
Attorneys for Defendant
90 Broad Street, Suite 2202
New York, NY 10004
BY: HENDRICK VANDAMME, ESQ.

ALSO PRESENT:
MAMADOU DOUMBOUYA, interpreter

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

Jalloh

M A M A D O U D O U M B O U Y A, was duly sworn to interpret the questions from English into Fulani, and the answers from Fulani into English.

A B O U B A C A R J A L L O H, called as a witness, having been duly sworn by a Notary Public, was examined and testified through the interpreter as follows:

EXAMINATION BY

MR. VANDAMME:

Q. Good morning, Mr. Jalloh.

My name is Hendrick Vandamme and I'm an attorney with Patrick Maloney's office. Today I'll be asking you a series of questions pertaining to an accident that allegedly occurred on August 7th, 2006.

A. Okay.

Q. Before we start, I want to give you some ground rules for this deposition. As you know, the court reporter is taking down everything that you say, so its important that you answer with words rather than with a nod or a shake of the head.

Do you understand?

A. Yes.

Q. To make it easier for the court reporter to record what we say accurately, its important that we not talk over one another. For this reason, I ask you to please wait until I finish my question before answering.

Is that okay?

A. Okay.

Q. Mr. Jalloh, do you understand that you are under oath today?

A. Yes, I understand.

Q. Okay.

If you don't understand any of my questions, please make sure that you tell me and I'll rephrase it or I'll ask it again.

A. All right.

Q. If you need to take a break at any time during this deposition, please let me know and I'll accommodate your request.

A. Okay.

Q. Are you prepared to answer my questions today?

A. Yes.

Q. Yes.

Jalloh

Please state your name for the record.

A. Aboubacar Jalloh.

Q. Your last name is Mr. Jalloh, correct, your first name is Aboubacar?

A. Yes.

Q. Okay.

What's your current address?

A. 108 East Clark Place in The Bronx.

Q. How long have you lived at this place?

A. Since 2000 I'm in that address.

Q. Are you renting or do you own that place?

A. I'm renting.

Q. Is there anyone else who lives in this place, in this address with you?

A. I live there with other people.

Q. Who are those people, how many people live there?

A. Two people.

Q. Who are those people?

A. M-o-u-h-a-m-a-d-o-u S-o-w, Mouhamadou Sow, M-a-m-a-d-o-u A-l-i-m-o-u

Jalloh

B-a-h, Mamadou Alimou Bah.

Q. Mr. Jalloh, what's your relationship to those individuals?

A. We just like are friends, we get along.

Q. So are they roommates?

A. You mean like if we --

Q. Who pays the rent, is it you who pays the rent or do you share the rent?

A. We help one another.

Q. In other words, you share the rent?

A. Yes.

If we are in good health and we are all working, we share it, but if somebody is not working and doesn't have good health, he's not going to pay the rent.

Q. Okay.

Mr. Jalloh, where you were born?

A. Guinea.

Q. Which city were you born in in Guinea?

A. Conakry, C-o-n-a-k-r-y.

Q. What's your date of birth?

Jalloh

A. June 5th, '63.

Q. Are you a United States citizen?

MR. McCABE: Note my objection.

He may answer the question.

A. No.

Q. What's your current immigration status?

MR. McCABE: Objection.

You may answer the question.

A. I don't have a status.

Q. When did you come to The United States?

A. Its been a while now.

Q. Is it more than 10 years ago?

A. Its not more than that but its close to that now.

Q. How did you come to The United States?

A. I came here by a visa.

Q. When you entered the United States, what type of visa did you have when you entered the country?

A. Visa like merchant, like merchant.

Q. Okay.

Jalloh

What was the name of the visa, was it a B1, B2, was it an E visa, what type of visa was it?

A. If I'm not mistaken, its a B2.

Q. As I understand, B2 is not a merchant's visa, correct?

MR. McCABE: Is that a question or a statement? Note my objection to the form.

He may answer the question.

Q. Is B2 visa a visitor's visa?

A. That I don't know.

Q. Okay.

You stated that you came on a merchant visa. What type of business were you involved in when you came to The United States?

A. It was to buy merchandises.

Q. What type of merchandises?

A. Like a T-shirt.

Q. Did you have your own business back in Guinea before you entered the United States?

A. Yes.

Jalloh

Q. What was the name of that business?

A. It was selling.

Q. I understand, but what was the nature of your business, were you a sole proprietor, did you have a corporation, what type of business was it?

A. I was working for myself.

Q. Okay.

Now you stated that you came here approximately not more than 10 years ago. When you entered the United States, what was your first address?

A. The first place I stayed here was Davidson Avenue.

Q. Where is Davidson Avenue?

A. Bronx.

Q. Mr. Jalloh, what's the highest level of education that you received in Guinea?

A. Just like eight years of education.

Q. Did you receive any higher education in the United States?

Jalloh

A. I didn't go to school like to official school or something like that, but I was learning the language more.

Q. Okay.

Have you ever been known by any other name than Aboubacar Jalloh?

A. No.

Q. Did you have any nicknames?

A. Nickname?

Q. Nickname.

A. No.

Q. Okay.

What's your current profession, what's your current --

MR. MCcABE: What do you do for a living?

Q. What do you do for a living?

A. Presently I don't work often, just rarely because I'm not in good health right now.

Q. When you say rarely, how often do you work?

MR. McCABE: In the period of time of the last six weeks?

Jalloh

MR. VANDAMME: Let's say in the last six months.

MR. McCABE: Six months, okay.

A. In a period of six months I had maybe two months of work.

Q. What type of work did you do in those last six months?

A. Driving taxi.

Q. Do you work for a particular company or do you own your cab?

A. Presently I don't have a car, my friends are the ones who give me their cars to drive.

Q. What are the names of your friends that give you the cars?

A. Alpha Bah, but also he's not here right now, he returned; he's the one who used to give me his car.

Q. Okay.

Is there one more person or is he the only one?

A. Right now, nobody else.

Q. What type of car did he use to give you?

A. Lincoln.

Q. Do you know the car registration number of this car?

A. No, I don't recall that.

Q. Now Mr. Jalloh, do you hold a driver's license?

A. Yes.

Q. Is it a New York driver's license?

A. Yes.

Q. When did you obtain this New York driver's license?

A. Its been a long time.

Q. Do you know when the license was issued?

A. The last time it was issued?

Q. No, when the license was issued for the first time.

A. That I forgot.

Q. How did you obtain your driver's license?

MR. McCABE: I'm going to object. What does that have to --

MR. VANDAMME: What does it have to do with it, I don't know if he has a

license. He's here illegally, I'm trying to establish if he has a driver's license. He doesn't know when the license was issued, counsel. I'm asking a very simple question when was the license issued. If I have a license, I know when my license was issued.

MR. McCABE: No, no, you're not the witness.

MR. VANDAMME: I understand.

MR. McCABE: Counsel, you're working on a different level than this gentleman, you're an attorney and there is a difference.

MR. VANDAMME: I understand.

So --

MR. McCABE: You can ask him approximately when, maybe he understands the question as you want a specific date, month and year, things like that.

MR. VANDAMME: It doesn't have to be specific, I can ask him approximately.

MR. McCABE: Ask approximately.

MR. VANDAMME: I understand.

Jalloh

MR. McCABE: When did you first get a driver's license approximately, if he knows. Can you ask it that way approximately, about when?

THE WITNESS: Since I got my first license?

MR. McCABE: Yes.

Nothing is simple.

**A. I forgot. I don't recall, I forgot.**

**Q. Okay.**

**Did you take any test to obtain your license?**

**A. Yes, I did.**

**Q. When you took this test, where did you take this test?**

**A. In Brooklyn.**

**Q. In what language was the test conducted?**

**A. English.**

**Q. Do you speak English?**

**A. Yes, I speak a little bit.**

**Q. Okay.**

**Let's talk about the accident, the**

alleged accident that occurred on August 7th, 2006.

Mr. Jalloh, on that particular day on August 7th, 2006, what were you doing in the morning hours?

A. The morning, you said?

Q. In the morning.

A. In the morning I went to work.

Q. Okay.

Where was that, where did you go to work?

A. Uptown.

Q. When you say Uptown, would you be able to tell me where exactly you went Uptown?

A. I can't count how many streets, how many roads I passed that day before I went to work.

Q. I'm not asking how many roads you passed. I'm asking you to give me the address, the place where you went on that particular day in the morning hours.

A. I don't think I understand your question.

MR. McCABE: Off the record for a

minute.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 11:03 a.m.)

(Time noted: 11:04 a.m.)

Q. Mr. Jalloh, on August 7th, 2006 in the morning, were you at home?

A. Early in the morning I was in the house.

Q. Okay.

At some point in the morning did you receive a phone call from your company?

A. No, my company didn't call me.

Q. On August 7th, 2006 what were you doing for a living?

A. At that time I was working as a driver of a livery cab.

Q. Okay.

Which company were you working for at the time?

A. Family.

Q. Family, that's it?

A. Yes.

Q. And where is Family located?

Jalloh

A. 181st and Amsterdam.

Q. That's in The Bronx, correct?

A. No.

Q. Where is it?

MR. McCABE: It is in Manhattan.

MR. VANDAMME: You're right.

Q. Prior to August 7th, 2006 how long had you been working for Family?

A. I had worked there before that day like three, four, five, six months, I don't know exactly.

Q. Were you a designated driver for a particular car while you were working for Family?

A. If I was given a car?

Q. Did you have an assigned car or did your car change every time you drove somewhere to pick up a client?

A. Only one car I had.

Q. Okay.

What type of car was that?

A. It was a Lincoln.

Q. Do you know what year, when the car was made?

Jalloh

A. Lincoln Town Car, '97.

Q. '97.

What color was the car?

A. Green (in English).

Q. Do you know where the car was regularly serviced at the time of the incident, which means August 7th, 2006.

A. Yes.

Q. Do you know who was responsible for the maintenance of the car?

A. Myself.

Q. When was the last time you had your car serviced prior to August 7th, 2006?

A. Every morning myself before I go anywhere in the morning my car when I put it on, I'll check the oil, I would check the wheels, I'll check everything.

MR. McCABE: I guess you have to ask the question again.

Q. When you say everything, what else, when you say everything, what do you mean by that?

A. Like the wheels, the oil, the water, the tires, so I'm going to check all of

those things to see if its good before I can start working.

Q. Did you have your car serviced by a professional mechanic at the time prior to the accident?

A. Yes.

Q. What was the name of that mechanic?

A. I know a Fulani guy he's a mechanic, he was the one who checked my car for me, but he doesn't have a fixed place.

Q. What is his name again?

A. S-o-w, Sow last name.

Q. When was the last time before the collision that you had your car serviced by Mr. Sow?

A. Like not more than five days before the accident.

Q. Can you give me the address of Mr. Sow's mechanic repair shop, do you know where he's located?

A. Presently he's at Webster and 170th.

MR. McCABE: That's Webster Avenue.

Jalloh

Q. Mr. Jalloh, on August 7th, 2006 what time did you leave that morning?

A. It was around like 11 all the way to like 12.

Q. Okay.

Did you consume any alcohol 24 hours prior to your leaving the house?

A. Since my birth I have never drank alcohol.

Q. Did you consume, did you take any prescription drugs 24 hours prior to your leaving the house?

A. Never.

Q. Okay.

Do you remember what the weather conditions were on that day?

A. It was nice weather, it was shining.

Q. It was clear and dry?

A. It was clear and dry, everything was good.

Q. Okay.

Now, could you tell me, Mr. Jalloh, when you left the house, and I'm

asking approximately where were you heading, what was the purpose of your trip?

A. It was to go to work.

Q. Okay.

How did you know where to go?

A. As a taxi driver when you say you're ready to work, anywhere you happen to find a customer, you take the customer.

Q. So when you left the house, where did you go? I understand you went to work, but can you tell me the direction where you went, did you go Uptown, did you go Downtown, which direction did you take?

A. I traveled, I drove Uptown.

Q. Okay.

Did you find any customers along the way?

A. No.

Q. No customers.

Now at some point there was an accident involving your vehicle.

Is that correct?

A. Yes.

Q. Where did this accident occur?

Jalloh

A. It was around 182nd and Jerome Avenue.

Q. Which street were you on, were you on 182nd Street or were you on Jerome Avenue?

A. I was on Jerome.

Q. Which direction were you heading?

A. Downtown.

Q. Is Jerome Avenue a two-lane Street or a one-way Street?

A. Its two ways.

Q. Two ways, okay.

At some point your car was involved in an accident with another vehicle.

How did that happen?

A. I stopped for the red light, the other vehicle came from the back and hit me.

Q. Okay.

How many do you remember, only if you know, do you remember how many traffic lights there are on Jerome Avenue at the intersection of 182nd and Jerome Avenue, only if you know.

A. You mean how many lights?

Q. How many traffic lights are there

in total, if you remember, if you know?

A. What I know is the lights that were in front of me, I cannot count all the lights over there.

Q. As you were approaching the traffic light, when was the first time you noticed the light was red?

A. Is when the light gave a yellow.

Q. Do you know approximately how far you were from the intersection when the light turned yellow, approximately, it doesn't have to be precise.

A. That I can't recall.

Q. Okay.

How was the traffic on that day at the area located at the intersection of Jerome Avenue and 182nd Street, if you remember? Can you tell me was the traffic heavy, were there any other cars next to you?

A. There was no traffic, it was clear and there was no cars in front of me.

Q. Okay.

Mr. Jalloh, do you remember what time of the day the accident occurred? It

doesn't have to be precise, if you can tell me an approximate time when the accident occurred?

A. It was around 11:00 p.m. something.

Q. 11:00 p.m. in the evening, correct?

A. Yes.

Q. Okay.

And you stated that you left your house at approximately, I don't remember. Could you tell me what time you left your house that particular day?

A. It was like 11-something, let's just say at 12 noon.

Q. Since 12 noon until 11:00 p.m. you had been working for almost 11 hours, correct?

A. I was not working during all those times because I have to go and relax a little bit and I also have to eat.

Q. Okay, let me ask you this.

How many hours did you work in total on August 7th, 2006 if you remember, it doesn't have to be precise, approximately.

A. Like eight hours.

Q. Now when you mentioned that you were standing at the intersection and the light was red, at some point did you feel an impact?

A. Yes.

Q. At the time of the impact where were you looking?

A. When he hit me, I didn't see anything at that time, my mind was completely messed up.

Q. Do you remember immediately preceding the accident what were you doing?

A. I was stopping for the light to turn green.

Q. Okay.

Where were your hands?

