LAW OFFICES OF

Budin, Reisman, Kupferberg & Bernstein, LLP

MARVIN REISMAN
JAY BUDIN
HARLAN S. BUDIN
ALICE KUPFERBERG
ADAM S. BERNSTEIN
PAUL D. BUDIN *
ROBERT L. BUDIN (1953-1982)
*Retired

(212) 696-5500
Fax (212) 889-3978
112 MADISON AVENUE
NEW YORK, N.Y. 10016-7416

GERARD A. CONNOLLY, JR.
RALPH GAVIN BELL
CHRISTINA M. RIEKER▫
▫Admitted in NY and NJ

JANICE COOK
ADMINISTRATOR

June 3, 2008

Chambers of the Honorable Naomi R. Buchwald
United States Courthouse
500 Pearl Street, Room 2270
New York, NY 10007

Re: Jalloh v. Wendel
Docket No. 07 Civ. 4091 (NRB)
Our File No. Y8236

Dear Judge Buchwald:

Enclosed herewith is plaintiff's opposition to defendant's motion for summary judgment, as well as plaintiff's cross-motion for summary judgment on the issues of liability and memorandum of law. Pursuant to Your Honor's Order dated May 21, 2008, these documents were due on June 4, 2008, and have already been sent to defendant via Federal Express Overnight Delivery.

Thank you for your courtesy in this matter.

Respectfully submitted,

BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP

Christina M. Rieker

CHRISTINA M. RIEKER, ESQ.

Enclosures

cc: Mark A. Solomon, Esq.
Law Offices of Harvey & Vandamme
90 Broad Street, Suite 2202
New York, NY 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---------------------------------------------------------------X

**NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT**

ECF CASE

Index No.: 07 Civ. 4091/(NRB)

Hon. Judge Naomi R. Buchwald

PLEASE TAKE NOTICE, that upon the annexed affirmation of CHRISTINA M. RIEKER, ESQ., dated June 3, 2008, and upon all of the pleading and proceedings heretofore had herein, the undersigned will move this Court before the Honorable Judge Naomi R. Buchwald at the Courthouse located at 500 Pearl Street, New York, NY 10007, on June 20, 2008, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an Order pursuant to FRCP 56 granting summary judgment in favor of plaintiff, ABOUBACAR JALLOH on the issue of liability; together with such other, further and different relief as the Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 3, 2008

Yours, etc.

Christina M. Rieker

CHRISTINA M. RIEKER, ESQ. (1566)
BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
Office & P.O. Address
112 Madison Avenue
New York, New York 10016
(212) 696-5500

TO:
Law Offices of Harvey & Vandamme
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street, Suite 2202
New York, NY 10004
(646) 428-2650

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.
-----------------------------------------------------------------X

**AFFIRMATION IN SUPPORT OF CROSS-MOTION AND IN OPPOSITION TO DEFENDANT'S MOTION <u>FOR SUMMARY JUDGMENT</u>**

Index No.: 07 Civ. 4091/(NRB)

CHRISTINA M. RIEKER, ESQ., an attorney admitted to practice law in the Courts of the State of New York hereby affirms under the penalties of perjury:

I am an associate of the firm of BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP, attorneys for the plaintiff herein and as such I am fully familiar with the facts and circumstances of the above entitled matter and submit this affirmation in support of plaintiff's motion for an Order pursuant to FRCP 56 granting summary judgment in his favor. I further submits this affirmation in opposition to defendant WENDEL's motion dated May 16, 2008 seeking an Order for summary judgment pursuant to FRCP 56 and N.Y. Insurance Law 5102. This cross-motion is being filed upon leave of the Court pursuant to the Order dated May 21, 2008 (Order annexed hereto as **Exhibit "A"**).

## <u>PART I</u>

## PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

### a. <u>Introduction</u>

The within action stems from a rear end collision, which occurred on August 6, 2006, a Sunday at approximately 12:00 a.m. At that time plaintiff was the operator of a 1997 Lincoln bearing the State of New York license plate number 62109LA that was **<u>rear ended</u>** by a 2005

Honda Element owned and operated by defendant, THOMAS P. WENDEL. Annexed hereto as **Exhibit "B"** is a copy of the Police Report.

Said accident occurred when defendant suddenly crashed into the rear of plaintiff's car while plaintiff was stopped at the red light on Seventh Avenue and its intersection of West 135th Street, in the County, City and State of New York.

Suit was commenced on or about March 12, 2007, issue was joined on or about May 21, 2007 (A copy of the Pleadings are annexed hereto collectively as **Exhibit "C"**).

**b. Deposition Testimony of the Defendant Thomas P. Wendel**

Deposition of the defendant, Thomas Wendel was conducted on February 8, 2008. (Annexed hereto as **Exhibit "D"** is a copy of Mr. Wendel's examination before trial transcript, in its entirety). Mr. Wendel testified that he resides in Connecticut, and prior to the accident, he was at a concert on Roosevelt Island (See Ex. "D", pg. 5, 10). Mr. Wendel testified that the road he was traveling on before he struck plaintiff's vehicle was dry and level. He testified that he struck plaintiff's stopped vehicle in the rear when he took his eyes off the road. Relevant testimony follows:

Pg. 14, lines 16-25

> Q: The contact involving your vehicle and the Lincoln Town car how would you describe that, heavy, medium, light, or something else?
> A: Medium.
> **Q: When the contact occurred was the Lincoln Town car moving or standing still?**
> **A: I believe it was standing still.**
> **Q: Just before this contact occurred did you see the Lincoln Town car?**
> **A: I don't remember.**

Defendant testified that he told the responding police officers that he rear-ended plaintiff's vehicle. Relevant testimony follows:

Pg. 19, lines 8-15

Q: What did you tell them?
**A: I told them I rear ended the other car.**
**Q: Other than, "I rear ended the other car," did you give them any other explanation as to that event?**
**A: I told them I took my eyes off the road and I didn't see the car.**

Pg. 21, lines 5-9

Q: What was the event or thing that distracted you as you've indicated before?
A: I was just looking around. The change in the scenery since the last time I had been there.

Mr. Wendel's testimony establishes that the accident occurred as a result of his own negligent operation of his vehicle, and plaintiff did not contribute to the accident in any way. As there is no evidence to contradict Mr. Wendel's version of how the accident took place, but is in fact supported by the entire evidence of record, there are no issues of fact for a jury to consider.

**c. Police Accident Report**

The Court is respectfully referred to the police accident report, which narrates how the accident occurred based upon the interview of the involved parties (see **Exhibit "B"**). The report states as follows: "At T.P.O above listed vehicle number 1 and vehicle number 2 were both traveling south bound on Jerome Ave. at the intersection of W. 182nd St. Veh. #2 did strike veh. #1 from the rear. Police officers did not witness accident."

**d. Summary Judgment Should be Granted as there are no Triable Issues of Fact Presented to Refute Mr. Wendel's Negligence.**

In the instant case Mr. Wendel readily admits he struck Mr. Jalloh's vehicle in the rear (See Police Report, Exhibit "B" and defendant's EBT transcript, Exhibit "D"). It is clear from Mr. Wendel's testimony that he failed to have his attention before him and maintain a proper lookout while operating his motor vehicle. It is submitted that only one conclusion can be drawn from the

totality of the facts in this case, that the defendant THOMAS P. WENDEL's negligent operation of his vehicle caused him to rear-end plaintiff's vehicle.

**WHEREFORE**, it is respectfully requested that this application be considered for an Order granting summary judgment on the issue of liability to the plaintiff, and setting this matter down for an assessment of damages, together with such other, further and different relief as this Court deems just and proper.

## PART II

## DEFENDANT FAILED TO MEETS HIS BURDEN OF PROVING *PRIMA FACIE* LACK OF SERIOUS INJURY.

### a. Defendant relies on only one expert who performed an incomplete evaluation of Mr. Jalloh's condition.

Dr. Robert S. April, the defense neurologist, *examined the plaintiff on April 2, 2008, one year and eight months post accident.* Dr. April's opinion was based solely on a single examination of the plaintiff (Dr. April's report is annexed to defendant's moving papers as Exhibit "E"). Dr. April only rendered an opinion as to Mr. Jalloh's neurological condition. He opined, "the accident of record did not produce a neurological diagnosis, limitation, disability or need for further intervention." (See defendant's Exhibit "E"). However, Mr. Jalloh's injuries are generally orthopedic in nature, and Dr. April is not qualified to render an expert opinion as to his orthopedic injuries or limitations. As such, defendant failed to meet his burden of establishing that Mr. Jalloh did not suffer a serious injury within the meaning of Insurance Law § 5102(d).

Dr. April failed to review plaintiff's treating physicians' records or reports. He only reviewed a one-page, unaffirmed record from Dr. Nelson. Defendant's practice of picking and choosing the records he offers for review is grounds for denial of his motion. A doctor cannot

perform a complete examination and prepare an accurate report without reviewing all of the material medical evidence. As such, Dr. April's opinion should be given little to no weight in determining this summary judgment motion.

Dr. April's report failed to discuss the diagnoses made by the plaintiff's physicians; the course of treatment plaintiff received when it was made available to him and the significance of procedures performed by plaintiff's physicians and whether they were medically necessary or whether the results indicate causal relation to the accident. The defendant's doctor conducted only a cursory examination of the plaintiff and failed to present any substantial medical proof of lack of serious injury. Thus, defendant is not entitled to summary judgment, as he has failed to meet his burden, only offering the lacking report of neurologist, Dr. April, especially in light of the fact that plaintiff's injuries are largely orthopedic in nature.

**b. Defendant's accusation that plaintiff did not sustain a serious injury which prevented him from performing substantially all of his daily activities for no less than 90 of the first 180 days after the accident is not based on admissible evidence.**

With respect to the 90/180-day serious injury category, defendant has failed to meet his initial burden of proof and, therefore, has not shifted the burden to plaintiff to lay bare his evidence with respect to this claim. The IME report relied upon by defendant states only that plaintiff can perform his daily activities, *most of the time*, and, further, the IME took place *well* beyond the expiration of the 180-day period. Defendant provides no admissible evidence supporting his opinion that plaintiff was able to perform his daily activities for 90 days following the accident, and is therefore not entitled to summary judgment with respect to this category of serious injury.

In the event that the Court determines that defendant had met his burden, plaintiff has offered sufficient prove to rebut defendant's argument. Plaintiff testified that he underwent an intensive course of physical therapy three times per week for approximately four months after the accident (*See* **Exhibits "F"** and **"G"**, plaintiff's Affidavit, and plaintiff's EBT transcript,

respectively).  He stated that since the accident, he attempted on several occasions to return to his previous job as a taxi driver.  However, he has not been able to work on a regular, consistent basis because of his neck and back pain.  He has only worked about a total of two months since the accident, which was nearly two years ago (**Exhibit "F"**).  Since the accident he has suffered severe back pain, making it difficult for him to kneel, which he is required to do to pray, which he used to do five times a day.  This has had a very negative impact on his life, as religion and prayer are the most important aspects of his life.  Mr. Jalloh feels that the distraction from prayer caused by the pain is affecting his life in a negative manner (See **Exhibit "F"**).

## MR. JALLOH'S COMPLAINTS ARE SUPPORTED BY OBJECTIVE TESTS.

### a. Positive MRI Findings

Plaintiff underwent MRI testing of the cervical spine on August 16, 2006 and the lumbar spine on September 6, 2006.  Annexed hereto as **Exhibit "H"** are MRI reports and a signed affirmation of the radiologist who read the films. The MRI reports are summarized as follows:

The MRI of the Cervical Spine revealed:

- **Straightening of cervical lordosis;**
- **Central disc herniations at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord; and**
- **Bulging disc at C4-C5 with flattening of the dural sac.**

The MRI of the Lumbar Spine revealed:

- **Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.**

### b. Quantitative and Qualitative Findings of Plaintiff's Treating Physicians

Dr. Dina Nelson, a pain management specialist and plaintiff's treating physician, treated the Mr. Jalloh from August 10, 2006 through December 7, 2006 (Affirmation of Dr. Nelson is

annexed hereto as **Exhibit "I"**). Mr. Jalloh received physical therapy treatments for four months, consisting of electrical stimulation, massages, and the application of hot and cold packs, all to the lower back and neck.

On initial physical examination on August 10, 2006, Mr. Jalloh presented with complaints of neck pain, and mid to low back pain, and frontal headaches. **Examination of the cervical spine revealed severe limitation in all planes with diffuse muscle spasm in the upper trapezius muscles, levator scapulae, and SCM and tenderness in the cervical paraspinal. Examination of the thoracolumbar spine revealed tenderness in the lower thoracic spinous processes up to the upper lumbar spine. Flexion was limited to 50 degrees (90 degrees is normal[1]) and lateral flexion was limited to 10 degrees (25 degrees is normal).** Dr. Nelson diagnosed: (1) cervical sprain/strain; (2) thoracolumbar sprain/strain; and (3) post traumatic headaches (**Exhibit "I"**).

On examination of September 21, 2006, Mr. Jalloh had continued complaints of neck pain and low back pain with complaints of sharp pain radiating down both legs. **Examination of the cervical spine revealed moderate restrictions in range of motion in all planes and bilateral trapezius and cervical paraspinal muscle spasm. Examination of the lumbar spine revealed moderate restriction and flexion bilateral lumbar paravertebral spasm, and a positive straight leg raise bilaterally (Exhibit "I").**

**On November 2, 2006, examination of the cervical spine revealed a decrease in lateral rotation to 60 degrees bilaterally (80 degrees is normal), and lateral flexion to 20 degrees bilaterally (45 degrees is normal).** There was bilateral upper trapezius muscle spasm and tenderness in the lower lumbar paravertebrals. Based on a reasonable degree of medical

certainty, and on Mr. Jalloh's history and clinical examinations, Dr. Nelson opined that a direct causal relationship exists between Mr. Jalloh's injuries and the accident of August 6, 2006 (See **Exhibit "I"**).

Dr. Mark S. McMahon, an orthopedic surgeon, examined plaintiff on May 14, 2008, and offered an opinion as to his condition, disability, and current symptoms. Dr. McMahon reviewed all of Mr. Jalloh's treating physician's reports, and the MRI and x-ray reports. **Upon evaluation, Dr. McMahon opined that Mr. Jalloh is currently unable to work due to his neck and back problems.** Mr. Jalloh still has pain radiating down his legs, as well as bilateral leg weakness. Mr. Jalloh's neck and back pain were reported to be worse with bending and lifting. Mr. Jalloh reported waking up at night with neck and back pain, and worsening pain with prolonged sitting, standing, and walking (See **Exhibit "E"**).

On physical examination of the cervical spine, Mr. Jalloh could flex to 2 degrees with pain (normal limit is 60) and extend to 0 degrees with pain (nl 50). He could bend to the left and right 0 degrees with pain (nl 40). On physical examination of the lumbar spine, Mr. Jalloh could flex to 2 degrees with pain (nl 90) and could extend to 0 degrees with pain (nl 30). He could bend to the left and right 0 degrees with pain (nl 20). He had decreased sensation in his left lower extremity and had a positive straight leg raising sign bilaterally (**Exhibit "E"**).

Dr. McMahon diagnosed (1) cervical disc herniations at C3-4 and C5-6 deforming the dural sac and bulging disc at C4-5 with flattening of the dural sac and (2) lumbar spine bulging disc at L4-5 with flattening of the dural sac with bilateral foraminal encroachment, and L5-S1 bulging disc with flattening of the epidural fat. He opined that this diagnoses occurred as a result of the August 6, 2006 accident (**Ex. "E"**).

---

[1] American Academy of Orthopedic Surgeons Standards

**Dr. McMahon opined that Mr. Jalloh's prognosis for recovery is poor and his condition is permanent. He stated that Mr. Jalloh's condition interferes with his quality of life and his activities of daily living, nearly two years after the accident. He opined that Mr. Jalloh is unable to work as a taxi driver because of his injuries, and requires a multilevel cervical discectomy and fusion using instrumentation and bone graft, as well as an L4-S1 decompression and fusion using instrumentation and bone graft (Exhibit "E").**

c. **Plaintiff's Deposition Testimony and Affidavit**

Mr. Jalloh's deposition was conducted on February 8, 2008 (A copy of plaintiff's Examination Before Trial transcript is annexed to moving papers as **Exhibit "G"**). He described the accident, injuries, and limitations in his signed and notarized affidavit, annexed hereto as **Exhibit "F"**.

Mr. Jalloh testified that on August 8, 2006, he was struck from behind by defendant's vehicle. He described the impact as 'heavy' (pg. 37). Mr. Jalloh testified that he saw a doctor the next day for pain in his neck, lower back, and down his legs. He immediately began a four-month course of physical therapy treatments three times per week (Ex. "G", pgs. 38, 40, 43).

Mr. Jalloh stated in his affidavit that he attempted to return to his job as a taxi driver, but was only able to work on a few occasions due to his severe neck and back pain and restriction in range of motion. He is not currently working. Mr. Jalloh also stated that his back pain makes it very difficult for him to kneel to pray, which he used to do five times per day, as his religion required. He finds the pain very distracting, which has negatively impacted his daily prayer ritual, to his chagrin, as religion is the most important aspect of his life (See Ex. "F").

**CONCLUSION**

This Court should deny defendant's motion and rule in favor of the plaintiff. The proponent of a summary judgment motion must make a prima facie showing of its entitlement to judgment as

a matter of law, tendering sufficient evidence. By submitting the lacking report of Dr. April and the unaffirmed one-page medical report of Dr. Nelson, defendant has clearly failed to meet this burden. However, should this Court find that the defendant has met his burden; plaintiff has set forth sufficient evidence to raise a triable issue of fact under §5102(d).

Issues of credibility and probativeness should not be decided by motion. That being the case, it is respectfully requested that plaintiff be permitted to present her expert testimony at trial to counter the medical proof offered by defendant. Moreover, plaintiff should be permitted to subpoena defendant's doctor for in-court testimony relevant to his examination findings. In sum, the plaintiff has shown that the methodology of testing and results has sufficient indicia of medical reliability such that it is appropriate to present this case to a jury.