A. On the wheel.

Q. Were you listening to the radio?

A. No.

Q. Were you talking on a cell phone?

A. No.

Q. Do you own a cell phone?

A. Yes.

Jalloh

Q. How about your brakes, when was the last time you had your brakes serviced prior to the time of this incident?

A. When this driver hit me, at that time my foot was on the brake.

Q. Was it your left foot or your right foot?

A. Right foot.

Q. Were you wearing a seat belt?

A. Yes.

Q. What type of seat belt were you wearing, a shoulder to lap or lap to lap; what type of seat belt was it?

MR. VANDAMME: Let the record reflect that the witness is indicating that he was wearing a shoulder to lap seat belt.

A. The seat belt was like a, you take it from here and you pass it through your, like through your stomach and you buckle it down here (indicating).

Q. Okay.

Were there any passengers in your car at the time of this incident?

Jalloh

A. No.

Q. Did your car have an air bag?

A. Yes, it has it.

Q. Did your air bag deploy at the time of the incident?

A. No, I didn't see it, at that time I didn't see it.

Q. Okay, let me ask you this.

At the time of the impact, did any portion of your body hit any portion of the car, and if so, which one?

A. What happened when the driver hit me, I had the belt on, but what happened my head went toward the wheel (indicating).

Q. The steering wheel?

A. The steering wheel, and I came back also to my seat, that's what happened (indicating).

Q. Did your head at any point hit the steering wheel?

A. At that time I don't know what happened to me because right there I lost my mind.

Q. Did you lose your consciousness as

a result of the impact?

A. I lost my consciousness.

Q. Mr. Jalloh, do you remember when you again gained consciousness following the impact?

A. After a while.

Q. Can you tell me approximately when, if you know?

A. After like one hour.

Q. Were you still in the car when you gained consciousness?

A. Yes.

Q. Once you gained consciousness, what do you remember, what do you recall seeing?

A. I see people were there surrounding the cars all over.

Q. How many people did you see approximately?

A. That I cannot count.

Q. Did you see any ambulance?

A. No.

Q. Did you see any police cars?

A. Yes, I did see.

Q. How many police cars did you see?

A. If I'm not mistaken, it was one.

Q. How many police officers do you remember were at the scene?

A. If I am not mistaken, if I still have a good memory, it was two of them.

Q. Do you know whether your windows, your car windows were open or whether they were shut?

A. That I don't recall.

Q. Once you gained consciousness and you recall that you saw two police officers, what did you do?

A. I didn't do anything, I stayed in my car.

Q. Did anyone talk to you after you gained consciousness?

A. The police people.

Q. Did you first talk to them or did they talk to you?

A. They are the ones who talk to me.

Q. What did they tell you?

A. They asked me if I need an ambulance.

Jalloh

Q. Were you still in the vehicle, in your seat when the police talked to you or were you outside the vehicle?

A. I was sitting put in my car.

Q. You mentioned you don't remember whether your window was shut or open.

When the police started talking to you was your door open, was your window open, how were they able to talk to you?

A. The door was open, the door of the car.

Q. Who opened the door?

A. If I am not mistaken, the police people are the ones who opened it.

Q. Which door was it?

A. The door where I was sitting.

Q. The driver's side door?

A. Yes.

Q. Could you tell me again, I think I asked you this question before, if you remember what was the first question the police officer asked you while you were in the car?

A. They asked me if they were going

to send an ambulance for me.

Q. What did you respond to that question?

A. At that time I told him no, to leave it for now because at that time I didn't know something major had happened to me, I told them, "Leave it for now."

Q. So what happened next?

A. After that I went home.

Q. Did you go home or did you drive home?

A. Somebody took me home.

Q. Who was it?

A. Another driver.

Q. Do you know his name?

A. Yes.

Q. What's his name?

A. Ibrahma, I-b-r-a-h-m-a.

Q. Is it his first name or his last name?

A. That's his first name.

Q. What's his last name?

A. B-a-h.

Q. Did Mr. Bah at the time of the

accident also work for Family?

A. No.

Q. Do you know which company he was working for at the time of the accident?

A. I don't know.

Q. How did Mr. Bah know, how did you establish contact with Mr. Bah at the time of the accident?

A. I called him.

Q. On his cell phone?

A. Yes.

Q. Do you still have his cell phone number?

A. Yes.

Q. Do you know what it is?

A. Yes.

Q. What is it?

MR. McCABE: I'm going to object to that. Now you're getting into a question of privacy.

MR. VANDAMME: All right, that's fine.

MR. McCABE: Whether a person's cell phone could be divulged.

Jalloh

Q. Mr. Jalloh, you called Mr. Bah on his cell phone, how long did it take for Mr. Bah to come to the scene of the accident approximately?

A. I couldn't calculate, indicate how long it took him.

Q. Was it less than 30 minutes approximately, was it less 30 minutes, was it more than 30 minutes if you can approximate for me?

A. It was more than 30 minutes.

Q. Was it more than an hour?

A. Yes.

Q. Was it more than two hours?

A. It was one hour and a few minutes, it wasn't close to two hours.

Q. Okay.

When you called Mr. Bah on his cell phone, what did you tell him?

A. I told him, I said, "Somebody hit me so could you come and take me home?"

Q. What did he say?

A. He said yes.

Q. Once Mr. Bah arrived at the scene

of the accident, were you still in the car?

A. Yes.

Q. At any time between the time of the incident and the time of Mr. Bah's arrival, did you at any point leave your vehicle?

A. I did not.

Q. Did you talk to anyone else apart from those two or one police officer?

A. No.

Q. Okay.

Once Mr. Bah arrived, what did you do?

A. He took me to my place.

Q. Did he help you get out of the car or did you leave the car on your own?

A. He's the one who helped me.

Q. Did you at any point while you were in the car talk to the driver of the other vehicle who was also involved in the incident?

A. No, I don't recall.

Q. Did you see the other driver?

A. I don't think I saw him, I saw the

driver (sic).

Q. When you talked to the police officer or police officers, did they ask you any questions about this incident?

A. They did ask me.

Q. What did they ask you?

A. They asked me, "How did the driver of the other car hit you?"

Q. What did you tell them?

A. I told him, I said, "I was stopping at the red light waiting for the light to turn green and the other driver hit me. I mean its not like we are going one next to another, I was just stopping and he hit me."

Q. Okay.

How would you describe the impact?

A. I would say it was heavy.

Q. Did you at any point see what part of your car was hit by the other vehicle?

A. At that time I didn't see. When he hit me right there, I didn't see where I was hit.

Q. When you left your car, what did

you do? Meaning did you go directly to Mr. Bah's car or did you look at your car?

A. I went directly to Mr. Bah's car.

Q. Apart from those two police officers, did you talk to anyone else?

A. I don't recall.

Q. Okay.

Once you were in Mr. Bah's car, where did you go?

A. I went to the place where I live, where I used to live.

Q. Where is that?

A. 108 East Clark Place.

Q. Mr. Jalloh, when you were in Mr. Bah's car did you feel any pain?

A. I had pain.

Q. Where?

A. (Indicating) Here to the back, head, and all the way to my back going to my legs.

Q. How long did it take you if you can approximate for me, how long did it take you to get home from the scene of the accident and your place? In other words, if you can

tell me how long, how much time did you spend in Mr. Bah's car?

A. Did you say how long?

Q. Approximately how long did it take you to get home from the scene of the accident?

A. At that time I couldn't approximate.

Q. Would you know which route you took while you were driving home?

A. Yes.

Q. Which route was that?

A. Jerome.

Q. Are you familiar with that area, in other words, had you been to that area before, prior to the accident?

A. Yes, I know.

Q. Once you got home, what happened next, what did you do?

A. I lay down.

Q. Okay.

Now, at some point you went to see a doctor, correct?

A. Yes.

Q. When was it?

A. The next day of that, the next day in the morning.

Q. Why did you go see a doctor?

A. Because I was feeling pains, a lot of pains.

MR. McCABE: Can we take a short break for one minute.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 11:49 a.m.)

(Time noted: 11:56 a.m.)

Q. Mr. Jalloh, at some point the next day you went to see a doctor, correct?

A. Yes.

Q. Do you remember the name of that doctor?

A. No.

Q. Okay.

If I told you that it was Dr. Greenfield, would that refresh your recollection?

A. No, I don't recall the doctor's name.

Jalloh

Q. Was it Dr. Crystal?

A. I have seen a lot of doctors.

What's happening is they are going to tell me their names, but its very difficult for me to remember or memorize their names.

Q. Let me ask you this way.

How did you find out about this doctor?

A. One of my friends told me about the doctor.

Q. Who was that friend?

A. It was Mamadou Diallo.

Q. In other words, it was a recommendation, correct?

A. Yes.

Q. In other words, you asked your friend if he knows any doctor and he gave you this number, correct?

A. Yes.

Q. You called this doctor and you asked him if you can come for an appointment, correct?

A. Yes.

Q. Okay.

Jalloh

Where was the doctor located at the time?

A. Grand Concourse.

Q. How did you get there?

A. I took a taxi.

Q. Once you got there, what did the examination consist of?

A. Lots of things was done for me over there. I remember they put some hot pad here (indicating) to the back and to the neck here, and --

Q. What else?

THE INTERPRETER: I don't know that name in Fulani.

A. Something like a needle they put in there.

THE INTERPRETER: Sorry.

Q. Mr. Jalloh, did you receive any medication while you were examined?

A. That day like I told you what they did for me was to put things on my body, the hot pad, and in particular the needle. And also I was given like a Tylenol and something was prescribed for me.

Jalloh

Q. Do you know, would you recall the name of the prescription drug?
A. I don't recall.
Q. Okay.
Did you see the doctor again following this first examination?
A. Yes, many times.
Q. Would you know approximately how many times?
A. Three months complete I'm seeing this doctor, I was even put, I even had an MRI for that.
Q. When you say three months, does it mean three months following your first visit?
A. Three months total I was seeing this doctor.
Q. Okay.
During those three months how often did you see your doctor, was it once a week, once a month, every other day?
A. I used to see the doctor like three times a week.
Q. Do you remember whether the doctor was a female or a male?

A. Female, some of the time.

Q. The first time you went to see that particular doctor, do you remember whether the doctor was a female or a male?

A. It was a female.

Q. Okay.

If I told you that her name was Dina Nelson, would that refresh your recollection?

A. If you tell me that's her name I'm not going to argue, but --

Q. All right.

During those three months, did you see any other doctors except for those you visited at Grand Concourse?

A. You mean from a different hospital?

Q. Did you go to any different providers or did you always go to the same place at Grand Concourse?

A. Grand Concourse, that's where I went to and where I had also the MRI.

Q. Okay.

Mr. Jalloh, would you recall

whether you were recommended to have any rehabilitation by those doctors?

A. I was recommended to go somewhere that was in Tremont, but that appointment did not happen.

Q. Okay.

Did you participate in any rehabilitation therapy following the accident?

A. Yes, I did, at Grand Concourse.

Q. What did this therapy consist of?

A. For the therapy it is something that they bring, they put around my neck and also my back and I'm laying down. So after that also they use a needle to press those areas of my back and also my neck, and also they massage me.

Q. Following the therapy did you feel that your health condition started to improve?

A. Just a little bit. It was better than the day it first happened to me, but not completely.

Q. So was there any reason why you stopped seeing your doctors and why you stopped participating in the rehabilitation

therapy?

A. Because I had been there a lot of times, many times.

Q. Okay.

When was the last time that you participated in therapy, if you know approximately?

A. I don't recall.

Q. As of now how, do you feel?

A. To the present time I have pain.

Q. Where do you have pain?

A. The place I had pain before is still the same place.

Q. If you can tell us again where that was?

A. (Indicating).

MR. McCABE: The neck and upper back.

A. The neck and upper back, the middle of the back --

THE INTERPRETER: And pointing to the legs, everything.

Q. Are you currently taking any prescription medication?

Jalloh

A. Right now Ben Gay, that's the only thing I'm putting on those areas.

Q. How often do you take Ben Gay?

A. Every day before I go to bed I use that.

Q. What is Ben Gay for?

A. Its because of the pain.

Q. Are you currently participating in any therapy?

A. No.

Q. Okay.

Are there any activities that you were able to do prior to the incident that you are unable to do now?

A. Yes.

Q. What are those activities?

A. Like for example, I used to like bend my knees and sit on like if when I pray, but now I can't do that.

Q. Anything else?

A. That's all.

And also if I'm walking, I walk a little bit gingerly, I cannot walk straight.

MR. McCABE: Can you read that

back, please.

(Record read.)

MR. McCABE: Thank you.

Q. Have you ever met a person called Thomas Wendel?

A. It is possible that I met somebody and that happened to be the name, but I don't recall the name.

Q. Do you know, Mr. Jalloh, that Mr. Wendel is the defendant in this action?

A. I don't understand, what do you mean, the accident?

Q. No, I'm talking about, do you know -- let me ask you this.

Have you ever spoken to the defendant in this action? In other words, have you ever spoken to the driver of the other vehicle that's --

A. No, I have never.

Q. Never ever?

A. No.

Q. That's all I need to know.

I'll ask you some follow up questions. At the time of the incident when

you were working for Family, how much were you making?

A. That's depends how lucky you are, ever day is different how much.

Q. Were you getting paid an hourly rate or were you getting paid based on how many customers you drove that particular day?

A. For a taxi driver it depends how many customers you get per day, that's how much money you're going to get.

Q. Let's take an average day.

If you can approximate for me on an average day, not a good day, not a bad day, on an average day how much would you make?

A. You mean how many customers?

MR. McCABE: No, how much money.

Q. It doesn't have to be precise.

I'm not asking for an X number, I'm not asking if you have no customers, I understand you would make nothing, on an average day how much would you make?

A. Like $90.

MR. McCABE: I'll just for the record point out that there is no claim

for lost earnings in this action.

MR. VANDAMME: Okay.

Q. Mr. Jalloh, I'm going to ask you one more question.

Do you know what happened to the vehicle once you left the scene of the incident with Mr. Bah?

A. Yes.

Q. What happened?

A. It was taken to the garage.

Q. Do you know who towed it away?

A. My friend is the one who talked with the tow people.

Q. Do you know whether someone drove the car to the garage or whether the car was towed away?

A. If I am not mistaken, he was the one who drove it.

Q. What was the name of your friend, if you recall?

A. Mamadou Diallo, that's his name.

Q. Do you know what happened to the car once the car was brought to the garage?

A. They repaired it.

Jalloh

Q. Do you know the name of the garage which repaired the vehicle?

A. Yes.

Q. What's the name of the garage?

A. No, I only know the name of the street.

Q. If you can give me the name of the street.

A. 137th between Third and, I don't know, between Third and Canal Place, something like that.

Q. Okay.

A. I do know for sure its on 137th Street.

MR. McCABE: Off the record.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 12:18 p.m.)