**WHEREFORE**, affirmant respectfully requests that the within motion for summary judgment based upon N.Y. Insurance Law 5102 be denied, and plaintiff's cross motion for summary judgment on the issue of liability be granted, and this matter set down for a date set certain on the matter of damages, together with such other, further, and different relief as to this Court seems just and proper.

Dated: New York, New York
June 3, 2008

Christina M. Rieker

CHRISTINA M. RIEKER, ESQ.

**ATTORNEY CERTIFICATION PURSUANT TO 22NYCRR 130-1.1a**

Pursuant to 22 NYCRR 130-1.1a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief, and after reasonable inquiry, the contentions contained in the annexed document(s) are not frivolous.

Dated: June 3, 2008

Christina M Rieker

**CHRISTINA M. RIEKER, ESQ.**

EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/21/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

- v -

THOMAS P. WENDEL,

Defendant.

-----------------------------------X

**ORDER**

07 Civ. 4091 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

**WHEREAS** the trial in this matter is currently scheduled to commence on June 10, 2008; and

**WHEREAS** defendant filed a motion for summary judgment on May 16, 2008 and plaintiff has sought leave to file a cross-motion; it is hereby

**ORDERED** that plaintiff's brief in opposition to defendant's motion for summary judgment and in support of its cross-motion for summary judgment is due on June 4, 2008, defendant's reply and answering brief is due June 13, and plaintiff's reply brief on its cross-motion is due June 20, 2008; and it is further

**ORDERED** that the trial in this matter shall commence on August 11, 2008 unless the Court's trial calendar permits an earlier trial.

Dated: New York, New York
May 20, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

A copy of the foregoing Order has been mailed on this date to the following:

**Attorney for Plaintiff**
Adam S. Bernstein, Esq.
Budin, Reisman, Kupferberg & Bernstein
112 Madison Avenue, 2nd Floor
New York, NY 10016-7416

**Attorney for Defendant**
Mark A. Solomon, Esq.
Harvey & Vandamme
90 Broad Street, Suite 2202
New York, NY 10004

# EXHIBIT B

Page 1 of 1 Pages

New York State Department of Motor Vehicles

# POLICE ACCIDENT REPORT (NYC)

MV-104AN (7/01)

Precinct: 046

Accident No.: CH2006 01128

Complaint Number:

☐ AMENDED REPORT

| Accident Date Month | Day | Year | Day of Week | Military Time | No. of Vehicles | No. Injured | No. Killed | Not Investigated at Scene | Accident Reconstructed | Left Scene | Police Photos |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08 | 07 | 2006 | MONDAY | 0115 | 2 | 0 | 0 | ☐ | ☒ | ☐ | ☐ Yes ☒ No |

## VEHICLE 1

| Field | Value |
|---|---|
| Driver License ID Number | 337 231 135 |
| State of Lic. | NY |
| Driver Name - exactly as printed on license | JALLOH, ABOUBACAR |
| Address (Include Number & Street) | 188 E CLARK PLACE |
| Apt. No. | 43 |
| City or Town | BRONX |
| State | NY |
| Zip Code | 10452 |
| Date of Birth | 05 03 63 |
| Sex | M |
| Unlicensed | ☐ |
| No. of Occupants | 1 |
| Public Property Damaged | ☐ |
| Name - exactly as printed on registration | NEW TUXEDO PARK LIMOUSINE & CAR INC |
| Sex | |
| Date of Birth | |
| Address (Include Number & Street) | 31 RTE 17 STE 16 |
| Apt. No. | |
| Haz. Mat Code | |
| Released | ☐ |
| City or Town | TUXEDO PARK |
| State | NY |
| Zip Code | 10987 |
| Plate Number | 6210GLA |
| State of Reg. | NY |
| Vehicle Year & Make | 1997 LINCOLN |
| Vehicle Type | 4DRSDN |
| Ins. Code | 036 |
| Ticket/Arrest Number(s) | |
| Violation Section(s) | |

## ☒ VEHICLE 2 ☐ BICYCLIST ☐ PEDESTRIAN ☐ OTHER PEDESTRIAN

| Field | Value |
|---|---|
| Driver License ID Number | 232762213 |
| State of Lic. | CT |
| Driver Name - exactly as printed on license | WENDEL THOMAS, P |
| Address (Include Number & Street) | 120 MAIN ST |
| Apt. No. | |
| City or Town | DANBURY |
| State | CT |
| Zip Code | 06810 |
| Date of Birth | 11 23 54 |
| Sex | M |
| Unlicensed | ☐ |
| No. of Occupants | 1 |
| Public Property Damaged | ☐ |
| Name - exactly as printed on registration | WENDEL THOMAS P |
| Sex | M |
| Date of Birth | 11 23 54 |
| Address (Include Number & Street) | 120 MAIN ST |
| Apt. No. | |
| Haz. Mat. Code | |
| Released | ☐ |
| City or Town | DANBURY |
| State | CT |
| Zip Code | 06810 |
| Plate Number | 551DAV |
| State of Reg. | CT |
| Vehicle Year & Make | 2005 HONDA |
| Vehicle Type | ST WAG |
| Ins. Code | |
| Ticket/Arrest Number(s) | |
| Violation Section(s) | |

## VEHICLE 1

Check if involved vehicle is:
- ☐ more than 95 inches wide;
- ☐ more than 34 feet long;
- ☐ operated with an overweight permit;
- ☐ operated with an overdimension permit.

### VEHICLE 1 DAMAGE CODES

Box 1 - Point of Impact: 8
Box 2 - Most Damage: 8
Enter up to three more Damage Codes: 3 ___ 4 ___ 5 ___

Vehicle Towed: By UNSIMERS COLLISION To 4343 3RD AVE BRONX NY

## VEHICLE 2

Check if involved vehicle is:
- ☐ more than 95 inches wide;
- ☐ more than 34 feet long;
- ☐ operated with an overweight permit;
- ☐ operated with an overdimension permit.

### VEHICLE 2 DAMAGE CODES

Box 1 - Point of Impact: 2
Box 2 - Most Damage: 2
Enter up to three more Damage Codes: 3 ___ 4 ___ 5 ___

Vehicle Towed: By ___ To ___

VEHICLE DAMAGE CODING:

1-13. SEE DIAGRAM ON RIGHT.
14. UNDERCARRIAGE
15. TRAILER
16. OVERTURNED
17. DEMOLISHED
18. NO DAMAGE
19. OTHER

Circle the diagram below that describes the accident, or draw your own diagram in space #9. Number the vehicles.

1. Rear End 2. Overtaking 3. Left Turn 0. Left Turn 4. Right Angle 5. Right Turn 6. Right Turn 7. Head On 8. Sideswipe

ACCIDENT DIAGRAM

W 182 ST; Jerome ave

Cost of repairs to any one vehicle will be more than $1000. ☐ Unknown/Unable to Determine ☒ Yes ☐ No

Reference Marker

Coordinates (if available): Latitude/Northing: Longitude/Easting:

Place Where Accident Occurred: ☒ BRONX ☐ KINGS ☐ NEW YORK ☐ QUEENS ☐ RICHMOND

Road on which accident occurred: Jerome ave (Route Number or Street Name)

at 1) intersecting street: W 182 ST (Route Number or Street Name)

or 2) ___ Feet ___ Miles ☐ N ☒ S ☐ E ☐ W of ___ (Milepost, Nearest Intersecting Route Number or Street Name)

Accident Description/Officer's Notes: AT T.P.O. above listed vehicle number 1 and vehicle number 2 where both traveling south bound on Jerome ave at the intersection of W 182 ST. veh #2 did strike veh #1 from the rear police officers did not witness accident

USE COVER SHEET

## ALL INVOLVED

| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | BY | TO | 18 | Names of all involved | Date of Death Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | 1 | 3 | 1 | 43 | M | — | — | 6 | — | | — | | JALLOH, ABOUBACAR | — |
| B | 2 | 1 | 3 | 1 | 52 | M | — | — | 6 | — | | — | | WENDEL, THOMAS | — |
| C | | | | | | | | | | | | | | | |
| D | | | | | | | | | | | | | | | |
| E | | | | | | | | | | | | | | | |
| F | | | | | | | | | | | | | | | |

| Officer's Rank and Signature | Tax ID No. | NCIC No. | Precinct | Post/Sector | Reviewing Officer | Date/Time Reviewed |
|---|---|---|---|---|---|---|
| PO [signature] | 940407 | 03030 | 046 | 34 | | |

Print Name in Full: STEPHEN SWETT

EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

Index No.: 13120/07
3/21/07

---------------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---------------------------------------------------------------------X

Plaintiff designates Bronx County as the place of trial.

**SUMMONS**

The basis of venue is: Plaintiff's residence

Plaintiff resides at:
108 East Clark Place
County of Bronx

**To the above named Defendant**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the plaintiff's attorneys within (20) twenty days after the service of this summons exclusive of the day of service, where service is made by delivery upon you personally within the state, or within (30) thirty days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
March 12, 2007

ADAM S. BERNSTEIN, ESQ.
BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
Office and P.O. Address
112 Madison Avenue, 2nd Floor
New York, New York 10016-7416
(212) 696-5500
Our File # Y8236

Defendant's Address:

**THOMAS P. WENDEL**
120 Main Street
Danbury, CT 06810

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.
------------------------------------------------------------------X

VERIFIED COMPLAINT

Index # 13120/07

Plaintiff, by his attorneys BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP, as and for a cause of action allege upon information and belief as follows:

1. That this action is brought pursuant to the provisions of the New York State Comprehensive Motor Vehicle Insurance Reparations Act and plaintiff has complied with all of the conditions thereof.

2. That plaintiff sustained serious injuries as defined in §5102(d) of the Insurance Law of the State of New York.

3. That by reason of the foregoing, plaintiff is entitled to recover for non-economic losses as are not included within the definition of "basic economic loss" as set forth in §5102(a) of the Insurance Law of the State of New York.

4. That plaintiff is a "covered person" as defined in §5102(j) of the Insurance Law of the State of New York.

5. That this action falls within one or more of the exceptions as set forth in CPLR §1602.

6. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant was the owner of a certain motor vehicle bearing State of Connecticut license plate No. 551UAV.

7. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant controlled the aforesaid motor vehicle.

8. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant maintained the aforesaid motor vehicle.

9. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant operated the aforesaid motor vehicle.

10. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant was operating the aforesaid motor vehicle with the knowledge, permission and consent of the owner thereof.

11. That at all of the times and places hereinafter mentioned, plaintiff was operating a certain motor vehicle bearing State of New York plate number 62109LA.

12. That at all times and places hereinafter mentioned, 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, were public roadways and/or thoroughfares.

13. That on or about August 6, 2006, at or about the intersection of 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, there was contact between the defendant's motor vehicle and plaintiff's motor vehicle.

14. That the said accident and the injuries and damages to the plaintiff resulting therefrom were caused solely and wholly by reason of the negligence, carelessness and recklessness of the defendant in the ownership, operation and control of his motor vehicle, in that he failed to have and keep the same under reasonable and proper control; in that he caused, allowed and permitted his said motor vehicle to run into and violently collide with the rear of plaintiff's stationary motor vehicle; in that he failed to observe and/or heed the presence of

plaintiff's stationary motor vehicle lawfully stopped upon the public roadway pursuant to a red traffic signal light; in that he failed to observe and/or heed the traffic signals and/or controls then and there in operation; in that he failed to bring his motor vehicle under control in time to avoid the collision; in that he failed to have his attention before him; in that he failed to look; in that he failed to see; in that he operated and controlled his motor vehicle at a fast and excessive rate of speed under the circumstances and conditions then and there prevailing; in that he failed to provide and/or make prompt and timely use of adequate and efficient brakes and steering mechanisms; in failing to apply the brakes of his motor vehicle or to take other proper and appropriate evasive action in time to avoid running into and violently colliding with the plaintiff's motor vehicle; in operating the aforesaid motor vehicle in an unreasonable and imprudent manner; in that he operated and controlled his motor vehicle in reckless disregard for the safety of others, and the plaintiff in particular; in that he violated the statutes, ordinances, rules and regulations in the cases made and provided; in that he was inattentive to his duties wherein had he been attentive to his duties the accident and ensuing injuries could have and would have been avoided; in that he failed to act as a reasonable and prudent person could have and would have under the circumstances and conditions then and there prevailing; in that he operated and controlled his motor vehicle in such a willful, wanton and grossly culpable manner as to be liable for damages and punitive damages; in that he acted in reckless disregard for the safety of others, and the plaintiff in particular; and in that he failed to take all necessary and proper means and precautions to avoid the said accident.

15. That as a result of the negligence of the defendant, plaintiff sustained injuries to various parts of his head, body, limbs and nervous system and, upon information and belief,

VERIFICATION

The undersigned, being an attorney duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury:

That I am one of the attorneys for the plaintiff in the within action; that I have read and know the contents of the foregoing complaint, and that the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters I believe it to be true.

This verification is made by affirmation and not by plaintiff herein because the plaintiff is not presently within the county wherein affirmant maintains an office.

This verification is based on information furnished by plaintiff in this action and information contained in affirmant's file.

Dated:    New York, New York
          March 12, 2007

                                        ADAM S. BERNSTEIN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---------------------------------------------------------------X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

**VERIFIED ANSWER**

-against-

**DEFENDANT DEMANDS TRIAL BY JURY**

THOMAS P. WENDEL,

Defendants.

---------------------------------------------------------------X

Defendant, THOMAS P. WENDEL, by and through his attorneys, the Law Offices of Patrick J. Maloney, as and for an answer to the complaint of the plaintiff, alleges as follows upon information and belief:

**FIRST**: Denies each and every allegation contained in Paragraphs "2", "14" and "15" of the Complaint.

**SECOND**: Denies each and every allegation contained in Paragraphs"3" and "4" and respectfully refers all questions of law therein to the Court for resolution.

**THIRD**: Denies knowledge or information sufficient to form a belief as to each and every allegation contained in Paragraphs "6", "7", "8", "9", "10", "11", "12" and "13" of the complaint.

**FOURTH**: Denies knowledge or information sufficient to form a belief as to each and every allegation contained in Paragraphs "1" and "5" and respectfully refers all questions of law therein to the Court for resolution.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

**FIFTH**: The amount of any judgment or award against this answering defendant shall be reduced by the amount of plaintiff's comparative fault and the comparative fault of any adverse party.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

**SIXTH**: Service of process was improper and as a consequence of the foregoing, the complaint should be dismissed in all respects.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE**

**SEVENTH:** That any damages otherwise recoverable by the plaintiff shall be diminished in the proportion which the failure of the plaintiff(s) to wear seat belts bears to the culpable conduct which caused the damages and/or injuries alleged.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE**

**EIGHTH**: The action is barred by reason of the plaintiff's failure to sustain a serious personal injury as defined by Section 5102 of Article 51 of the Insurance Law.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**

**NINTH**: That in the event of any judgment or verdict on behalf of the plaintiff, the defendant is entitled to a set-off verdict with respect to the amounts of any payments made to the plaintiff for medical and other expenses prior thereto.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**

**TENTH**: That plaintiff assumed the risk of any injuries which plaintiff may have sustained at the time and place set forth in the Complaint herein.

**WHEREFORE,** defendant demands judgment of this court dismissing the complaint in all respects and granting defendant such other, further or different relief as the Court may deem just and proper.

Dated: New York, New York
May 21, 2007

Yours, etc.

LAW OFFICES OF PATRICK J. MALONEY

By:______________________________
Mark A. Solomon
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

TO: BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, New York 10016
(212) 696-5500
File Number: Y8236

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

----------------------------------------------------------------X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

**ATTORNEY'S VERIFICATION**

-against-

THOMAS P. WENDEL,

Defendants.

----------------------------------------------------------------X

Mark A. Solomon, an attorney duly admitted to practice law before the Courts of New York State, hereby affirms under the penalties of perjury pursuant to CPLR 2106:

I am an associate of the firm of the LAW OFFICES OF PATRICK J. MALONEY, attorneys for defendant, THOMAS P. WENDEL.

I submit the following statement upon information and belief, based upon an inspection of the records maintained by this office, which records I believe to be true.

That I have read the contents of the attached Verified Answer and believe it to be true based on information available or maintained by this firm. I make this verification because this defendant is not located in New York County.

Dated: New York, New York
May 21, 2007

Mark A. Solomon

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

--------------------------------------------------------------X Index No. 13120/07

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendants.

--------------------------------------------------------------X

## VERIFIED ANSWER

LAW OFFICES OF PATRICK J. MALONEY
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------x
ABOUBACAR JALLOH,

PLAINTIFF,

-against- Case No: 07CIV4091NRB

THOMAS P. WENDEL,

DEFENDANT.
----------------------------------------------x

112 Madison Avenue
New York, New York 10016

DATE: February 8th, 2008
TIME: 1:11 p.m.

EXAMINATION BEFORE TRIAL of the Defendant, THOMAS P. WENDEL, taken by the Plaintiff, pursuant to a Court Order, held at the above time and place, before Linda Orlando, a Registered Professional Reporter and Notary Public of the State of New York.

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 2

A P P E A R A N C E S:

BUDIN, REISMAN, KUPFERBERG and Bernstein, LLP.,
Attorneys for the Plaintiff
ABOUBACAR JALLOH
112 Madison Avenue
New York, New York 10016
BY: PETER McCABE, ESQ.
File #: Y8236

LAW OFFICES OF PATRICK J. MALONEY
Attorneys for the Defendant
THOMAS P. WENDEL
90 Broad Street
New York, New York 10004
BY: HENDRICK VANDAMME, ESQ.
File #: 2007-100069

* * *

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 3

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED By and between the counsel for the respective parties hereto, that the filing, sealing, and certification of the within deposition shall Be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED That all objections, except as to the form Of the question, shall be reserved to the times Of the trial.

IT IS FURTHER STIPULATED AND AGREED That the within deposition may be signed before Any Notary Public with the same force and effect As if signed and sworn to before this court.