(Time noted: 12:19 p.m.)

Q. Did you take any photographs of the scene of the accident?

A. You mean where the accident happened?

Q. Yes.

A. No, I didn't. At that time I was not thinking about that.

Q. Okay.

MR. VANDAMME: I have no more questions.

MR. McCABE: All right.

Off the record.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 12:20 p.m.)

____________________

ABOUBACAR JALLOH

Subscribed and sworn to before me this ___ day of __________, 2008.

__________________________________

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, Jeremy Frank, a Notary Public within and for the State of New York, do hereby certify:

That ABOUBACAR JALLOH, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereby set my hand on the 8th day of February, 2008.

JEREMY FRANK, MPM

Jalloh

*** ERRATA SHEET ***

NAME OF CASE: JALLOH v. WENDEL

DATE OF DEPOSITION: February 8th, 2008

NAME OF WITNESS: JALLOH

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_______________________________

ABOUBACAR JALLOH

Subscribed and sworn to before me this ____ day of ____________, 2008.

_______________________ _______________________

JEREMY FRANK My Commission Expires:

A
able 17:15 32:10 47:14
Aboubacar 1:5 1:13 2:5 7:4,6 12:7 52:14 53:10 54:19
accident 5:16 16:25 17:2 21:6,19 23:22 23:25 24:14 25:25 26:3 27:14 34:2,5 34:9 35:4 36:2 38:24 39:7,17 45:9 48:13 51:22 51:23
accommodate 6:20
accurately 6:4
action 48:11,17 50:2 53:15
activities 47:13 47:17
address 7:9,13 7:18 11:14 17:21 21:20
ago 9:15 11:12
AGREED 4:2,7 4:11
air 29:3,5
alcohol 22:7,10
Alimou 8:2
alleged 17:2
allegedly 5:16
Alpha 13:17
ambulance 30:22 31:25 33:2
Amsterdam 19:2
answer 5:23 6:22 9:5,10 10:11
answering 6:7
answers 5:4
apart 36:9 38:5
appointment 41:22 45:5
approaching 25:6
approximate 26:3 35:10 38:23 39:9 49:13
approximately 11:12 15:19 15:23,24 16:3 16:5 23:2 25:10,12 26:12,25 30:8 30:20 35:5,9 39:5 43:9 46:8
area 25:17 39:15,16
areas 45:16 47:3
argue 44:12
arrival 36:6
arrived 35:25 36:13
asked 31:24 32:21,23,25 37:8 41:17,22
asking 5:15 15:5 17:19,20 23:2 49:19,20
assigned 19:17
attorney 5:14 15:14
Attorneys 3:6 3:12
August 5:17 17:2,5 18:7 18:15 19:8 20:8,14 22:2 26:24
Avenue 2:7 3:7 11:16,17 21:25 24:3,5 24:9,21,22 25:18
average 49:12 49:14,15,22
A-l-i-m-o-u 7:25
a.m 2:3 18:5,6 40:12,13

B
B 5:2,6,6
back 10:23 24:17 29:18 38:19,20 42:11 45:14 45:16 46:19 46:20,21 48:2
bad 49:14
bag 29:3,5
Bah 8:2 13:17 33:25 34:7,8 35:2,4,19,25 36:13 50:8
Bah's 36:5 38:3 38:4,9,16 39:3
based 49:7
bed 47:5
belt 28:10,12 28:14,18,19 29:14
Ben 47:2,4,7
bend 47:19
Bernstein 2:7 3:4
better 45:20
birth 8:25 22:9
bit 16:23 26:21 45:20 47:24
blood 53:15
body 29:11 42:22
born 8:20,22
brake 28:6
brakes 28:2,3
break 6:18 40:9
bring 45:13
Broad 3:13
Bronx 7:10 11:18 19:3
Brooklyn 16:18
brought 50:24
buckle 28:21
Budin 2:6 3:4
business 10:16 10:22 11:3,6 11:8
buy 10:19
B-a-h 8:2 33:24
B1 10:3
B2 10:3,5,6,12

C
C 3:2 5:6 53:2,2
cab 13:11 18:18
calculate 35:6
call 18:13,14
called 5:6 34:10 35:2,19 41:21 48:5
Canal 51:11
car 13:12,19,24 14:3,4 19:14 19:16,17,18 19:20,22,25 20:2,4,6,11 20:14,16 21:4 21:11,16 24:13 28:25 29:3,12 30:11 31:9,16 32:5 32:12,24 36:2 36:16,17,20 37:9,21,25 38:3,3,4,9,16 39:3 50:16,16 50:24,24
cars 13:13,16 25:20,22 30:18,24 31:2
CASE 54:3
cell 27:22,24 34:11,13,25 35:3,20
certification 4:5
certify 53:9,14
change 19:18
check 20:17,17 20:18,25
checked 21:11
citizen 9:3
city 8:22
Civ 1:7
claim 49:25
Clark 7:10 38:14
clear 22:20,21 25:21
client 19:19
close 9:17 35:17
collision 21:16
color 20:4
come 9:12,18 35:4,22 41:22
Commission 54:22
company 13:11 18:13,14,20 34:4
complete 43:11
completely 27:11 45:22
Conakry 8:24
Concourse 42:4 44:16,21 44:22 45:10
condition 45:19
conditions 22:17
conducted 16:20
consciousne... 29:25 30:3,5 30:12,14 31:12,18
consist 42:8 45:11
consume 22:7 22:11
contact 34:8
corporation 11:7
correct 7:6

10:7 19:3 23:23 26:8,18 39:24 40:15 41:15,19,23
**counsel** 3:9 4:3 15:5,12
**count** 17:16 25:4 30:21
**country** 9:23
**COUNTY** 53:5
**court** 1:2 4:15 5:21 6:3
**Crystal** 41:2
**current** 7:9 9:7 12:14,15
**currently** 46:24 47:9
**customer** 23:9 23:9
**customers** 23:17,20 49:8 49:10,16,20
**C-o-n-a-k-r-y** 8:24

D

**D** 5:2,2
**date** 8:25 15:20 54:4
**Davidson** 11:16,17
**day** 17:4,17,22 19:10 22:17 25:16,25 26:14 40:3,3 40:15 42:21 43:21 45:21 47:5 49:5,8 49:10,12,14 49:14,14,15 49:22 52:17 53:19 54:20
**days** 21:18
**defendant** 1:9 3:12 48:11,17
**depends** 49:4 49:9
**deploy** 29:5
**deposition** 1:13 2:5 4:5 4:12 5:20 6:19 53:11,12 54:4
**describe** 37:18
**designated** 19:13
**Diallo** 41:13 50:22
**difference** 15:15
**different** 15:13 44:17,19 49:5
**difficult** 41:5
**Dina** 44:9
**direction** 23:12 23:14 24:7
**directly** 38:2,4
**discussion** 18:4 40:11 51:18 52:10
**DISTRICT** 1:2,3
**divulged** 34:25
**doctor** 39:24 40:5,15,18 41:9,11,18,21 42:2 43:6,12 43:17,20,22 43:24 44:4,5
**doctors** 41:3 44:15 45:3,24
**doctor's** 40:24
**doing** 17:5 18:16 27:14
**door** 32:9,11 32:11,13,16 32:17,18
**DOUMBOUYA** 3:19
**Downtown** 23:13 24:8
**Dr** 40:21 41:2
**drank** 22:9
**drive** 13:14 33:11
**driver** 18:18 19:13 23:7 28:5 29:13 33:15 36:20 36:24 37:2,8 37:13 48:18 49:9
**driver's** 14:7,9 14:12,20 15:3 16:3 32:18
**driving** 13:9 39:11
**drove** 19:18 23:15 49:8 50:15,19
**drug** 43:3
**drugs** 22:12
**dry** 22:20,21
**duly** 5:2,7 53:11

E

**E** 3:2,2 10:3 53:2,2
**Early** 18:9
**earnings** 50:2
**easier** 6:3
**East** 7:10 38:14
**eat** 26:21
**education** 11:20,23,25
**effect** 4:14
**eight** 11:22 27:2
**English** 5:3,5 16:21,22 20:5
**entered** 9:21 9:23 10:23 11:13
**ERRATA** 54:2
**ESQ** 3:9,15
**establish** 15:3 34:8
**evening** 26:7
**exactly** 17:15 19:12
**examination** 5:10 42:8 43:7
**examined** 5:8 42:20
**example** 47:18
**Expires** 54:22

F

**F** 53:2
**familiar** 39:15
**Family** 18:22 18:23,25 19:9 19:15 34:2 49:2
**far** 25:10
**February** 1:15 2:2 53:19 54:4
**feel** 27:5 38:16 45:18 46:10
**feeling** 40:6
**female** 43:25 44:2,5,6
**filing** 4:4
**find** 23:9,17 41:8
**fine** 34:23
**finish** 6:7
**first** 7:6 11:14 11:15 14:18 16:2,6 25:7 31:20 32:22 33:20,22 43:7 43:15 44:3 45:21
**five** 19:11 21:18
**fixed** 21:12
**follow** 48:24
**following** 30:5 43:7,15 45:9 45:18
**follows** 5:9
**foot** 28:6,7,8,9
**force** 4:13
**forgot** 14:19 16:10,11
**form** 4:8 10:10
**forth** 53:11
**four** 19:11
**Frank** 1:22 2:9 53:7,22 54:22
**Friday** 1:15
**friend** 41:12,18 50:13,20
**friends** 8:5 13:13,15 41:10
**front** 25:4,22
**Fulani** 5:4,4 21:10 42:15
**further** 4:7,11 53:14

G

**gained** 30:5,12 30:14 31:12 31:18
**garage** 50:11 50:16,24 51:2 51:5
**Gay** 47:2,4,7
**gentleman** 15:14
**getting** 34:20 49:6,7
**gingerly** 47:24
**give** 5:19 13:13 13:16,19,25 17:20 21:20 51:8
**given** 19:16 42:24 53:13
**go** 12:2 17:11 20:15 23:4,6 23:11,13,13 26:20 33:11 38:2,10 40:5 44:19,20 45:4 47:5
**going** 8:18 14:22 20:25 32:25 34:19 37:14 38:20 41:4 44:12 49:11 50:4
**good** 5:12 8:15 8:17 12:20 21:2 22:22

31:7 49:14
**Grand** 42:4 44:16,21,22 45:10
**green** 20:5 27:16 37:13
**Greenfield** 40:22
**ground** 5:20
**guess** 20:19
**Guinea** 8:21,23 10:23 11:21
**guy** 21:10

**H**

**H** 5:6
**hand** 53:19
**hands** 27:18
**happen** 23:8 24:15 45:6
**happened** 29:13,14,18 29:23 33:7,9 39:19 45:21 48:8 50:6,10 50:23 51:24
**happening** 41:4
**head** 5:24 29:15,20 38:20
**heading** 23:2 24:7
**health** 8:15,17 12:20 45:19
**heavy** 25:19 37:19
**held** 2:5 18:4 40:11 51:18 52:10
**help** 8:11 36:16
**helped** 36:18
**Hendrick** 3:15 5:13
**hereinbefore** 53:11
**hereto** 4:4
**higher** 11:24
**highest** 11:19
**hit** 24:17 27:10 28:5 29:11,13 29:20 35:21 37:9,13,15,21 37:23,24
**hold** 14:6
**home** 18:8 33:10,11,12 33:13 35:22 38:24 39:6,11 39:19
**hospital** 44:18
**hot** 42:10,23
**hour** 30:10 35:13,16
**hourly** 49:6
**hours** 17:6,22 22:8,12 26:18 26:23 27:2 35:15,17
**house** 18:10 22:8,13,25 23:10 26:12 26:14

**I**

**Ibrahma** 33:19
**illegally** 15:2
**immediately** 27:13
**immigration** 9:7
**impact** 27:6,8 29:10 30:2,6 37:18
**important** 5:22 6:5
**improve** 45:19
**incident** 20:8 28:4,25 29:6 36:5,22 37:5 47:14 48:25 50:8
**indicate** 35:6
**indicating** 28:16,22 29:15,19
38:19 42:11 46:17
**individuals** 8:4
**interested** 53:17
**interpret** 5:3
**interpreter** 3:19 5:9 42:14,18 46:22
**intersection** 24:22 25:11 25:17 27:4
**involved** 10:17 24:14 36:21
**involving** 23:22
**issued** 14:15 14:16,17 15:5 15:7,8
**I-b-r-a-h-m-a** 33:19

**J**

**J** 3:11 5:6
**Jalloh** 1:5,13 2:5 5:1,12 6:1 6:10 7:1,4,5 8:1,3,20 9:1 10:1 11:1,19 12:1,7 13:1 14:1,6 15:1 16:1 17:1,4 18:1,7 19:1 20:1 21:1 22:1,2,25 23:1 24:1 25:1,24 26:1 27:1 28:1 29:1 30:1,4 31:1 32:1 33:1 34:1 35:1,2 36:1 37:1 38:1,15 39:1 40:1,14 41:1 42:1,19 43:1 44:1,25 45:1 46:1 47:1 48:1,10
49:1 50:1,4 51:1 52:1,14 53:1,10 54:1 54:3,4,19
**Jeremy** 1:22 2:8 53:7,22 54:22
**Jerome** 24:2,5 24:6,9,21,22 25:17 39:14
**JOB** 1:23
**June** 9:2

**K**

**knees** 47:19
**know** 5:21 6:20 10:13 14:3,14 14:25 15:4,8 19:12,24 20:6 20:10 21:10 21:21 23:6 24:20,23 25:2 25:3,10 29:22 30:9 31:8 33:7,16 34:4 34:6,7,16 39:10,18 42:14 43:2,9 46:7 48:10,15 48:23 50:6,12 50:15,23 51:2 51:6,11,14
**known** 12:6
**knows** 16:4 41:18
**Kupferberg** 2:6 3:4

**L**

**L** 5:6,6
**language** 12:4 16:19
**lap** 28:13,13,13 28:17
**LAW** 3:11
**lay** 39:21
**laying** 45:14
**learning** 12:4
**leave** 22:3 33:6 33:8 36:6,17
**leaving** 22:8,13
**left** 22:25 23:10 26:11,13 28:7 37:25 50:7
**legs** 38:21 46:23
**let's** 13:2 16:25 26:15 49:12
**level** 11:20 15:13
**license** 14:7,9 14:12,14,17 14:21 15:2,4 15:5,7,7,8 16:3,7,14
**light** 24:16 25:7 25:8,9,11 27:5,15 37:12 37:13
**lights** 24:21,24 24:25 25:3,5
**Lincoln** 14:2 19:23 20:2
**LINE** 54:5
**listening** 27:20
**little** 16:23 26:20 45:20 47:24
**live** 7:19,21 38:11,12
**lived** 7:11
**livery** 18:18
**lives** 7:17
**living** 12:17,18 18:16
**LLP** 2:7 3:5
**located** 18:25 21:22 25:17 42:2
**long** 7:11 14:13 19:8 35:3,7 38:22,23 39:2 39:4,5
**look** 38:3
**looking** 27:9
**lose** 29:25