* * * *

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 4

----------INDEX------------

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| THOMAS P. WENDEL | MR. McCABE | 5 |

----------EXHIBIT-------------

| PLAINTIFF'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| One | Photograph | 9 |

INFORMATION AND/OR DOCUMENTATION REQUESTED

| INFORMATION AND/OR DOCUMENTATION | PAGE |
|---|---|
| Name of medication | 12 |

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Thomas P. Wendel

T H O M A S P. W E N D E L, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. McCABE:

Q. Please state your name for the record.

A. Thomas P. Wendel.

Q. Where do you reside?

A. 81 South Lake Shore Drive, Brookfield, Connecticut, 06804.

Q. Good afternoon, sir. My name is Peter McCabe. I'm an attorney. I represent a gentleman named Aboubacar Jalloh, who is making a claim against you for personal injuries as a result of an automobile accident.

A. Yes.

Q. I'm going to asking you some questions about the happening of the accident. My questions should be short and simple, direct questions, which you could respond to in the same manner. But, from time to time you may be puzzled by a question of mine, and if you are, and if you have any problem understanding what I'm

Thomas P. Wendel

saying, please indicate to that to me and I will try and explain myself to you.

A. Yes.

Q. During the course of this examination I will be asking questions. Your lawyer has explained to you that the manner in which you're supposed to answer. But, we have a court stenographer here or a reporter who records the questions and answers.

You may know what the response is before I finish. But, wait until you hear my question and when you answer my question please respond with whatever response you feel comfortable with in words of spoken English so the reporter can record your statements correctly and succinctly.

A. Yes.

Q. Sir, on August 7th, the year 2006, did you have an automobile accident that day?

A. Yes, sir.

Q. At what time of the day did the accident happen, approximately?

A. I believe it was about one o'clock in the morning.

Thomas P. Wendel

Q. Were did the accident happen?

A. On Jerome Avenue.

Q. At or near an intersecting street?

A. I believe it was 182nd Street.

Q. At the time of this accident were you driving a motor vehicle?

A. Yes, sir.

Q. Was that a 2005 Honda station wagon?

A. It's a Honda Element. E-L-E-M-E-N-T. That's the model.

Q. Who was the owner of that vehicle?

A. I am.

Q. At the time of this incident was there anyone in the Honda with you?

A. No, sir.

Q. At the time of this incident did you have a driver's license?

A. Yes, sir.

Q. Issued in what state?

A. Connecticut.

Q. Were there any restrictions or requirements on that license?

A. No, sir.

Q. You're wearing glasses at this

Thomas P. Wendel

deposition, correct?

A. Yes, sir.

Q. What are the glasses designed to correct?

A. They're reading glasses. They're non-prescription.

Q. What part or portion of your vehicle was involved in this incident?

A. The front end.

Q. Was there damage to that part of your vehicle?

A. Yes, sir.

Q. Was that damage repaired?

A. Yes, sir.

Q. What was the cost of preparing that damage, approximately?

A. I don't recall. I don't remember.

Q. Was it more or less than $2,500?

A. I believe so.

Q. All right. Who paid for the repairs?

A. Safe Co Insurance.

Q. At the time of this accident was your vehicle in contact with another car or vehicle?

A. Yes, sir.

Page 9

Thomas P. Wendel

Q. And did you later learn that that was a Lincoln Town car operated by a Mr. Jalloh?

A. Yes, sir.

Q. What part of his vehicle was involved in the incident?

A. Rear end.

Q. Did you look at the rear end of Mr. Jalloh's car following the accident?

A. I observed it.

Q. Did you see any damage to it?

A. Yes, sir.

MR. McCABE: If you could just mark that on the back as Plaintiff's Exhibit One for identification, please?

(Whereupon, the aforementioned Photograph was marked as Plaintiff's Exhibit One for identification as of this date by the Reporter.)

Q. Sir, I show you a photograph which has been marked for identification as Plaintiff's Exhibit One. Just take a look at that. Can you tell me does that show the vehicle that you were in contact with at the time of this accident as it appeared immediately after the accident?

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 10

Thomas P. Wendel

A. I believe so.

Q. Sir, at any time before there was a contact between these two vehicles did you see that Lincoln Town car?

A. No. I don't believe so.

Q. At the time of this accident was it light out?

A. No.

Q. Was it dark out?

A. Yes.

Q. Was it raining?

A. No.

Q. Where were you coming from?

A. I was coming from Fordham Road.

Q. What place was the last place you had been immediately before this accident?

A. Roosevelt Island.

Q. What was the occasion that you were there for?

A. I went to entertainment. A show.

Q. What was it when you say entertainment?

A. It was a concert.

Q. Sir?

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 11

Thomas P. Wendel

A. A concert.

Q. At the time of the accident where were you going?

A. I lived there. I used to live there. I grew up on 1263 University Avenue, which is right in that area. So, I got off the Major Deegan. I wanted to visit where I used to live as a child. I grew up in that area.

Q. All right. Did you actual locate that premises before this accident occurred?

A. Yes, sir.

Q. Had you actually gotten out of your vehicle in that area to look at the premises?

A. No.

Q. So, you just stopped and looked?

A. Yes.

Q. And now you were preceding where?

A. I was going to do go down by Jerome Avenue. That's where I used to take a bus. I used to go to Catholic school. I wanted to see the area.

Q. For a period of twelve hours prior to that accident had you had any alcoholic beverages to drink?

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 12

Thomas P. Wendel

A. No.

Q. Had you taken any prescription or non-prescription drugs?

A. I take a medication for depression.

Q. Had you taken that medication within twelve hours of this event?

A. I take it every day. I would assume that I did, sir. Sometimes I forget.

Q. When you say you take medication, what's the name of it?

A. I just have a blank spot. Just a second.

MR. VANDAMME: Take your time.

MR. McCABE: We'll believe a blank at this point.

THE WITNESS: I'm sorry. I know I'll think of it.

(Space.)_____________________________

Q. What I'm saying is that this hearing will be reduced to type written form. It will be sent to you at some point. When you receive it there will be a space in the transcript at this point for you to insert the name of the medication.

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Thomas P. Wendel

A. Okay.

Q. So, don't agonize.

A. Thank you.

Q. What type of business or profession did you have at the time of this event?

A. I'm a Police officer.

Q. With what agency?

A. The Danbury Police Department.

Q. What is your title?

A. I'm Captain of patrol.

Q. Just before this accident happened were you operating your vehicle on Jerome Avenue?

A. Yes, sir.

Q. And Jerome Avenue, at or near the place where this accident happened, is that a one-way or a two-way street?

A. I believe it is a two-way street.

Q. In which direction were you proceeding immediately before the accident happened?

A. Southbound.

Q. When last before this accident had you been in the area where the accident happened?

A. I don't know.

Thomas P. Wendel

Q. Many years before?

A. A long time. Yes, sir.

Q. In the direction that you were proceeding how many lanes were there for moving traffic?

A. I believe there was one.

Q. At the place where this accident happened was the roadway that you were traveling on wet or dry?

A. Dry.

Q. Just before this accident happened the roadway that you were traveling on was it level or uphill or downhill or something else?

A. Level.

Q. The contact involving your vehicle and the Lincoln Town car how would you describe that, heavy, medium, light, or something else?

A. Medium.

Q. When the contact occurred was the Lincoln Town car moving or standing still?

A. I believe it was standing still.

Q. Just before this contact occurred did you see the Lincoln Town car?

A. I don't remember.

Thomas P. Wendel

Q. As a result of this accident or incident did you suffer any type of injury involving your loss of consciousness?

A. No.

Q. Did you strike your head on something at the time of your accident?

MR. VANDAMME: You have to give a verbal answer.

A. I'm sorry. No, sir.

Q. Just before this accident happened for how many blocks or what distance had you traveled on Jerome Avenue? Where did you get on to where the accident happened? What was that space?

A. I was on Fordham Road which intersects with Jerome Avenue. I'm not sure how many blocks. I believe it very close. I'm not sure.

Q. What was the closest intersecting street to the place where this accident happened?

A. I don't know. I'm sorry. I believe it was 182nd Street. I know that now.

Q. About how much from the place where this impact occurred to the intersection of Jerome

Thomas P. Wendel

Avenue and 182 Street, how much distance separated those two points?

A. I don't remember.

Q. Would it be more or less than two car lengths?

A. I don't remember.

Q. The intersection of Jerome Avenue and 182nd Street at the time of this accident was it controlled by a traffic light?

A. I don't remember.

Q. When this contact occurred did the vehicle, the Lincoln Town car, did it move?

A. I don't know.

Q. An instant before there was an impact was the Lincoln Town car moving or standing still?

A. I don't know. I don't remember. I believe it was stopped.

Q. How long was it stopped before the accident happened?

A. I don't know.

Q. At the time of this accident did you have a cellphone with you?

A. Yes.

Q. Were you talking on the cellphone at

Thomas P. Wendel

time of the accident?

A. No, sir.

Q. Were you eating or drinking anything at the time of the accident?

A. No, sir.

Q. I know you said you were alone?

A. Yes.

Q. Were you eating or drinking?

A. No.

Q. Following this accident did the Police come to the scene?

A. Yes, sir.

Q. Did you contact the Police?

A. No, sir.

Q. How soon after the accident did the Police appear, approximately?

A. Very quickly.

Q. Did they arrive on foot or by vehicle?

A. I believe they were on foot.

Q. When the Police arrived where was your car?

A. Right where the accident occurred.

Q. What about the Lincoln Town car?

Thomas P. Wendel

A. I believe it was right where the accident occurred.

Q. When the Police arrived were you in your car or out of your car?

A. I was in my car.

Q. Did you get out when the Police got there?

A. Yes.

Q. When you got out were both vehicles in the same position where they had stopped immediately after the impact?

A. I know my car was.

Q. What about the other car?

A. I believe it was. But, I can't be sure.

Q. About how much space separated the two cars, your car and the Lincoln Town car?

A. No. I don't know.

Q. Did you speak to the Police?

A. Yes.

Q. Did they take your license and registration information?

A. Yes, sir.

Q. Did you identify yourself to the

Thomas P. Wendel

Police as a Police officer?

A. Yes, I did.

Q. Did they ask you what happened?

A. Yes, they did.

Q. Did you tell them?

A. Yes, I did.

Q. What did you tell them?

A. I told them I rear ended the other car.

Q. Other than, "I rear ended the other car," did you give them any other explanation as to that event?

A. I told them I took my eyes off the road and I didn't see the car.

Q. Did you speak to the driver of the Lincoln Town car?

A. Yes, I do.

Q. What did you say to him?

A. I told them to go back to his car. To calm down.

Q. And did he respond to you?

A. I couldn't understand him, sir.

Q. When the Police arrived was the driver of the Lincoln Town car still present?

Thomas P. Wendel

A. Yes.

Q. Within your hearing did the driver of the Lincoln Town car have a conversation with the Police?

A. Within my hearing, no.

Q. Was your vehicle towed from the scene?

A. Yes, it was.

Q. When you left the scene was the Lincoln Town car still at the scene of the accident?

A. I don't remember.

Q. Did you observe was the Lincoln Town ar also towed from the scene?

A. No, sir.

Q. How do you know that?

A. Well, while I was there, it was not towed.

Q. When you left the scene of the accident it was still present?

A. I'm not sure. I don't believe so, but.

Q. Was your vehicle equipped with air bags?

Page 21
Thomas P. Wendel

A. Yes.

Q. Did the air bags deploy?

A. No.

Q. What was the event or thing that distracted you as you've indicated before?

A. I was just looking around. The change in the scenery since the last time I had been there.

MR. McCABE: Thank you, sir.

THE WITNESS: Thank you.

(Whereupon, at 1:31 p.m. the Examination of this Witness was concluded.)

______________________________

THOMAS P. WENDEL

Subscribed and sworn to before me

this _____ day of ________, 2008.

______________________________

NOTARY PUBLIC

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 22
Thomas P. Wendel

C E R T I F I C A T E

I, LINDA ORLANDO, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2008.

Linda Orlando

LINDA ORLANDO, RPR

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 23

A
Aboubacar 1:3 2:5 5:15
accident 5:17,20 6:20,23 7:2,6 8:23 9:9,24,25 10:7,17 11:3,11,24 13:12 13:16,20,23,24 14:8,12 15:2,7,11 15:14,21 16:9,20 16:22 17:2,5,11 17:16,24 18:3 20:12,21
action 22:11
actual 11:10
aforementioned 9:16
afternoon 5:13
agency 13:8
agonize 13:3
AGREED 3:4,10 3:15
air 20:24 21:3
alcoholic 11:24
AND/OR 4:15,16
answer 6:8,13 15:9
answers 6:10
appear 17:17
appeared 9:25
approximately 6:23 8:17 17:17
ar 20:15
area 11:7,9,14,22 13:24
arrive 17:19
arrived 17:22 18:4 19:24
asking 5:19 6:6
assume 12:8
attorney 5:14
Attorneys 2:4,9
August 6:19
automobile 5:17 6:20
Avenue 1:10 2:5
7:3 11:6,20 13:13 13:15 15:13,17 16:2,8
B
back 9:14 19:20
bags 20:25 21:3
believe 6:24 7:5 8:20 10:2,6 12:15 13:18 14:7,22 15:18,22 16:18 17:21 18:2,15 20:22
Bernstein 2:4
beverages 11:24
blank 12:12,15
blocks 15:12,18
blood 22:11
Broad 2:10
Brookfield 5:12
BUDIN 2:4
bus 11:20
business 13:5
C
C 2:2 22:2,2
called 5:2
calm 19:21
Captain 13:11
car 8:24 9:3,9 10:5 14:17,21,24 16:5 16:13,16 17:23,25 18:5,5,6,13,14,18 18:18 19:10,12,15 19:17,20,25 20:4 20:11
cars 18:18
Case 1:6
Catholic 11:21
cellphone 16:23,25
certification 3:7
certify 22:5,10
change 21:8
child 11:9
claim 5:16
close 15:18
closest 15:20
come 17:12
comfortable 6:15
coming 10:14,15
concert 10:24 11:2
concluded 21:13
Connecticut 5:12 7:21
consciousness 15:4
contact 8:24 9:24 10:4 14:16,20,23 16:12 17:14
controlled 16:10
conversation 20:4
correct 8:2,5
correctly 6:16
cost 8:16
counsel 3:5
course 6:5
court 1:2,18 3:18 6:8
D
D 3:2 5:2
damage 8:11,14,17 9:11
Danbury 13:9
dark 10:10
date 1:13 9:19
day 6:20,22 12:8 21:18 22:15
Deegan 11:8
Defendant 1:8,16 2:9
Department 13:9
deploy 21:3
deposition 3:7,16 8:2
depression 12:5
describe 14:17
DESCRIPTION 4:10
designed 8:4
direct 5:21
direction 13:19 14:4
distance 15:12 16:2
distracted 21:6
DISTRICT 1:2,2
DOCUMENTAT... 4:15,16
downhill 14:14
drink 11:25
drinking 17:4,9
Drive 5:11
driver 19:16,25 20:3
driver's 7:18
driving 7:7
drugs 12:4
dry 14:10,11
duly 5:3 22:7
E
E 2:2,2 3:2,2 5:2,2 22:2,2
eating 17:4,9
effect 3:17
Element 7:10
ended 19:9,11
English 6:15
entertainment 10:21,23
equipped 20:24
ESQ 2:6,11
event 12:7 13:6 19:13 21:5
examination 1:16 5:6 6:5 21:13 22:6,8
examined 4:4 5:4
Exhibit 4:9,11 9:14 9:18,22
explain 6:3
explained 6:7
explanation 19:12
eyes 19:14
E-L-E-M-E-N-T 7:10
F
F 3:2 22:2
February 1:13 22:15
feel 6:14
File 2:7,12
filing 3:6
finish 6:12
first 5:3
following 9:9 17:11
follows 5:5
foot 17:19,21
force 3:17
Fordham 10:15 15:16
forget 12:9
form 3:11 12:21
forth 22:7
front 8:10
further 3:10,15 22:10
G
gentleman 5:15
give 15:8 19:12
given 22:9
glasses 7:25 8:4,6
go 11:19,21 19:20
going 5:19 11:4,19
Good 5:13
gotten 11:13
grew 11:6,9
H
H 5:2
hand 22:15
happen 6:23 7:2
happened 13:12,16 13:21,24 14:9,12 15:11,14,21 16:20 19:4
happening 5:20
head 15:6
hear 6:12
hearing 12:20 20:3 20:6
heavy 14:18
held 1:18