**lost** 29:23 30:3 50:2
**lot** 40:6 41:3 46:3
**Lots** 42:9
**lucky** 49:4

**M**

**M** 5:2,2,2
**Madison** 2:7 3:7
**maintenance** 20:11
**major** 33:7
**making** 49:3
**male** 43:25 44:5
**MALONEY** 3:11
**Maloney's** 5:14
**Mamadou** 3:19 8:2 41:13 50:22
**Manhattan** 19:6
**marriage** 53:16
**massage** 45:17
**matter** 53:17
**McCABE** 3:9 9:4,9 10:8 12:16,24 13:4 14:22 15:9,12 15:18,24 16:2 16:8 17:25 19:6 20:19 21:25 34:19 34:24 40:8 46:18 47:25 48:4 49:17,24 51:16 52:7
**mean** 8:8 20:23 24:24 37:14 43:15 44:17 48:13 49:16 51:23
**Meaning** 38:2
**means** 20:8
**mechanic** 21:5 21:9,11,21
**medication** 42:20 46:25
**memorize** 41:6
**memory** 31:7
**mentioned** 27:3 32:6
**merchandises** 10:19,20
**merchant** 9:24 9:24 10:16
**merchant's** 10:7
**messed** 27:12
**met** 48:5,7
**middle** 46:21
**mind** 27:11 29:24
**minute** 18:2 40:9
**minutes** 35:8,9 35:10,12,16
**mistaken** 10:5 31:3,6 32:14 50:18
**money** 49:11 49:17
**month** 15:21 43:21
**months** 13:3,4 13:5,6,8 19:11 43:11 43:14,15,16 43:19 44:14
**morning** 5:12 17:6,7,8,9,22 18:8,9,12 20:15,16 22:3 40:4
**Mouhamadou** 7:25
**MPM** 1:22 53:22
**MRI** 43:12 44:23
**M-a-m-a-d-o-u** 7:25
**M-o-u-h-a-m-...** 7:24

**N**

**N** 3:2
**name** 5:13 7:2 7:5,6 10:2 11:2 12:7 21:8,13,14 33:16,18,20 33:21,22,23 40:17,25 42:15 43:3 44:8,11 48:8 48:9 50:20,22 51:2,5,6,8 54:3,4
**names** 13:15 41:5,6
**nature** 11:6
**neck** 42:11 45:13,16 46:18,20
**need** 6:18 31:24 48:23
**needle** 42:16 42:23 45:15
**Nelson** 44:9
**never** 22:9,14 48:20,21
**New** 1:3,14,14 2:7,8,9 3:8,14 14:9,11 53:3 53:5,8
**nice** 22:18
**Nickname** 12:10,11
**nicknames** 12:9
**nod** 5:23
**noon** 26:16,17
**Notary** 2:9 4:13 5:7 53:7
**Note** 9:4 10:9
**noted** 18:5,6 40:12,13 51:19,20 52:11
**noticed** 25:8
**NRB** 1:7
**number** 14:4 34:14 41:19 49:19
**NY** 3:8,14

**O**

**O** 5:2,2,2,6,6
**oath** 6:11
**object** 14:22 34:19
**objection** 9:4,9 10:9
**objections** 4:8
**obtain** 14:11 14:20 16:13
**occur** 23:25
**occurred** 5:17 17:2 25:25 26:4
**office** 5:14
**officer** 32:23 36:10 37:4
**officers** 31:4 31:13 37:4 38:6
**offices** 2:6 3:11
**official** 12:3
**off-the-record** 18:3 40:10 51:17 52:9
**oil** 20:17,24
**okay** 5:18 6:8,9 6:13,21 7:8 8:19 9:25 10:14 11:10 12:5,13 13:4 13:20 16:12 16:24 17:10 18:11,19 19:21 22:6,15 22:23 23:5,16 24:12,18 25:15,23 26:10,22 27:17 28:23 29:9 35:18 36:12 37:17 38:8 39:22 40:20 41:25 43:5,18 44:7 44:24 45:7 46:5 47:12 50:3 51:13 52:4
**once** 30:14 31:12 35:25 36:13 38:9 39:19 42:7 43:20,21 50:7 50:24
**ones** 13:13 31:22 32:15
**one-way** 24:10
**open** 31:9 32:7 32:9,9,11
**opened** 32:13 32:15
**Order** 2:8
**outcome** 53:17
**outside** 32:4

**P**

**P** 1:8 3:2,2
**pad** 42:10,23
**PAGE** 54:5
**paid** 49:6,7
**pain** 38:16,17 46:11,12,13 47:8
**pains** 40:6,7
**part** 37:20
**participate** 45:8
**participated** 46:7
**participating** 45:25 47:9
**particular** 13:10 17:4,22 19:14 26:14 42:23 44:4 49:8
**parties** 4:4 53:15
**pass** 28:20

**passed** 17:17 17:20
**passengers** 28:24
**Patrick** 3:11 5:14
**pay** 8:18
**pays** 8:9,10
**people** 7:19,20 7:21,22,23 30:17,19 31:19 32:15 50:14
**period** 12:24 13:5
**person** 13:21 48:5
**person's** 34:24
**pertaining** 5:16
**PETER** 3:9
**phone** 18:13 27:22,24 34:11,13,25 35:3,20
**photographs** 51:21
**pick** 19:19
**place** 7:10,12 7:15,18 11:15 17:21 21:12 36:15 38:11 38:14,25 44:21 46:13 46:14 51:11
**Plaintiff** 1:6 3:6
**please** 6:6,15 6:19 7:2 48:2
**point** 18:12 23:21 24:13 27:5 29:20 36:6,19 37:20 39:23 40:14 49:25
**pointing** 46:22
**police** 30:24 31:2,4,13,19 32:3,8,14,23 36:10 37:3,4 38:5
**portion** 29:11 29:11
**possible** 48:7
**pray** 47:19
**preceding** 27:14
**precise** 25:13 26:2,25 49:18
**prepared** 6:22
**prescribed** 42:25
**prescription** 22:12 43:3 46:25
**present** 3:18 46:11
**Presently** 12:19 13:12 21:23
**press** 45:15
**prior** 19:8 20:14 21:5 22:8,12 28:4 39:17 47:14
**privacy** 34:21
**profession** 12:14
**professional** 21:5
**proprietor** 11:7
**providers** 44:20
**Public** 2:9 4:13 5:8 53:7
**purpose** 23:3
**pursuant** 2:8
**put** 20:16 32:5 42:10,16,22 43:12 45:13
**putting** 47:3
**p.m** 26:5,7,17 51:19,20 52:11

**Q**

**question** 4:9 6:7 9:5,10 10:8,11 15:6 15:20 17:24 20:20 32:21 32:22 33:4 34:20 50:5
**questions** 5:3 5:15 6:15,23 37:5 48:25 52:6

**R**

**R** 3:2 5:6 53:2
**radio** 27:20
**rarely** 12:20,22
**rate** 49:7
**read** 47:25 48:3
**ready** 23:8
**reason** 6:6 45:23
**recall** 14:5 16:10 25:14 30:15 31:11 31:13 36:23 38:7 40:24 43:2,4 44:25 46:9 48:9 50:21
**receive** 11:24 18:13 42:19
**received** 11:20
**recollection** 40:23 44:10
**recommenda...** 41:15
**recommended** 45:2,4
**record** 6:4 7:3 17:25 28:15 48:3 49:25 51:16 52:8 53:13
**red** 24:16 25:8 27:5 37:12
**reflect** 28:16
**refresh** 40:22 44:9
**registration** 14:3
**regularly** 20:7
**rehabilitation** 45:3,9,25
**Reisman** 2:6 3:4
**related** 53:14
**relationship** 8:4
**relax** 26:20
**remember** 22:16 24:19 24:20 25:2,18 25:24 26:12 26:24 27:13 30:4,15 31:5 32:6,22 40:17 41:6 42:10 43:24 44:4
**rent** 8:9,10,10 8:13,18
**renting** 7:14,16
**repair** 21:21
**repaired** 50:25 51:3
**rephrase** 6:16
**Reported** 1:21
**reporter** 5:21 6:4
**request** 6:20
**reserved** 4:9
**respective** 4:3
**respond** 33:3
**responsible** 20:10
**result** 30:2
**returned** 13:18
**right** 6:17 12:20 13:18 13:23 19:7 28:8,9 29:23 34:22 37:23 44:13 47:2 52:7
**roads** 17:17,19
**roommates** 8:7
**route** 39:10,13
**rules** 5:20

**S**

**S** 3:2
**saw** 31:13 36:25,25
**scene** 31:5 35:4,25 38:24 39:6 50:7 51:22
**school** 12:2,3
**sealing** 4:4
**seat** 28:10,12 28:14,18,19 29:18 32:3
**see** 21:2 27:10 29:7,8 30:17 30:19,22,24 30:25 31:2 36:24 37:20 37:22,23 39:23 40:5,15 43:6,20,22 44:3,15
**seeing** 30:16 43:11,16 45:24
**seen** 41:3
**selling** 11:4
**send** 33:2
**series** 5:15
**serviced** 20:7 20:14 21:4,16 28:3
**set** 53:11,19
**shake** 5:24
**share** 8:10,12 8:16
**SHEET** 54:2
**shining** 22:19
**shop** 21:21
**short** 40:8
**shoulder** 28:13 28:17
**shut** 31:10 32:7
**sic** 37:2
**side** 32:18
**signed** 4:12,14
**simple** 15:6 16:9

**sit** 47:19
**sitting** 32:5,17
**six** 12:25 13:3 13:4,5,8 19:11
**sole** 11:6
**somebody** 8:16 33:13 35:21 48:7
**Sorry** 42:18
**SOUTHERN** 1:3
**Sow** 7:25 21:14 21:17
**Sow's** 21:21
**speak** 16:22,23
**specific** 15:20 15:23
**spend** 39:2
**spoken** 48:16 48:18
**ss** 53:4
**standing** 27:4
**start** 5:19 21:3
**started** 32:8 45:19
**state** 2:9 7:2 53:3,8
**stated** 10:15 11:11 26:11
**statement** 10:9
**States** 1:2 9:3 9:13,19,22 10:18,24 11:13,25
**status** 9:8,11
**stayed** 11:15 31:15
**steering** 29:16 29:17,21
**STIPULATED** 4:2,7,11
**stomach** 28:21
**stopped** 24:16 45:24,25
**stopping** 27:15 37:12,15
**straight** 47:24
**street** 3:13 24:4,5,9,10 25:18 51:7,9 51:15
**streets** 17:16
**Subscribed** 52:16 54:20
**Suite** 3:13
**sure** 6:15 51:14
**surrounding** 30:18
**sworn** 4:14 5:3 5:7 52:16 53:12 54:20
**S-o-w** 7:24 21:14

**T**

**T** 53:2,2
**take** 6:18 16:13 16:17 22:11 23:9,14 28:19 35:3,22 38:22 38:23 39:5 40:8 47:4 49:12 51:21
**taken** 50:11
**talk** 6:5 16:25 31:17,20,21 31:22 32:10 36:9,20 38:6
**talked** 32:3 37:3 50:13
**talking** 27:22 32:8 48:14
**taxi** 13:9 23:7 42:6 49:9
**tell** 6:15 17:15 22:24 23:12 25:19 26:2,13 30:8 31:23 32:20 35:20 37:10 39:2 41:5 44:11 46:15
**test** 16:13,16 16:17,19
**testified** 5:8
**testimony** 53:13
**Thank** 48:4
**therapy** 45:9 45:11,12,18 46:2,7 47:10
**thing** 47:3
**things** 15:21 21:2 42:9,22
**think** 17:23 32:20 36:25
**thinking** 52:3
**Third** 51:10,11
**Thomas** 1:8 48:6
**three** 19:11 43:11,14,15 43:16,19,23 44:14
**time** 4:10 6:19 12:24 14:13 14:16,18 18:5 18:6,17,21 19:18 20:7,13 21:5,15 22:3 25:7,25 26:3 26:13 27:8,11 28:3,4,6,25 29:6,7,10,22 33:5,6,25 34:5,8 36:4,4 36:5 37:22 39:2,8 40:12 40:13 42:3 44:2,3 46:6 46:11 48:25 51:19,20 52:2 52:11
**times** 26:20 43:8,10,23 46:4,4
**tires** 20:25
**today** 5:15 6:11 6:23
**told** 33:5,8 35:21 37:11 40:21 41:10 42:21 44:8
**total** 25:2 26:24 43:16
**tow** 50:14
**towed** 50:12,17
**Town** 20:2
**traffic** 24:20,25 25:7,16,19,21
**traveled** 23:15
**Tremont** 45:5
**trial** 4:10
**trip** 23:3
**true** 53:12
**trying** 15:2
**turn** 27:16 37:13
**turned** 25:12
**two** 7:22 13:6 24:11,12 31:7 31:13 35:15 35:17 36:10 38:5
**two-lane** 24:9
**Tylenol** 42:24
**type** 9:22 10:3 10:16,20 11:8 13:7,24 19:22 28:12,14
**T-shirt** 10:21

**U**

**U** 5:2,2,2,6
**unable** 47:15
**understand** 5:25 6:10,12 6:14 10:6 11:5 15:11,16 15:25 17:23 23:11 48:12 49:21
**understands** 15:19
**United** 1:2 9:3 9:12,18,21 10:17,23 11:13,25
**upper** 46:18,20
**Uptown** 17:13 17:14,15 23:13,15
**use** 13:24 45:15 47:5

**V**

**v** 54:3
**Vandamme** 3:15 5:11,13 13:2 14:24 15:11,16,22 15:25 19:7 28:15 34:22 50:3 52:5
**vehicle** 23:22 24:14,17 32:2 32:4 36:7,21 37:21 48:19 50:7 51:3
**visa** 9:20,22,24 10:2,3,4,7,12 10:12,16
**visit** 43:15
**visited** 44:16
**visitor's** 10:12
**vs** 1:7

**W**

**wait** 6:6
**waiting** 37:12
**waived** 4:6
**walk** 47:23,24
**walking** 47:23
**want** 5:19 15:20
**wasn't** 35:17
**water** 20:25
**way** 16:4 22:4 23:18 38:20 41:7 53:16
**ways** 24:11,12
**wearing** 28:10 28:13,17
**weather** 22:16 22:18
**Webster** 21:23 21:25
**week** 43:21,23
**weeks** 12:25