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

Page 24

HENDRICK 2:11
hereinbefore 22:7
hereto 3:6
hereunto 22:14
Honda 7:9,10,15
hours 11:23 12:7
I
identification 9:15 9:18,21
identify 18:25
immediately 9:25 10:17 13:20 18:12
impact 15:25 16:15 18:12
incident 7:14,17 8:9 9:6 15:3
INDEX 4:3
indicate 6:2
indicated 21:6
information 4:15 4:16 18:23
injuries 5:16
injury 15:3
insert 12:24
instant 16:15
Insurance 8:22
interested 22:12
intersecting 7:4 15:20
intersection 15:25 16:8
intersects 15:17
involved 8:9 9:5
involving 14:16 15:4
Island 10:18
Issued 7:20
J
J 2:9
Jalloh 1:3 2:5 5:15 9:3
Jalloh's 9:9
Jerome 7:3 11:19 13:13,15 15:13,17
15:25 16:8
K
know 6:11 12:17 13:25 15:22,23 16:14,17,21 17:7 18:13,19 20:17
KUPFERBERG 2:4
L
L 3:2,2 5:2
Lake 5:11
lanes 14:5
LAW 2:9
lawyer 6:6
learn 9:2
left 20:10,20
lengths 16:6
level 14:14,15
license 7:18,23 18:22
light 10:8 14:18 16:10
Lincoln 9:3 10:5 14:17,21,24 16:13 16:16 17:25 18:18 19:17,25 20:4,11 20:14
Linda 1:19 22:4,18
live 11:5,8
lived 11:5
LLP 2:4
locate 11:10
long 14:3 16:19
look 9:8,22 11:14
looked 11:16
looking 21:7
loss 15:4
M
M 5:2
Madison 1:10 2:5
Major 11:7
making 5:15
MALONEY 2:9
manner 5:23 6:7
mark 9:13
marked 9:17,21
marriage 22:12
matter 22:13
McCABE 2:6 4:5 5:6,14 9:13 12:15 21:10
medication 4:17 12:5,6,10,25
medium 14:18,19
mine 5:24
model 7:11
morning 6:25
motor 7:7
move 16:13
moving 14:5,21 16:16
N
N 2:2 3:2 5:2
name 4:17 5:7,13 12:11,24
named 5:15
near 7:4 13:15
New 1:2,11,11,21 2:6,6,11,11 5:4 22:5
non-prescription 8:7 12:4
Notary 1:20 3:17 5:3 21:19 22:4
O
O 3:2 5:2
objections 3:11
observe 20:14
observed 9:10
occasion 10:19
occurred 11:11 14:20,23 15:25 16:12 17:24 18:3
officer 13:7 19:2
OFFICES 2:9
Okay 13:2
one-way 13:17
operated 9:3
operating 13:13
Order 1:18
Orlando 1:19 22:4 22:18
outcome 22:13
owner 7:12
o'clock 6:24
P
P 1:7,17 2:2,2,10 3:2 4:5 5:1,2,9 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,15 22:1
PAGE 4:4,10,16
paid 8:21
part 8:8,11 9:5
parties 3:6 22:11
PATRICK 2:9
patrol 13:11
period 11:23
personal 5:16
Peter 2:6 5:14
photograph 4:12 9:17,20
place 1:19 10:16,16 13:16 14:8 15:21 15:24
Plaintiff 1:4,17 2:4
Plaintiff's 4:10 9:14,17,21
please 5:7 6:2,13 9:15
point 12:16,22,24
points 16:3
Police 13:7,9 17:12 17:14,17,22 18:4 18:7,20 19:2,2,24 20:5
portion 8:8
position 18:11
preceding 11:18
premises 11:11,14
preparing 8:16
prescription 12:3
present 19:25 20:21
prior 11:23
problem 5:25
proceeding 13:20 14:5
profession 13:5
Professional 1:20
Public 1:20 3:17 5:4 21:19 22:4
pursuant 1:17
puzzled 5:24
p.m 1:14 21:12
Q
question 3:12 5:24 6:13,13
questions 5:20,21 5:22 6:6,10
quickly 17:18
R
R 2:2 3:2 22:2
raining 10:12
reading 8:6
rear 9:7,8 19:9,11
recall 8:18
receive 12:22
record 5:8 6:16 22:8
records 6:9
reduced 12:21
Registered 1:19
registration 18:23
REISMAN 2:4
related 22:10
remember 8:18 14:25 16:4,7,11 16:17 20:13
repaired 8:14
repairs 8:21
reporter 1:20 6:9 6:16 9:19

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700 212-374-7700 718-527-7700 FAX# 516-678-4488

represent 5:14
REQUESTED 4:15
requirements 7:23
reserved 3:12
reside 5:10
respective 3:5
respond 5:22 6:14 19:22
response 6:11,14
restrictions 7:22
result 5:17 15:2
right 8:21 11:7,10 17:24 18:2
road 10:15 15:16 19:15
roadway 14:9,13
Roosevelt 10:18
RPR 22:18

S

S 2:2 3:2,2 5:2
Safe 8:22
saying 6:2 12:20
scene 17:12 20:8,10 20:11,15,20
scenery 21:8
school 11:21
sealing 3:6
second 12:13
see 9:11 10:4 11:21 14:24 19:15
sent 12:22
separated 16:2 18:17
set 22:7,14
Shore 5:11
short 5:21
show 9:20,23 10:21
signed 3:16,18
simple 5:21
sir 5:13 6:19,21 7:8 7:16,19,24 8:3,13 8:15,25 9:4,12,20 10:3,25 11:12 12:9 13:14 14:3 15:10 17:3,6,13 17:15 18:24 19:23 20:16 21:10
soon 17:16
sorry 12:17 15:10 15:22
South 5:11
Southbound 13:22
SOUTHERN 1:2
space 12:19,23 15:15 18:17
speak 18:20 19:16
spoken 6:15
spot 12:12
standing 14:21,22 16:16
state 1:21 5:4,7 7:20 22:5
statements 6:16
STATES 1:2
station 7:9
stenographer 6:9
STIPULATED 3:4 3:10,15
stopped 11:16 16:18,19 18:11
street 2:10 7:4,5 13:17,18 15:21,23 16:2,9
strike 15:6
Subscribed 21:17
succinctly 6:17
suffer 15:3
supposed 6:8
sure 15:17,19 18:16 20:22
sworn 3:18 5:3 21:17 22:7

T

T 3:2,2 5:2 22:2,2
take 9:22 11:20 12:5,8,10,14 18:22
taken 1:17 12:3,6
talking 16:25
tell 9:23 19:6,8
testified 5:5
testimony 22:8
Thank 13:4 21:10 21:11
thing 21:5
think 12:18
Thomas 1:7,17 2:10 4:5 5:1,9 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,15 22:1
time 1:14,18 5:23 5:23 6:22 7:6,14 7:17 8:23 9:24 10:3,7 11:3 12:14 13:6 14:3 15:7 16:9,22 17:2,5 21:8
times 3:12
title 13:10
told 19:9,14,20
towed 20:7,15,19
Town 9:3 10:5 14:17,21,24 16:13 16:16 17:25 18:18 19:17,25 20:4,11 20:14
traffic 14:6 16:10
transcript 12:23
traveled 15:13
traveling 14:9,13
trial 1:16 3:13
true 22:8
try 6:3
twelve 11:23 12:7
two 10:4 16:3,5 18:18
two-way 13:17,18
type 12:21 13:5 15:3

U

U 3:2
understand 19:23
understanding 5:25
UNITED 1:2
University 11:6
uphill 14:14

V

VANDAMME 2:11 12:14 15:8
vehicle 7:7,12 8:8 8:12,24,24 9:5,23 11:14 13:13 14:16 16:13 17:20 20:7 20:24
vehicles 10:4 18:10
verbal 15:9
visit 11:8

W

W 5:2
wagon 7:9
wait 6:12
waived 3:8
wanted 11:8,21
way 22:12
wearing 7:25
Wendel 1:7,17 2:10 4:5 5:1,9 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,15 22:1
went 10:21
wet 14:10
We'll 12:15
WHEREOF 22:14
witness 4:4 5:3 12:17 21:11,13 22:6,9,14
words 6:15
written 12:21

X

X 1:3,9

Y

year 6:19
years 14:2
York 1:2,11,11,21 2:6,6,11,11 5:4 22:5
Y8236 2:7

$

$2,500 8:19

0

06804 5:12
07CIV4091NRB 1:6

1

1:11 1:14
1:31 21:12
10th 22:15
10004 2:11
10016 1:11 2:6
112 1:10 2:5
12 4:17
1263 11:6
182 16:2
182nd 7:5 15:23 16:9

2

2005 7:9
2006 6:19
2007-100069 2:12
2008 1:13 21:18 22:15

5

5 4:5

7

7th 6:19

8

8th 1:13
81 5:11

9

EXHIBIT E

***Mark S. McMahon, M.D.***
***876 Park Avenue***
***New York, New York 10021***
***Phone: (212) 717-1405***
***Fax: (212) 396-3277***

May 14 , 2008

Budin, Reisman, Kupferberg and Bernstein
112 Madison Avenue
New York, New York 10016

**RE: Aboubacar Jalloh**

Att: Mable Garcia

On August 6, 2006 the patient was in a motor vehicle accident in which his car was stationary at a red light and he was rear-ended. His head, neck and back were injured. On August 10, 2006 he saw Dr. Nelson, who stared him on physical therapy. He saw Dr. Nelson in follow-up on September 21, 2006 and November 2, 2006. Dr. Nelson performed an EMG of his lower extremities which was negative on October 4, 2006. The patient went to physical therapy from August 15, 2006 until November 8, 2006. On September 5, 2006 the patient was seen by a psychologist, Dr. Kogan. He was seen in follow-up on September 6, 2006, September 19, 2006, September 20, 2006, September 26, 2006, October 3, 2006, October 24, 2006, November 7, 2006, and November 15, 2006. He was out of work as a taxi driver for 3 months after the accident.

On August 9, 2006 he had an x-ray of his cervical spine which showed muscular spasm. On August 9, 2006 he had an x-ray of his lumbar spine which showed mild degenerative changes. On August 16, 2006 he had an MRI of his cervical spine which showed disc herniations at C3-4 and C5-6 deforming the dural sac. In addition, it showed a bulging disc at C4-5 with flattening of the dural sac. On August 21, 2006 the patient had an x-ray of his thoracic spine which showed mild dextro-scoliosis. On September 6, 2006 the patient had an MRI of his lumbar spine which showed a bulging disc at L4-5 with flattening of the dural sac and bilateral foraminal encroachment. It also showed an L5-S1 disc bulge with flattening of the epidural fat.

Currently, the patient is unable to work due to his neck and back problems. He has pain radiating down both legs. His legs feel weak. His neck and back are worse with

***Mark S. McMahon, M.D.***
*876 Park Avenue*
*New York, New York 10021*
*Phone: (212) 717-1405*
*Fax: (212) 396-3277*

May 14 , 2008
**RE: Aboubacar Jalloh**

bending and lifting. He wakes up at night with pain in his neck and back. Weather changes make his condition worse. He has worsening pain with prolonged sitting, standing, and walking.

PAST MEDICAL HISTORY:

Negative.

MEDICATIONS:

Tylenol.

PHYSICAL EXAMINATION:

On physical examination of the cervical spine: he can flex to 2 degrees with pain (nl 60). He can extend to 0 degrees with pain (nl 50). He can bend to the left and right 0 degrees with pain (nl 40). Sensation is intact in his upper extremities. He is tender to palpation in the paracervical musculature.

On physical examination of his lumbar spine: he can flex to 2 degrees with pain (nl 90). He can extend to 0 degree with pain (nl 30). He can bend to the right 0 degrees with pain (nl 20). He can bend to the left 0 degrees with pain (nl 20). He has decreased sensation to light touch in his left lower extremity. His EHL strength is 3+/5 bilaterally. He has a positive straight leg raising sign bilaterally.

**DIAGNOSIS:**

1. Cervical disc herniations at C3-4 and C5-6 deforming the dural sac. Bulging disc at C4-5 with flattening of the dural sac.

2. Lumbar spine bulging disc at L4-5 with flattening of the dural sac with bilateral foraminal encroachment. L5-S1 bulging disc with flattening of the epidural fat.

*Mark S. McMahon, M.D.*
*876 Park Avenue*
*New York, New York 10021*
*Phone: (212) 717-1405*
*Fax: (212) 396-3277*

May 14 , 2008
**RE: Aboubacar Jalloh**

**CAUSATION:**

The above diagnoses occurred as a result of the accident of August 6, 2006.

**PROGNOSIS:**

The patient's prognosis is poor. His condition is permanent. He is now 1 ¾ years from the time of the accident. His condition interferes with his quality of life and his activities of daily living. He is unable to work as a taxi driver because of his injuries. The patient requires a multilevel cervical discectomy and fusion using instrumentation and bone graft. In addition, he requires an L4-S1 decompression and fusion using instrumentation and bone graft.

I, the undersigned, am a physician authorized by law to practice medicine in the State of New York, and I am not a party to this proceeding. I have reviewed the medical records pertaining to this patient and have provided a report that summarizes my evaluation. The statements in the report are true and accurate under penalty of perjury.

Mark S. McMahon, MD

Mark S. McMahon, M.D.

EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ABOUBACAR JALLOH,

**AFFIDAVIT**

Plaintiff,

Index No.: 07 Civ. 4091/(NRB)

-against-

THOMAS P. WENDEL,

Defendant.

---------------------------------------------------------------X

STATE OF NEW YORK )
)ss:
COUNTY OF BRONX )

I, ABOUBACAR JALLOH, being duly sworn deposes and says:

1. That I presently reside at 108 East Clark Place, Bronx, New York, 10452.

2. On or about August 6, 2006, at 182nd Street and Jerome Avenue, County of Bronx, I was the seatbelted driver of a motor vehicle. I was stopped at a red traffic light when suddenly and without warning, my vehicle was struck from the rear by the vehicle driven by defendant. It was a very heavy impact.

3. After the accident, the police came to the scene. I did not get out of my car at any time. I was not aware of the severity of my injuries, and I just wanted to go home and lie down, so I told the police officers that I was not ready to leave in an ambulance. Instead, I called my friend, who came to the scene and took me to my home.

4. While on the way home, I felt pain in my neck and lower back. I also had a very bad headache. The pain in my back when all the way down into my legs. I laid down as soon as I got home and went to see a doctor the next morning because I was in very much pain. I was given pain medicine, and electrical stimulation and hot packs were placed on my neck and lower back.

5. I started, at the recommendation of my doctor, a four-month course of physical therapy, which I attended three times per week. The doctor gave me massages, hot and cold packs, did MRIs and did electrical stimulation, all to my neck and lower back.

6. I stopped going to physical therapy, because after going there three times per week for four months, my pain did not go away. I feel it was not helping me completely to get better.

7. I have to rub Ben-Gay on my neck and lower back every night before bed, or else I wake up with very bad neck and lower back pain and stiffness.

8. Prior to the accident, I was working as a taxi driver. I try to go back to work when I feel better, but I can not work because of my severe neck and back pain and neck stiffness. It is still very painful for me to turn my head or sit for too long. I have not returned to work on a regular basis. I have worked only maybe two months total since the accident. I want to go back to work when I feel better.

9. It is very painful for me to get on my knees and pray, which I do five times per day, every day of the week. Prayer is the most important thing in my life, and it is very difficult for me to concentrate because of the pain I am in while I do it. I can not walk for a very long time, and I have to walk much slower than I did before the accident because of my lower back pain.

ABOUBACAR JALLOH

ABOUBACAR JALLOH

Sworn to before me this 28th day of May, 2008

Mabel Garcia

Notary Public

MABEL C. GARCIA
COMMISSIONER OF DEEDS
CITY OF NEW YORK
NO. 1-3097
COMMISSION EXPIRES MARCH 1, 2009

EXHIBIT G

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ABOUBACAR JALLOH,

Plaintiff,

vs. No. 07 Civ 4091 (NRB)

THOMAS P. WENDEL,

Defendant.

---

COPY

DEPOSITION OF ABOUBACAR JALLOH

New York, New York

Friday, February 8th, 2008

Reported by:
Jeremy Frank, MPM
JOB NO. 672356a

February 8th, 2008

10:41 a.m.

Deposition of ABOUBACAR JALLOH, held at the offices of Budin, Reisman, Kupferberg & Bernstein, LLP, 112 Madison Avenue, New York, New York, pursuant to Order, before Jeremy Frank, a Notary Public of the State of New York.

A P P E A R A N C E S:

BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
112 Madison Avenue
New York, NY 10016
BY: PETER McCABE, ESQ., of counsel

LAW OFFICES OF PATRICK J. MALONEY
Attorneys for Defendant
90 Broad Street, Suite 2202
New York, NY 10004
BY: HENDRICK VANDAMME, ESQ.

ALSO PRESENT:
MAMADOU DOUMBOUYA, interpreter

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

M A M A D O U D O U M B O U Y A, was duly sworn to interpret the questions from English into Fulani, and the answers from Fulani into English.

A B O U B A C A R J A L L O H, called as a witness, having been duly sworn by a Notary Public, was examined and testified through the interpreter as follows:

EXAMINATION BY
MR. VANDAMME:

Q. Good morning, Mr. Jalloh.
My name is Hendrick Vandamme and I'm an attorney with Patrick Maloney's office. Today I'll be asking you a series of questions pertaining to an accident that allegedly occurred on August 7th, 2006.
A. Okay.
Q. Before we start, I want to give you some ground rules for this deposition. As you know, the court reporter is taking down everything that you say, so its important that you answer with words rather than with a nod or a shake of the head.
Do you understand?

A. Yes.
Q. To make it easier for the court reporter to record what we say accurately, its important that we not talk over one another. For this reason, I ask you to please wait until I finish my question before answering.
Is that okay?
A. Okay.
Q. Mr. Jalloh, do you understand that you are under oath today?
A. Yes, I understand.
Q. Okay.
If you don't understand any of my questions, please make sure that you tell me and I'll rephrase it or I'll ask it again.
A. All right.
Q. If you need to take a break at any time during this deposition, please let me know and I'll accommodate your request.
A. Okay.
Q. Are you prepared to answer my questions today?
A. Yes.
Q. Yes.

Please state your name for the record.
A. Aboubacar Jalloh.
Q. Your last name is Mr. Jalloh, correct, your first name is Aboubacar?
A. Yes.
Q. Okay.
What's your current address?
A. 108 East Clark Place in The Bronx.
Q. How long have you lived at this place?
A. Since 2000 I'm in that address.
Q. Are you renting or do you own that place?
A. I'm renting.
Q. Is there anyone else who lives in this place, in this address with you?
A. I live there with other people.
Q. Who are those people, how many people live there?
A. Two people.
Q. Who are those people?
A. M-o-u-h-a-m-a-d-o-u S-o-w, Mouhamadou Sow, M-a-m-a-d-o-u A-l-i-m-o-u

B-a-h, Mamadou Alimou Bah.
Q. Mr. Jalloh, what's your relationship to those individuals?
A. We just like are friends, we get along.
Q. So are they roommates?
A. You mean like if we --
Q. Who pays the rent, is it you who pays the rent or do you share the rent?
A. We help one another.
Q. In other words, you share the rent?
A. Yes.
If we are in good health and we are all working, we share it, but if somebody is not working and doesn't have good health, he's not going to pay the rent.
Q. Okay.
Mr. Jalloh, where you were born?
A. Guinea.
Q. Which city were you born in in Guinea?
A. Conakry, C-o-n-a-k-r-y.
Q. What's your date of birth?

Jalloh

A. June 5th, '63.
Q. Are you a United States citizen?
MR. McCABE: Note my objection.
He may answer the question.
A. No.
Q. What's your current immigration status?
MR. McCABE: Objection.
You may answer the question.
A. I don't have a status.
Q. When did you come to The United States?
A. Its been a while now.
Q. Is it more than 10 years ago?
A. Its not more than that but its close to that now.
Q. How did you come to The United States?
A. I came here by a visa.
Q. When you entered the United States, what type of visa did you have when you entered the country?
A. Visa like merchant, like merchant.
Q. Okay.