**Wendel** 1:8 48:6,11 54:3
**went** 17:9,15 17:17,21 23:11,13 29:15 33:10 38:4,11 39:23 40:15 44:3,23
**wheel** 27:19 29:15,16,17 29:21
**wheels** 20:18 20:24
**WHEREOF** 53:18
**window** 32:7,9
**windows** 31:8 31:9
**witness** 5:7 15:10 16:6 28:16 53:10 53:13,18 54:4
**words** 5:23 8:12 38:25 39:16 41:14 41:17 48:17
**work** 12:19,23 13:6,7,10 17:9,12,18 23:4,8,11 26:23 34:2
**worked** 19:10
**working** 8:16 8:17 11:9 15:13 18:17 18:20 19:9,14 21:3 26:18,19 34:5 49:2

**X**

**X** 49:19

**Y**

**Y** 5:2
**year** 15:21 19:24
**years** 9:15 11:12,22
**yellow** 25:9,12
**York** 1:3,14,14 2:7,8,10 3:8 3:14 14:9,11 53:3,5,8

**$**

**$90** 49:23

**0**

**07** 1:7

**1**

**10** 9:15 11:12
**10:41** 2:3
**10004** 3:14
**10016** 3:8
**108** 7:10 38:14
**11** 22:4 26:18
**11-something** 26:15
**11:00** 26:5,7,17
**11:03** 18:5
**11:04** 18:6
**11:49** 40:12
**11:56** 40:13
**112** 2:7 3:7
**12** 22:5 26:16 26:17
**12:18** 51:19
**12:19** 51:20
**12:20** 52:11
**137th** 51:10,14
**170th** 21:24
**181st** 19:2
**182nd** 24:2,5 24:22 25:18

**2**

**2000** 7:13
**2006** 5:17 17:3 17:5 18:7,15 19:8 20:8,14 22:2 26:24
**2008** 1:15 2:2 52:17 53:19 54:4,20
**2202** 3:13
**24** 22:8,12

**3**

**30** 35:8,9,10,12

**4**

**4091** 1:7

**5**

**5th** 9:2

**6**

**63** 9:2
**672356a** 1:23

**7**

**7th** 5:17 17:2,5 18:7,15 19:8 20:8,14 22:2 26:24

**8**

**8th** 1:15 2:2 53:19 54:4

**9**

**90** 3:13
**97** 20:2,3

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Jalloh v. Wendel
Dep. Date: 2/8/2008
Deponent: Aboubacar Jalloh

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

______________________________
Signature of Deponent

______________________________

# EXHIBIT "C

Page 1 of 1 Pages

New York State Department of Motor Vehicles

# POLICE ACCIDENT REPORT (NYC)

MV-104AN (7/01)

☐ AMENDED REPORT

Precinct: 046

Accident No.: 046060 1128

Complaint Number:

**1 — Accident Date**

| Month | Day | Year | Day of Week | Military Time | No. of Vehicles | No. Injured | No. Killed |
|---|---|---|---|---|---|---|---|
| 08 | 07 | 2006 | MONDAY | 0115 | 2 | 0 | 0 |

Not Investigated at Scene ☐ · Accident Reconstructed ☒ · Left Scene ☐ · Police Photos ☐ Yes ☒ No

**VEHICLE 1**

- Vehicle 1 – Driver License ID Number: 337 231 135 — State of Lic.: NY
- Driver Name – exactly as printed on license: JALLOH, ABOUBACAR
- Address (Include Number & Street): 188 E CLARK PLACE — Apt. No.: 43
- City or Town: BRONX — State: NY — Zip Code: 10452
- Date of Birth: Month 05, Day 03, Year 63 — Sex: M — Unlicensed ☐ — No. of Occupants: 1 — Public Property Damaged ☐
- Name – exactly as printed on registration: NEW TUXEDO PARK LIMOUSINE CAR INC.
- Address (Include Number & Street): 31 RTE 17 STE 16
- City or Town: TUXEDO PARK — State: NY — Zip Code: 10987
- Plate Number: 6210LA — State of Reg.: NY — Vehicle Year & Make: 1997 LINCOLN — Vehicle Type: 4DRSDN — Ins. Code: 036
- Ticket/Arrest Number(s):
- Violation Section(s):

**☒ VEHICLE 2** ☐ BICYCLIST ☐ PEDESTRIAN ☐ OTHER PEDESTRIAN

- Vehicle 2 – Driver License ID Number: 232762213 — State of Lic.: CT
- Driver Name – exactly as printed on license: WENDEL THOMAS, P
- Address (Include Number & Street): 120 MAIN ST — Apt. No.:
- City or Town: DANBURY — State: CT — Zip Code: 06810
- Date of Birth: Month 11, Day 23, Year 59 — Sex: M — Unlicensed ☐ — No. of Occupants: 1 — Public Property Damaged ☐
- Name – exactly as printed on registration: WENDEL THOMAS P — Sex: M — Date of Birth: Month 11, Day 23, Year 59
- Address (Include Number & Street): 120 MAIN ST
- City or Town: DANBURY — State: CT — Zip Code: 06810
- Plate Number: SSIDAV — State of Reg.: CT — Vehicle Year & Make: 2005 HONDA — Vehicle Type: ST WAG — Ins. Code:
- Ticket/Arrest Number(s):
- Violation Section(s):

**6 — Vehicle 1** — Check if involved vehicle is:
- ☐ more than 95 inches wide;
- ☐ more than 34 feet long;
- ☐ operated with an overweight permit;
- ☐ operated with an overdimension permit.

**VEHICLE 1 DAMAGE CODES**

Box 1 - Point of Impact: 8 — Box 2 - Most Damage: 8

Enter up to three more Damage Codes: 3 , 4 , 5

Vehicle Towed: By (?) JNSEMERS COLLISION To 4343 3RD AVE BRONX NY

**Vehicle 2** — Check if involved vehicle is:
- ☐ more than 95 inches wide;
- ☐ more than 34 feet long;
- ☐ operated with an overweight permit;
- ☐ operated with an overdimension permit.

**VEHICLE 2 DAMAGE CODES**

Box 1 - Point of Impact: 2 — Box 2 - Most Damage: 2

Enter up to three more Damage Codes: 3 , 4 , 5

Vehicle Towed: By — To

VEHICLE DAMAGE CODING:

1-13. SEE DIAGRAM ON RIGHT.
14. UNDERCARRIAGE
15. TRAILER
16. OVERTURNED
17. DEMOLISHED
18. NO DAMAGE
19. OTHER

Circle the diagram below that describes the accident, or draw your own diagram in space #9. Number the vehicles.

1. Rear End 2. Overtaking 3. Left Turn 0. Left Turn 4. Right Angle 5. Right Turn 6. Right Turn 7. Head On 8. Sideswipe

ACCIDENT DIAGRAM — 9. W 182 St — Jerome ave

Cost of repairs to any one vehicle will be more than $1000. ☐ Unknown/Unable to Determine ☒ Yes ☐ No

Reference Marker — Coordinates (if available): Latitude/Northing: — Longitude/Easting:

Place Where Accident Occurred: ☒ BRONX ☐ KINGS ☐ NEW YORK ☐ QUEENS ☐ RICHMOND

Road on which accident occurred: Jerome ave (Route Number or Street Name)

at 1) intersecting street: W 182 St (Route Number or Street Name)

or 2) ____ Feet Miles ☐ N ☒ S ☐ E ☐ W of ____ (Milepost, Nearest Intersecting Route Number or Street Name)

Accident Description/Officer's Notes: At TPO. above listed vehicle number 1 and vehicle number 2 where both traveling south bound on Jerome ave at the intersection of W 182 St. veh #2 did strike veh #1 from the rear. Police officers did not witness accident

**All Involved**

| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | BY | TO | 18 | Names of all involved | Date of Death Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | 1 | 3 | 1 | 43 | M | | | 6 | | | | | JALLOH, ABOUBACAR | |
| B | 2 | 1 | 3 | 1 | 52 | M | | | 6 | | | | | WENDEL, THOMAS | |
| C | | | | | | | | | | | | | | | |
| D | | | | | | | | | | | | | | | |
| E | | | | | | | | | | | | | | | |
| F | | | | | | | | | | | | | | | |

| Officer's Rank and Signature | Print Name in Full | Tax ID No. | NCIC No. | Precinct | Post/Sector | Reviewing Officer | Date/Time Reviewed |
|---|---|---|---|---|---|---|---|
| PO [signature] | STEPHEN SWETT | 940407 | 03030 | 046 | 34 | | |

# EXHIBIT "D"

**MED CARE F ALTH & REHABILITATIO SERVICES, P.C.**
**334 Grand Concourse**
**Bronx, New York 10451**
**(718) 590-5900**

Y 8236

fH

**DATE:** 11/2/06

**PATIENT:** JALLOH, ABOUBACAR

**History:** This is a 42-year-old right-handed male injured in a MVA 8/6/06, injuries to neck and low back here for follow-up.

**Current Complaints:** He is feeling improved with less neck pain and less low back pain. He tolerates sitting. He is working eight hours a day as a taxi driver. He applies Ben-Gay and takes Tylenol occasionally. He has been undergoing physical therapy three times a week, which he finds helpful. He does complain of cramping in his calf, sometimes at night with a severe sharp burning pain lasting about five minutes, but also with rapid walking for 15 to 20 minutes, he gets cramping that relieves with rest. It seemed he had this prior to the accident, but it has gotten worse.

**Physical Examination:**
**Cervical Spine:** Limitation to lateral rotation 60 degrees bilateral, lateral flexion 20 degrees bilaterally with mild bilateral upper trapezius muscle spasm to palpation.

**Lumbar Spine:** Range of motion is not limited in flexion or extension and there is tenderness in the lower lumbar paravertebrals, but no spasm. Straight leg raise is negative.

***Lower Extremities:*** There are palpable dorsalis pedis pulses bilaterally.

**Impression:**
1. Cervical Sprain and Strain, Multiple Disc Displacements, Myofascial Pain.
2. Lumbar Sprain and Strain. Multiple Disc Bulges L4 to S1. No Central Spinal Stenosis. Electrodiagnostic Testing Did Not Reveal Any Signs Of A Radiculopathy.
3. Possible Intermittent Self-Claudication.

**Plan:**
1. To continue physical therapy, reduce to twice a week.
2. The patient is advised that if cramping sensations continues, should consult with internist to evaluate for peripheral vascular disease.
3. Follow up in six weeks.

**Dina Nelson, M.D.**

Dictated but not read for expediency
DN:dep/vin/N 1102-122 1616 0000

# EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant,
-------------------------------------------------------------X

**EXCHANGE OF EXPERT INFORMATION PURSUANT TO F.R.C.P. 26(a)(2)**

Index No.: 07 Civ. 4091 (NRB)

COUNSELORS:

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, please be advised that the defendant, Thomas P. Wendel, hereby exchanges the following information regarding Robert S. April, MD, an expert physician whom the defendant intends to call at the time of trial to testify regarding the medical condition of and injuries allegedly sustained by the plaintiff, Aboubacar Jolloh.

**MEDICAL TESTIMONY**

The defendant identifies as an examining doctor, Robert S. April, a Neurologist, who is a Neurologist with an office located in New York, New York and is affiliated with Lenox Hill Hospital located in New York, NY, Beth Israel North Hospital located in New York, NY, New York Eye & Ear Infirmary located in New York, NY, Manhattan Eye & Ear located in New York, NY, and Mount Sinai Hospital located in New York, NY. Dr. April is licensed in Neurology, Psychiatry and Electrodiagnostic Medicine in the State of New York and the State of California, and is a member of the Committee to Combat Huntington's Disease, The American Academy of Neurology, New York County Medical Society, Eastern EEG Society, Societe Francaise de Neurologie, American EEG Society, Grievance Committee of New York County Medical Society, Academy of Asphasia, Utilization Committee of Lenox Hill Hospital, Society

of Neuroimaging, New York Rotary Club, American Society for Electrodiagnostic Medicine and Society of Vascular Technology. He is certified by the National Board of Medical Examiners , as well as The American Board of Qualification in EEG. The subject matter, the facts, and the opinions on which Dr. April is expected to testify, if called at trial, are those contained in his medical report, a copy of which is annexed hereto.

A copy of Dr. April's Curriculum Vitae is also annexed hereto, which sets forth in detail his qualifications. He has not published any articles since 2004. The compensation to be paid for the independent medical examination of the plaintiff and his report is $850.00. If he is called upon to testify at trial, his customary testimony fee is $6,000 for an appearance, whether it is half a day or a full day. A listing of the cases in which he testified as an expert at trial or by deposition within the preceding five years in annexed hereto.

Dr. April will testify as to the nature and the extent of plaintiff's injuries occasioned by the accident which is the subject matter of this dispute, the diagnosis of said injuries, based upon his April 02, 2008 independent neurological examination of the plaintiff.

**PLEASE BE ADVISED** that Dr. April is expected to testify that the examination of the plaintiff revealed no objective neurological findings or consideration in this case, that there was no evidence of any mild traumatic brain injury, his neuromuscular examination was normal and that with reasonable medical certainty that the subject accident did not produce a neurological

diagnosis, limitation, disability or need for further intervention.

Dated: New York, New York
April 08, 2008

Yours etc.,

LAW OFFICES OF DIFFENDERFER & SOLOMON

BY:______________________________

Mark A. Solomon, Esq. (2613)
Attorneys for Defendant
Thomas P. Wendel
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650
Our File No.: 2007-100069

TO: Attn.: Harlan S. Budin., Esq.
Budin, Reisman, Kupferberg & Bernstein, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, New York 10016
(212) 696-5500

RECEIVED 4/7/08

2007-100069

**Robert S. April M.D. P.C.**
**Four East 88th Street**
**New York, New York 10128**
**Phone (212) 722 7800**

Law offices of Diffenderfer & Solomon
90 Broad Street, Suite 2202
New York, NY 10004

Attention: Ms. Laura E. Martinez

RE: Mr. Aboubacar Jalloh
File #: 2007-100069

Dear: Ms. Martinez:

Thank you for your letter of March 31, 2008.

This is the report of the independent neurological liability examination of the above-named, 45-year-old, male plaintiff who came to this office alone and gave me a history in his native language, French, in which I am fluent. The plaintiff was born in Guinée, a country in West Africa.

He stated he was a driver of a car on the above date, when he had an accident. He claims that he was unconscious for a very short period of time and has some vague memory of the accident itself. He knew that he could not get up by himself and was helped by someone at the site of the accident. There was no ambulance and he did not go to an emergency room on the day of the accident despite the history of minimal loss of consciousness. He went back to work after 4 months, because he suffered pain in the neck and lower back. His own doctor sent him for acupuncture, and since the accident, he is the same, being independent in daily activity most of the time, and suffering from pain in the neck. He applies Ben-gay, a soothing ointment, to his shoulder for purposes of pain relief. He is having no physical therapy and relates all symptoms to the accident, because there were no other accidents and he has no other illness. There has been no mention of spinal surgery or spinal injury.