Jalloh

What was the name of the visa, was it a B1, B2, was it an E visa, what type of visa was it?
A. If I'm not mistaken, its a B2.
Q. As I understand, B2 is not a merchant's visa, correct?
MR. McCABE: Is that a question or a statement? Note my objection to the form.
He may answer the question.
Q. Is B2 visa a visitor's visa?
A. That I don't know.
Q. Okay.
You stated that you came on a merchant visa. What type of business were you involved in when you came to The United States?
A. It was to buy merchandises.
Q. What type of merchandises?
A. Like a T-shirt.
Q. Did you have your own business back in Guinea before you entered the United States?
A. Yes.

Jalloh

Q. What was the name of that business?
A. It was selling.
Q. I understand, but what was the nature of your business, were you a sole proprietor, did you have a corporation, what type of business was it?
A. I was working for myself.
Q. Okay.
Now you stated that you came here approximately not more than 10 years ago. When you entered the United States, what was your first address?
A. The first place I stayed here was Davidson Avenue.
Q. Where is Davidson Avenue?
A. Bronx.
Q. Mr. Jalloh, what's the highest level of education that you received in Guinea?
A. Just like eight years of education.
Q. Did you receive any higher education in the United States?

Jalloh

A. I didn't go to school like to official school or something like that, but I was learning the language more.
Q. Okay.
Have you ever been known by any other name than Aboubacar Jalloh?
A. No.
Q. Did you have any nicknames?
A. Nickname?
Q. Nickname.
A. No.
Q. Okay.
What's your current profession, what's your current --
MR. MCCABE: What do you do for a living?
Q. What do you do for a living?
A. Presently I don't work often, just rarely because I'm not in good health right now.
Q. When you say rarely, how often do you work?
MR. McCABE: In the period of time of the last six weeks?

Jalloh

MR. VANDAMME: Let's say in the last six months.

MR. McCABE: Six months, okay.

A. In a period of six months I had maybe two months of work.

Q. What type of work did you do in those last six months?

A. Driving taxi.

Q. Do you work for a particular company or do you own your cab?

A. Presently I don't have a car, my friends are the ones who give me their cars to drive.

Q. What are the names of your friends that give you the cars?

A. Alpha Bah, but also he's not here right now, he returned; he's the one who used to give me his car.

Q. Okay.

Is there one more person or is he the only one?

A. Right now, nobody else.

Q. What type of car did he use to give you?

Jalloh

A. Lincoln.

Q. Do you know the car registration number of this car?

A. No, I don't recall that.

Q. Now Mr. Jalloh, do you hold a driver's license?

A. Yes.

Q. Is it a New York driver's license?

A. Yes.

Q. When did you obtain this New York driver's license?

A. Its been a long time.

Q. Do you know when the license was issued?

A. The last time it was issued?

Q. No, when the license was issued for the first time.

A. That I forgot.

Q. How did you obtain your driver's license?

MR. McCABE: I'm going to object. What does that have to --

MR. VANDAMME: What does it have to do with it, I don't know if he has a

Jalloh

license. He's here illegally, I'm trying to establish if he has a driver's license. He doesn't know when the license was issued, counsel. I'm asking a very simple question when was the license issued. If I have a license, I know when my license was issued.

MR. McCABE: No, no, you're not the witness.

MR. VANDAMME: I understand.

MR. McCABE: Counsel, you're working on a different level than this gentleman, you're an attorney and there is a difference.

MR. VANDAMME: I understand.

So --

MR. McCABE: You can ask him approximately when, maybe he understands the question as you want a specific date, month and year, things like that.

MR. VANDAMME: It doesn't have to be specific, I can ask him approximately.

MR. McCABE: Ask approximately.

MR. VANDAMME: I understand.

Jalloh

MR. McCABE: When did you first get a driver's license approximately, if he knows. Can you ask it that way approximately, about when?

THE WITNESS: Since I got my first license?

MR. McCABE: Yes.

Nothing is simple.

A. I forgot. I don't recall, I forgot.

Q. Okay.

Did you take any test to obtain your license?

A. Yes, I did.

Q. When you took this test, where did you take this test?

A. In Brooklyn.

Q. In what language was the test conducted?

A. English.

Q. Do you speak English?

A. Yes, I speak a little bit.

Q. Okay.

Let's talk about the accident, the

Jalloh

alleged accident that occurred on August 7th, 2006.

Mr. Jalloh, on that particular day on August 7th, 2006, what were you doing in the morning hours?

A. The morning, you said?

Q. In the morning.

A. In the morning I went to work.

Q. Okay.

Where was that, where did you go to work?

A. Uptown.

Q. When you say Uptown, would you be able to tell me where exactly you went Uptown?

A. I can't count how many streets, how many roads I passed that day before I went to work.

Q. I'm not asking how many roads you passed. I'm asking you to give me the address, the place where you went on that particular day in the morning hours.

A. I don't think I understand your question.

MR. McCABE: Off the record for a

Jalloh

minute.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 11:03 a.m.)

(Time noted: 11:04 a.m.)

Q. Mr. Jalloh, on August 7th, 2006 in the morning, were you at home?

A. Early in the morning I was in the house.

Q. Okay.

At some point in the morning did you receive a phone call from your company?

A. No, my company didn't call me.

Q. On August 7th, 2006 what were you doing for a living?

A. At that time I was working as a driver of a livery cab.

Q. Okay.

Which company were you working for at the time?

A. Family.

Q. Family, that's it?

A. Yes.

Q. And where is Family located?

Jalloh

A. 181st and Amsterdam.

Q. That's in The Bronx, correct?

A. No.

Q. Where is it?

MR. McCABE: It is in Manhattan.

MR. VANDAMME: You're right.

Q. Prior to August 7th, 2006 how long had you been working for Family?

A. I had worked there before that day like three, four, five, six months, I don't know exactly.

Q. Were you a designated driver for a particular car while you were working for Family?

A. If I was given a car?

Q. Did you have an assigned car or did your car change every time you drove somewhere to pick up a client?

A. Only one car I had.

Q. Okay.

What type of car was that?

A. It was a Lincoln.

Q. Do you know what year, when the car was made?

Jalloh

A. Lincoln Town Car, '97.

Q. '97.

What color was the car?

A. Green (in English).

Q. Do you know where the car was regularly serviced at the time of the incident, which means August 7th, 2006.

A. Yes.

Q. Do you know who was responsible for the maintenance of the car?

A. Myself.

Q. When was the last time you had your car serviced prior to August 7th, 2006?

A. Every morning myself before I go anywhere in the morning my car when I put it on, I'll check the oil, I would check the wheels, I'll check everything.

MR. McCABE: I guess you have to ask the question again.

Q. When you say everything, what else, when you say everything, what do you mean by that?

A. Like the wheels, the oil, the water, the tires, so I'm going to check all of

Jalloh

those things to see if its good before I can start working.

Q. Did you have your car serviced by a professional mechanic at the time prior to the accident?

A. Yes.

Q. What was the name of that mechanic?

A. I know a Fulani guy he's a mechanic, he was the one who checked my car for me, but he doesn't have a fixed place.

Q. What is his name again?

A. S-o-w, Sow last name.

Q. When was the last time before the collision that you had your car serviced by Mr. Sow?

A. Like not more than five days before the accident.

Q. Can you give me the address of Mr. Sow's mechanic repair shop, do you know where he's located?

A. Presently he's at Webster and 170th.

MR. McCABE: That's Webster Avenue.

Jalloh

Q. Mr. Jalloh, on August 7th, 2006 what time did you leave that morning?

A. It was around like 11 all the way to like 12.

Q. Okay.

Did you consume any alcohol 24 hours prior to your leaving the house?

A. Since my birth I have never drank alcohol.

Q. Did you consume, did you take any prescription drugs 24 hours prior to your leaving the house?

A. Never.

Q. Okay.

Do you remember what the weather conditions were on that day?

A. It was nice weather, it was shining.

Q. It was clear and dry?

A. It was clear and dry, everything was good.

Q. Okay.

Now, could you tell me, Mr. Jalloh, when you left the house, and I'm

Jalloh

asking approximately where were you heading, what was the purpose of your trip?

A. It was to go to work.

Q. Okay.

How did you know where to go?

A. As a taxi driver when you say you're ready to work, anywhere you happen to find a customer, you take the customer.

Q. So when you left the house, where did you go? I understand you went to work, but can you tell me the direction where you went, did you go Uptown, did you go Downtown, which direction did you take?

A. I traveled, I drove Uptown.

Q. Okay.

Did you find any customers along the way?

A. No.

Q. No customers.

Now at some point there was an accident involving your vehicle.

Is that correct?

A. Yes.

Q. Where did this accident occur?

Jalloh

A. It was around 182nd and Jerome Avenue.

Q. Which street were you on, were you on 182nd Street or were you on Jerome Avenue?

A. I was on Jerome.

Q. Which direction were you heading?

A. Downtown.

Q. Is Jerome Avenue a two-lane Street or a one-way Street?

A. Its two ways.

Q. Two ways, okay.

At some point your car was involved in an accident with another vehicle.

How did that happen?

A. I stopped for the red light, the other vehicle came from the back and hit me.

Q. Okay.

How many do you remember, only if you know, do you remember how many traffic lights there are on Jerome Avenue at the intersection of 182nd and Jerome Avenue, only if you know.

A. You mean how many lights?

Q. How many traffic lights are there

Jalloh

in total, if you remember, if you know?

A. What I know is the lights that were in front of me, I cannot count all the lights over there.

Q. As you were approaching the traffic light, when was the first time you noticed the light was red?

A. Is when the light gave a yellow.

Q. Do you know approximately how far you were from the intersection when the light turned yellow, approximately, it doesn't have to be precise.

A. That I can't recall.

Q. Okay.

How was the traffic on that day at the area located at the intersection of Jerome Avenue and 182nd Street, if you remember? Can you tell me was the traffic heavy, were there any other cars next to you?

A. There was no traffic, it was clear and there was no cars in front of me.

Q. Okay.

Mr. Jalloh, do you remember what time of the day the accident occurred? It

Jalloh

doesn't have to be precise, if you can tell me an approximate time when the accident occurred?

A. It was around 11:00 p.m. something.

Q. 11:00 p.m. in the evening, correct?

A. Yes.

Q. Okay.

And you stated that you left your house at approximately, I don't remember. Could you tell me what time you left your house that particular day?

A. It was like 11-something, let's just say at 12 noon.

Q. Since 12 noon until 11:00 p.m. you had been working for almost 11 hours, correct?

A. I was not working during all those times because I have to go and relax a little bit and I also have to eat.

Q. Okay, let me ask you this.

How many hours did you work in total on August 7th, 2006 if you remember, it doesn't have to be precise, approximately.

Jalloh

A. Like eight hours.

Q. Now when you mentioned that you were standing at the intersection and the light was red, at some point did you feel an impact?

A. Yes.

Q. At the time of the impact where were you looking?

A. When he hit me, I didn't see anything at that time, my mind was completely messed up.

Q. Do you remember immediately preceding the accident what were you doing?

A. I was stopping for the light to turn green.

Q. Okay.

Where were your hands?

A. On the wheel.

Q. Were you listening to the radio?

A. No.

Q. Were you talking on a cell phone?

A. No.

Q. Do you own a cell phone?

A. Yes.

Jalloh

Q. How about your brakes, when was the last time you had your brakes serviced prior to the time of this incident?

A. When this driver hit me, at that time my foot was on the brake.

Q. Was it your left foot or your right foot?

A. Right foot.

Q. Were you wearing a seat belt?

A. Yes.

Q. What type of seat belt were you wearing, a shoulder to lap or lap to lap; what type of seat belt was it?

MR. VANDAMME: Let the record reflect that the witness is indicating that he was wearing a shoulder to lap seat belt.

A. The seat belt was like a, you take it from here and you pass it through your, like through your stomach and you buckle it down here (indicating).

Q. Okay.

Were there any passengers in your car at the time of this incident?

Jalloh

A. No.

Q. Did your car have an air bag?

A. Yes, it has it.

Q. Did your air bag deploy at the time of the incident?

A. No, I didn't see it, at that time I didn't see it.

Q. Okay, let me ask you this.

At the time of the impact, did any portion of your body hit any portion of the car, and if so, which one?

A. What happened when the driver hit me, I had the belt on, but what happened my head went toward the wheel (indicating).

Q. The steering wheel?

A. The steering wheel, and I came back also to my seat, that's what happened (indicating).

Q. Did your head at any point hit the steering wheel?

A. At that time I don't know what happened to me because right there I lost my mind.

Q. Did you lose your consciousness as

Jalloh

a result of the impact?

A. I lost my consciousness.

Q. Mr. Jalloh, do you remember when you again gained consciousness following the impact?

A. After a while.

Q. Can you tell me approximately when, if you know?

A. After like one hour.

Q. Were you still in the car when you gained consciousness?

A. Yes.

Q. Once you gained consciousness, what do you remember, what do you recall seeing?

A. I see people were there surrounding the cars all over.

Q. How many people did you see approximately?

A. That I cannot count.

Q. Did you see any ambulance?

A. No.

Q. Did you see any police cars?

A. Yes, I did see.

Jalloh

Q. How many police cars did you see?

A. If I'm not mistaken, it was one.

Q. How many police officers do you remember were at the scene?

A. If I am not mistaken, if I still have a good memory, it was two of them.

Q. Do you know whether your windows, your car windows were open or whether they were shut?

A. That I don't recall.

Q. Once you gained consciousness and you recall that you saw two police officers, what did you do?

A. I didn't do anything, I stayed in my car.

Q. Did anyone talk to you after you gained consciousness?

A. The police people.

Q. Did you first talk to them or did they talk to you?

A. They are the ones who talk to me.

Q. What did they tell you?

A. They asked me if I need an ambulance.

Jalloh

Q. Were you still in the vehicle, in your seat when the police talked to you or were you outside the vehicle?

A. I was sitting put in my car.

Q. You mentioned you don't remember whether your window was shut or open.

When the police started talking to you was your door open, was your window open, how were they able to talk to you?

A. The door was open, the door of the car.

Q. Who opened the door?

A. If I am not mistaken, the police people are the ones who opened it.

Q. Which door was it?

A. The door where I was sitting.

Q. The driver's side door?

A. Yes.

Q. Could you tell me again, I think I asked you this question before, if you remember what was the first question the police officer asked you while you were in the car?

A. They asked me if they were going

Jalloh

to send an ambulance for me.

Q. What did you respond to that question?

A. At that time I told him no, to leave it for now because at that time I didn't know something major had happened to me, I told them, "Leave it for now."

Q. So what happened next?

A. After that I went home.

Q. Did you go home or did you drive home?

A. Somebody took me home.

Q. Who was it?

A. Another driver.

Q. Do you know his name?

A. Yes.

Q. What's his name?

A. Ibrahma, I-b-r-a-h-m-a.

Q. Is it his first name or his last name?

A. That's his first name.

Q. What's his last name?

A. B-a-h.

Q. Did Mr. Bah at the time of the

Jalloh

accident also work for Family?

A. No.

Q. Do you know which company he was working for at the time of the accident?

A. I don't know.

Q. How did Mr. Bah know, how did you establish contact with Mr. Bah at the time of the accident?

A. I called him.

Q. On his cell phone?

A. Yes.

Q. Do you still have his cell phone number?

A. Yes.

Q. Do you know what it is?

A. Yes.

Q. What is it?

MR. McCABE: I'm going to object to that. Now you're getting into a question of privacy.

MR. VANDAMME: All right, that's fine.

MR. McCABE: Whether a person's cell phone could be divulged.

Jalloh

Q. Mr. Jalloh, you called Mr. Bah on his cell phone, how long did it take for Mr. Bah to come to the scene of the accident approximately?

A. I couldn't calculate, indicate how long it took him.

Q. Was it less than 30 minutes approximately, was it less 30 minutes, was it more than 30 minutes if you can approximate for me?

A. It was more than 30 minutes.

Q. Was it more than an hour?

A. Yes.

Q. Was it more than two hours?

A. It was one hour and a few minutes, it wasn't close to two hours.

Q. Okay.

When you called Mr. Bah on his cell phone, what did you tell him?

A. I told him, I said, "Somebody hit me so could you come and take me home?"

Q. What did he say?

A. He said yes.

Q. Once Mr. Bah arrived at the scene

Jalloh

of the accident, were you still in the car?

A. Yes.

Q. At any time between the time of the incident and the time of Mr. Bah's arrival, did you at any point leave your vehicle?

A. I did not.

Q. Did you talk to anyone else apart from those two or one police officer?

A. No.

Q. Okay.

Once Mr. Bah arrived, what did you do?

A. He took me to my place.

Q. Did he help you get out of the car or did you leave the car on your own?

A. He's the one who helped me.

Q. Did you at any point while you were in the car talk to the driver of the other vehicle who was also involved in the incident?

A. No, I don't recall.

Q. Did you see the other driver?

A. I don't think I saw him, I saw the

Jalloh

driver (sic).

Q. When you talked to the police officer or police officers, did they ask you any questions about this incident?

A. They did ask me.

Q. What did they ask you?

A. They asked me, "How did the driver of the other car hit you?"

Q. What did you tell them?

A. I told him, I said, "I was stopping at the red light waiting for the light to turn green and the other driver hit me. I mean its not like we are going one next to another, I was just stopping and he hit me."

Q. Okay.

How would you describe the impact?

A. I would say it was heavy.

Q. Did you at any point see what part of your car was hit by the other vehicle?

A. At that time I didn't see. When he hit me right there, I didn't see where I was hit.

Q. When you left your car, what did

Jalloh

you do? Meaning did you go directly to Mr. Bah's car or did you look at your car?

A. I went directly to Mr. Bah's car.

Q. Apart from those two police officers, did you talk to anyone else?

A. I don't recall.

Q. Okay.

Once you were in Mr. Bah's car, where did you go?

A. I went to the place where I live, where I used to live.

Q. Where is that?

A. 108 East Clark Place.

Q. Mr. Jalloh, when you were in Mr. Bah's car did you feel any pain?

A. I had pain.

Q. Where?

A. (Indicating) Here to the back, head, and all the way to my back going to my legs.

Q. How long did it take you if you can approximate for me, how long did it take you to get home from the scene of the accident and your place? In other words, if you can

Jalloh

tell me how long, how much time did you spend in Mr. Bah's car?