**REVIEW OF DOCUMENTS:**

- There is a police accident report, but no mention of his physical condition at the site of the injury.
- Report of MRI of cervical spine dated August 16, 2006, shows herniated discs at 2 levels and a bulging disc at another.
- Report of MRI of lumbar spine showed bulging discs at numerous levels.
- X-ray of cervical spine dated August 09, 2006, showed straightening of spine.

- Report of MRI of the lumbar spine of same date showed degeneration. The x-ray of the thoracic spine was normal.
- Narrative report by Dr. Dina Nelson dated November 02, 2006, describes cervical strain and sprain, and the need for physical therapy, which she supervised over several office visits, which are listed on individual pages in this document. Dr. Nelson also did an EMG examination, which showed evidence of lumbosacral radiculopathy. For this, she said that once should "consider scleratogenous and myotogenous referral." The meaning of this statement is unclear to this examiner.
- The tabulation of physical therapy visits covers several pages of billing. No-Fault vouchers are also filed.
- Deposition of the plaintiff was noted on February 08, 2008. He stated that he was a driver of car and did that for living. He remembers the day of the accident and describes the accident in detail. He seemed to have no amnesia for any aspect of the day of the accident, the incident of the accident, or thereafter. He also describes his activities at the time of the accident at the scene, when he used his cellphone to call his friends for help.

**NEUROLOGICAL EXAMINATION:** The plaintiff was 5 feet 10 inches, 143 pounds, and was in no distress. He was in very good spirits, spoke freely and volubly. He had no trouble sitting in my office for 30 minutes during the examination, standing, walking in the examining room, disrobing, getting on and off the table, and moving about without any limitation. He had no external signs of injury.

**CRANIAL NERVE EXAMINATION:** There were full eye movements, pupillary constriction, facial symmetry, and speech output. The range of motion of the neck was 90° lateral rotation with 40° extension and full flexion to chest (normal range is 75-90° lateral rotation, 40-60° extension and full flexion to chest). The neck movement was not associated with radiating pain to the neck and shoulder. Shoulder shrug was full. The plaintiff had no problems with hearing or vision.

**MOTOR EXAMINATION:** Motor power was 5/5 in the muscles of upper and lower limbs on individual muscle testing. There was no atrophy to inspection or measurement. Biceps were 33 cm right and left. Calves were 33 cm bilaterally. Fasciculations were not in evidence. There was no problem with gait and stance. Tandem walking was normal. All reflexes were present and equal in the upper and lower limbs (including triceps, biceps, periosteal, patellar, and Achilles reflexes). Babinski sign was absent. The plaintiff could walk on toes and heels without difficulty and also run in place. Tremor and rigidity were absent.

**MECHANICAL EXAM:** Straight leg raising was negative to 80° bilaterally (normal range is 75° to 90°). Bowstring sign was absent. There was no trouble sitting unaided. Percussion and palpation of the vertebral column were unremarkable. There was no spasm of the paraspinal musculature. The range of motion of the lumbar spine was normal – that is, 75° flexion, 30° extension, 30° left and right lateral bending, and 30° right and left thoracicolumbar rotation. Range of motion of the upper limbs was normal – that is, 180° extension at the shoulder and full reach behind the back, without limitation in pronation, supination, elbow flexion (130°) and wrist flexion (90°). There was no Tinel sign or other signs of carpal tunnel syndrome. All range of motion measurements were done with reference to an orthopedic caliper.

**SENSORY EXAMINATION:** Perception of touch, pin and vibration was normal and symmetrical in all limbs and the parts of the body axis that was stimulated, particularly both upper extremities. There was no mottling of skin or changes in local temperature or skin turgor.

**IMPRESSION:** There are no objective neurological findings or consideration in this case. He did not receive acute medical care. There was no evidence of any mild traumatic brain injury. His neuromuscular examination is normal.

Without privilege of seeing the images of the spine, which I would request for independent review, I have concluded with reasonable medical certainty that the accident of record did not produce a neurological diagnosis, limitation, disability or need for further intervention.

I affirm under the penalties of perjury, that the information contained within this document was prepared and is the work product of the undersigned, and is true to the best of my knowledge and information. I reserve the right to change the conclusions reached in this report based on further documentation or information that might be received about this matter. This report does not imply a doctor-patient relationship; no treatment was given or suggested.

Sincerely,

Robert S. April, M.D.
RSA/rm
P-18197
Enclosure (photo)

2007-100069



Abubacr Jalloh

Curriculum Vita of Robert S. April, M.D.

BORN: July 17, 1936
Los Angeles, California
Married : Four Children

EDUCATION:

University of California, Berkeley, 1956, B.A.
University of California, San Francisco, 1960, M.D.

HONORS:

Phi Eta Sigma
Phi Beta Kappa

POST DOCTUI AL TRAINING:

General Rotating Intern, The Mount Sinai Hospital NYC, 1960-61
Assistant Reseident, Neurology, The Mount Sinai Hospital, NYC 1961-63, Chief M.B. Bender, M.D.
Resident in Pathology, Laboratory of Neuropathology, The Downstate Medical Center, Brooklyn, NYC 1963-64 Chief: S.M. Aronson M.D. Fellow and Research Associate Laboratories of Clinical Neuropsychology and Electroculography The Mount Sinai Hospital, NYC, 1964-66
N.I.N.D.B. Special Fellowship 2F11 NB 1113-02 in Laboratory of Physiology, NYU Medical School, 1966-68. Advisor : W.A. Spencer, M.D.
Fellow of Then National Multiple Sclerosis Society in the M.R.C. Cerebral Functions Group, University College, London England. Mentor: Professor P.D. Wall

TEACHING P( SITIONS:

Instructor, Neurology, The Mount Sinai Medical School, NYC 1964-66
Associate Professor, Neurology, NY Medical College, 1973-80
Lecturer to Medical Students, Clinical, Lenox Hill Hospital
Clinical Assistant Professor, Mount Sinai Medical School
Faculty, NYU Medical School

ADMINISTRA TIVE POSITIONS:

Consultant in Neurology, Bureau of Disability Insurance, Social Security Administration, Baltimore, Maryland, 1969-73
Chairman, Symposium on Pain at the Fifth Joint Meeting of the

ADMINISTRAT IVE POSITIONS: (cont'd)

Clinical Society and Commissioned Officer's Association, U.S. Public Health Service, Washington, D.C., April 2, 1970
Assistant Chief of Medicine (neurology), U.S. Health Service Hospital, Baltimore, Maryland, 1969-71
Neurologist, Rosewood State Hospital for the Mentally Defective, 1972-73
Chief, Neurology Service, New York Medical College Center for Chronic Disease, Bird S. Coler Hospital, Roosevelt Island NYC, 1973-80
Vice President of Medical Board, Bird S. Coler Hospital 1973-74
Legislature Committee, Senator Roy Gordman, N.Y. 2000

HOSPITAL AN D MEDICAL SCHOOL COMMITTEES:

Member, Nominating Committee Medical Board, BSCH, 1975
Member, Research Committee, BSCH, 1974-90
Elected Delegate: Alternative to New York State Medical Society Meeting representing New York County, November, 1982
Board of Directors, Alumni Association, Mount Sinai Medical Center, Present

MEMBERSHII S:

Member of Committee to Combat Huntington's Disease
American Academy of Neurology (active) since 1963
New York County Medical Society, 1973-Present
Eastern EEG Society
Societe Francaise de Neurologie, 1977-Present
American EEG Society, 1975-Present
Grievance Committee of New York County Medical Society, 1981-Present
Academy of Asphasia, 1982-Present
Utilization Committee, Lenox Hill Hospital, 1984
Society of Neuroimaging, 1988-Present
New York Rotary Club
American Society for Electrodiagnostic Medicine
Fellow, New York Academy of Medicine
Society of Vascular Technology, 1988-Present

BOARD CERTI ICATIONS:

National Board of Medical Examiners, 1961
Diplomate of the American Board of Psychiatry and Neurology, 1967

BOARD CERTI ICATIONS: (cont'd)

Certified by The American Board of Qualification in EEG, 1974
Eligible American Board of Electrodiagnostic Medicine

COMPLETED I ILITARY SERVICE:

Senior Surgeon®, U.S. Public Health Service, 1969-71

ACTIVE MEDI AL LICENSES:

California: A19968
New York: 090419 registration #, 062239

PRESENT HOS PITAL AFFILIATIONS:

Lenox Hill Hospital, NYC
Beth Israel North Hospital, NYC
New York Eye & Ear Infirmary, NYC
Manhattan Eye, Ear and Throat Hospital, NYC
Mount Sinai Hospital, NYC

WORKER'S C OMPENSATION RATING:

PN-N

OFFICE ADDR ESS:

4 East 88th Street NYC 10128

PUBLICATIO S:

April, R.S., Discussion in Clinico-Pathological Conference, Aronson S.M. Editor, Diseases of the Nervous System, 24;757-63, 1964

PUBLICATION : (cont'd)

Sher, J.M., April, R.S., and Aronson, S.M. "Dissemented Micro-Abscesses of the Central Nervous System; J Neuropath, 24: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

Shanzer, S., April, R.S., and Atkin, A., "Seizures Induced by Eye Deviation", Arch, Neurology, 13:621-23, 1965

Diamond, S.P., and April, R.S., "Observations on the Organization Of Perceptual Space", Abstr., 8th Intl. Congress Neurology, 1965 pp. 198-99

April, R.S., "Observations on Parkinsonian Tremor in All-Night Sleep", Neurology, 16:720-73, 1966

April, R.S., and Spencer, W.A., "Synaptic Disuse and Enhanced Synaptic Effectiveness at Clarke's Column Relay", Neurology, 18:303, 1968

April, R.S., and Spencer, W.A., Enhanced Ascending Monosynaptic Responses to Activation of Group I Afferents fron Tenotomized, Defferented Muscles", The Physiologist, 10:139, 1969

April, R.S., and Spencer, W.A., "Enhanced Synaptic Effectiveness Following Prolonged Changes in Synaptic Use", Experienta, 25:1272-73, 1969

April, R.S., and Spencer, W.A., "Plastic Properties of Monosynaptic Pathways in Mammals", in Horn, R., and Hinde, A., Short Term Changes in Neural Activity and Behavior, Cambridge University Press, 1970

April, R.S., "The Brain and Recovery of Function" Speech and Hearing Review, 8:2-20, Summer, 1976

Thatcher, R.W., and April, R.S., Evoked Potentials in Information Processing:, in The Neuropsychology of Language, Essays in Honor Of Eric Lenneberg, Pieber, R.W., Editor, Plenum Press, 1976

April, R.S., and VanSonnenberg, E., A Case of Neuro-Myelitis Optica (Devic's Syndrome) in Systemic Lupus Erthematosus", Neurology, 26:1066-70, 1976

PUBLICATION : (cont'd)

April, R.S., and Tse, P.C., "Crossed Aphasia in a Chinese-English Bilingual Dextral", Arch Neuro, 34 (12): 766-70, 1977

April, R.S., and Tse, P.C., Letters to the Editor "In Response to Dr. Charles Wintergreen", Arch Neuro, 35:694, 1978

April, R.S., "Concepts actuals sur L'organisation cerebrale due Langage, A Partir de quelquez cas d'aphasie croisess chez les Orientaux bilingues", Rev. Neuroloquique (Paris) 134(11): 715 Novembre, 1978

April, R.S., and Tse, P.C. Letters to the Editor: "Crossed Aphasia In a Chinese Bilingual Extral", Arch Neuro, 36:253, April, 1979

April, R.S., and Han, M., "Crossed Aphasia in a Chinese Bilingual Extral", a second case, Arch Neuro, 37:342-346, June 1980

April, R.S., "Concepts actuels sur L'oragnisation cerebrale due Langage a partir de quelques cas d'aphasi crosisee chex les orientaux Bilingues:, Rev Neuro, (Paris), 1979, 135, 4, 375-378

April, R.S., Letters to the Editor: "In Response to Dr. R. Malcolm And colleagues", Unruptured cerebral anuerysms presenting as Recurrent transcient neurologic deficits", Neurology, 31:229-30, 1981

April, R.S., "Neurological Complications of Diabetes", Practical Diabetology, 5:Sept/Oct, 1985, 1-3

April, R.S., "The Neurological Examination" in Percutaneous Laser Disc Decompression, ED. D.S.J. Choy, in J. Cl Laser Med Surgery, 13, Je 95

April, R.S., and Lanfranchi, R., :Clinical Criteria to Rule Out Cervical Spinal Injury. Letter to the Editor", NEJM.343, 2000

April, R.S., "Representation of the Dead Body in Literature and Medical Writings during the Restoration in France (1799-1848)" in Klaver, Elizabeth, Ed., Images of the Corpse from the Renaissance to Cyberspace, U. Wisconsin Press, 2004, pp. 63-87.