A. Did you say how long?

Q. Approximately how long did it take you to get home from the scene of the accident?

A. At that time I couldn't approximate.

Q. Would you know which route you took while you were driving home?

A. Yes.

Q. Which route was that?

A. Jerome.

Q. Are you familiar with that area, in other words, had you been to that area before, prior to the accident?

A. Yes, I know.

Q. Once you got home, what happened next, what did you do?

A. I lay down.

Q. Okay.

Now, at some point you went to see a doctor, correct?

A. Yes.

Jalloh

Q. When was it?

A. The next day of that, the next day in the morning.

Q. Why did you go see a doctor?

A. Because I was feeling pains, a lot of pains.

MR. McCABE: Can we take a short break for one minute.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 11:49 a.m.)

(Time noted: 11:56 a.m.)

Q. Mr. Jalloh, at some point the next day you went to see a doctor, correct?

A. Yes.

Q. Do you remember the name of that doctor?

A. No.

Q. Okay.

If I told you that it was Dr. Greenfield, would that refresh your recollection?

A. No, I don't recall the doctor's name.

Jalloh

Q. Was it Dr. Crystal?

A. I have seen a lot of doctors. What's happening is they are going to tell me their names, but its very difficult for me to remember or memorize their names.

Q. Let me ask you this way. How did you find out about this doctor?

A. One of my friends told me about the doctor.

Q. Who was that friend?

A. It was Mamadou Diallo.

Q. In other words, it was a recommendation, correct?

A. Yes.

Q. In other words, you asked your friend if he knows any doctor and he gave you this number, correct?

A. Yes.

Q. You called this doctor and you asked him if you can come for an appointment, correct?

A. Yes.

Q. Okay.

Jalloh

Where was the doctor located at the time?

A. Grand Concourse.

Q. How did you get there?

A. I took a taxi.

Q. Once you got there, what did the examination consist of?

A. Lots of things was done for me over there. I remember they put some hot pad here (indicating) to the back and to the neck here, and --

Q. What else?

THE INTERPRETER: I don't know that name in Fulani.

A. Something like a needle they put in there.

THE INTERPRETER: Sorry.

Q. Mr. Jalloh, did you receive any medication while you were examined?

A. That day like I told you what they did for me was to put things on my body, the hot pad, and in particular the needle. And also I was given like a Tylenol and something was prescribed for me.

Jalloh

Q. Do you know, would you recall the name of the prescription drug?

A. I don't recall.

Q. Okay. Did you see the doctor again following this first examination?

A. Yes, many times.

Q. Would you know approximately how many times?

A. Three months complete I'm seeing this doctor, I was even put, I even had an MRI for that.

Q. When you say three months, does it mean three months following your first visit?

A. Three months total I was seeing this doctor.

Q. Okay. During those three months how often did you see your doctor, was it once a week, once a month, every other day?

A. I used to see the doctor like three times a week.

Q. Do you remember whether the doctor was a female or a male?

Jalloh

A. Female, some of the time.

Q. The first time you went to see that particular doctor, do you remember whether the doctor was a female or a male?

A. It was a female.

Q. Okay. If I told you that her name was Dina Nelson, would that refresh your recollection?

A. If you tell me that's her name I'm not going to argue, but --

Q. All right. During those three months, did you see any other doctors except for those you visited at Grand Concourse?

A. You mean from a different hospital?

Q. Did you go to any different providers or did you always go to the same place at Grand Concourse?

A. Grand Concourse, that's where I went to and where I had also the MRI.

Q. Okay. Mr. Jalloh, would you recall

Jalloh

whether you were recommended to have any rehabilitation by those doctors?

A. I was recommended to go somewhere that was in Tremont, but that appointment did not happen.

Q. Okay.

Did you participate in any rehabilitation therapy following the accident?

A. Yes, I did, at Grand Concourse.

Q. What did this therapy consist of?

A. For the therapy it is something that they bring, they put around my neck and also my back and I'm laying down. So after that also they use a needle to press those areas of my back and also my neck, and also they massage me.

Q. Following the therapy did you feel that your health condition started to improve?

A. Just a little bit. It was better than the day it first happened to me, but not completely.

Q. So was there any reason why you stopped seeing your doctors and why you stopped participating in the rehabilitation

Jalloh

therapy?

A. Because I had been there a lot of times, many times.

Q. Okay.

When was the last time that you participated in therapy, if you know approximately?

A. I don't recall.

Q. As of now how, do you feel?

A. To the present time I have pain.

Q. Where do you have pain?

A. The place I had pain before is still the same place.

Q. If you can tell us again where that was?

A. (Indicating).

MR. McCABE: The neck and upper back.

A. The neck and upper back, the middle of the back --

THE INTERPRETER: And pointing to the legs, everything.

Q. Are you currently taking any prescription medication?

Jalloh

A. Right now Ben Gay, that's the only thing I'm putting on those areas.

Q. How often do you take Ben Gay?

A. Every day before I go to bed I use that.

Q. What is Ben Gay for?

A. Its because of the pain.

Q. Are you currently participating in any therapy?

A. No.

Q. Okay.

Are there any activities that you were able to do prior to the incident that you are unable to do now?

A. Yes.

Q. What are those activities?

A. Like for example, I used to like bend my knees and sit on like if when I pray, but now I can't do that.

Q. Anything else?

A. That's all.

And also if I'm walking, I walk a little bit gingerly, I cannot walk straight.

MR. McCABE: Can you read that

Jalloh

back, please.

(Record read.)

MR. McCABE: Thank you.

Q. Have you ever met a person called Thomas Wendel?

A. It is possible that I met somebody and that happened to be the name, but I don't recall the name.

Q. Do you know, Mr. Jalloh, that Mr. Wendel is the defendant in this action?

A. I don't understand, what do you mean, the accident?

Q. No, I'm talking about, do you know -- let me ask you this.

Have you ever spoken to the defendant in this action? In other words, have you ever spoken to the driver of the other vehicle that's --

A. No, I have never.

Q. Never ever?

A. No.

Q. That's all I need to know.

I'll ask you some follow up questions. At the time of the incident when

Jalloh

you were working for Family, how much were you making?

A. That's depends how lucky you are, ever day is different how much.

Q. Were you getting paid an hourly rate or were you getting paid based on how many customers you drove that particular day?

A. For a taxi driver it depends how many customers you get per day, that's how much money you're going to get.

Q. Let's take an average day.

If you can approximate for me on an average day, not a good day, not a bad day, on an average day how much would you make?

A. You mean how many customers?

MR. McCABE: No, how much money.

Q. It doesn't have to be precise.

I'm not asking for an X number, I'm not asking if you have no customers, I understand you would make nothing, on an average day how much would you make?

A. Like $90.

MR. McCABE: I'll just for the record point out that there is no claim

Jalloh

for lost earnings in this action.

MR. VANDAMME: Okay.

Q. Mr. Jalloh, I'm going to ask you one more question.

Do you know what happened to the vehicle once you left the scene of the incident with Mr. Bah?

A. Yes.

Q. What happened?

A. It was taken to the garage.

Q. Do you know who towed it away?

A. My friend is the one who talked with the tow people.

Q. Do you know whether someone drove the car to the garage or whether the car was towed away?

A. If I am not mistaken, he was the one who drove it.

Q. What was the name of your friend, if you recall?

A. Mamadou Diallo, that's his name.

Q. Do you know what happened to the car once the car was brought to the garage?

A. They repaired it.

Jalloh

Q. Do you know the name of the garage which repaired the vehicle?

A. Yes.

Q. What's the name of the garage?

A. No, I only know the name of the street.

Q. If you can give me the name of the street.

A. 137th between Third and, I don't know, between Third and Canal Place, something like that.

Q. Okay.

A. I do know for sure its on 137th Street.

MR. McCABE: Off the record.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 12:18 p.m.)

(Time noted: 12:19 p.m.)

Q. Did you take any photographs of the scene of the accident?

A. You mean where the accident happened?

Q. Yes.

Jalloh

A. No, I didn't. At that time I was not thinking about that.

Q. Okay.

MR. VANDAMME: I have no more questions.

MR. McCABE: All right.

Off the record.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 12:20 p.m.)

____________________

ABOUBACAR JALLOH

Subscribed and sworn to before me this ___ day of __________, 2008.

______________________________

Jalloh

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, Jeremy Frank, a Notary Public within and for the State of New York, do hereby certify:

That ABOUBACAR JALLOH, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereby set my hand on the 8th day of February, 2008.

JEREMY FRANK, MPM

Jalloh

*** ERRATA SHEET ***

NAME OF CASE: JALLOH v. WENDEL

DATE OF DEPOSITION: February 8th, 2008

NAME OF WITNESS: JALLOH

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________

ABOUBACAR JALLOH

Subscribed and sworn to before me this ____ day of __________, 2008.

______________ ______________

JEREMY FRANK My Commission Expires:

A

**able** 17:15 32:10 47:14
**Aboubacar** 1:5 1:13 2:5 7:4,6 12:7 52:14 53:10 54:19
**accident** 5:16 16:25 17:2 21:6,19 23:22 23:25 24:14 25:25 26:3 27:14 34:2,5 34:9 35:4 36:2 38:24 39:7,17 45:9 48:13 51:22 51:23
**accommodate** 6:20
**accurately** 6:4
**action** 48:11,17 50:2 53:15
**activities** 47:13 47:17
**address** 7:9,13 7:18 11:14 17:21 21:20
**ago** 9:15 11:12
**AGREED** 4:2,7 4:11
**air** 29:3,5
**alcohol** 22:7,10
**Alimou** 8:2
**alleged** 17:2
**allegedly** 5:16
**Alpha** 13:17
**ambulance** 30:22 31:25 33:2
**Amsterdam** 19:2
**answer** 5:23 6:22 9:5,10 10:11
**answering** 6:7
**answers** 5:4
**apart** 36:9 38:5
**appointment** 41:22 45:5
**approaching** 25:6
**approximate** 26:3 35:10 38:23 39:9 49:13
**approximately** 11:12 15:19 15:23,24 16:3 16:5 23:2 25:10,12 26:12,25 30:8 30:20 35:5,9 39:5 43:9 46:8
**area** 25:17 39:15,16
**areas** 45:16 47:3
**argue** 44:12
**arrival** 36:6
**arrived** 35:25 36:13
**asked** 31:24 32:21,23,25 37:8 41:17,22
**asking** 5:15 15:5 17:19,20 23:2 49:19,20
**assigned** 19:17
**attorney** 5:14 15:14
**Attorneys** 3:6 3:12
**August** 5:17 17:2,5 18:7 18:15 19:8 20:8,14 22:2 26:24
**Avenue** 2:7 3:7 11:16,17 21:25 24:3,5 24:9,21,22 25:18
**average** 49:12 49:14,15,22
**A-l-i-m-o-u** 7:25
**a.m** 2:3 18:5,6 40:12,13

B

**B** 5:2,6,6
**back** 10:23 24:17 29:18 38:19,20 42:11 45:14 45:16 46:19 46:20,21 48:2
**bad** 49:14
**bag** 29:3,5
**Bah** 8:2 13:17 33:25 34:7,8 35:2,4,19,25 36:13 50:8
**Bah's** 36:5 38:3 38:4,9,16 39:3
**based** 49:7
**bed** 47:5
**belt** 28:10,12 28:14,18,19 29:14
**Ben** 47:2,4,7
**bend** 47:19
**Bernstein** 2:7 3:4
**better** 45:20
**birth** 8:25 22:9
**bit** 16:23 26:21 45:20 47:24
**blood** 53:15
**body** 29:11 42:22
**born** 8:20,22
**brake** 28:6
**brakes** 28:2,3
**break** 6:18 40:9
**bring** 45:13
**Broad** 3:13
**Bronx** 7:10 11:18 19:3
**Brooklyn** 16:18
**brought** 50:24
**buckle** 28:21
**Budin** 2:6 3:4
**business** 10:16 10:22 11:3,6 11:8
**buy** 10:19
**B-a-h** 8:2 33:24
**B1** 10:3
**B2** 10:3,5,6,12

C

**C** 3:2 5:6 53:2,2
**cab** 13:11 18:18
**calculate** 35:6
**call** 18:13,14
**called** 5:6 34:10 35:2,19 41:21 48:5
**Canal** 51:11
**car** 13:12,19,24 14:3,4 19:14 19:16,17,18 19:20,22,25 20:2,4,6,11 20:14,16 21:4 21:11,16 24:13 28:25 29:3,12 30:11 31:9,16 32:5 32:12,24 36:2 36:16,17,20 37:9,21,25 38:3,3,4,9,16 39:3 50:16,16 50:24,24
**cars** 13:13,16 25:20,22 30:18,24 31:2
**CASE** 54:3
**cell** 27:22,24 34:11,13,25 35:3,20
**certification** 4:5
**certify** 53:9,14
**change** 19:18
**check** 20:17,17
20:18,25
**checked** 21:11
**citizen** 9:3
**city** 8:22
**Civ** 1:7
**claim** 49:25
**Clark** 7:10 38:14
**clear** 22:20,21 25:21
**client** 19:19
**close** 9:17 35:17
**collision** 21:16
**color** 20:4
**come** 9:12,18 35:4,22 41:22
**Commission** 54:22
**company** 13:11 18:13,14,20 34:4
**complete** 43:11
**completely** 27:11 45:22
**Conakry** 8:24
**Concourse** 42:4 44:16,21 44:22 45:10
**condition** 45:19
**conditions** 22:17
**conducted** 16:20
**consciousne...** 29:25 30:3,5 30:12,14 31:12,18
**consist** 42:8 45:11
**consume** 22:7 22:11
**contact** 34:8
**corporation** 11:7
**correct** 7:6

10:7 19:3 23:23 26:8,18 39:24 40:15 41:15,19,23
**counsel** 3:9 4:3 15:5,12
**count** 17:16 25:4 30:21
**country** 9:23
**COUNTY** 53:5
**court** 1:2 4:15 5:21 6:3
**Crystal** 41:2
**current** 7:9 9:7 12:14,15
**currently** 46:24 47:9
**customer** 23:9 23:9
**customers** 23:17,20 49:8 49:10,16,20
**C-o-n-a-k-r-y** 8:24

D

**D** 5:2,2
**date** 8:25 15:20 54:4
**Davidson** 11:16,17
**day** 17:4,17,22 19:10 22:17 25:16,25 26:14 40:3,3 40:15 42:21 43:21 45:21 47:5 49:5,8 49:10,12,14 49:14,14,15 49:22 52:17 53:19 54:20
**days** 21:18
**defendant** 1:9 3:12 48:11,17
**depends** 49:4 49:9
**deploy** 29:5
**deposition** 1:13 2:5 4:5 4:12 5:20 6:19 53:11,12 54:4
**describe** 37:18
**designated** 19:13
**Diallo** 41:13 50:22
**difference** 15:15
**different** 15:13 44:17,19 49:5
**difficult** 41:5
**Dina** 44:9
**direction** 23:12 23:14 24:7
**directly** 38:2,4
**discussion** 18:4 40:11 51:18 52:10
**DISTRICT** 1:2,3
**divulged** 34:25
**doctor** 39:24 40:5,15,18 41:9,11,18,21 42:2 43:6,12 43:17,20,22 43:24 44:4,5
**doctors** 41:3 44:15 45:3,24
**doctor's** 40:24
**doing** 17:5 18:16 27:14
**door** 32:9,11 32:11,13,16 32:17,18
**DOUMBOUYA** 3:19
**Downtown** 23:13 24:8
**Dr** 40:21 41:2
**drank** 22:9
**drive** 13:14 33:11
**driver** 18:18 19:13 23:7
28:5 29:13 33:15 36:20 36:24 37:2,8 37:13 48:18 49:9
**driver's** 14:7,9 14:12,20 15:3 16:3 32:18
**driving** 13:9 39:11
**drove** 19:18 23:15 49:8 50:15,19
**drug** 43:3
**drugs** 22:12
**dry** 22:20,21
**duly** 5:2,7 53:11

E

**E** 3:2,2 10:3 53:2,2
**Early** 18:9
**earnings** 50:2
**easier** 6:3
**East** 7:10 38:14
**eat** 26:21
**education** 11:20,23,25
**effect** 4:14
**eight** 11:22 27:2
**English** 5:3,5 16:21,22 20:5
**entered** 9:21 9:23 10:23 11:13
**ERRATA** 54:2
**ESQ** 3:9,15
**establish** 15:3 34:8
**evening** 26:7
**exactly** 17:15 19:12
**examination** 5:10 42:8 43:7
**examined** 5:8
42:20
**example** 47:18
**Expires** 54:22

F

**F** 53:2
**familiar** 39:15
**Family** 18:22 18:23,25 19:9 19:15 34:2 49:2
**far** 25:10
**February** 1:15 2:2 53:19 54:4
**feel** 27:5 38:16 45:18 46:10
**feeling** 40:6
**female** 43:25 44:2,5,6
**filing** 4:4
**find** 23:9,17 41:8
**fine** 34:23
**finish** 6:7
**first** 7:6 11:14 11:15 14:18 16:2,6 25:7 31:20 32:22 33:20,22 43:7 43:15 44:3 45:21
**five** 19:11 21:18
**fixed** 21:12
**follow** 48:24
**following** 30:5 43:7,15 45:9 45:18
**follows** 5:9
**foot** 28:6,7,8,9
**force** 4:13
**forgot** 14:19 16:10,11
**form** 4:8 10:10
**forth** 53:11
**four** 19:11
**Frank** 1:22 2:9
53:7,22 54:22
**Friday** 1:15
**friend** 41:12,18 50:13,20
**friends** 8:5 13:13,15 41:10
**front** 25:4,22
**Fulani** 5:4,4 21:10 42:15
**further** 4:7,11 53:14