PRESENTATIO NS:

April, R.S., and Christian, C., "EEG Aspects of Different Methods of Obstetrical Delivery in Newborn Infants". 28th Annual Meeting of The American EEG Society, Seattle, Washington, June 26, 1974

April, R.S., and Christian, C., "Pseudoperiodic Lateralizing Epileptiform Discharges (PLEDs) in Chronic Neurologic Patient". 28th Annual Meeting of The American EEG Society, Seattle Washington, July 26, 1974

April, R.S., and Brown, J., Gerstman, L., and Brown, G., "Preliminary Observations on EEG Patterns and Asphasic Performance." American Academy of Asphasia, October 10-13 1974, Washington

April, R.S., "The Brain and Recovery of Function." Invited address To Annual Convention of New York Speech and Hearing Association, 1973

April, R.S., "The Use of Neuropsychologic Testing in Neuro-Psychiatric Diagnosis." Monthly meeting of Medical Staff, Gracie Square Hospital, November, 1975

April, R.S., and Tse, P.C., "An Unusual Case of Tonic Seizures." Eastern EEG Association, December 5, 1974

April, R.S., "Acute Management of Strokes." Nassau County Heart Association, March 25, 1976

April, R.S., Lectures on "Brain and Recovery of Function" to Faculty of Medicine/Neurology Service, Montpelier, France, July, 1977

April, R.S., "Evaluation of Anticonvulsant Drugs." Presentation at Epilepsy Society for Social Service, Lenox Hill Hospital, N.Y.C., October 2, 1977

April, R.S., "The EEG in New York City Municipal Chronic Disease Hospital." Presented at the 31st Annual Meeting of the Eastern Association of Electroencephalographers at Lenox Hill Hospital, N.Y.C., November 29, 1977

PRESENTATIO NS: (cont'd)

April, R.S., Represented NYCSRO in Chicago, Illinois at Meeting Of the Alliance of Continuing Medical Education, February 1st and 2nd, 1978

April, R.S., "The Treatable Dementias", Grand Rounds of Bronx-Lebanon Hospital, March 14, 1978

April, R.S., "Is Sprouting the Mechanism for Restitution of Function in the Central Nervous System?" Grand Rounds of

New York University Medical Center, March 24, 1978

April, R.S., "Reversible CT Changes in a Case of Hepatic Encephalopathy." 1978 Annual Meeting of the American EEG Society, San Francisco, CA, September 4-8, 1978

April, R.S., "Dementia" Guest Lecturer at Manhattan Psychiatric Center, September 14, 1978

April, R.S., "Neurological Correlates of Dysarthria" Dysarthria Conference at St. Vincent's Hospital, NYC September 16, 1978

April, R.S., "Epilepsy" Guest Lecturer at Manhattan Psychiatric Center, Ward's Island, N.Y. September 21, 1978

April, R.S., "Movement Disorders" Guest Lecturer at Manhattan Psychiatric Center, Ward's Island, N.Y. September 28, 1978

April, R.S., "Crossed Aphasia in a Bilingual Dextral" Presentation at Salpetriere, Paris, France, November 8-14, 1978

April, R.S., "Recovery of Language Function" Presentation at Queens College, N.Y., January 12, 1979

April, R.S., "Two Reports of Crossed Aphasia in Chinese Bilingual Extrals" International Neuropsychological Society, N.Y. January 31, 1979

April, R.S., "Age–related Disease of the Brain" Geriatric Conference, Coler Memorial Hospital, Roosevelt Island, NYC March 28, 1979

PRESENTATIO NS: (cont'd)

April, R.S., "Psychological Stigmata of OBS" Harlem Hospital N.Y., April 4, 1979

April, R.S., "Dysarthria" The Kessler Institute for Rehabilitation, New Jersey, April 18, 1979

April, R.S., "Motor Speech Disorders" Speech and Hearing Society, New Jersey, May 18, 1979

April, R.S., "Crossed Aphasia in Chronic Dextral" Grand Rounds

Department of Neurology, University of Iowa Medical Center Iowa City, Iowa, August 24, 1979

April, R.S., Lectures-Ophthalmology Resident Program, New York Eye and Ear Infirmary, Monthly, 1981-1981

April, R.S., and Han, M., "Current Observations of Aphasia in Chinese Subjects" Presentation at North Shore University Hospital, Great Neck, N.Y., May 28, 1980

April, R.S., and Han, M., "Current Observations of Aphasia in Chinese Subjects" Third INS European Conference, Chianciano Terme, Italy, June 4, 1980

April, R.S., "Acute Brain Syndrome" Child Psychology Fellowship Training Program New York Medical College, Metropolitan Hospital, September 18, 1980

April, R.S., "Lecture to Sigma Alpha Eta, Speech and Hearing Association Honor Society at St. John's University, Queens, N.Y. "Clinical Neurological Substrates of Aphasia, Dysarthria and Apraxia", November 19, 1980

April, R.S., "Special Problems of Language Learning in Chinese" Presentation at the New York Branch of the Orton Society's Eight Annual Conference, March 27, 1980

April, R.S., "The CT Scan as a Correlate of Neuropsychological Functioning in Psychiatric Hospital Practice" Presentation at the Fourth INS European Conference, Bergen, Norway, June 29, 1981

PRESENTATIO NS: (cont'd)

April, R.S., 'Correlation of CT Scans with Recovery from Asphasia" Presentation at the Adelphi University, Garden City, Long Island, April 2, 1982

April, R.S., "Epilepsy and Pregnancy" to the Epilepsy Society for Social Service, Inc., at Lenox Hill Hospital, October 29, 1982

April, R.S., "Natural History of Age Related Brain Disease" Symposium at Southampton Hospital, Southampton, N.Y. November 30, 1982

April, R.S., Leutic Hearing Loss, Presented to Meeting of ENT Department, Manhattan Eye & Ear Hospital, December, 1988

April, R.S., Neurological Engima, CPC at NYU-Bellevue Medical Center Department of Neurology Grand Rounds, September 25, 1992

April, R.S., and Holtzman, R.N., A case of neurosarcoid of the Brains Brainstem, Differential Diagnosis, Management and Review of Literature, In preparation for Archives of Neurology

April, R.S., "Laserotherapie pour l'algie discale lombaire" presented At Meeting of French Society of Neurology, Paris, July, 1994

April, R.S., and Choy, D.S.J., Laser Treatment of Herniated Lumbar Discs submitted as abstracts to 47th Annual Meeting of American Academy of Neurology, May 1995

April, R.S., Alzheimer's Disease, Lenox Hill Hospital, November 29, 1998

April, R.S., Course in Neuromuscular Disease, P.A. School for Pace College, May 2000

April, R.S., X Annual Conference of Aizen in Philadelphia, Genetics Of Neurological Disease in the XIXth Century Writings of Emoile Zola 2001. The Geneaology of the Rougon Maquart Family and Concepts of Heredity in XIXth Century France

PRESENTATIO NS: (cont'd)

April, R.S., XI Annual Conference of Aizen in Jaen Spain, June 2002, Madame Raquin's Parlysis, Locked in Syndrome and Paralysis in XIXth Century Literature

April, R.S., XII Annual Conference of Aizen in San Antonio Texas October 2003, Chairman of the Panel. The History and Mystery of Hysteria, Zola Lourdes, Charcot and Beyond

April, R.S., XIII Annual Conference of AIZEN in Rio de Janeiro, Brazil. The Death of Nana. Smallpox and Infectious Disease in Zola's Time. (submitted for publication in EXCAVATIO) 2004

Jan 13 2003 S ipreme NY Judge Payne. Case of Lance Jackson 6654. Hit by car and no brain inury. Pazer tried to make a :ase for concussion and brain damage to correlate with poor school perf in a premature child by weight with earl ' school problems. Mr. Martin Semel of Molod Spitz

- Jacks n v. Mungo One, Index No. 111153/2000 (Sup. Ct., New York County);

Jan 22 2003 I atthew Rich....Mr. Vincent Vicenzi Zawacki....Judge Wilkins NY Supreme Zawacki....case of alleged brain njury in a young man w no neuro signs defendant award $44000 split.

- Rich . I Hope Plumbing & Heating Co, Index No. 106601/2001 (Sup. Ct., New York County);

Jan 23 Iris Rosa Mr. Kleva Defendant decision $50,000 awarded Allste...McMahon Martin and Gallagher 90 B: oad St.

Feb 14 2003 Judge Stem NY Supreme Neil Galvan......alleges brain injury with controversial neuropsycholog cal results. No findings. And that was it. Jeffrey Samel Defendant verdict.

- Galvai v. Dattco, Index Number 100387/1999 (Sup. Ct., New York County)

Feb 24 2003 udge Stephen Green Bx Supreme Kevin Smith v Montefiore....a man had a completed left cva and has all the indings. The testimony revolved about the moot point of need for help at home in a disabled man who walk: independently with a hemiplegic gait. Tommy Moore made a fool of himself, but verdict will relate to the que stion of medical malpractice which I did not address.
16,000000 for | aintiff

- Smith . Montefiore, Index Number 22183/99 (Sup Ct., Bronx New york)

March 6, 2003 Bx Supreme case .... Juliana Diaz Judge Stern Miss Lee of TA....all about carpal tunnel syndrome from banging the horn when hit by bus. Defendant win.

- Diaz v NYMTA, Index Number 18928/1997 (Sup. Ct., Bronx County)

March 20, 2( )3 NY Supreme......Judge Gammerman Mr. O'Malley Rbert P Tusa. Case of Terry McKlackion $ 60,000 award to plaintiff who had no findings. LS injury

March 26 200: NY Supreme Judge Billings Ms Martin of Tusa....othe rlawyer Glenn. Short testimony no findings. Ada 1a Traore. Settled for $8500..out win

- Tradre v. Grant, Index Number 123986/2000 (Sup. Ct., New York County)

March 27, 200: NY Supreme. Judge Omansky. Mr. Gering of Jeff Samel. Case of Sean Marcinuk. No findings in someone wi 1 C5-6 disk deg disease that Dr. Cammisa wants to operate. No causal relation to the accident which was min r. I was not allowed to look at films before jury. Short testimony. $75000 award for lumbar fusion is very s nall, indeed. win

March 28, 200 Bx Supreme Criminal case of Bernard Thompson. Judge Williams I was for defeendent in pe.ople v Thon pson accused of shooting with left hand, a stabbed hand. Lawyer John Janiec.

4/10/03 Kar 1 Carino child fell from slide on playground with bruise and maybe a small depressed fx with lenticular ble ding. Plaintiff plead brain damage and I said nothing. Lawyer is Wilson of Leahey Johnson, they have not paid An award made partial payment

- Cari o v. NYCHA, Index Number 17494/1998, (Sup. Ct., Bronx County)

4/30/03 Ca ole Kirkpatrick, a plaintiff case for Melvin Solomon judge Kramer in NY Supreme and City Defense. Uln r nerve section

- Kirk atrick v. City, Index Number Index Number: 9362/1991 (Sup., Ct, New York County)

5/06/03 Da d Vita, a defendant case for Mr. Phil Crawford of Gibbon, Del Dio of a man who had a neck inj from falling p ece and then 5 d later went to ER with low back complaint and after about 18 mo had laminectomy by Cammisa ho did not find disk extrusion but only osteophytosis with lateral recess stenosis. Patient is a few weeks post o and says the pain is different but still uses a cane. My testimony stressed the non back aspect of injury and the fact that he was normal in my office and that the films taken just after inj showed calcificied ridge in LS MRI a d that this was older than accident. We emphasized the correlatioin of surgical findings and my impression as o absent of herniation from accident. The plaijntiff made point that the twisting movement at time of the injury neck caused exacerbation of preexisting, but asymptomatic LS lesion. Judge Silverman, no jury and Mr. Harv y Katz.

- Vita . Alstom Signaling, Index Number 29186/2002 (Sup Ct., Kings County)

6/16/03 Phili Sottile Mr. Bentzen of Cerussi. Judge Held. This was a case where I saw no lesion, he had no ER treatment nd is claiming a cervical disk. There is no data to support this diagnosis. The atty did not make any good poin s. Brooklyn Supreme

- Sotti v. Ogunfowora, Index Number 1235/1999 (Sup Ct., Kings County)

6/25/03 Selw n Schulere P6178 NY Supreme Jeffrey Burkhoff of Burns, Russo, Tamigi and Reardon Judge was Soto...ju ge Samuels...Mr. Chedrick their lawyer. This is a little, funny looking elderly lady with diabetes, retinopathy, v sual impairment, degenerative spine disease and neuropathy who was hit by a car coming onto sidewalk in a most peculiar accident with no ER findings and nothing but Dr. Parisi and Patel talking about subjective lim tation and disability without proof. I do not think this case meets threshold for substantial injury.

- Schu re v. Century Condominium, Index Number 105331/2000 (Sup Ct., New York County)

6/25/03 Lorr ne Murphy. Firm of Robert Tusa Paul Costanidis. NY Supreme and we won on a threshold issue. After m testimony. Full defendant verdict.

- Murp y v. Towncar Limousine, Index Number 103400/2001 (Sup Ct., New York County)

7/02/03 Elana Moore Malapero and Prisco Mr. John Komar Judge Kemead NY Supreme No findings only EMG and repo ted MRI findings. I did not see films. I made the point that EMG is adjunctive test and should be used only whe there are clinical findings and diagnostic dilemmas. The "positive": finding in this case does not relate to the ac ident of record.

- Moor v. Cougar Mgmt., Index Number 400668/2003 (Sup Ct., New York County)

10/27/03 Ron an Calderon 8873 Judge Karen Smith, NY Supreme Miss Claire Martin of Robert Tusa. No injury and min nal questioning DEFENDANT VERDICT

- Calde on v. Garcia, Index Number 122452/2001 (Sup Ct., New York County)

11/19/03 A am Wachtel Judge Recant NY Supreme Miss Claire Martin of Robert Tusa. Defendant verdict. Important to stress the fact that someone has another history (tumor seizures) to explain a real C4-5 disk, but no neurological igns and no disability.

- Wa ntel v. Zagaria, Index Number 104388/2001 (Sup Ct., New York County)

12/10/03 B atrice Weber Judge Schaefer New York Supreme Mr. Michael Veras of Kral, Clerkin (212 406 9710) It w s a case of an old woman who fell an injured the right hand, fracturing the finger. There is no evidence of njury to the elbow. Within the year she saw Dr. Stephen Green who began to treat her for ulnar nerve sympt ms. Three years later he operated on the cubital canal, transposing nerve. After that there was a second full w th ecchymosis to the right elbow and another surgery to decompress the scar. It was my contention that althoug she had bona fide ulnar neuropathy, it was not caused by the accident of record for which the emergency-r om record did not document any direct. to the elbow. A basis on the idea that traumatically induced ulnar palsy ecessitates direct trauma to the elbow. It is well known that tardy ulnar palsy can occur spontaneous and is attributed to aging changes, small repetitive trauma of daily life, and can be accelerated by underlying di betes, which she had. The problem in this case was that critical evidence could not be admitted in the courtroo . Defendant Verdict

- Wel er v. City of New York, Index Number 119729/1993 (Sup Ct., New York County)

12/17/03 Pe ple vs. Sean White. Mr. K. Wahid from Neighborhood Defense Fund of Harlem. Criminel Court of NYS, Judge White. To review docs and give expert opinion about the nature of the prolonged coma and its correlation w th limited external bruises to head. The allegation in this case was assault and battery with a premeditated attempt to murder. Decision in favor of Sean White

- Peo e v. Sean White, Index Number 92356/1992 (Sup. Ct., New York Criminal Court)

12/24/03 Cas of Winston Dasent. Kelly Rode and Kelly. Mr. Dan Cerritos. Judge De Grasse. No real injury. Not much of n enquiry.