G

**gained** 30:5,12 30:14 31:12 31:18
**garage** 50:11 50:16,24 51:2 51:5
**Gay** 47:2,4,7
**gentleman** 15:14
**getting** 34:20 49:6,7
**gingerly** 47:24
**give** 5:19 13:13 13:16,19,25 17:20 21:20 51:8
**given** 19:16 42:24 53:13
**go** 12:2 17:11 20:15 23:4,6 23:11,13,13 26:20 33:11 38:2,10 40:5 44:19,20 45:4 47:5
**going** 8:18 14:22 20:25 32:25 34:19 37:14 38:20 41:4 44:12 49:11 50:4
**good** 5:12 8:15 8:17 12:20 21:2 22:22

31:7 49:14
**Grand** 42:4 44:16,21,22 45:10
**green** 20:5 27:16 37:13
**Greenfield** 40:22
**ground** 5:20
**guess** 20:19
**Guinea** 8:21,23 10:23 11:21
**guy** 21:10

H

**H** 5:6
**hand** 53:19
**hands** 27:18
**happen** 23:8 24:15 45:6
**happened** 29:13,14,18 29:23 33:7,9 39:19 45:21 48:8 50:6,10 50:23 51:24
**happening** 41:4
**head** 5:24 29:15,20 38:20
**heading** 23:2 24:7
**health** 8:15,17 12:20 45:19
**heavy** 25:19 37:19
**held** 2:5 18:4 40:11 51:18 52:10
**help** 8:11 36:16
**helped** 36:18
**Hendrick** 3:15 5:13
**hereinbefore** 53:11
**hereto** 4:4
**higher** 11:24
**highest** 11:19
**hit** 24:17 27:10 28:5 29:11,13 29:20 35:21 37:9,13,15,21 37:23,24
**hold** 14:6
**home** 18:8 33:10,11,12 33:13 35:22 38:24 39:6,11 39:19
**hospital** 44:18
**hot** 42:10,23
**hour** 30:10 35:13,16
**hourly** 49:6
**hours** 17:6,22 22:8,12 26:18 26:23 27:2 35:15,17
**house** 18:10 22:8,13,25 23:10 26:12 26:14

I

**Ibrahma** 33:19
**illegally** 15:2
**immediately** 27:13
**immigration** 9:7
**impact** 27:6,8 29:10 30:2,6 37:18
**important** 5:22 6:5
**improve** 45:19
**incident** 20:8 28:4,25 29:6 36:5,22 37:5 47:14 48:25 50:8
**indicate** 35:6
**indicating** 28:16,22 29:15,19
38:19 42:11 46:17
**individuals** 8:4
**interested** 53:17
**interpret** 5:3
**interpreter** 3:19 5:9 42:14,18 46:22
**intersection** 24:22 25:11 25:17 27:4
**involved** 10:17 24:14 36:21
**involving** 23:22
**issued** 14:15 14:16,17 15:5 15:7,8
**I-b-r-a-h-m-a** 33:19

J

**J** 3:11 5:6
**Jalloh** 1:5,13 2:5 5:1,12 6:1 6:10 7:1,4,5 8:1,3,20 9:1 10:1 11:1,19 12:1,7 13:1 14:1,6 15:1 16:1 17:1,4 18:1,7 19:1 20:1 21:1 22:1,2,25 23:1 24:1 25:1,24 26:1 27:1 28:1 29:1 30:1,4 31:1 32:1 33:1 34:1 35:1,2 36:1 37:1 38:1,15 39:1 40:1,14 41:1 42:1,19 43:1 44:1,25 45:1 46:1 47:1 48:1,10
49:1 50:1,4 51:1 52:1,14 53:1,10 54:1 54:3,4,19
**Jeremy** 1:22 2:8 53:7,22 54:22
**Jerome** 24:2,5 24:6,9,21,22 25:17 39:14
**JOB** 1:23
**June** 9:2

K

**knees** 47:19
**know** 5:21 6:20 10:13 14:3,14 14:25 15:4,8 19:12,24 20:6 20:10 21:10 21:21 23:6 24:20,23 25:2 25:3,10 29:22 30:9 31:8 33:7,16 34:4 34:6,7,16 39:10,18 42:14 43:2,9 46:7 48:10,15 48:23 50:6,12 50:15,23 51:2 51:6,11,14
**known** 12:6
**knows** 16:4 41:18
**Kupferberg** 2:6 3:4

L

**L** 5:6,6
**language** 12:4 16:19
**lap** 28:13,13,13 28:17
**LAW** 3:11
**lay** 39:21
**laying** 45:14
**learning** 12:4
**leave** 22:3 33:6 33:8 36:6,17
**leaving** 22:8,13
**left** 22:25 23:10 26:11,13 28:7 37:25 50:7
**legs** 38:21 46:23
**let's** 13:2 16:25 26:15 49:12
**level** 11:20 15:13
**license** 14:7,9 14:12,14,17 14:21 15:2,4 15:5,7,7,8 16:3,7,14
**light** 24:16 25:7 25:8,9,11 27:5,15 37:12 37:13
**lights** 24:21,24 24:25 25:3,5
**Lincoln** 14:2 19:23 20:2
**LINE** 54:5
**listening** 27:20
**little** 16:23 26:20 45:20 47:24
**live** 7:19,21 38:11,12
**lived** 7:11
**livery** 18:18
**lives** 7:17
**living** 12:17,18 18:16
**LLP** 2:7 3:5
**located** 18:25 21:22 25:17 42:2
**long** 7:11 14:13 19:8 35:3,7 38:22,23 39:2 39:4,5
**look** 38:3
**looking** 27:9
**lose** 29:25

**lost** 29:23 30:3 50:2
**lot** 40:6 41:3 46:3
**Lots** 42:9
**lucky** 49:4

M

**M** 5:2,2,2
**Madison** 2:7 3:7
**maintenance** 20:11
**major** 33:7
**making** 49:3
**male** 43:25 44:5
**MALONEY** 3:11
**Maloney's** 5:14
**Mamadou** 3:19 8:2 41:13 50:22
**Manhattan** 19:6
**marriage** 53:16
**massage** 45:17
**matter** 53:17
**McCABE** 3:9 9:4,9 10:8 12:16,24 13:4 14:22 15:9,12 15:18,24 16:2 16:8 17:25 19:6 20:19 21:25 34:19 34:24 40:8 46:18 47:25 48:4 49:17,24 51:16 52:7
**mean** 8:8 20:23 24:24 37:14 43:15 44:17 48:13 49:16 51:23
**Meaning** 38:2
**means** 20:8
**mechanic** 21:5 21:9,11,21
**medication** 42:20 46:25
**memorize** 41:6
**memory** 31:7
**mentioned** 27:3 32:6
**merchandises** 10:19,20
**merchant** 9:24 9:24 10:16
**merchant's** 10:7
**messed** 27:12
**met** 48:5,7
**middle** 46:21
**mind** 27:11 29:24
**minute** 18:2 40:9
**minutes** 35:8,9 35:10,12,16
**mistaken** 10:5 31:3,6 32:14 50:18
**money** 49:11 49:17
**month** 15:21 43:21
**months** 13:3,4 13:5,6,8 19:11 43:11 43:14,15,16 43:19 44:14
**morning** 5:12 17:6,7,8,9,22 18:8,9,12 20:15,16 22:3 40:4
**Mouhamadou** 7:25
**MPM** 1:22 53:22
**MRI** 43:12 44:23
**M-a-m-a-d-o-u** 7:25
**M-o-u-h-a-m-...** 7:24

N

**N** 3:2
**name** 5:13 7:2 7:5,6 10:2 11:2 12:7 21:8,13,14 33:16,18,20 33:21,22,23 40:17,25 42:15 43:3 44:8,11 48:8 48:9 50:20,22 51:2,5,6,8 54:3,4
**names** 13:15 41:5,6
**nature** 11:6
**neck** 42:11 45:13,16 46:18,20
**need** 6:18 31:24 48:23
**needle** 42:16 42:23 45:15
**Nelson** 44:9
**never** 22:9,14 48:20,21
**New** 1:3,14,14 2:7,8,9 3:8,14 14:9,11 53:3 53:5,8
**nice** 22:18
**Nickname** 12:10,11
**nicknames** 12:9
**nod** 5:23
**noon** 26:16,17
**Notary** 2:9 4:13 5:7 53:7
**Note** 9:4 10:9
**noted** 18:5,6 40:12,13 51:19,20 52:11
**noticed** 25:8
**NRB** 1:7
**number** 14:4 34:14 41:19 49:19
**NY** 3:8,14

O

**O** 5:2,2,2,6,6
**oath** 6:11
**object** 14:22 34:19
**objection** 9:4,9 10:9
**objections** 4:8
**obtain** 14:11 14:20 16:13
**occur** 23:25
**occurred** 5:17 17:2 25:25 26:4
**office** 5:14
**officer** 32:23 36:10 37:4
**officers** 31:4 31:13 37:4 38:6
**offices** 2:6 3:11
**official** 12:3
**off-the-record** 18:3 40:10 51:17 52:9
**oil** 20:17,24
**okay** 5:18 6:8,9 6:13,21 7:8 8:19 9:25 10:14 11:10 12:5,13 13:4 13:20 16:12 16:24 17:10 18:11,19 19:21 22:6,15 22:23 23:5,16 24:12,18 25:15,23 26:10,22 27:17 28:23 29:9 35:18 36:12 37:17 38:8 39:22 40:20 41:25 43:5,18 44:7 44:24 45:7 46:5 47:12 50:3 51:13 52:4
**once** 30:14 31:12 35:25 36:13 38:9 39:19 42:7 43:20,21 50:7 50:24
**ones** 13:13 31:22 32:15
**one-way** 24:10
**open** 31:9 32:7 32:9,9,11
**opened** 32:13 32:15
**Order** 2:8
**outcome** 53:17
**outside** 32:4

P

**P** 1:8 3:2,2
**pad** 42:10,23
**PAGE** 54:5
**paid** 49:6,7
**pain** 38:16,17 46:11,12,13 47:8
**pains** 40:6,7
**part** 37:20
**participate** 45:8
**participated** 46:7
**participating** 45:25 47:9
**particular** 13:10 17:4,22 19:14 26:14 42:23 44:4 49:8
**parties** 4:4 53:15
**pass** 28:20

**passed** 17:17 17:20
**passengers** 28:24
**Patrick** 3:11 5:14
**pay** 8:18
**pays** 8:9,10
**people** 7:19,20 7:21,22,23 30:17,19 31:19 32:15 50:14
**period** 12:24 13:5
**person** 13:21 48:5
**person's** 34:24
**pertaining** 5:16
**PETER** 3:9
**phone** 18:13 27:22,24 34:11,13,25 35:3,20
**photographs** 51:21
**pick** 19:19
**place** 7:10,12 7:15,18 11:15 17:21 21:12 36:15 38:11 38:14,25 44:21 46:13 46:14 51:11
**Plaintiff** 1:6 3:6
**please** 6:6,15 6:19 7:2 48:2
**point** 18:12 23:21 24:13 27:5 29:20 36:6,19 37:20 39:23 40:14 49:25
**pointing** 46:22
**police** 30:24 31:2,4,13,19 32:3,8,14,23 36:10 37:3,4 38:5
**portion** 29:11 29:11
**possible** 48:7
**pray** 47:19
**preceding** 27:14
**precise** 25:13 26:2,25 49:18
**prepared** 6:22
**prescribed** 42:25
**prescription** 22:12 43:3 46:25
**present** 3:18 46:11
**Presently** 12:19 13:12 21:23
**press** 45:15
**prior** 19:8 20:14 21:5 22:8,12 28:4 39:17 47:14
**privacy** 34:21
**profession** 12:14
**professional** 21:5
**proprietor** 11:7
**providers** 44:20
**Public** 2:9 4:13 5:8 53:7
**purpose** 23:3
**pursuant** 2:8
**put** 20:16 32:5 42:10,16,22 43:12 45:13
**putting** 47:3
**p.m** 26:5,7,17 51:19,20 52:11

**Q**

**question** 4:9 6:7 9:5,10 10:8,11 15:6 15:20 17:24 20:20 32:21 32:22 33:4 34:20 50:5
**questions** 5:3 5:15 6:15,23 37:5 48:25 52:6

**R**

**R** 3:2 5:6 53:2
**radio** 27:20
**rarely** 12:20,22
**rate** 49:7
**read** 47:25 48:3
**ready** 23:8
**reason** 6:6 45:23
**recall** 14:5 16:10 25:14 30:15 31:11 31:13 36:23 38:7 40:24 43:2,4 44:25 46:9 48:9 50:21
**receive** 11:24 18:13 42:19
**received** 11:20
**recollection** 40:23 44:10
**recommenda...** 41:15
**recommended** 45:2,4
**record** 6:4 7:3 17:25 28:15 48:3 49:25 51:16 52:8 53:13
**red** 24:16 25:8 27:5 37:12
**reflect** 28:16
**refresh** 40:22 44:9
**registration** 14:3
**regularly** 20:7
**rehabilitation** 45:3,9,25
**Reisman** 2:6 3:4
**related** 53:14
**relationship** 8:4
**relax** 26:20
**remember** 22:16 24:19 24:20 25:2,18 25:24 26:12 26:24 27:13 30:4,15 31:5 32:6,22 40:17 41:6 42:10 43:24 44:4
**rent** 8:9,10,10 8:13,18
**renting** 7:14,16
**repair** 21:21
**repaired** 50:25 51:3
**rephrase** 6:16
**Reported** 1:21
**reporter** 5:21 6:4
**request** 6:20
**reserved** 4:9
**respective** 4:3
**respond** 33:3
**responsible** 20:10
**result** 30:2
**returned** 13:18
**right** 6:17 12:20 13:18 13:23 19:7 28:8,9 29:23 34:22 37:23 44:13 47:2 52:7
**roads** 17:17,19
**roommates** 8:7
**route** 39:10,13
**rules** 5:20

**S**

**S** 3:2
**saw** 31:13 36:25,25
**scene** 31:5 35:4,25 38:24 39:6 50:7 51:22
**school** 12:2,3
**sealing** 4:4
**seat** 28:10,12 28:14,18,19 29:18 32:3
**see** 21:2 27:10 29:7,8 30:17 30:19,22,24 30:25 31:2 36:24 37:20 37:22,23 39:23 40:5,15 43:6,20,22 44:3,15
**seeing** 30:16 43:11,16 45:24
**seen** 41:3
**selling** 11:4
**send** 33:2
**series** 5:15
**serviced** 20:7 20:14 21:4,16 28:3
**set** 53:11,19
**shake** 5:24
**share** 8:10,12 8:16
**SHEET** 54:2
**shining** 22:19
**shop** 21:21
**short** 40:8
**shoulder** 28:13 28:17
**shut** 31:10 32:7
**sic** 37:2
**side** 32:18
**signed** 4:12,14
**simple** 15:6 16:9

**sit** 47:19
**sitting** 32:5,17
**six** 12:25 13:3 13:4,5,8 19:11
**sole** 11:6
**somebody** 8:16 33:13 35:21 48:7
**Sorry** 42:18
**SOUTHERN** 1:3
**Sow** 7:25 21:14 21:17
**Sow's** 21:21
**speak** 16:22,23
**specific** 15:20 15:23
**spend** 39:2
**spoken** 48:16 48:18
**ss** 53:4
**standing** 27:4
**start** 5:19 21:3
**started** 32:8 45:19
**state** 2:9 7:2 53:3,8
**stated** 10:15 11:11 26:11
**statement** 10:9
**States** 1:2 9:3 9:13,19,22 10:18,24 11:13,25
**status** 9:8,11
**stayed** 11:15 31:15
**steering** 29:16 29:17,21
**STIPULATED** 4:2,7,11
**stomach** 28:21
**stopped** 24:16 45:24,25
**stopping** 27:15 37:12,15
**straight** 47:24
**street** 3:13 24:4,5,9,10 25:18 51:7,9 51:15
**streets** 17:16
**Subscribed** 52:16 54:20
**Suite** 3:13
**sure** 6:15 51:14
**surrounding** 30:18
**sworn** 4:14 5:3 5:7 52:16 53:12 54:20
**S-o-w** 7:24 21:14

**T**

**T** 53:2,2
**take** 6:18 16:13 16:17 22:11 23:9,14 28:19 35:3,22 38:22 38:23 39:5 40:8 47:4 49:12 51:21
**taken** 50:11
**talk** 6:5 16:25 31:17,20,21 31:22 32:10 36:9,20 38:6
**talked** 32:3 37:3 50:13
**talking** 27:22 32:8 48:14
**taxi** 13:9 23:7 42:6 49:9
**tell** 6:15 17:15 22:24 23:12 25:19 26:2,13 30:8 31:23 32:20 35:20 37:10 39:2 41:5 44:11 46:15
**test** 16:13,16 16:17,19
**testified** 5:8
**testimony** 53:13
**Thank** 48:4
**therapy** 45:9 45:11,12,18 46:2,7 47:10
**thing** 47:3
**things** 15:21 21:2 42:9,22
**think** 17:23 32:20 36:25
**thinking** 52:3
**Third** 51:10,11
**Thomas** 1:8 48:6
**three** 19:11 43:11,14,15 43:16,19,23 44:14
**time** 4:10 6:19 12:24 14:13 14:16,18 18:5 18:6,17,21 19:18 20:7,13 21:5,15 22:3 25:7,25 26:3 26:13 27:8,11 28:3,4,6,25 29:6,7,10,22 33:5,6,25 34:5,8 36:4,4 36:5 37:22 39:2,8 40:12 40:13 42:3 44:2,3 46:6 46:11 48:25 51:19,20 52:2 52:11
**times** 26:20 43:8,10,23 46:4,4
**tires** 20:25
**today** 5:15 6:11 6:23
**told** 33:5,8 35:21 37:11 40:21 41:10 42:21 44:8
**total** 25:2 26:24 43:16
**tow** 50:14
**towed** 50:12,17
**Town** 20:2
**traffic** 24:20,25 25:7,16,19,21
**traveled** 23:15
**Tremont** 45:5
**trial** 4:10
**trip** 23:3
**true** 53:12
**trying** 15:2
**turn** 27:16 37:13
**turned** 25:12
**two** 7:22 13:6 24:11,12 31:7 31:13 35:15 35:17 36:10 38:5
**two-lane** 24:9
**Tylenol** 42:24
**type** 9:22 10:3 10:16,20 11:8 13:7,24 19:22 28:12,14
**T-shirt** 10:21