- Win ton v. Cesar, Index Number 103246/2002 (Sup Ct., New York County)

2/9/04 NY S preme Case of Barbara Ford Atty Frank Melendez Judge Schichtman claim c rad but no signs on exam spondyl sis on all films normal er exam

-

3/9/04 NY Su preme Case of Joan Fittante Atty Dan Paliseno of Smith Mazure, Judge Goldman. I agreed with plaintiff (orth pedist) treating doctor that fall caused left wrist fracture, but that after her decompressive surgery of median ne ve, no residual neurological deficit. Mr. Peterman attacked my character and my omission of left grip strength uantification in my report. Important point: Include in the report the focus of the complaint and minimize the st of the observation. Settled before verdict for $160,000

- Fitta te v. Transit Authority, Index Number 111087/2002 (Sup Ct., New York County)

03/26/04 Sup eme Court of Queens. Case of Jorge Navarro (P 9930) in front of Judge Schulman. Mr. Steven B urke Martin Fallon and Mule. About a cervical disk and a crazy case. This case might not reach threshold. Total of $550, 00

- Nava ro v. Chen, Index Number 116638/2002 (Sup Ct., New York County)

03/31/04 Sup eme NY Judge Solomon Jorge Navarro MR. Burnett. Diamond Rutman Only knee complaint and was it d to the accident.of Martin, Fallon and Mulle. I thought we did well because I mentioned the forbidden wor , degeneration.

Navarr v. Chen, Index Number 116638/2002 (Sup Ct., New York County)

05/07/04 Supre ne Bx Judge Schechner Mr. Ramon Martinez. Case from 1994. Mr. Phil Lee, office of Michael Barnett, counsel to Allstate....controversy revolved about whether C5 C6 bulges were accident or degenerative-rela :d. I said latter because there was no ev of neck injury at accident. Also no progression of lesions from 4 mc after accident to recent. And I found nothing on my IME. Defendant verdict.

- Martinez v. Passaro, Index Number 7780/1997 (Sup Ct., Bronx County)

5/19/04 Supreme JY Judge Evans Ms. Dorota Linette. Mr. Bill Fitzgerald of Shapiro Bailey for Allstate. Only a knee injury and atty hounded me on need for records in an IME and the fact that I never appeared in court for one of my owr patients, per some statement taken out of context from a Bx testimony. They would not let me comment on th unlikelihood of the accident's having caused the knee injury based on no mention in ER, etc. Plaintiff verdict of ıax of policy....$25,000 I do not think that this was an ideal neurological case.

- Linette v. Green, Index Number 101692/2002 (Sup Ct., New York County)

5/20/04 Supreme N Y Judge Solomon Mr. Tom Nemia of Shapiro Beilly Case of Luis Taveras....claim was back disk bulge but he had no signs and the MRI which I saw before trial was perfectly normal. The plaintiff's atty had little to chal enge me and I went into great detail about the neuro exam and my qualifications as an expert. Defendant verdict.

- Taveras v. Cooper, Index Number 120932/2002 (Sup. Ct., New York County)

Case of Maria Tapia n Brooklyn Supreme before Judge Schack. Lawyer John Frank of Jeff. Semel. The case was brought out that a hough Britan, the argument about records. What day was this.

- Tapia v. Datt Inc., Index Number 38245/2001 (Sup Ct., Kings County)

Case of Eberle, Nicole Bronx ......Peter Prisco.....Sacks.........Whole argument was that there was nothing on exam or films shown in the trial. The other atty only argued that I was a hired hand. Defense verdict.

- Eberle v. Manning, Index Number **015178/2001** (Sup Ct., Bronx County)

9/23/0-4 Case of Evely Wrubel Abrams Gorelick Mr. G. Jacobson. Judge DeGrasse Mr. Finnegan NY Sup. Concentred only on my being professional witness. I said she had vertigo and no neurological dysfunction. Time had healed her as John Schaefer had predicted.

- Wrubel v. Rose Boutique Inc., Index Number 104259/2001 (Sup. Ct., New York County)

Sept 27 04 NY Supreme Judge Stallman Case of Kevin Gaston 10803 Miss Litos from Tusa. No injury whatsoever and he (Rodriguez) had nothing to say. Defendant's verdict.

- Gaston v. Sabov, Index Number 120516/2002 (Sup Ct., New York County)

November 15, 2004: Supreme NY Frances Van Leuven P-4756 Judge Singh Mr. Foreman plaintiff atty. Mr. John Stewart of KRK defense. No findings. He rambled about ind recollection, Dr. Jones' finding of cervical lumbar syndrome, and much patronizing, insulting, cross examination without anything to do with fact. It all amounts to subjective pain in a person without findings. Awarded $65000 for damage and no pain and suffering. Mr. Stewart was pleased with the testimony in the face of character assassination.

Dec 2 04 ;upreme NY Dennis Naughton Judge Freedman. Mr. Coffey of WEMED. This was not a neurological case but had to do with pain in ankle from podiatric surgery and removal of a subtalar cyst. Thjere was no reasc i for my testimony

- Nau hton v. Durst Organization, Index Number 115147/1998 (Sup. Ct., New York County).

Feb 2 05 NY Supreme. Judge Samuels. Mr. Bill Fitzgerald of Schapiro Bailly. Case of EARLINE ROUGIER. No substanti l cross....only about inconsistency of my report. Patient had claim of c rad but films weren't available for me and she had chronic changes and controversity about MS plaque, that I was not allowed to discuss. All could say was that the neuro exam was normal and their EMG equivocal at best. Hung jury, no decision. Wil have to have a retrial in the future.

Feb 6, 2005 Case of Hector Varada NY Supreme Court Judge Gisch Mr. Judd of Schapiro Beilley tole me that they won but n liability not on medical.

- Vara a v. Bousaid, Index Number 113031/2001 (Sup.Ct., New York County)

April 1, 2005 Case of Frank Durso ...NYC Law Dept. Mr. Matthew Brown....Defendent verdict in slip and fall in Park in ma who had aortic stenosis and heart surgery 11 mo after accident, continued syncope before, and then, 9 mo lat , intractable pseudoseizures. DEFENDANT VERDICT. $5525 OUTSTANDING.

- Durs v. City, Index Number 20884/1999 (Sup. Ct., Bronx County)

Ma y 6, 200: NY Supreme Mr. Steven Morgenlender of McCabe Collins. Case of Ndiye Fallou...claim of injury to neck 1 mva...prior acc not mentioned. No findings. Why would you testify the same in case of plaintiff or defendant if this were the client? Mr. Pravda plantiff atty. PAID. Judge Scarpulla.

August 1 2005 NY Supreme Judge Allen People v. Kim Simpson. Mr. Terrence Grifferty. I testified that one had to coorelat the mild signs with minimal injury and that fist was the cause with reasonable medical certainty, rather than a bl ckjack. Assigned counsel fund.

October 11, 20 5 Case of Sammy Sencione. Bronx Supreme: Judge Wilma Guzman. Mr. Morothy of Dubow and Smith. Cas of lumbar disk without findings on ex and on films. I disagreed with radiologists at St. Lukes.

November...wi 1 Mr. Spevack of Jeff Samel. No neurologicalawared was given. Check it out]

November 14 Case of Tawfik Nissim......had orb fx in a fall and question of brain hem. Day 1 spotty frontal bleed Day2 no bleed at all. Watch him for 8 days and then do the orbital repair. Ful,l fx recovery he is a 70 prof of astrophysics nd is working full. Therefore, little ev of brain inj. Motoric normal. I think our testimony Mr. Sculnik of Gord n and Silber.

Feb 16, 2006 N ew York Supreme before Judge Figueroa....case of PATRIZIA SICARI...Mr. Phillips of Smith Mazure........Qu stion of Kolb reading C5-6 bulge which was totally normal in a person withtout signs after minimal injury. Defense verdict.

- Sicari v 525 Realty Co., Index Number 100507/2002 (Sup Ct., New York County)

Feb 27, 2006 N Y Supreme Judge Kibby Payne...case of Philip GONSALVES..12975 No findings at all. No films shown. Not ing substantial in cross. Kelly Rode Kelly Mr. Cerrito. Cannot get response from KRK.

-

March 29, 2006 NY Supreme Judge Kibby Payne case of Jaime Rodriguez 5919. whole thing turned on whether two bulges were related to the accident. I said no. He had no findings. Atty Tracy Callahan Fishman and Callahan. Mr Ma thew Fein the plaintiff atty. Nothing to the plaintiff

May 24, 20( 5 NY Supreme Judge Soto Case of Stephanie Gonzalez 15283 Mr. Kendrick of Ahmuty.....can you have se ious injury and a normal neurological examination? Jury decided on a $60000 award which was below what ıc carrier was willing to settle.

June 09 06 Kimberly Sullivan Richard Sands of JHCB. Judge Friedlander in Bx. A mva, minc , in which this person became bedridden and regressed over the next years. Defense verdict.

- Sullivan v. Goksan, Index Number 016637/2000 (Sup. Ct., Bronx County)

September 1 , 2006. Case of Franklin Garcia NYC Law. Mr. Michael Reddy. Before Judge Francois Rivera in Brooklyn Su reme. 1999 case of inj to cyclist messenger with left arm laceration and fracture. No neurology here. Jury fo ıd plaintiff 88% at fault, City 12% City paid only $7200. Very good, indeed.

October 18, 2006 Case of Eusebio Duran NY Supreme Judge Figueroa. Mr. Craig Dolinger of Andrew McConboy F isco About a cervical and lumbar disk that was not in a very facitious patient. Big plaintiff settlement wi ıout verdict for $500000

- Dur ı v. TJX Companies, Index Number 401066/2005 (Sup Ct., New York County)

October 18, 2 06 Case of Jeff Howell Bronx Supreme Mr. John Beyrer of Mulholland Minion and Roe about alleged RSD nd Dr. Hausknecht's allegations with many prior injuries.. Plaintiff's verdict. They belived the RSD but gave ıim nothing for future earnings.

- Jeffr / Howell v. Karl Kock Contracting, Index Number 24821/1997 (Sup Ct. Bronx County)

November , 2006 Eddie Caban.......Lewis Prisboy......212 232 1368 Alikakos.......dont know the results. Left message : 2 05 06

-

January 25, 2( 07. Case of Andrea Paola Flores, plaintiff, in Supreme Queens before Judge Dollard. They allowed no his ıry or films in court and accepted my normal examination, asked how I had independent memory of the case, an how much I charged. That was all. Mr. Hamilton Driggs of Office of Robert Tusa for Allstate. The jury award d $6000 for past damages and $60,000 for the next five years.

January 29, 20( 7 Case of Jean Clary Hussey in NY Supreme Mr. Robert Spivak of Jeff. Samel and Mr. Fluger, the plaintiff's a ty. The claim was injury to lumbar roots, but my two exams and 9 by Dr. Stein, her doctor, had normal neurolo ical examinations. Fluger made a big point of my not having the q uestionnaire of the first exam available. He ı ıade a missing document claim. Nonetheless, he had nothing to say but that one can have pain with a normal n urological examination.

- Husse y. ABM Janitorial Services, Index Number 107305/2004 (Sup. Ct., New York County)

March 2, 2007 Case of Alistair Sellasie v. defendant. A plaintiff case for Mr. Josh Gropper v. Robert Tusa. I stated that th ; caused labyrinthine concussion with vertigo and imbalance and there was a central spinal contusion in the cervical cord. I talked about the functional nature of the vestibuar system and trauma induced vestibulopathy. Decision for the plaintiff.

March 16, 2007 Case of Michael Grandis in NY Supreme......Judge Figueroa...Mr. Michael Smar of Kral, Clerkin Patient ıad nothing wrong and no traumatic spine image but the other side just went for it.

- Grandis v. Ford Credit Titling, Index number 101558/2003 (Sup. Ct., New York County)

March 14, 1 )07 Joseph Jesselle Mr. Oliver Williams...........the case was decided with no neurological damages. Mi imal award was given.

Mar 22, 200; Case of Roy Boston......concussion in elderly man with multiple reasons for his findings of OMS and trouble v alking. No neurol diag from the accident. Mr. Flomenhaft and Judge Cooper NY Supreme. Mr. Sules for De :nse. All for the plaintiff.......on the basis ofdiffuse axonal injury....$1500000, all for damage. They will app :al because it was based on nothing.

- Bost n v. Varano, Index Number 300001-TSN-2005 (Civil Ct., New York County)

May 11, 2007 Case of Jennifer and Oscar Arrietta. Bx Supreme. Justice Rodriguez Problem of congential CP in Jennifer and a board hit her on leg and broke femur. Argued that the CP was unrelated and not aggravated by the injury. Oscar ad only an elbow injury and no neurology. Mr. Mike Coffey and Mr. G. Mero (J. Samel). Total Defendant's v rdict. They gave this couple essentially nothing.

- ~~[illegible]~~, Index Number ________ (Sup. Ct., Bronx County)

May 18, 2007 NY supreme Judge Caren Smith. Mr. Bigelow of J. Samel Rosario Agramonte.....although no findings but exaggeration and no findings on the MRI of LS spine produced only in the courtroom, remarkably normal film, th : jury awarded $600,000 to plaintiff as a plaintiff's verdict. I really do not know why. I was very effective in dea ing with Mr. Ngyuen.

- Agran onte v. New York University, Index Number 111434/2004 (Sup. Ct., New York County)

May 31, 2007 Case of Brenes in Qns Supreme, Judge Eliott, plaintiff atty Cervini. Defense Griggs of Robert Tusa. Minimal injury in a 39 yo who had chronic degenerativbe changes at two disk levels in C spine. The plaintiff attorne 's inquiry talked only about my fees and my working for CW. $20,000 award for cervical pain and nothing for adiculopathy and nothing for future pain and suffering.

- Brenes /. Chand, Index Number 21564/2003 (Sup. Ct., Queens County)

AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
COUNTY OF NEW YORK) SS:

Laura E. Martinez, being duly sworn, deposes and says:

I am over 18 years of age, I am not a party to the action, and I reside in Nassau County in the State of New York.

On April 8, 2008 I served a true copy of the **EXCHANGE OF EXPERT INFORMATION PURSUANT TO F.R.C.P. 26(a)(2)** by mailing same in a sealed envelope, with postage paid thereon, in a post office or official depository of the U.S. Postal Service within the State of New York addressed to the last known address of the addressee as indicated below:

TO: Attn.: Harlan S. Budin., Esq.
Budin, Reisman, Kupferberg & Bernstein, LLP
112 Madison Avenue
New York, New York 10016

Laura E. Martinez

Sworn to before me on the
8 day of April 2008

Notary Public

HENDRICK VANDAMME
NOTARY PUBLIC-STATE OF NEW YORK
No. 02VA6155083
Qualified in New York County
My Commission Expires 11/12/ 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant,

-------------------------------------------------------------X

Index No.: 07 Civ. 4091 (NRB)

**EXCHANGE OF EXPERT INFORMATION PURSUANT TO F.R.C.P. 26(a)(2**

LAW OFFICES OF DIFFENDERFER & SOLOMON
Attorneys for Defendant
Thomas P. Wendel
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

**Our File No.: 2007-100069**