**U**

**U** 5:2,2,2,6
**unable** 47:15
**understand** 5:25 6:10,12 6:14 10:6 11:5 15:11,16 15:25 17:23 23:11 48:12 49:21
**understands** 15:19
**United** 1:2 9:3 9:12,18,21 10:17,23 11:13,25
**upper** 46:18,20
**Uptown** 17:13 17:14,15 23:13,15
**use** 13:24 45:15 47:5

**V**

**v** 54:3
**Vandamme** 3:15 5:11,13 13:2 14:24 15:11,16,22 15:25 19:7 28:15 34:22 50:3 52:5
**vehicle** 23:22 24:14,17 32:2 32:4 36:7,21 37:21 48:19 50:7 51:3
**visa** 9:20,22,24 10:2,3,4,7,12 10:12,16
**visit** 43:15
**visited** 44:16
**visitor's** 10:12
**vs** 1:7

**W**

**wait** 6:6
**waiting** 37:12
**waived** 4:6
**walk** 47:23,24
**walking** 47:23
**want** 5:19 15:20
**wasn't** 35:17
**water** 20:25
**way** 16:4 22:4 23:18 38:20 41:7 53:16
**ways** 24:11,12
**wearing** 28:10 28:13,17
**weather** 22:16 22:18
**Webster** 21:23 21:25
**week** 43:21,23
**weeks** 12:25

**Wendel** 1:8 48:6,11 54:3
**went** 17:9,15 17:17,21 23:11,13 29:15 33:10 38:4,11 39:23 40:15 44:3,23
**wheel** 27:19 29:15,16,17 29:21
**wheels** 20:18 20:24
**WHEREOF** 53:18
**window** 32:7,9
**windows** 31:8 31:9
**witness** 5:7 15:10 16:6 28:16 53:10 53:13,18 54:4
**words** 5:23 8:12 38:25 39:16 41:14 41:17 48:17
**work** 12:19,23 13:6,7,10 17:9,12,18 23:4,8,11 26:23 34:2
**worked** 19:10
**working** 8:16 8:17 11:9 15:13 18:17 18:20 19:9,14 21:3 26:18,19 34:5 49:2

**X**

**X** 49:19

**Y**

**Y** 5:2
**year** 15:21 19:24
**years** 9:15 11:12,22
**yellow** 25:9,12
**York** 1:3,14,14 2:7,8,10 3:8 3:14 14:9,11 53:3,5,8

**$**

**$90** 49:23

**0**

**07** 1:7

**1**

**10** 9:15 11:12
**10:41** 2:3
**10004** 3:14
**10016** 3:8
**108** 7:10 38:14
**11** 22:4 26:18
**11-something** 26:15
**11:00** 26:5,7,17
**11:03** 18:5
**11:04** 18:6
**11:49** 40:12
**11:56** 40:13
**112** 2:7 3:7
**12** 22:5 26:16 26:17
**12:18** 51:19
**12:19** 51:20
**12:20** 52:11
**137th** 51:10,14
**170th** 21:24
**181st** 19:2
**182nd** 24:2,5 24:22 25:18

**2**

**2000** 7:13
**2006** 5:17 17:3 17:5 18:7,15 19:8 20:8,14 22:2 26:24
**2008** 1:15 2:2 52:17 53:19 54:4,20
**2202** 3:13
**24** 22:8,12

**3**

**30** 35:8,9,10,12

**4**

**4091** 1:7

**5**

**5th** 9:2

**6**

**63** 9:2
**672356a** 1:23

**7**

**7th** 5:17 17:2,5 18:7,15 19:8 20:8,14 22:2 26:24

**8**

**8th** 1:15 2:2 53:19 54:4

**9**

**90** 3:13
**97** 20:2,3

EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---X

**RADIOLOGIST'S AFFIRMATION**

Index No.: 07 Civ. 4091/(NRB)

I, ALAN GREENFIELD, M.D., affirm the following under the penalties of perjury:

1. I am a Radiologist, duly licensed by the State of New York to practice medicine.

2. I am affiliated with U.S. Diagnostic, whose offices are located at 1963 Grand Concourse, Suite #LL, Bronx, New York 10453.

3. I took or supervised the taking of the MRIs of the cervical spine and lumbar spine of ABOUBACAR JALLOH, the plaintiff in this action.

4. Upon review of the MRI of the cervical spine taken on August 16, 2006, my findings were as follows:

   a) **Straightening of cervical lordosis;**
   b) **Central disc herniations at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord; and**
   c) **Bulging disc at C4-C5 with flattening of the dural sac.**

5. Upon review of the MRI of the lumbar spine taken on September 6, 2006, my findings were as follows:

   a) **Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.**

6. If I am called upon to testify in Court, my testimony will reflect the statements listed above.

7. I, the undersigned, certify that the foregoing report is true to the best of my knowledge. I am a duly licensed Board Certified Radiologist in the State of New York and I hereby affirm under the penalties of perjury the contents of this report to be true.

Dated: New York, New York
May 20, 2008

ALAN GREENFIELD, M.D.

U.S. DIAGNOSTIC
SERVING HEALTH CARE NEEDS OF YOUR FAMILY
1963 GRAND CONCOURSE SUITE #LL • BRONX, NY 10453 • OFF: (718) 731-2500 / FAX: (718) 731-5100

Dr. Monagan

8/16/2006

RE: Jalloh, Aboubacar
DOB: 5/3/1963
File #:2400
DOS: 8/16/2006

Dear Doctor:

The following is a report on the above patient who was examined on 8/16/2006.

**MRI OF THE CERVICAL SPINE:**

**Technique:** Sagittal T1 and either gradient echo T2* or FSE T2 sagittal, T1 and T2 axial angled through disc spaces.

**Findings:** There is straightening of cervical lordosis. Central disc herniations are present at C3-C4 and C5-C6 indenting the dural sac. There is near contact with the cord at C5-C6. A bulging disc at C4-C5 is seen with flattening of the dural sac. The cord is normal in position and signal. There is no central spinal stenosis. No fracture, bone marrow edema, or replacement is demonstrated. The neural foramina are patent on both sides. There is no fracture or paraspinal mass.

**IMPRESSION:**

1. **Straightening of cervical lordosis.**
2. **Central disc herniations are present at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord.**
3. **Bulging disc at C4-C5 with flattening of the dural sac.**

Thank you for the courtesy of this referral.
***** Electronically Signed *****
08/20/06 09:48
Alan Greenfield, MD
Diplomate, American Board of Radiology

SEP-21-2006 14:16 US DIAGNOSTIC PAGE 01 P.05/06

Jun. 2. 2008 9:21AM ISLANDWIDE MEDICAL IMAGING No.4636 P. 3

**U.S. DIAGNOSTIC**

SERVING HEALTH CARE NEEDS OF YOUR FAMILY

1865 GRAND CONCOURSE SUITE #LL • BRONX, NY 10453 • OFF: (718) 731-2600 / FAX: (718) 731-5100

9/6/2006

Dr. Monagan
334 Grand Concourse
Bronx, NY 10451
718-590-5900
718-590-6399

RE: Jalloh, Aboubacar
DOB: 5/3/1973
File #:2747
DOS: 9/6/2006

Dear Doctor:

The following is a report on the above patient who was examined on 9/6/2006.

**MRI OF THE LUMBAR SPINE:**

**Technique:** T1 sagittal, fast spin T2 sagittal, T1 axial angled through disc spaces.

**Findings:** There is a bulging disc at L4-L5 with flattening of the dural sac and right greater than left foraminal encroachment. A bulging disc is also seen at L5-S1 with flattening of epidural fat. The conus is unremarkable. There is no central spinal stenosis. No disc herniations are seen. There is no sign of fracture. Anterior spondylosis at L4-L5 is seen. There is no sign of paraspinal mass.

**IMPRESSION:**
**Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.**

Thank you for the courtesy of this referral.
***** Electronically Signed *****
09/06/06 18:16
**Alan Greenfield, MD**
**Diplomate, American Board of Radiology**

EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

PHYSICIAN'S AFFIRMATION

Index No.: 07 Civ. 4091/(NRB)

I, DINA NELSON, M.D., affirm the following under the penalties of perjury:

1. I am a physician duly licensed to practice medicine in the State of New York.

2. My offices are located at Med Care Health & Rehabilitation Services, P.C., 334 Grand Concourse, Bronx, NY 10451.

3. ABOUBACAR JALLOH sustained personal injuries when he was involved in a motor vehicle accident on August 6, 2006. He received physical therapy treatments at my facility from August 10, 2006 through December 7, 2006. Physical therapy treatments consisted of electrical stimulation, massages, and the application of hot and cold packs, all to the lower back and neck.

4. On initial physical examination on August 10, 2006, patient presented with complaints of neck pain, and mid to low back pain, and frontal headaches. The patient was 42 years old and has no history of prior injuries.

5. Examination of the cervical spine revealed severe limitation in all planes with diffuse muscle spasm in the upper trapezius muscles, levator scapulae, and SCM and tenderness in the cervical paraspinal.

6. Examination of the thoracolumbar spine revealed tenderness in the lower thoracic spinous processes up to the upper lumbar spine. Flexion was limited to 50 degrees (90 degrees is normal[1]) and lateral flexion was limited to 10 degrees (25 degrees is normal).

7. I diagnosed: (1) cervical sprain/strain; (2) thoracolumbar sprain/strain; and (3) post traumatic headaches. I began the patient on a course of physical therapy treatments three times per week.

[1] American Academy of Orthopedic Surgeons Standards

P.02/02

JUN-02-2008 01:43 P.02/0

8. On examination of September 21, 2006, patient had continued complaints of neck pain and low back pain with complaints of sharp pain radiating down both legs. At that time, he had not returned to work as a taxi driver due to his neck and lower back pain.

9. Examination of the cervical spine revealed moderate restrictions in range of motion in all planes and bilateral trapezius and cervical paraspinal muscle spasm.

10. Examination of the lumbar spine revealed moderate restriction and flexion bilateral lumbar paravertebral spasm, and a positive straight leg raise bilaterally.

11. I reviewed x-ray films of the cervical spine which revealed straightening of lordosis. I reviewed an MRI of the cervical spine which revealed central disc herniations at C3-C4 and C5-C6 and bulging disc at C4-C5. I reviewed x-ray films of the lumbar spine which revealed mild degenerative changes at L2 and bulging disc at L4 through S1 and bilateral foraminal narrowing at L4-L5 and possible lumbosacral radiculopathy.

12. On November 2, 2006, the patient presented to me with complaints of cramping in his calf with severe sharp burning pain. ~~This could be evidence of intermittent self-claudication.~~ Examination of the cervical spine revealed a decrease in lateral rotation to 60 degrees bilaterally (80 degrees is normal), and lateral flexion to 20 degrees bilaterally (45 degrees is normal). There was also mild bilateral upper trapezius muscle spasm. There was also tenderness in the lower lumbar paravertebrals.

13. Based on a reasonable degree of medical certainty, as well as on the patient's history and clinical examinations, it is my opinion that a direct causal relationship exists between Mr. Jalloh's injuries as described above and the accident of August 6, 2006.

14. I, the undersigned, certify that the foregoing report is true to the best of my knowledge. I am a duly licensed physician in the State of New York and I hereby affirm under the penalties of perjury the contents of this report to be true.

Dated: New York, New York
May 20, 2008

DINA NELSON, M.D.

AFFIRMATION OF MAILING

I am an attorney at law in the State of New York and am associate with the law firm of Budin, Reisman, Kupferberg & Bernstein, LLP, attorneys for the plaintiff in the above-captioned matter. I hereby affirm under oath that a true and correct copy of the within Notice of Cross Motion for Summary Judgment; Affirmation in Support of Cross-Motion and in Opposition to Defendant's Motion for Summary Judgment; Rule 56.1 Statement of Facts; Rule 56.1 Opposition to Movant's Statement of Facts; and Memorandum of Law in Support of Cross-Motion for Summary Judgment on the Issue of Liability and in Opposition to Defendant's Motion for Summary Judgment on the Issue of Threshold, were furnished on June 3, 2008 to opposing counsel by forwarding same by Federal Express Overnight Delivery, addressed as follows:

Law Offices of Harvey & Vandamme
90 Broad Street
Suite 2202
New York, NY 10004
(646) 428-2650

Christina M Rieker
CHRISTINA M. RIEKER

Index No. 07 Civ. 4091(NRB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---

**NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT AFFIRMATION IN SUPPORT OF CROSS-MOTION AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

------------------------------------------------------------------X

Index No.: 07 Civ. 4091/(NRB)

ECF CASE

**RULE 56.1 STATEMENT OF FACTS**

**Hon. Judge Naomi R. Buchwald**

Pursuant to Local Civil Rule 56.1(b) of the United States District Court for the Southern District of New York, the plaintiff, ABOUBACAR JALLOH, submits that there are no genuine issues of fact as to liability requiring a trial of the following material facts:

1. This is an action for personal injuries sustained by Aboubacar Jalloh in a motor vehicle accident on August 7, 2006.

2. The accident occurred at nearly midnight at the intersection of Jerome Avenue and West 182nd Street in the Bronx, New York. Both vehicles were traveling southbound on Jerome Avenue at the time of the accident (See Exhibit "B").

3. It is undisputed that Mr. Wendel's vehicle struck Mr. Jalloh's vehicle in the rear while Mr. Jalloh's vehicle was stopped at a red traffic light at the aforementioned intersection.

4. Mr. Wendel was coming from a concert on Roosevelt Island immediately prior to the accident, and on his way home to Connecticut, took a detour through his old neighborhood around the location of the accident (See Exhibit "D", pgs. 10-11).

5. Mr. Wendel told the responding police officers that he "rear ended the other car". (Exhibit "D", pg. 19).

6. Mr. Wendel further told the responding police officers "I took my eyes off the road and I didn't see the car" (Ex. "D", pg. 19).

7. Mr. Wendel testified that, at the time of the accident, and immediately before, he "was just looking around." And was distracted by "the change in scenery since the last time I had been there." (Ex. "D", pg. 21).

8. Plaintiff asserts that there are no genuine issues of fact requiring a trial in this matter on the issue of liability based upon defendant, Thomas P. Wendel's statements, and plaintiff is therefore entitled to summary judgment on the issue of liability.

Dated: New York, New York
June 3, 2008

Yours, etc.,
Budin, Reisman, Kupferberg & Bernstein, LLP

By: Christina M. Rieker
CHRISTINA M. RIEKER, ESQ. (1566)

TO: Law Offices of Harvey & Vandamme
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street, Suite 2202
New York, NY 10004
(646) 428-2650

SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---

**RULE 56.1 STATEMENT OF FACTS**

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---------------------------------------------------------------------X

Index No.: 07 Civ. 4091/(NRB)

ECF CASE

**RULE 56.1 OPPOSITION TO MOVANT'S STATEMENT OF FACTS**

**Hon. Judge Naomi R. Buchwald**

Pursuant to Local Civil Rule 56.1(b) of the United States District Court for the Southern District of New York, the plaintiff, ABOUBACAR JALLOH, submits that there are genuine issues of fact as to the severity of plaintiff's injuries requiring a trial of the following material facts:

1. This is an action for personal injuries sustained by Aboubacar Jalloh in a motor vehicle accident on August 7, 2006.

2. Mr. Jalloh was asked by the police who responded to the accident if he wanted to leave the scene in an ambulance. He responded, 'leave it for now'. (See plaintiff's EBT transcript, annexed to plaintiff's moving papers as Exhibit "G"). He was in pain, but did not appreciate the severity of his injuries. He also wanted to just go home and lie down (See plaintiff's Affidavit, annexed to plaintiff's papers as Exhibit "F").

3. There are no reported injuries to Aboubacar Jalloh in the Police Accident Report.

4. Aboubacar Jalloh received medical treatment from his treating physician, Dina Nelson, M.D. on August 10, 2006 and received physical therapy treatments three times per week for four months. Defendant offers the inadmissible, unaffirmed one page medical record indicating

that Mr. Jalloh told Dr. Nelson that he was working eight hours a day as a taxi driver. Plaintiff explains his work situation in his Affidavit. Mr. Jalloh states that he works only when he feels healthy enough to. He has not returned to work on a regular basis since the accident, but would like to when he feels able (See Exhibit "F"). Further, on February 8, 2008, he testified that in the last six months, he only worked about two months, total (See Exhibit "G", pgs. 12-13).

5. As of February 8, 2008, Mr. Jalloh testified that he could not kneel to pray, which he did five times per day, every day, prior to the accident. Mr. Jalloh must rub Ben-Gay on his neck and back every night before bed, so as not to wake up with severe pain and stiffness. He still suffers from severe neck and back pain and has yet to return to work on a regular basis. He looks forward to returning to work as soon as he feels able. However, Dr. McMahon found Mr. Jalloh's condition to be permanent and offered a poor prognosis for recovery. He found him unable to work (Ex. "E"). Mr. Jalloh is negatively affected by his injuries, as prayer is the most important thing in his life, and because of the pain with kneeling, he is distracted while doing so (Ex. "F" and "G").

6. On April 2, 2008, Aboubacar Jalloh was examined by Robert S. April, M.D.

7. Plaintiff asserts that Aboubacar Jalloh did sustain a medically determined "serious injury" pursuant to New York Insurance Law §5102 that is causally related to the subject motor vehicle accident, and that defendant is not entitled to summary judgment dismissing the complaint.

8. On May 14, 2008, Aboubacar Jalloh was examined by Mark S. McMahon, M.D.

Dated: New York, New York
June 3, 2008

Yours, etc.,
Budin, Reisman, Kupferberg & Bernstein, LLP

By: Christina M. Rieker
CHRISTINA M. RIEKER, ESQ. (1566)

TO:    Law Offices of Harvey & Vandamme
          Attorneys for Defendant
          THOMAS P. WENDEL
          90 Broad Street, Suite 2202
          New York, NY 10004
          (646) 428-2650

Index No. 07 Civ. 4091(NRB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

Plaintiff,

-against-

THOMAS P. WENDEL,

Defendant.

---

**RULE 56.1 OPPOSITION TO MOVANT'S STATEMENT OF FACTS**

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**