LAW OFFICES OF

*Budin, Reisman, Kupferberg & Bernstein, LLP*

MARVIN REISMAN
JAY BUDIN
HARLAN S. BUDIN
ALICE KUPFERBERG
ADAM S. BERNSTEIN
PAUL D. BUDIN *
ROBERT L. BUDIN (1953-1982)
*Retired

(212) 696-5500
Fax (212) 889-3978
112 MADISON AVENUE
NEW YORK, N.Y. 10016-7416

GERARD A. CONNOLLY, JR.
RALPH GAVIN BELL
CHRISTINA M. RIEKER□
□Admitted in NY and NJ

JANICE COOK
ADMINISTRATOR

June 3, 2008

Chambers of the Honorable Naomi R. Buchwald
United States Courthouse
500 Pearl Street, Room 2270
New York, NY 10007

Re:   Jalloh v. Wendel
      Docket No. 07 Civ. 4091 (NRB)
      Our File No. Y8236

Dear Judge Buchwald:

Enclosed herewith is plaintiff's opposition to defendant's motion for summary judgment, as well as plaintiff's cross-motion for summary judgment on the issues of liability and memorandum of law. Pursuant to Your Honor's Order dated May 21, 2008, these documents were due on June 4, 2008, and have already been sent to defendant via Federal Express Overnight Delivery.

Thank you for your courtesy in this matter.

Respectfully submitted,

BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP

*Christina M. Rieker*

CHRISTINA M. RIEKER, ESQ.

Enclosures

cc:   Mark A. Solomon, Esq.
      Law Offices of Harvey & Vandamme
      90 Broad Street, Suite 2202
      New York, NY 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\------------------------------------------------------------------X

ABOUBACAR JALLOH,

                       Plaintiff,

      -against-

THOMAS P. WENDEL,

                     Defendant.

\------------------------------------------------------------------X

**NOTICE OF
CROSS MOTION FOR
SUMMARY JUDGMENT**

ECF CASE

Index No.: 07 Civ. 4091/(NRB)

Hon. Judge Naomi R. Buchwald

     PLEASE TAKE NOTICE, that upon the annexed affirmation of CHRISTINA M. RIEKER, ESQ., dated June 3, 2008, and upon all of the pleading and proceedings heretofore had herein, the undersigned will move this Court before the Honorable Judge Naomi R. Buchwald at the Courthouse located at 500 Pearl Street, New York, NY 10007, on June 20, 2008, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an Order pursuant to FRCP 56 granting summary judgment in favor of plaintiff, ABOUBACAR JALLOH on the issue of liability; together with such other, further and different relief as the Court deems just and proper.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       June 3, 2008

                      Yours, etc.

                      *Christina M. Rieker*
                      CHRISTINA M. RIEKER, ESQ. (1566)
                      BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
                      Attorneys for Plaintiff
                      Office & P.O. Address
                      112 Madison Avenue
                      New York, New York 10016
                      (212) 696-5500

TO:
Law Offices of Harvey & Vandamme
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street, Suite 2202
New York, NY 10004
(646) 428-2650

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ABOUBACAR JALLOH,

                                 Plaintiff,

              -against-

THOMAS P. WENDEL,

                           Defendant.

------------------------------------------------------------------X

**AFFIRMATION
IN SUPPORT OF CROSS-
MOTION AND IN
OPPOSITION TO
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Index No.: 07 Civ. 4091/(NRB)

        CHRISTINA M. RIEKER, ESQ., an attorney admitted to practice law in the Courts of the

State of New York hereby affirms under the penalties of perjury:

        I am an associate of the firm of BUDIN, REISMAN, KUPFERBERG & BERNSTEIN,

LLP, attorneys for the plaintiff herein and as such I am fully familiar with the facts and

circumstances of the above entitled matter and submit this affirmation in support of plaintiff's

motion for an Order pursuant to FRCP 56 granting summary judgment in his favor.  I further

submits this affirmation in opposition to defendant WENDEL's motion dated May 16, 2008

seeking an Order for summary judgment pursuant to FRCP 56 and N.Y. Insurance Law 5102.  This

cross-motion is being filed upon leave of the Court pursuant to the Order dated May 21, 2008

(Order annexed hereto as **Exhibit "A"**).

**PART I**

**PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY**

a.      **Introduction**

        The within action stems from a rear end collision, which occurred on August 6, 2006, a

Sunday at approximately 12:00 a.m.  At that time plaintiff was the operator of a 1997 Lincoln

bearing the State of New York license plate number 62109LA that was **rear ended** by a 2005

Honda Element owned and operated by defendant, THOMAS P. WENDEL.   Annexed hereto as

**Exhibit "B"** is a copy of the Police Report.

Said accident occurred when defendant suddenly crashed into the rear of plaintiff's car

while plaintiff was stopped at the red light on Seventh Avenue and its intersection of West 135th

Street, in the County, City and State of New York.

Suit was commenced on or about March 12, 2007, issue was joined on or about May 21,

2007 (A copy of the Pleadings are annexed hereto collectively as **Exhibit "C"**).

**b.**    **Deposition Testimony of the Defendant Thomas P. Wendel**

Deposition of the defendant, Thomas Wendel was conducted on February 8, 2008.

(Annexed hereto as **Exhibit "D"** is a copy of Mr. Wendel's examination before trial transcript, in

its entirety).  Mr. Wendel testified that he resides in Connecticut, and prior to the accident, he was

at a concert on Roosevelt Island (See Ex. "D", pg. 5, 10).  Mr. Wendel testified that the road he was

traveling on before he struck plaintiff's vehicle was dry and level.   He testified that he struck

plaintiff's stopped vehicle in the rear when he took his eyes off the road.   Relevant testimony

follows:

Pg. 14, lines 16-25

    Q:  The contact involving your vehicle and the Lincoln Town car how would you describe
    that, heavy, medium, light, or something else?
    A:  Medium.
    **Q:  When the contact occurred was the Lincoln Town car moving or standing still?**
    **A:  I believe it was standing still.**
    **Q:  Just before this contact occurred did you see the Lincoln Town car?**
    **A:  I don't remember.**

Defendant testified that he told the responding police officers that he rear-ended plaintiff's

vehicle.  Relevant testimony follows:

Pg. 19, lines 8-15

    Q: What did you tell them?
    A: I told them I rear ended the other car.
    Q: Other than, "I rear ended the other car," did you give them any other explanation
    as to that event?
    A: I told them I took my eyes off the road and I didn't see the car.

Pg. 21, lines 5-9

    Q: What was the event or thing that distracted you as you've indicated before?
    A: I was just looking around. The change in the scenery since the last time I had been
    there.

Mr. Wendel's testimony establishes that the accident occurred as a result of his own negligent operation of his vehicle, and plaintiff did not contribute to the accident in any way. As there is no evidence to contradict Mr. Wendel's version of how the accident took place, but is in fact supported by the entire evidence of record, there are no issues of fact for a jury to consider.

**c.    Police Accident Report**

    The Court is respectfully referred to the police accident report, which narrates how the accident occurred based upon the interview of the involved parties (see **Exhibit "B"**). The report states as follows: "At T.P.O above listed vehicle number 1 and vehicle number 2 were both traveling south bound on Jerome Ave. at the intersection of W. 182nd St. Veh. #2 did strike veh. #1 from the rear. Police officers did not witness accident."

**d.    Summary Judgment Should be Granted as there are no Triable Issues of Fact Presented to Refute Mr. Wendel's Negligence.**

    In the instant case Mr. Wendel readily admits he struck Mr. Jalloh's vehicle in the rear (See Police Report, Exhibit "B" and defendant's EBT transcript, Exhibit "D"). It is clear from Mr. Wendel's testimony that he failed to have his attention before him and maintain a proper lookout while operating his motor vehicle. It is submitted that only one conclusion can be drawn from the

totality of the facts in this case, that the defendant THOMAS P. WENDEL's negligent operation of his vehicle caused him to rear-end plaintiff's vehicle.

      **WHEREFORE**, it is respectfully requested that this application be considered for an Order granting summary judgment on the issue of liability to the plaintiff, and setting this matter down for an assessment of damages, together with such other, further and different relief as this Court deems just and proper.

**PART II**

**DEFENDANT FAILED TO MEETS HIS BURDEN OF PROVING *PRIMA FACIE* LACK OF SERIOUS INJURY.**

**a.  Defendant relies on only one expert who performed an incomplete evaluation of Mr. Jalloh's condition.**

      Dr. Robert S. April, the defense neurologist, *examined the plaintiff on April 2, 2008, one year and eight months post accident.*  Dr. April's opinion was based solely on a single examination of the plaintiff (Dr. April's report is annexed to defendant's moving papers as Exhibit "E").  Dr. April only rendered an opinion as to Mr. Jalloh's neurological condition.  He opined, "the accident of record did not produce a neurological diagnosis, limitation, disability or need for further intervention." (See defendant's Exhibit "E").  However, Mr. Jalloh's injuries are generally orthopedic in nature, and Dr. April is not qualified to render an expert opinion as to his orthopedic injuries or limitations.  As such, defendant failed to meet his burden of establishing that Mr. Jalloh did not suffer a serious injury within the meaning of Insurance Law § 5102(d).

      Dr. April failed to review plaintiff's treating physicians' records or reports.  He only reviewed a one-page, unaffirmed record from Dr. Nelson.  Defendant's practice of picking and choosing the records he offers for review is grounds for denial of his motion.  A doctor cannot

perform a complete examination and prepare an accurate report without reviewing all of the material medical evidence. As such, Dr. April's opinion should be given little to no weight in determining this summary judgment motion.

Dr. April's report failed to discuss the diagnoses made by the plaintiff's physicians; the course of treatment plaintiff received when it was made available to him and the significance of procedures performed by plaintiff's physicians and whether they were medically necessary or whether the results indicate causal relation to the accident. The defendant's doctor conducted only a cursory examination of the plaintiff and failed to present any substantial medical proof of lack of serious injury. Thus, defendant is not entitled to summary judgment, as he has failed to meet his burden, only offering the lacking report of neurologist, Dr. April, especially in light of the fact that plaintiff's injuries are largely orthopedic in nature.

**b.   Defendant's accusation that plaintiff did not sustain a serious injury which prevented him from performing substantially all of his daily activities for no less than 90 of the first 180 days after the accident is not based on admissible evidence.**

With respect to the 90/180-day serious injury category, defendant has failed to meet his initial burden of proof and, therefore, has not shifted the burden to plaintiff to lay bare his evidence with respect to this claim. The IME report relied upon by defendant states only that plaintiff can perform his daily activities, *most of the time*, and, further, the IME took place *well* beyond the expiration of the 180-day period. Defendant provides no admissible evidence supporting his opinion that plaintiff was able to perform his daily activities for 90 days following the accident, and is therefore not entitled to summary judgment with respect to this category of serious injury.

In the event that the Court determines that defendant had met his burden, plaintiff has offered sufficient prove to rebut defendant's argument. Plaintiff testified that he underwent an intensive course of physical therapy three times per week for approximately four months after the accident (*See* **Exhibits "F"** and **"G"**, plaintiff's Affidavit, and plaintiff's EBT transcript,

respectively). He stated that since the accident, he attempted on several occasions to return to his previous job as a taxi driver. However, he has not been able to work on a regular, consistent basis because of his neck and back pain. He has only worked about a total of two months since the accident, which was nearly two years ago (**Exhibit "F"**). Since the accident he has suffered severe back pain, making it difficult for him to kneel, which he is required to do to pray, which he used to do five times a day. This has had a very negative impact on his life, as religion and prayer are the most important aspects of his life. Mr. Jalloh feels that the distraction from prayer caused by the pain is affecting his life in a negative manner (See **Exhibit "F"**).

## MR. JALLOH'S COMPLAINTS ARE SUPPORTED BY OBJECTIVE TESTS.

### a. Positive MRI Findings

Plaintiff underwent MRI testing of the cervical spine on August 16, 2006 and the lumbar spine on September 6, 2006. Annexed hereto as **Exhibit "H"** are MRI reports and a signed affirmation of the radiologist who read the films. The MRI reports are summarized as follows:

The MRI of the Cervical Spine revealed:

- **Straightening of cervical lordosis;**
- **Central disc herniations at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord; and**
- **Bulging disc at C4-C5 with flattening of the dural sac.**

The MRI of the Lumbar Spine revealed:

- **Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.**

### b. Quantitative and Qualitative Findings of Plaintiff's Treating Physicians

Dr. Dina Nelson, a pain management specialist and plaintiff's treating physician, treated the Mr. Jalloh from August 10, 2006 through December 7, 2006 (Affirmation of Dr. Nelson is

annexed hereto as **Exhibit "I"**). Mr. Jalloh received physical therapy treatments for four months, consisting of electrical stimulation, massages, and the application of hot and cold packs, all to the lower back and neck.

On initial physical examination on August 10, 2006, Mr. Jalloh presented with complaints of neck pain, and mid to low back pain, and frontal headaches. **Examination of the cervical spine revealed severe limitation in all planes with diffuse muscle spasm in the upper trapezius muscles, levator scapulae, and SCM and tenderness in the cervical paraspinal. Examination of the thoracolumbar spine revealed tenderness in the lower thoracic spinous processes up to the upper lumbar spine. Flexion was limited to 50 degrees (90 degrees is normal[1]) and lateral flexion was limited to 10 degrees (25 degrees is normal).** Dr. Nelson diagnosed: (1) cervical sprain/strain; (2) thoracolumbar sprain/strain; and (3) post traumatic headaches (**Exhibit "I"**).

On examination of September 21, 2006, Mr. Jalloh had continued complaints of neck pain and low back pain with complaints of sharp pain radiating down both legs. **Examination of the cervical spine revealed moderate restrictions in range of motion in all planes and bilateral trapezius and cervical paraspinal muscle spasm. Examination of the lumbar spine revealed moderate restriction and flexion bilateral lumbar paravertebral spasm, and a positive straight leg raise bilaterally (Exhibit "I").**

**On November 2, 2006, examination of the cervical spine revealed a decrease in lateral rotation to 60 degrees bilaterally (80 degrees is normal), and lateral flexion to 20 degrees bilaterally (45 degrees is normal).** There was bilateral upper trapezius muscle spasm and tenderness in the lower lumbar paravertebrals. Based on a reasonable degree of medical

certainty, and on Mr. Jalloh's history and clinical examinations, Dr. Nelson opined that a direct causal relationship exists between Mr. Jalloh's injuries and the accident of August 6, 2006 (See **Exhibit "I"**).

Dr. Mark S. McMahon, an orthopedic surgeon, examined plaintiff on May 14, 2008, and offered an opinion as to his condition, disability, and current symptoms. Dr. McMahon reviewed all of Mr. Jalloh's treating physician's reports, and the MRI and x-ray reports. **Upon evaluation, Dr. McMahon opined that Mr. Jalloh is currently unable to work due to his neck and back problems.** Mr. Jalloh still has pain radiating down his legs, as well as bilateral leg weakness. Mr. Jalloh's neck and back pain were reported to be worse with bending and lifting. Mr. Jalloh reported waking up at night with neck and back pain, and worsening pain with prolonged sitting, standing, and walking (See **Exhibit "E"**).

On physical examination of the cervical spine, Mr. Jalloh could flex to 2 degrees with pain (normal limit is 60) and extend to 0 degrees with pain (nl 50). He could bend to the left and right 0 degrees with pain (nl 40). On physical examination of the lumbar spine, Mr. Jalloh could flex to 2 degrees with pain (nl 90) and could extend to 0 degrees with pain (nl 30). He could bend to the left and right 0 degrees with pain (nl 20). He had decreased sensation in his left lower extremity and had a positive straight leg raising sign bilaterally (**Exhibit "E"**).

Dr. McMahon diagnosed (1) cervical disc herniations at C3-4 and C5-6 deforming the dural sac and bulging disc at C4-5 with flattening of the dural sac and (2) lumbar spine bulging disc at L4-5 with flattening of the dural sac with bilateral foraminal encroachment, and L5-S1 bulging disc with flattening of the epidural fat. He opined that this diagnoses occurred as a result of the August 6, 2006 accident (**Ex. "E"**).

---

[1] American Academy of Orthopedic Surgeons Standards

**Dr. McMahon opined that Mr. Jalloh's prognosis for recovery is poor and his condition is permanent. He stated that Mr. Jalloh's condition interferes with his quality of life and his activities of daily living, nearly two years after the accident. He opined that Mr. Jalloh is unable to work as a taxi driver because of his injuries, and requires a multilevel cervical discectomy and fusion using instrumentation and bone graft, as well as an L4-S1 decompression and fusion using instrumentation and bone graft (Exhibit "E").**

c. <u>Plaintiff's Deposition Testimony and Affidavit</u>

Mr. Jalloh's deposition was conducted on February 8, 2008 (A copy of plaintiff's Examination Before Trial transcript is annexed to moving papers as **Exhibit "G"**). He described the accident, injuries, and limitations in his signed and notarized affidavit, annexed hereto as **Exhibit "F"**.

Mr. Jalloh testified that on August 8, 2006, he was struck from behind by defendant's vehicle. He described the impact as 'heavy' (pg. 37). Mr. Jalloh testified that he saw a doctor the next day for pain in his neck, lower back, and down his legs. He immediately began a four-month course of physical therapy treatments three times per week (Ex. "G", pgs. 38, 40, 43).

Mr. Jalloh stated in his affidavit that he attempted to return to his job as a taxi driver, but was only able to work on a few occasions due to his severe neck and back pain and restriction in range of motion. He is not currently working. Mr. Jalloh also stated that his back pain makes it very difficult for him to kneel to pray, which he used to do five times per day, as his religion required. He finds the pain very distracting, which has negatively impacted his daily prayer ritual, to his chagrin, as religion is the most important aspect of his life (See Ex. "F").

<u>CONCLUSION</u>

This Court should deny defendant's motion and rule in favor of the plaintiff. The proponent of a summary judgment motion must make a prima facie showing of its entitlement to judgment as

a matter of law, tendering sufficient evidence. By submitting the lacking report of Dr. April and the unaffirmed one-page medical report of Dr. Nelson, defendant has clearly failed to meet this burden. However, should this Court find that the defendant has met his burden; plaintiff has set forth sufficient evidence to raise a triable issue of fact under §5102(d).

Issues of credibility and probativeness should not be decided by motion. That being the case, it is respectfully requested that plaintiff be permitted to present her expert testimony at trial to counter the medical proof offered by defendant. Moreover, plaintiff should be permitted to subpoena defendant's doctor for in-court testimony relevant to his examination findings. In sum, the plaintiff has shown that the methodology of testing and results has sufficient indicia of medical reliability such that it is appropriate to present this case to a jury.

**WHEREFORE**, affirmant respectfully requests that the within motion for summary judgment based upon N.Y. Insurance Law 5102 be denied, and plaintiff's cross motion for summary judgment on the issue of liability be granted, and this matter set down for a date set certain on the matter of damages, together with such other, further, and different relief as to this Court seems just and proper.

Dated: New York, New York
      June 3, 2008

_Christina M. Rieka_
CHRISTINA M. RIEKER, ESQ.

## ATTORNEY CERTIFICATION PURSUANT TO 22 NYCRR 130-1.1a

Pursuant to 22 NYCRR 130-1.1a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief, and after reasonable inquiry, the contentions contained in the annexed document(s) are not frivolous.

Dated: June 3, 2008

_Christina M. Rieka_
CHRISTINA M. RIEKER, ESQ.

EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5 21 08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

ABOUBACAR JALLOH,

                            Plaintiff,                    ORDER

              - v -                               07 Civ. 4091 (NRB)

THOMAS P. WENDEL,

                            Defendant.

------------------------------------X
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE


      **WHEREAS** the trial in this matter is currently scheduled to
commence on June 10, 2008; and

      **WHEREAS** defendant filed a motion for summary judgment on
May 16, 2008 and plaintiff has sought leave to file a cross-
motion; it is hereby

      **ORDERED** that plaintiff's brief in opposition to defendant's
motion for summary judgment and in support of its cross-motion
for summary judgment is due on June 4, 2008, defendant's reply
and answering brief is due June 13, and plaintiff's reply brief
on its cross-motion is due June 20, 2008; and it is further

      **ORDERED** that the trial in this matter shall commence on
August 11, 2008 unless the Court's trial calendar permits an
earlier trial.

Dated:     New York, New York
           May 20, 2008

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

        A copy of the foregoing Order has been mailed on this date
to the following:

**Attorney for Plaintiff**
Adam S. Bernstein, Esq.
Budin, Reisman, Kupferberg  & Bernstein
112 Madison Avenue, 2nd Floor
New York, NY 10016-7416

**Attorney for Defendant**
Mark A. Solomon, Esq.
Harvey & Vandamme
90 Broad Street, Suite 2202
New York, NY 10004

EXHIBIT B

# POLICE ACCIDENT REPORT (NYC)
## MV-104AN (7/01)

Precinct **046**

Accident No. **CH2061128**

Complaint Number

☐ **AMENDED REPORT**

| Accident Date | | | Day of Week | Military Time | No. of Vehicles | No. Injured | No. Killed | Not Investigated at Scene | Left Scene | Police Photos |
|---|---|---|---|---|---|---|---|---|---|---|
| Month **08** | Day **07** | Year **2006** | **MONDAY** | **0115** | **2** | | | ☐ Accident Reconstructed ☒ | ☐ | ☐ Yes ☐ No |

### VEHICLE 1
☒ VEHICLE 2   ☐ BICYCLIST   ☐ PEDESTRIAN   ☐ OTHER PEDESTRIAN

**VEHICLE 1 - Driver** License ID Number **337 231 135**   State NYC **NY**

**VEHICLE 2 - Driver** License ID Number **232762213**   State of Lic. **CT**

Driver Name - exactly as printed on license **JALLOH, ABOUBACAR**

Driver Name - exactly as printed on license **WENDEL THOMAS, P**

Address (Include Number & Street) **1408 E CLARK PLACE** Apt. No. **43**

Address (Include Number & Street) **20 MAIN ST** Apt. No.

City or Town **BRONX** State **N.Y.** Zip Code **10452**

City or Town **DANBURY** State **CT** Zip Code **06810**

| Date of Birth | | | Sex | Unlicensed | No. of Occupants | Public Property Damaged |
|---|---|---|---|---|---|---|
| Month **01** | Day **03** | Year **?** | M | | **1** | |

| Date of Birth | | | Sex | Unlicensed | No. of Occupants | Public Property Damaged |
|---|---|---|---|---|---|---|
| Month **07** | Day **23** | Year **?** | M | | | |

Name-exactly as printed on registration **NEW TUXEDO PARK LIMOUSINE CAR INC** Sex Date of Birth Month Day Year

Name-exactly as printed on registration **WENDEL THOMAS P** Sex **M** Date of Birth Month **07** Day **23** Year **84**

Address (Include Number & Street) **31 RTE 17 STE 16** Apt. No. Haz. Mat Code Released ☐

Address (Include Number & Street) **20 MAIN ST** Apt. No. Haz. Mat. Code Released ☐

City or Town **TUXEDO PARK** State **NY** Zip Code **10987**

City or Town **DANBURY** State **CT** Zip Code **06810**

Plate Number **GZ101GLA** State of Reg. **NY** Vehicle Year & Make **1997 LINKON** Vehicle Type **4DRSDN** Ins. Code **036**

Plate Number **551DAV** State of Reg. **CT** Vehicle Year & Make **2005 HONDA 5T** Vehicle Type **WAG** Ins. Code

Ticket/Arrest Number(s)

Violation Section(s)

### VEHICLE
Check if involved vehicle is:
☐ more than 95 inches wide;
☐ more than 34 feet long;
☐ operated with an overweight permit.
☐ operated with an overdimension permit.

Check if involved vehicle is:
☐ more than 95 inches wide;
☐ more than 34 feet long;
☐ operated with an overweight permit.
☐ operated with an overdimension permit.

Circle the diagram below that describes the accident, or draw your own diagram in space #9. Number the vehicles.

**VEHICLE 1 DAMAGE CODES**
Box 1 - Point of Impact **8**
Box 2 - Most Damage **8**
Enter up to three more Damage Codes   **3  4  5**

**VEHICLE 2 DAMAGE CODES**
Box 1 - Point of Impact **2**
Box 2 - Most Damage **2**
Enter up to three more Damage Codes   **3  4  5**

| | Rear End | Left Turn | Right Angle | Right Turn | Head On |
|---|---|---|---|---|---|
| | Overtaking | Left Turn | | Right Turn | Sideswipe |

**ACCIDENT DIAGRAM**

Vehicle Towed By **CJ SENIORS COLLISION** To **4343 3RD AVE BRONX NY**

Vehicle Towed By To

Jerome ave

**VEHICLE DAMAGE CODING:**
1-13. SEE DIAGRAM ON RIGHT.
14. UNDERCARRIAGE
15. TRAILER
16. OVERTURNED
17. DEMOLISHED
18. NO DAMAGE
19. OTHER

Cost of repairs to any one vehicle will be more than $1000.
☐ Unknown/Unable to Determine   ☒ Yes   ☐ No

| Reference Marker | Coordinates (if available) Latitude/Northing | Place Where Accident Occurred: ☒ BRONX ☐ KINGS ☐ NEW YORK ☐ QUEENS ☐ RICHMOND |
|---|---|---|
| | | Road on which accident occurred **Jerome Ave** (Route Number or Street Name) |
| | Longitude/Easting | at 1) intersecting street **W 182 ST** (Route Number or Street Name) |
| | | or 2) ☐N ☐S ☐E ☐W of Feet ☐Miles (Milepost, Nearest Intersecting Route Number or Street Name) |

Accident Description/Officer's Notes: **TPO above listed vehicle number 1 and vehicle number 2 where both traveling south bound on Jerome ave at the intersection of W 182 av. veh #2 did strike vd #1 from the rear. police officers did not witness accident**

| ALL INVOLVED | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 17 | BY | TO 18 | Names of all involved | Date of Death Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | | | 3 | B | 43 | M | | | | B | JALLOH, ABOUBACAR | |
| B | 2 | | | 3 | 1 | 52 | M | | | 8 | | WENDEL, THOMAS | |
| C | | | | | | | | | | | | | |
| D | | | | | | | | | | | | | |
| E | | | | | | | | | | | | | |
| F | | | | | | | | | | | | | |

Officer's Rank and Signature **PO**

Print Name in Full **STEPHEN SWETT**

Tax ID No. **940407**

NCIC No. **03030**

Precinct **046**

Post/Sector **34**

Reviewing Officer

Date/Time Reviewed

EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

Index No.: 13120|07
                3|21|07

------------------------------------------------------------X

ABOUBACAR JALLOH,

Plaintiff designates Bronx
County as the place of trial.

                                        Plaintiff,

**SUMMONS**

          -against-

The basis of venue is:
Plaintiff's residence

THOMAS P. WENDEL,

Plaintiff resides at:

                                        Defendant.

108 East Clark Place
County of Bronx

------------------------------------------------------------X

**To the above named Defendant**

    **You are hereby summoned** to answer the complaint in this action, and to serve a copy of
your answer, or, if the complaint is not served with this summons, to serve a notice of appearance
on the plaintiff's attorneys within (20) twenty days after the service of this summons exclusive of
the day of service, where service is made by delivery upon you personally within the state, or
within (30) thirty days after completion of service where service is made in any other manner. In
case of your failure to appear or answer, judgment will be taken against you by default for the
relief demanded in the complaint.

Dated: New York, New York
      March 12, 2007

_____
ADAM S. BERNSTEIN, ESQ.
BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
Attorneys for Plaintiff
Office and P.O. Address
112 Madison Avenue, 2nd Floor
New York, New York 10016-7416
(212) 696-5500
Our File # Y8236

Defendant's Address:

**THOMAS P. WENDEL**
120 Main Street
Danbury, CT 06810

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X
ABOUBACAR JALLOH,                                    VERIFIED COMPLAINT

                              Plaintiff,

                                                     Index #  13120|07
        -against-

THOMAS P. WENDEL,

                              Defendant.
-------------------------------------------------------------------X

        Plaintiff, by his attorneys BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP, as

and for a cause of action allege upon information and belief as follows:

        1.      That this action is brought pursuant to the provisions of the New York State

Comprehensive Motor Vehicle Insurance Reparations Act and plaintiff has complied with all of

the conditions thereof.

        2.      That plaintiff sustained serious injuries as defined in §5102(d) of the Insurance

Law of the State of New York.

        3.      That by reason of the foregoing, plaintiff is entitled to recover for non-economic

losses as are not included within the definition of "basic economic loss" as set forth in §5102(a)

of the Insurance Law of the State of New York.

        4.      That plaintiff is a "covered person" as defined in §5102(j) of the Insurance Law of

the State of New York.

        5.      That this action falls within one or more of the exceptions as set forth in CPLR

§1602.

        6.      Upon information and belief, that at all of the times and places hereinafter

mentioned, defendant was the owner of a certain motor vehicle bearing State of Connecticut

license plate No. 551UAV.

7.     Upon information and belief, that at all of the times and places hereinafter mentioned, defendant controlled the aforesaid motor vehicle.

8.     Upon information and belief, that at all of the times and places hereinafter mentioned, defendant maintained the aforesaid motor vehicle.

9.     Upon information and belief, that at all of the times and places hereinafter mentioned, defendant operated the aforesaid motor vehicle.

10.    Upon information and belief, that at all of the times and places hereinafter mentioned, defendant was operating the aforesaid motor vehicle with the knowledge, permission and consent of the owner thereof.

11.    That at all of the times and places hereinafter mentioned, plaintiff was operating a certain motor vehicle bearing State of New York plate number 62109LA.

12.    That at all times and places hereinafter mentioned, 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, were public roadways and/or thoroughfares.

13.    That on or about August 6, 2006, at or about the intersection of 182nd Street and Jerome Avenue, in the County of Bronx, City and State of New York, there was contact between the defendant's motor vehicle and plaintiff's motor vehicle.

14.    That the said accident and the injuries and damages to the plaintiff resulting therefrom were caused solely and wholly by reason of the negligence, carelessness and recklessness of the defendant in the ownership, operation and control of his motor vehicle, in that he failed to have and keep the same under reasonable and proper control; in that he caused, allowed and permitted his said motor vehicle to run into and violently collide with the rear of plaintiff's stationary motor vehicle; in that he failed to observe and/or heed the presence of

plaintiff's stationary motor vehicle lawfully stopped upon the public roadway pursuant to a red traffic signal light; in that he failed to observe and/or heed the traffic signals and/or controls then and there in operation; in that he failed to bring his motor vehicle under control in time to avoid the collision; in that he failed to have his attention before him; in that he failed to look; in that he failed to see; in that he operated and controlled his motor vehicle at a fast and excessive rate of speed under the circumstances and conditions then and there prevailing; in that he failed to provide and/or make prompt and timely use of adequate and efficient brakes and steering mechanisms; in failing to apply the brakes of his motor vehicle or to take other proper and appropriate evasive action in time to avoid running into and violently colliding with the plaintiff's motor vehicle; in operating the aforesaid motor vehicle in an unreasonable and imprudent manner; in that he operated and controlled his motor vehicle in reckless disregard for the safety of others, and the plaintiff in particular; in that he violated the statutes, ordinances, rules and regulations in the cases made and provided; in that he was inattentive to his duties wherein had he been attentive to his duties the accident and ensuing injuries could have and would have been avoided; in that he failed to act as a reasonable and prudent person could have and would have under the circumstances and conditions then and there prevailing; in that he operated and controlled his motor vehicle in such a willful, wanton and grossly culpable manner as to be liable for damages and punitive damages; in that he acted in reckless disregard for the safety of others, and the plaintiff in particular; and in that he failed to take all necessary and proper means and precautions to avoid the said accident.

15.    That as a result of the negligence of the defendant, plaintiff sustained injuries to various parts of his head, body, limbs and nervous system and, upon information and belief,

<u>VERIFICATION</u>

The undersigned, being an attorney duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury:

That I am one of the attorneys for the plaintiff in the within action; that I have read and know the contents of the foregoing complaint, and that the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters I believe it to be true.

This verification is made by affirmation and not by plaintiff herein because the plaintiff is not presently within the county wherein affirmant maintains an office.

This verification is based on information furnished by plaintiff in this action and information contained in affirmant's file.

Dated:     New York, New York
           March 12, 2007

                                        ADAM S. BERNSTEIN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------X    Index No. 13120/07
ABOUBACAR JALLOH,

<table>
<tr><td>Plaintiff,</td><td><b><u>VERIFIED ANSWER</u></b></td></tr>
<tr><td>-against-</td><td><b>DEFENDANT DEMANDS<br>TRIAL BY JURY</b></td></tr>
</table>

THOMAS P. WENDEL,

Defendants.
------------------------------------------------------------X

Defendant, THOMAS P. WENDEL, by and through his attorneys, the Law

Offices of Patrick J. Maloney, as and for an answer to the complaint of the plaintiff,

alleges as follows upon information and belief:

**FIRST:**    Denies each and every allegation contained in Paragraphs "2",

"14" and "15" of the Complaint.

**SECOND:**    Denies each and every allegation contained in Paragraphs"3" and

"4" and respectfully refers all questions of law therein to the Court for resolution.

**THIRD:**    Denies knowledge or information sufficient to form a belief as to

each and every allegation contained in Paragraphs "6", "7", "8", "9", "10", "11", "12"

and "13" of the complaint.

**FOURTH:**    Denies knowledge or information sufficient to form a belief as to

each and every allegation contained in Paragraphs "1" and "5" and respectfully refers all

questions of law therein to the Court for resolution.

<u>**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**</u>

**FIFTH:**    The amount of any judgment or award against this answering

defendant shall be reduced by the amount of plaintiff's comparative fault and the

comparative fault of any adverse party.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

**SIXTH:**        Service of process was improper and as a consequence of the

foregoing, the complaint should be dismissed in all respects.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

**SEVENTH:**  That any damages otherwise recoverable by the plaintiff shall be

diminished in the proportion which the failure of the plaintiff(s) to wear seat belts bears

to the culpable conduct which caused the damages and/or injuries alleged.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

**EIGHTH:**        The action is barred by reason of the plaintiff's failure to sustain a

serious personal injury as defined by Section 5102 of Article 51 of the Insurance Law.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

**NINTH:**        That in the event of any judgment or verdict on behalf of the

plaintiff, the defendant is entitled to a set-off verdict with respect to the amounts of any

payments made to the plaintiff for medical and other expenses prior thereto.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

**TENTH:**        That plaintiff assumed the risk of any injuries which plaintiff may

have sustained at the time and place set forth in the Complaint herein.

**WHEREFORE**, defendant demands judgment of this court dismissing the

complaint in all respects and granting defendant such other, further or different relief as

the Court may deem just and proper.

2

Dated: New York, New York
       May 21, 2007

                                    Yours, etc.

                                    LAW OFFICES OF PATRICK J. MALONEY

                                    By:_____
                                          Mark A. Solomon
                                    Attorneys for Defendant
                                    THOMAS P. WENDEL
                                    90 Broad Street – Suite 2202
                                    New York, New York 10004
                                    (646) 428-2650

TO:    BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP
       Attorneys for Plaintiff
       112 Madison Avenue
       New York, New York 10016
       (212) 696-5500
       File Number: Y8236

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------X    Index No. 13120/07

ABOUBACAR JALLOH,

                           Plaintiff,                   **ATTORNEY'S**
                                                          **VERIFICATION**

    -against-

THOMAS P. WENDEL,

                         Defendants.
-----------------------------------------------------------------X

      Mark A. Solomon, an attorney duly admitted to practice law before the Courts of

New York State, hereby affirms under the penalties of perjury pursuant to CPLR 2106:

      I am an associate of the firm of the LAW OFFICES OF PATRICK J.

MALONEY, attorneys for defendant, THOMAS P. WENDEL.

      I submit the following statement upon information and belief, based upon an

inspection of the records maintained by this office, which records I believe to be true.

      That I have read the contents of the attached Verified Answer and believe it to be

true based on information available or maintained by this firm. I make this verification

because this defendant is not located in New York County.

Dated: New York, New York
       May 21, 2007

                                                 Mark A. Solomon

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X    Index No. 13120/07
ABOUBACAR JALLOH,

                              Plaintiff,

       -against-

THOMAS P. WENDEL,

                              Defendants.

-------------------------------------------------------------------X

---

**VERIFIED ANSWER**

---

**LAW OFFICES OF PATRICK J. MALONEY**
Attorneys for Defendant
THOMAS P. WENDEL
90 Broad Street – Suite 2202
New York, New York 10004
(646) 428-2650

EXHIBIT D

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ABOUBACAR JALLOH,

                        PLAINTIFF,

         -against-    Case No: 07CIV4091NRB

THOMAS P. WENDEL,

                        DEFENDANT.
-------------------------------------------x
                 112 Madison Avenue
                 New York, New York 10016

                 DATE:  February 8th, 2008
                 TIME:  1:11 p.m.

        EXAMINATION BEFORE TRIAL of the Defendant,
THOMAS P. WENDEL, taken by the Plaintiff, pursuant
to a Court Order, held at the above time and
place, before Linda Orlando, a Registered
Professional Reporter and Notary Public of the
State of New York.
```

Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4   RUDIN, REISMAN, KUPFERBERG and Bernstein, LLP.,
            Attorneys for the Plaintiff
 5          ABOUBACAR JALLOH
            112 Madison Avenue
 6          New York, New York 10016
     BY:    PETER McCABE, ESQ.
 7          File #:  Y8236
 8
 9   LAW OFFICES OF PATRICK J. MALONEY
            Attorneys for the Defendant
10          THOMAS P. WENDEL
            90 Broad Street
11          New York, New York 10004
     BY:    HENDRICK VANDAMME, ESQ.
12          File #:  2007-100069
13
14
15                    *     *     *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   F E D E R A L    S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND AGREED
 5   By and between the counsel for the respective
 6   parties hereto, that the filing, sealing, and
 7   certification of the within deposition shall
 8   Be and the same are hereby waived;
 9
10        IT IS FURTHER STIPULATED AND AGREED
11   That all objections, except as to the form
12   of the question, shall be reserved to the times
13   of the trial.
14
15        IT IS FURTHER STIPULATED AND AGREED
16   That the within deposition may be signed before
17   Any Notary Public with the same force and effect
18   As if signed and sworn to before this court.
19
20
21                 *     *     *     *
22
23
24
25
```

Page 4

```
 1
 2
 3            -----------INDEX-------------
 4   WITNESS              EXAMINED BY        PAGE
 5   THOMAS P. WENDEL     MR. McCABE          5
 6
 7
 8
 9            ----------EXHIBIT-------------
10   PLAINTIFF'S          DESCRIPTION        PAGE
11   EXHIBIT
12   One                  Photograph          9
13
14
15   INFORMATION AND/OR DOCUMENTATION REQUESTED
16   INFORMATION AND/OR DOCUMENTATION        PAGE
17   Name of medication                      12
18
19
20
21
22
23
24
25
```

Page 6

```
                    Thomas P. Wendel
1                   Thomas P. Wendel
2   T H O M A S   P.   W E N D E L, called as a
3   witness, having been first duly sworn by a Notary
4   Public of the State of New York, was examined and
5   testified as follows:
6   EXAMINATION BY MR. McCABE:
7         Q.    Please state your name for the
8   record.
9         A.    Thomas P. Wendel.
10        Q.    Where do you reside?
11        A.    81 South Lake Shore Drive,
12  Brookfield, Connecticut, 06804.
13        Q.    Good afternoon, sir.  My name is
14  Peter McCabe.  I'm an attorney.  I represent a
15  gentleman named Aboubacar Jalloh, who is making a
16  claim against you for personal injuries as a
17  result of an automobile accident.
18        A.    Yes.
19        Q.    I'm going to asking you some
20  questions about the happening of the accident.  My
21  questions should be short and simple, direct
22  questions, which you could respond to in the same
23  manner.  But, from time to time you may be
24  puzzled by a question of mine, and if you are, and
25  if you have any problem understanding what I'm
```

```
1   saying, please indicate to that to me and I will
2   try and explain myself to you.
3         A.    Yes.
4         Q.    During the course of this examination
5   I will be asking questions.  Your lawyer has
6   explained to you that the manner in which you're
7   supposed to answer.  But, we have a court
8   stenographer here or a reporter who records the
9   questions and answers.
10        You may know what the response is
11  before I finish.  But, wait until you hear my
12  question and when you answer my question please
13  respond with whatever response you feel
14  comfortable with in words of spoken English so the
15  reporter can record your statements correctly and
16  succinctly.
17        A.    Yes.
18        Q.    Sir, on August 7th, the year 2006,
19  did you have an automobile accident that day?
20        A.    Yes, sir.
21        Q.    At what time of the day did the
22  accident happen, approximately?
23        A.    I believe it was about one o'clock in
24  the morning.
```

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700   212-374-7700   718-527-7700   FAX# 516-678-4488

Page 7

```
1                   Thomas P. Wendel
2         Q.    Were did the accident happen?
3         A.    On Jerome Avenue.
4         Q.    At or near an intersecting street?
5         A.    I believe it was 182nd Street.
6         Q.    At the time of this accident were you
7   driving a motor vehicle?
8         A.    Yes, sir.
9         Q.    Was that a 2005 Honda station wagon?
10        A.    It's a Honda Element.  E-L-E-M-E-N-T.
11  That's the model.
12        Q.    Who was the owner of that vehicle?
13        A.    I am.
14        Q.    At the time of this incident was
15  there anyone in the Honda with you?
16        A.    No, sir.
17        Q.    At the time of this incident did you
18  have a driver's license?
19        A.    Yes, sir.
20        Q.    Issued in what state?
21        A.    Connecticut.
22        Q.    Were there any restrictions or
23  requirements on that license?
24        A.    No, sir.
25        Q.    You're wearing glasses at this
```

Page 8

```
1                   Thomas P. Wendel
2   deposition, correct?
3         A.    Yes, sir.
4         Q.    What are the glasses designed to
5   correct?
6         A.    They're reading glasses.  They're
7   non-prescription.
8         Q.    What part or portion of your vehicle
9   was involved in this incident?
10        A.    The front end.
11        Q.    Was there damage to that part of your
12  vehicle?
13        A.    Yes, sir.
14        Q.    Was that damage repaired?
15        A.    Yes, sir.
16        Q.    What was the cost of preparing that
17  damage, approximately?
18        A.    I don't recall.  I don't remember.
19        Q.    Was it more or less than $2,500?
20        A.    I believe so.
21        Q.    All right.  Who paid for the repairs?
22        A.    Safe Co Insurance.
23        Q.    At the time of this accident was your
24  vehicle in contact with another car or vehicle?
25        A.    Yes, sir.
```

JAY DEITZ AND ASSOCIATES LTD.
516-678-0700   212-374-7700   718-527-7700   FAX# 516-678-4488

Page 10

Thomas P. Wendel

2  Q.    And did you later learn that that was
3  a Lincoln Town car operated by a Mr. Jalloh?
4  A.    Yes, sir.
5  Q.    What part of his vehicle was involved
6  in the incident?
7  A.    Rear end.
8  Q.    Did you look at the rear end of
9  Mr. Jalloh's car following the accident?
10  A.    I observed it.
11  Q.    Did you see any damage to it?
12  A.    Yes, sir.
13  MR. McCABE:  If you could just mark
14  that on the back as Plaintiff's Exhibit
15  One for identification, please?
16  (Whereupon, the aforementioned
17  Photograph was marked as Plaintiff's
18  Exhibit One for identification as of this
19  date by the Reporter.)
20  Q.    Sir.  I show you a photograph which
21  has been marked for identification as Plaintiff's
22  Exhibit One.  Just take a look at that.  Can you
23  tell me does that show the vehicle that you were
24  in contact with at the time of this accident as it
25  appeared immediately after the accident?

Thomas P. Wendel

2  A.    I believe so.
3  Q.    Sir, at any time before there was a
4  contact between these two vehicles did you see
5  that Lincoln Town car?
6  A.    No.  I don't believe so.
7  Q.    At the time of this accident was it
8  light out?
9  A.    No.
10  Q.    Was it dark out?
11  A.    Yes.
12  Q.    Was it raining?
13  A.    No.
14  Q.    Where were you coming from?
15  A.    I was coming from Fordham Road.
16  Q.    What place was the last place you had
17  been immediately before this accident?
18  A.    Roosevelt Island.
19  Q.    What was the occasion that you were
20  there for?
21  A.    I went to entertainment.  A show.
22  Q.    What was it when you say
23  entertainment?
24  A.    It was a concert.
25  Q.    Sir?

Page 11

Thomas P. Wendel

2  A.    A concert.
3  Q.    At the time of the accident where
4  were you going?
5  A.    I lived there.  I used to live there.
6  I grew up on 1263 University Avenue, which is
7  right in that area.  So, I got off the Major
8  Deegan.  I wanted to visit where I used to live as
9  a child.  I grew up in that area.
10  Q.    All right.  Did you actual locate
11  that premises before this accident occurred?
12  A.    Yes, sir.
13  Q.    Had you actually gotten out of your
14  vehicle in that area to look at the premises?
15  A.    No.
16  Q.    So, you just stopped and looked?
17  A.    Yes.
18  Q.    And now you were preceding where?
19  A.    I was going to do go down by Jerone
20  Avenue.  That's where I used to take a bus.  I
21  used to go to Catholic school.  I wanted to see
22  the area.
23  Q.    For a period of twelve hours prior to
24  that accident had you had any alcoholic beverages
25  to drink?

Page 12

Thomas P. Wendel

2  A.    No.
3  Q.    Had you taken any prescription or
4  non-prescription drugs?
5  A.    I take a medication for depression.
6  Q.    Had you taken that medication within
7  twelve hours of this event?
8  A.    I take it every day.  I would assume
9  that I did, sir.  Sometimes I forget.
10  Q.    When you say you take medication,
11  what's the name of it?
12  A.    I just have a blank spot.  Just a
13  second.
14  MR. VANDAMME:  Take your time.
15  MR. McCABE:  We'll believe a blank at
16  this point.
17  THE WITNESS:  I'm sorry.  I know
18  I'll think of it.
19  (Space.)_____
20  Q.    What I'm saying is that this hearing
21  will be reduced to type written form.  It will be
22  sent to you at some point.  When you receive it
23  there will be a space in the transcript at this
24  point for you to insert the name of the
25  medication.

Page 14

Thomas P. Wendel

1
2  A.   Okay.
3  Q.   So, don't agonize.
4  A.   Thank you.
5  Q.   What type of business or profession
6  did you have at the time of this event?
7  A.   I'm a Police officer.
8  Q.   With what agency?
9  A.   The Danbury Police Department.
10  Q.   What is your title?
11  A.   I'm Captain of patrol.
12  Q.   Just before this accident happened
13  were you operating your vehicle on Jerome Avenue?
14  A.   Yes, sir.
15  Q.   And Jerome Avenue, at or near the
16  place where this accident happened, is that a
17  one-way or a two-way street?
18  A.   I believe it is a two-way street.
19  Q.   In which direction were you
20  proceeding immediately before the accident
21  happened?
22  A.   Southbound.
23  Q.   When last before this accident had
24  you been in the area where the accident happened?
25  A.   I don't know.

Page 14

Thomas P. Wendel

1
2  Q.   Many years before?
3  A.   A long time. Yes, sir.
4  Q.   In the direction that you were
5  proceeding how many lanes were there for moving
6  traffic?
7  A.   I believe there was one.
8  Q.   At the place where this accident
9  happened was the roadway that you were traveling
10  on wet or dry?
11  A.   Dry.
12  Q.   Just before this accident happened
13  the roadway that you were traveling on was it
14  level or uphill or downhill or something else?
15  A.   Level.
16  Q.   The contact involving your vehicle
17  and the Lincoln Town car how would you describe
18  that, heavy, medium, light, or something else?
19  A.   Medium.
20  Q.   When the contact occurred was the
21  Lincoln Town car moving or standing still?
22  A.   I believe it was standing still.
23  Q.   Just before this contact occurred did
24  you see the Lincoln Town car?
25  A.   I don't remember.

Page 15

Thomas P. Wendel

1
2  Q.   As a result of this accident or
3  incident did you suffer any type of injury
4  involving your loss of consciousness?
5  A.   No.
6  Q.   Did you strike your head on something
7  at the time of your accident?
8  MR. VANDAMME:  You have to give a
9  verbal answer.
10  A.   I'm sorry. No, sir.
11  Q.   Just before this accident happened
12  for how many blocks or what distance had you
13  traveled on Jerome Avenue? Where did you get on
14  to where the accident happened? What was that
15  space?
16  A.   I was on Fordham Road which
17  intersects with Jerome Avenue. I'm not sure how
18  many blocks. I believe it very close. I'm not
19  sure.
20  Q.   What was the closest intersecting
21  street to the place where this accident happened?
22  A.   I don't know. I'm sorry. I believe
23  it was 182nd Street. I know that now.
24  Q.   About how much from the place where
25  this impact occurred to the intersection of Jerome

Page 16

Thomas P. Wendel

1
2  Avenue and 182 Street, how much distance separated
3  those two points?
4  A.   I don't remember.
5  Q.   Would it be more or less than two car
6  lengths?
7  A.   I don't remember.
8  Q.   The intersection of Jerome Avenue and
9  182nd Street at the time of this accident was it
10  controlled by a traffic light?
11  A.   I don't remember.
12  Q.   When this contact occurred did the
13  vehicle, the Lincoln Town car, did it move?
14  A.   I don't know.
15  Q.   An instant before there was an impact
16  was the Lincoln Town car moving or standing still?
17  A.   I don't know. I don't remember. I
18  believe it was stopped.
19  Q.   How long was it stopped before the
20  accident happened?
21  A.   I don't know.
22  Q.   At the time of this accident did you
23  have a cellphone with you?
24  A.   Yes.
25  Q.   Were you talking on the cellphone at

Thomas P. Wendel

1  
2  time of the accident?

3    A.   No, sir.

4    Q.   Were you eating or drinking anything

5  at the time of the accident?

6    A.   No, sir.

7    Q.   I know you said you were alone?

8    A.   Yes.

9    Q.   Were you eating or drinking?

10   A.   No.

11   Q.   Following this accident did the

12  Police come to the scene?

13   A.   Yes, sir.

14   Q.   Did you contact the Police?

15   A.   No, sir.

16   Q.   How soon after the accident did the

17  Police appear, approximately?

18   A.   Very quickly.

19   Q.   Did they arrive on foot or by

20  vehicle?

21   A.   I believe they were on foot.

22   Q.   When the Police arrived where was

23  your car?

24   A.   Right where the accident occurred.

25   Q.   What about the Lincoln Town car?

Thomas P. Wendel

1  
2    A.   I believe it was right where the

3  accident occurred.

4    Q.   When the Police arrived were you in

5  your car or out of your car?

6    A.   I was in my car.

7    Q.   Did you get out when the Police got

8  there?

9    A.   Yes.

10   Q.   When you got out were both vehicles

11  in the same position where they had stopped

12  immediately after the impact?

13   A.   I know my car was.

14   Q.   What about the other car?

15   A.   I believe it was.  But, I can't be

16  sure.

17   Q.   About how much space separated the

18  two cars, your car and the Lincoln Town car?

19   A.   No.  I don't know.

20   Q.   Did you speak to the Police?

21   A.   Yes.

22   Q.   Did they take your license and

23  registration information?

24   A.   Yes, sir.

25   Q.   Did you identify yourself to the

Thomas P. Wendel

1  
2  Police as a Police officer?

3    A.   Yes, I did.

4    Q.   Did they ask you what happened?

5    A.   Yes, they did.

6    Q.   Did you tell them?

7    A.   Yes, I did.

8    Q.   What did you tell them?

9    A.   I told them I rear ended the other

10  car.

11   Q.   Other than, "I rear ended the other

12  car," did you give them any other explanation as

13  to that event?

14   A.   I told them I took my eyes off the

15  road and I didn't see the car.

16   Q.   Did you speak to the driver of the

17  Lincoln Town car?

18   A.   Yes, I do.

19   Q.   What did you say to him?

20   A.   I told them to go back to his car.

21  To calm down.

22   Q.   And did he respond to you?

23   A.   I couldn't understand him, sir.

24   Q.   When the Police arrived was the

25  driver of the Lincoln Town car still present?

Thomas P. Wendel

1  
2    A.   Yes.

3    Q.   Within your hearing did the driver of

4  the Lincoln Town car have a conversation with the

5  Police?

6    A.   Within my hearing, no.

7    Q.   Was your vehicle towed from the

8  scene?

9    A.   Yes, it was.

10   Q.   When you left the scene was the

11  Lincoln Town car still at the scene of the

12  accident?

13   A.   I don't remember.

14   Q.   Did you observe was the Lincoln Town

15  ar also towed from the scene?

16   A.   No, sir.

17   Q.   How do you know that?

18   A.   Well, while I was there, it was not

19  towed.

20   Q.   When you left the scene of the

21  accident it was still present?

22   A.   I'm not sure.  I don't believe so,

23  but.

24   Q.   Was your vehicle equipped with air

25  bags?

## Page 21

```
Thomas P. Wendel
 1
 2   A.   Yes.
 3   Q.   Did the air bags deploy?
 4   A.   No.
 5   Q.   What was the event or thing that
 6   distracted you as you've indicated before?
 7   A.   I was just looking around.  The
 8   change in the scenery since the last time I had
 9   been there.
10        MR. McCABE:  Thank you, sir.
11        THE WITNESS:  Thank you.
12        (Whereupon, at 1:31 p.m. the
13        Examination of this Witness was concluded.)
14
                 _____
15
                 THOMAS P. WENDEL
16
17   Subscribed and sworn to before me
18   this _____ day of _____, 2008.
19   _____
        NOTARY PUBLIC
20
21
22
23
24
25
```

## Page 22

```
Thomas P. Wendel
 1
 2        C E R T I F I C A T E
 3
 4   I, LINDA ORLANDO, a Notary Public for and
 5   within the State of New York, do hereby certify:
 6        That the witness whose examination is
 7   hereinbefore set forth was duly sworn and that
 8   such examination is a true record of the testimony
 9   given by that witness.
10        I further certify that I am not related to
11   any of the parties to this action by blood or by
12   marriage and that I am in no way interested in the
13   outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand this 10th day of February, 2008.
16
17
18                 _____
                   LINDA ORLANDO, RPR
19
20
21
22
23
24
25
```

## Page 23 (Index)

Index entries omitted for brevity.

## Page 24 (Index)

Index entries omitted for brevity.

represent 5:14
REQUESTED
4:15
requirements 7:23
reserved 3:12
reside 5:10
respective 3:5
respond 5:22 6:14
19:22
response 6:11,14
restrictions 7:22
result 5:17 15:2
right 8:21 11:7,10
17:24 18:2
road 10:15 15:16
19:15
roadway 14:9,13
Roosevelt 10:18
RPR 22:18

**S**
S 2:2 3:2,2 5:2
Safe 8:22
saying 6:2 12:20
scene 17:12 20:8,10
20:11,15,20
scenery 21:8
school 11:21
sealing 3:6
second 12:13
see 9:11 10:4 11:21
14:24 19:15
sent 12:22
separated 16:2
18:17
set 22:7,14
Shore 5:11
short 5:21
show 9:20,23 10:21
signed 3:16,18
simple 5:21
sir 5:13 6:19,21 7:8
7:16,19,24 8:3,13
8:15,25 9:4,12,20
10:3,25 11:12
12:9 13:14 14:3

15:10 17:3,6,13
17:15 18:24 19:23
20:16 21:10
soon 17:16
sorry 12:17 15:10
15:22
South 5:11
Southbound 13:22
SOUTHERN 1:2
space 12:19,23
15:15 18:17
speak 18:20 19:16
spoken 6:15
spot 12:12
standing 14:21,22
16:16
state 1:21 5:4,7
7:20 22:5
statements 6:16
STATES 1:2
station 7:9
stenographer 6:9
STIPULATED 3:4
3:10,15
stopped 11:16
16:18,19 18:11
street 2:10 7:4,5
13:17,18 15:21,23
16:2,9
strike 15:6
Subscribed 21:17
succinctly 6:17
suffer 15:3
supposed 6:8
sure 15:17,19 18:16
20:22
sworn 3:18 5:3
21:17 22:7

**T**
T 3:2,2 5:2 22:2,2
take 9:22 11:20
12:5,8,10,14
18:22
taken 1:17 12:3,6
talking 16:25

tell 9:23 19:6,8
testified 5:5
testimony 22:8
Thank 13:4 21:10
21:11
thing 21:5
think 12:18
Thomas 1:7,17
2:10 4:5 5:1,9 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1,15 22:1
time 1:14,18 5:23
5:23 6:22 7:6,14
7:17 8:23 9:24
10:3,7 11:3 12:14
13:6 14:3 15:7
16:9,22 17:2,5
21:8
times 3:12
title 13:10
told 19:9,14,20
towed 20:7,15,19
Town 9:3 10:5
14:17,21,24 16:13
16:16 17:25 18:18
19:17,25 20:4,11
20:14
traffic 14:6 16:10
transcript 12:23
traveled 15:13
traveling 14:9,13
trial 1:16 3:13
true 22:8
try 6:3
twelve 11:23 12:7
two 10:4 16:3,5
18:18
two-way 13:17,18
type 12:21 13:5
15:3

**U**
U 3:2

understand 19:23
understanding
5:25
UNITED 1:2
University 11:6
uphill 14:14

**V**
V
VANDAMME 2:11
12:14 15:8
vehicle 7:7,12 8:8
8:12,24,24 9:5,23
11:14 13:13 14:16
16:13 17:20 20:7
20:24
vehicles 10:4 18:10
verbal 15:9
visit 11:8

**W**
W 5:2
wagon 7:9
wait 6:12
waived 3:8
wanted 11:8,21
way 22:12
wearing 7:25
Wendel 1:7,17 2:10
4:5 5:1,9 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1,15 22:1
went 10:21
wet 14:10
We'll 12:15
WHEREOF 22:14
witness 4:4 5:3
12:17 21:11,13
22:6,9,14
words 6:15
written 12:21

**X**
X 1:3,9

**Y**
Y
year 6:19
years 14:2
York 1:2,11,11,21
2:6,6,11,11 5:4
22:5
Y8236 2:7

**$**
$2,500 8:19

**0**
06804 5:12
07CIV4091NRB
1:6

**1**
1:11 1:14
1:31 21:12
10th 22:15
10004 2:11
10016 1:11 2:6
112 1:10 2:5
12 4:17
1263 11:6
182 16:2
182nd 7:5 15:23
16:9

**2**
2005 7:9
2006 6:19
2007-100069 2:12
2008 1:13 21:18
22:15

**5**
5 4:5

**7**
7th 6:19

**8**
8th 1:13
81 5:11

**9**
9

EXHIBIT E

# Mark S. McMahon, M.D.

**876 Park Avenue**
**New York, New York 10021**
**Phone: (212) 717-1405**
**Fax: (212) 396-3277**

May 14 , 2008

Budin, Reisman, Kupferberg and Bernstein
112 Madison Avenue
New York, New York 10016

**RE: Aboubacar Jalloh**

Att: Mable Garcia

On August 6, 2006 the patient was in a motor vehicle accident in which his car was
stationary at a red light and he was rear-ended. His head, neck and back were
injured.  On August 10, 2006 he saw Dr. Nelson, who stared him on physical
therapy. He saw Dr. Nelson in follow-up on September 21, 2006 and November 2,
2006. Dr. Nelson performed an EMG of his lower extremities which was negative on
October 4, 2006. The patient went to physical therapy from August 15, 2006 until
November 8, 2006.  On September 5, 2006 the patient was seen by a psychologist,
Dr. Kogan.  He was seen in follow-up on September 6, 2006, September 19, 2006,
September 20, 2006, September 26, 2006, October 3, 2006, October 24, 2006,
November 7, 2006, and November 15, 2006. He was out of work as a taxi driver for
3 months after the accident.

On August 9, 2006 he had an x-ray of his cervical spine which showed muscular
spasm. On August 9, 2006 he had an x-ray of his lumbar spine which showed mild
degenerative changes. On August 16, 2006 he had an MRI of his cervical spine
which showed disc herniations  at C3-4 and C5-6 deforming the dural sac. In
addition, it showed a bulging disc at C4-5 with flattening of the dural sac. On August
21, 2006 the patient had an x-ray of his thoracic spine which showed mild dextro-
scoliosis.  On September 6, 2006 the patient had an MRI of his lumbar spine which
showed a bulging disc at L4-5 with flattening of the dural sac and bilateral foraminal
encroachment. It also showed an L5-S1 disc bulge with flattening of the epidural fat.

Currently, the patient is unable to work due to his neck and back problems.  He has
pain radiating down both legs. His legs feel weak. His neck and back are worse with

### *Mark S. McMahon, M.D.*

*876 Park Avenue*
*New York, New York 10021*
*Phone: (212) 717-1405*
*Fax: (212) 396-3277*

May 14 , 2008
**RE: Aboubacar Jalloh**

bending and lifting.  He wakes up at night with pain in his neck and back.  Weather changes make his condition worse.  He has worsening pain with prolonged sitting, standing, and walking.

PAST MEDICAL HISTORY:

Negative.

MEDICATIONS:

Tylenol.

PHYSICAL EXAMINATION:

On physical examination of the cervical spine: he can flex to 2 degrees with pain (nl 60). He can extend to 0 degrees with pain (nl 50).  He can bend to the left and right 0 degrees with pain (nl 40). Sensation is intact in his upper extremities. He is tender to palpation in the paracervical musculature.

On physical examination of his lumbar spine: he can flex to 2 degrees with pain (nl 90).  He can extend to 0 degree with pain (nl 30).  He can bend to the right 0 degrees with pain (nl 20). He can bend to the left 0 degrees with pain (nl 20). He has decreased sensation to light touch in his left lower extremity. His EHL strength is 3+/5 bilaterally. He has a positive straight leg raising sign bilaterally.

**DIAGNOSIS:**

1.  Cervical disc herniations at C3-4 and C5-6 deforming the dural sac. Bulging disc at C4-5 with flattening of the dural sac.

2.  Lumbar spine bulging disc at L4-5 with flattening of the dural sac with bilateral foraminal encroachment.  L5-S1 bulging disc with flattening of the epidural fat.

### Mark S. McMahon, M.D.
**876 Park Avenue**
**New York, New York 10021**
**Phone: (212) 717-1405**
**Fax: (212) 396-3277**

May 14 , 2008
**RE:  Aboubacar Jalloh**

## CAUSATION:

The above diagnoses occurred as a result of the accident of August 6, 2006.

## PROGNOSIS:

The patient's prognosis is poor. His condition is permanent. He is now 1 ¾ years
from the time of the accident. His condition interferes with his quality of life and his
activities of daily living.  He is unable to work as a taxi driver because of his injuries.
The patient requires a multilevel cervical discectomy and fusion using
instrumentation and bone graft. In addition, he requires an L4-S1 decompression and
fusion using instrumentation and bone graft.

I, the undersigned, am a physician authorized by law to practice medicine in the
State of New York, and I am not a party to this proceeding. I have reviewed the
medical records pertaining to this patient and have provided a report that
summarizes my evaluation. The statements in the report are true and accurate under
penalty of perjury.

*Mark S. Mc Mahon, MD*

Mark S. McMahon, M.D.

EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ABOUBACAR JALLOH,                                                    **AFFIDAVIT**

                              Plaintiff,

                                                       Index No.: 07 Civ. 4091/(NRB)

         -against-

THOMAS P. WENDEL,

                          Defendant.

------------------------------------------------------------------X

STATE OF NEW YORK       )
                        )ss:
COUNTY OF BRONX         )

        I, ABOUBACAR JALLOH, being duly sworn deposes and says:

1.      That I presently reside at 108 East Clark Place, Bronx, New York, 10452.

2.      On or about August 6, 2006, at 182nd Street and Jerome Avenue, County of Bronx, I was the seatbelted driver of a motor vehicle. I was stopped at a red traffic light when suddenly and without warning, my vehicle was struck from the rear by the vehicle driven by defendant. It was a very heavy impact.

3.      After the accident, the police came to the scene. I did not get out of my car at any time. I was not aware of the severity of my injuries, and I just wanted to go home and lie down, so I told the police officers that I was not ready to leave in an ambulance. Instead, I called my friend, who came to the scene and took me to my home.

4.      While on the way home, I felt pain in my neck and lower back. I also had a very bad headache. The pain in my back when all the way down into my legs. I laid down as soon as I got home and went to see a doctor the next morning because I was in very much pain. I was given pain medicine, and electrical stimulation and hot packs were placed on my neck and lower back.

5.      I started, at the recommendation of my doctor, a four-month course of physical therapy, which I attended three times per week. The doctor gave me massages, hot and cold packs, did MRIs and did electrical stimulation, all to my neck and lower back.

6.      I stopped going to physical therapy, because after going there three times per week for four months, my pain did not go away. I feel it was not helping me completely to get better.

7.      I have to rub Ben-Gay on my neck and lower back every night before bed, or else I wake up with very bad neck and lower back pain and stiffness.

8.     Prior to the accident, I was working as a taxi driver. I try to go back to work when I feel better, but I can not work because of my severe neck and back pain and neck stiffness. It is still very painful for me to turn my head or sit for too long. I have not returned to work on a regular basis. I have worked only maybe two months total since the accident. I want to go back to work when I feel better.

9.     It is very painful for me to get on my knees and pray, which I do five times per day, every day of the week. Prayer is the most important thing in my life, and it is very difficult for me to concentrate because of the pain I am in while I do it. I can not walk for a very long time, and I have to walk much slower than I did before the accident because of my lower back pain.

_ABOUBACAR JALLOH_

ABOUBACAR JALLOH

Sworn to before me this 28th
day of May, 2008

_Mabel Garcia_

Notary Public

**MABEL C. GARCIA**
**COMMISSIONER OF DEEDS**
**CITY OF NEW YORK**
**NO. 1-3097**
**COMMISSION EXPIRES MARCH 1, 2009**

EXHIBIT G

Page 1

1
2

UNITED STATES DISTRICT COURT

3

SOUTHERN DISTRICT OF NEW YORK

4
5   ABOUBACAR JALLOH,
6              Plaintiff,
7          vs.     No. 07 Civ 4091 (NRB)
8   THOMAS P. WENDEL,
9              Defendant.

-------------------------------------------

10
11                      **COPY**
12
13      DEPOSITION OF ABOUBACAR JALLOH
14            New York, New York
15         Friday, February 8th, 2008
16
17
18
19
20
21  Reported by:
22  Jeremy Frank, MPM
23  JOB NO. 672356a
24
25

---

Page 2

1
2                      February 8th, 2008
3                        10:41 a.m.
4
5      Deposition of ABOUBACAR JALLOH, held at
6   the offices of Budin, Reisman, Kupferberg &
7   Bernstein, LLP, 112 Madison Avenue, New York,
8   New York, pursuant to Order, before Jeremy
9   Frank, a Notary Public of the State of New
10  York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1
2   A P P E A R A N C E S:
3
4      BUDIN, REISMAN, KUPFERBERG & BERNSTEIN,
5      LLP
6      Attorneys for Plaintiff
7          112 Madison Avenue
8          New York, NY 10016
9      BY:   PETER McCABE, ESQ., of counsel
10
11     LAW OFFICES OF PATRICK J. MALONEY
12     Attorneys for Defendant
13         90 Broad Street, Suite 2202
14         New York, NY 10004
15     BY:   HENDRICK VANDAMME, ESQ.
16
17
18  ALSO PRESENT:
19     MAMADOU DOUMBOUYA, interpreter
20
21
22
23
24
25

---

Page 4

1
2      IT IS HEREBY STIPULATED AND AGREED,
3   by and between counsel for the respective
4   parties hereto, that the filing, sealing and
5   certification of the within deposition shall
6   be and the same are hereby waived;
7      IT IS FURTHER STIPULATED AND AGREED
8   that all objections, except as to the form
9   of the question, shall be reserved to the
10  time of the trial;
11     IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be signed
13  before any Notary Public with the same force
14  and effect as if signed and sworn to before
15  the Court.
16
17
18
19
20
21
22
23
24
25

Page 5

```
                    Jalloh
 1
 2   M A M A D O U   D O U M B O U Y A,  was duly
 3   sworn to interpret the questions from English
 4   into Fulani, and the answers from Fulani into
 5   English.
 6   A B O U B A C A R   J A L L O H,   called as a
 7   witness, having been duly sworn by a Notary
 8   Public, was examined and testified through the
 9   interpreter as follows:
10   EXAMINATION BY
11   MR. VANDAMME:
12        Q.   Good morning, Mr. Jalloh.
13             My name is Hendrick Vandamme and
14   I'm an attorney with Patrick Maloney's office.
15   Today I'll be asking you a series of questions
16   pertaining to an accident that allegedly
17   occurred on August 7th, 2006.
18        A.   Okay.
19        Q.   Before we start, I want to give
20   you some ground rules for this deposition.  As
21   you know, the court reporter is taking down
22   everything that you say, so its important that
23   you answer with words rather than with a nod
24   or a shake of the head.
25             Do you understand?
```

Page 6

```
                    Jalloh
 1
 2        A.   Yes.
 3        Q.   To make it easier for the court
 4   reporter to record what we say accurately, its
 5   important that we not talk over one another.
 6   For this reason, I ask you to please wait
 7   until I finish my question before answering.
 8             Is that okay?
 9        A.   Okay.
10        Q.   Mr. Jalloh, do you understand that
11   you are under oath today?
12        A.   Yes, I understand.
13        Q.   Okay.
14             If you don't understand any of my
15   questions, please make sure that you tell me
16   and I'll rephrase it or I'll ask it again.
17        A.   All right.
18        Q.   If you need to take a break at any
19   time during this deposition, please let me
20   know and I'll accommodate your request.
21        A.   Okay.
22        Q.   Are you prepared to answer my
23   questions today?
24        A.   Yes.
25        Q.   Yes.
```

Page 7

```
                    Jalloh
 1
 2             Please state your name for the
 3   record.
 4        A.   Aboubacar Jalloh.
 5        Q.   Your last name is Mr. Jalloh,
 6   correct, your first name is Aboubacar?
 7        A.   Yes.
 8        Q.   Okay.
 9             What's your current address?
10        A.   108 East Clark Place in The Bronx.
11        Q.   How long have you lived at this
12   place?
13        A.   Since 2000 I'm in that address.
14        Q.   Are you renting or do you own that
15   place?
16        A.   I'm renting.
17        Q.   Is there anyone else who lives in
18   this place, in this address with you?
19        A.   I live there with other people.
20        Q.   Who are those people, how many
21   people live there?
22        A.   Two people.
23        Q.   Who are those people?
24        A.   M-o-u-h-a-m-a-d-o-u S-o-w,
25   Mouhamadou Sow, M-a-m-a-d-o-u A-l-i-m-o-u
```

Page 8

```
                    Jalloh
 1
 2   B-a-h, Mamadou Alimou Bah.
 3        Q.   Mr. Jalloh, what's your
 4   relationship to those individuals?
 5        A.   We just like are friends, we get
 6   along.
 7        Q.   So are they roommates?
 8        A.   You mean like if we --
 9        Q.   Who pays the rent, is it you who
10   pays the rent or do you share the rent?
11        A.   We help one another.
12        Q.   In other words, you share the
13   rent?
14        A.   Yes.
15             If we are in good health and we
16   are all working, we share it, but if somebody
17   is not working and doesn't have good health,
18   he's not going to pay the rent.
19        Q.   Okay.
20             Mr. Jalloh, where you were born?
21        A.   Guinea.
22        Q.   Which city were you born in in
23   Guinea?
24        A.   Conakry, C-o-n-a-k-r-y.
25        Q.   What's your date of birth?
```

Page 9

```
 1                    Jalloh
 2      A.    June 5th, '63.
 3      Q.    Are you a United States citizen?
 4            MR. McCABE:  Note my objection.
 5            He may answer the question.
 6      A.    No.
 7      Q.    What's your current immigration
 8 status?
 9            MR. McCABE:  Objection.
10            You may answer the question.
11      A.    I don't have a status.
12      Q.    When did you come to The United
13 States?
14      A.    Its been a while now.
15      Q.    Is it more than 10 years ago?
16      A.    Its not more than that but its
17 close to that now.
18      Q.    How did you come to The United
19 States?
20      A.    I came here by a visa.
21      Q.    When you entered the United
22 States, what type of visa did you have when
23 you entered the country?
24      A.    Visa like merchant, like merchant.
25      Q.    Okay.
```

Page 10

```
 1                    Jalloh
 2            What was the name of the visa, was
 3 it a B1, B2, was it an E visa, what type of
 4 visa was it?
 5      A.    If I'm not mistaken, its a B2.
 6      Q.    As I understand, B2 is not a
 7 merchant's visa, correct?
 8            MR. McCABE:  Is that a question or
 9      a statement?  Note my objection to the
10      form.
11            He may answer the question.
12      Q.    Is B2 visa a visitor's visa?
13      A.    That I don't know.
14      Q.    Okay.
15            You stated that you came on a
16 merchant visa.  What type of business were you
17 involved in when you came to The United
18 States?
19      A.    It was to buy merchandises.
20      Q.    What type of merchandises?
21      A.    Like a T-shirt.
22      Q.    Did you have your own business
23 back in Guinea before you entered the United
24 States?
25      A.    Yes.
```

Page 11

```
 1                    Jalloh
 2      Q.    What was the name of that
 3 business?
 4      A.    It was selling.
 5      Q.    I understand, but what was the
 6 nature of your business, were you a sole
 7 proprietor, did you have a corporation, what
 8 type of business was it?
 9      A.    I was working for myself.
10      Q.    Okay.
11            Now you stated that you came here
12 approximately not more than 10 years ago.
13 When you entered the United States, what was
14 your first address?
15      A.    The first place I stayed here was
16 Davidson Avenue.
17      Q.    Where is Davidson Avenue?
18      A.    Bronx.
19      Q.    Mr. Jalloh, what's the highest
20 level of education that you received in
21 Guinea?
22      A.    Just like eight years of
23 education.
24      Q.    Did you receive any higher
25 education in the United States?
```

Page 12

```
 1                    Jalloh
 2      A.    I didn't go to school like to
 3 official school or something like that, but I
 4 was learning the language more.
 5      Q.    Okay.
 6            Have you ever been known by any
 7 other name than Aboubacar Jalloh?
 8      A.    No.
 9      Q.    Did you have any nicknames?
10      A.    Nickname?
11      Q.    Nickname.
12      A.    No.
13      Q.    Okay.
14            What's your current profession,
15 what's your current --
16            MR. McCABE:  What do you do for a
17      living?
18      Q.    What do you do for a living?
19      A.    Presently I don't work often, just
20 rarely because I'm not in good health right
21 now.
22      Q.    When you say rarely, how often do
23 you work?
24            MR. McCABE:  In the period of time
25      of the last six weeks?
```

```
 1                    Jalloh
 2           MR. VANDAMME:  Let's say in the
 3      last six months.
 4           MR. McCABE:  Six months, okay.
 5      A.    In a period of six months I had
 6  maybe two months of work.
 7      Q.    What type of work did you do in
 8  those last six months?
 9      A.    Driving taxi.
10      Q.    Do you work for a particular
11  company or do you own your cab?
12      A.    Presently I don't have a car, my
13  friends are the ones who give me their cars to
14  drive.
15      Q.    What are the names of your friends
16  that give you the cars?
17      A.    Alpha Bah, but also he's not here
18  right now, he returned; he's the one who used
19  to give me his car.
20      Q.    Okay.
21            Is there one more person or is he
22  the only one?
23      A.    Right now, nobody else.
24      Q.    What type of car did he use to
25  give you?
```

```
 1                    Jalloh
 2      A.    Lincoln.
 3      Q.    Do you know the car registration
 4  number of this car?
 5      A.    No, I don't recall that.
 6      Q.    Now Mr. Jalloh, do you hold a
 7  driver's license?
 8      A.    Yes.
 9      Q.    Is it a New York driver's license?
10      A.    Yes.
11      Q.    When did you obtain this New York
12  driver's license?
13      A.    Its been a long time.
14      Q.    Do you know when the license was
15  issued?
16      A.    The last time it was issued?
17      Q.    No, when the license was issued
18  for the first time.
19      A.    That I forgot.
20      Q.    How did you obtain your driver's
21  license?
22           MR. McCABE:  I'm going to object.
23           What does that have to --
24           MR. VANDAMME:  What does it have to
25      do with it, I don't know if he has a
```

```
 1                    Jalloh
 2      license.  He's here illegally, I'm trying
 3      to establish if he has a driver's
 4      license.  He doesn't know when the
 5      license was issued, counsel.  I'm asking
 6      a very simple question when was the
 7      license issued.  If I have a license, I
 8      know when my license was issued.
 9           MR. McCABE:  No, no, you're not the
10      witness.
11           MR. VANDAMME:  I understand.
12           MR. McCABE:  Counsel, you're
13      working on a different level than this
14      gentleman, you're an attorney and there
15      is a difference.
16           MR. VANDAMME:  I understand.
17           So --
18           MR. McCABE:  You can ask him
19      approximately when, maybe he understands
20      the question as you want a specific date,
21      month and year, things like that.
22           MR. VANDAMME:  It doesn't have to
23      be specific, I can ask him approximately.
24           MR. McCABE:  Ask approximately.
25           MR. VANDAMME:  I understand.
```

```
 1                    Jalloh
 2           MR. McCABE:  When did you first get
 3      a driver's license approximately, if he
 4      knows.  Can you ask it that way
 5      approximately, about when?
 6           THE WITNESS:  Since I got my first
 7      license?
 8           MR. McCABE:  Yes.
 9           Nothing is simple.
10      A.    I forgot.  I don't recall, I
11  forgot.
12      Q.    Okay.
13            Did you take any test to obtain
14  your license?
15      A.    Yes, I did.
16      Q.    When you took this test, where did
17  you take this test?
18      A.    In Brooklyn.
19      Q.    In what language was the test
20  conducted?
21      A.    English.
22      Q.    Do you speak English?
23      A.    Yes, I speak a little bit.
24      Q.    Okay.
25            Let's talk about the accident, the
```

Jalloh

1
2    alleged accident that occurred on August 7th,
3    2006.
4          Mr. Jalloh, on that particular day
5    on August 7th, 2006, what were you doing in
6    the morning hours?
7          A.    The morning, you said?
8          Q.    In the morning.
9          A.    In the morning I went to work.
10         Q.    Okay.
11               Where was that, where did you go
12   to work?
13         A.    Uptown.
14         Q.    When you say Uptown, would you be
15   able to tell me where exactly you went Uptown?
16         A.    I can't count how many streets,
17   how many roads I passed that day before I went
18   to work.
19         Q.    I'm not asking how many roads you
20   passed.  I'm asking you to give me the
21   address, the place where you went on that
22   particular day in the morning hours.
23         A.    I don't think I understand your
24   question.
25               MR. McCABE:  Off the record for a

Jalloh

1
2    minute.
3          (Whereupon, an off-the-record
4    discussion was held.)
5          (Time noted:  11:03 a.m.)
6          (Time noted:  11:04 a.m.)
7          Q.    Mr. Jalloh, on August 7th, 2006 in
8    the morning, were you at home?
9          A.    Early in the morning I was in the
10   house.
11         Q.    Okay.
12               At some point in the morning did
13   you receive a phone call from your company?
14         A.    No, my company didn't call me.
15         Q.    On August 7th, 2006 what were you
16   doing for a living?
17         A.    At that time I was working as a
18   driver of a livery cab.
19         Q.    Okay.
20               Which company were you working for
21   at the time?
22         A.    Family.
23         Q.    Family, that's it?
24         A.    Yes.
25         Q.    And where is Family located?

Jalloh

1
2          A.    181st and Amsterdam.
3          Q.    That's in The Bronx, correct?
4          A.    No.
5          Q.    Where is it?
6                MR. McCABE:  It is in Manhattan.
7                MR. VANDAMME:  You're right.
8          Q.    Prior to August 7th, 2006 how long
9    had you been working for Family?
10         A.    I had worked there before that day
11   like three, four, five, six months, I don't
12   know exactly.
13         Q.    Were you a designated driver for a
14   particular car while you were working for
15   Family?
16         A.    If I was given a car?
17         Q.    Did you have an assigned car or
18   did your car change every time you drove
19   somewhere to pick up a client?
20         A.    Only one car I had.
21         Q.    Okay.
22               What type of car was that?
23         A.    It was a Lincoln.
24         Q.    Do you know what year, when the
25   car was made?

Jalloh

1
2          A.    Lincoln Town Car, '97.
3          Q.    '97.
4                What color was the car?
5          A.    Green (in English).
6          Q.    Do you know where the car was
7    regularly serviced at the time of the
8    incident, which means August 7th, 2006.
9          A.    Yes.
10         Q.    Do you know who was responsible
11   for the maintenance of the car?
12         A.    Myself.
13         Q.    When was the last time you had
14   your car serviced prior to August 7th, 2006?
15         A.    Every morning myself before I go
16   anywhere in the morning my car when I put it
17   on, I'll check the oil, I would check the
18   wheels, I'll check everything.
19               MR. McCABE:  I guess you have to
20         ask the question again.
21         Q.    When you say everything, what
22   else, when you say everything, what do you
23   mean by that?
24         A.    Like the wheels, the oil, the
25   water, the tires, so I'm going to check all of

```
1                     Jalloh
2    those things to see if its good before I can
3    start working.
4          Q.    Did you have your car serviced by
5    a professional mechanic at the time prior to
6    the accident?
7          A.    Yes.
8          Q.    What was the name of that
9    mechanic?
10         A.    I know a Fulani guy he's a
11   mechanic, he was the one who checked my car
12   for me, but he doesn't have a fixed place.
13         Q.    What is his name again?
14         A.    S-o-w, Sow last name.
15         Q.    When was the last time before the
16   collision that you had your car serviced by
17   Mr. Sow?
18         A.    Like not more than five days
19   before the accident.
20         Q.    Can you give me the address of Mr.
21   Sow's mechanic repair shop, do you know where
22   he's located?
23         A.    Presently he's at Webster and
24   170th.
25               MR. McCABE:  That's Webster Avenue.
```

```
1                     Jalloh
2          Q.    Mr. Jalloh, on August 7th, 2006
3    what time did you leave that morning?
4          A.    It was around like 11 all the way
5    to like 12.
6          Q.    Okay.
7                Did you consume any alcohol
8    24 hours prior to your leaving the house?
9          A.    Since my birth I have never drank
10   alcohol.
11         Q.    Did you consume, did you take any
12   prescription drugs 24 hours prior to your
13   leaving the house?
14         A.    Never.
15         Q.    Okay.
16               Do you remember what the weather
17   conditions were on that day?
18         A.    It was nice weather, it was
19   shining.
20         Q.    It was clear and dry?
21         A.    It was clear and dry, everything
22   was good.
23         Q.    Okay.
24               Now, could you tell me, Mr.
25   Jalloh when you left the house, and I'm
```

```
1                     Jalloh
2    asking approximately where were you heading,
3    what was the purpose of your trip?
4          A.    It was to go to work.
5          Q.    Okay.
6                How did you know where to go?
7          A.    As a taxi driver when you say
8    you're ready to work, anywhere you happen to
9    find a customer, you take the customer.
10         Q.    So when you left the house, where
11   did you go?  I understand you went to work,
12   but can you tell me the direction where you
13   went, did you go Uptown, did you go Downtown,
14   which direction did you take?
15         A.    I traveled, I drove Uptown.
16         Q.    Okay.
17               Did you find any customers along
18   the way?
19         A.    No.
20         Q.    No customers.
21               Now at some point there was an
22   accident involving your vehicle.
23               Is that correct?
24         A.    Yes.
25         Q.    Where did this accident occur?
```

```
1                     Jalloh
2          A.    It was around 182nd and Jerome
3    Avenue.
4          Q.    Which street were you on, were you
5    on 182nd Street or were you on Jerome Avenue?
6          A.    I was on Jerome.
7          Q.    Which direction were you heading?
8          A.    Downtown.
9          Q.    Is Jerome Avenue a two-lane Street
10   or a one-way Street?
11         A.    Its two ways.
12         Q.    Two ways, okay.
13               At some point your car was
14   involved in an accident with another vehicle.
15               How did that happen?
16         A.    I stopped for the red light, the
17   other vehicle came from the back and hit me.
18         Q.    Okay.
19               How many do you remember, only if
20   you know, do you remember how many traffic
21   lights there are on Jerome Avenue at the
22   intersection of 182nd and Jerome Avenue, only
23   if you know.
24         A.    You mean how many lights?
25         Q.    How many traffic lights are there
```

```
 1                    Jalloh
 2   in total, if you remember, if you know?
 3        A.   What I know is the lights that
 4   were in front of me, I cannot count all the
 5   lights over there.
 6        Q.   As you were approaching the
 7   traffic light, when was the first time you
 8   noticed the light was red?
 9        A.   Is when the light gave a yellow.
10        Q.   Do you know approximately how far
11   you were from the intersection when the light
12   turned yellow, approximately, it doesn't have
13   to be precise.
14        A.   That I can't recall.
15        Q.   Okay.
16             How was the traffic on that day at
17   the area located at the intersection of Jerome
18   Avenue and 182nd Street, if you remember?  Can
19   you tell me was the traffic heavy, were there
20   any other cars next to you?
21        A.   There was no traffic, it was clear
22   and there was no cars in front of me.
23        Q.   Okay.
24             Mr. Jalloh, do you remember what
25   time of the day the accident occurred?  It
```

```
 1                    Jalloh
 2   doesn't have to be precise, if you can tell me
 3   an approximate time when the accident
 4   occurred?
 5        A.   It was around 11:00 p.m.
 6   something.
 7        Q.   11:00 p.m. in the evening,
 8   correct?
 9        A.   Yes.
10        Q.   Okay.
11             And you stated that you left your
12   house at approximately, I don't remember.
13   Could you tell me what time you left your
14   house that particular day?
15        A.   It was like 11-something, let's
16   just say at 12 noon.
17        Q.   Since 12 noon until 11:00 p.m. you
18   had been working for almost 11 hours, correct?
19        A.   I was not working during all those
20   times because I have to go and relax a little
21   bit and I also have to eat.
22        Q.   Okay, let me ask you this.
23             How many hours did you work in
24   total on August 7th, 2006 if you remember, it
25   doesn't have to be precise, approximately.
```

```
 1                    Jalloh
 2        A.   Like eight hours.
 3        Q.   Now when you mentioned that you
 4   were standing at the intersection and the
 5   light was red, at some point did you feel an
 6   impact?
 7        A.   Yes.
 8        Q.   At the time of the impact where
 9   were you looking?
10        A.   When he hit me, I didn't see
11   anything at that time, my mind was completely
12   messed up.
13        Q.   Do you remember immediately
14   preceding the accident what were you doing?
15        A.   I was stopping for the light to
16   turn green.
17        Q.   Okay.
18             Where were your hands?
19        A.   On the wheel.
20        Q.   Were you listening to the radio?
21        A.   No.
22        Q.   Were you talking on a cell phone?
23        A.   No.
24        Q.   Do you own a cell phone?
25        A.   Yes.
```

```
 1                    Jalloh
 2        Q.   How about your brakes, when was
 3   the last time you had your brakes serviced
 4   prior to the time of this incident?
 5        A.   When this driver hit me, at that
 6   time my foot was on the brake.
 7        Q.   Was it your left foot or your
 8   right foot?
 9        A.   Right foot.
10        Q.   Were you wearing a seat belt?
11        A.   Yes.
12        Q.   What type of seat belt were you
13   wearing, a shoulder to lap or lap to lap; what
14   type of seat belt was it?
15             MR. VANDAMME:  Let the record
16        reflect that the witness is indicating
17        that he was wearing a shoulder to lap
18        seat belt.
19        A.   The seat belt was like a, you take
20   it from here and you pass it through your,
21   like through your stomach and you buckle it
22   down here (indicating).
23        Q.   Okay.
24             Were there any passengers in your
25   car at the time of this incident?
```

Page 29

```
                        Jalloh
 1
 2      A.    No.
 3      Q.    Did your car have an air bag?
 4      A.    Yes, it has it.
 5      Q.    Did your air bag deploy at the
 6   time of the incident?
 7      A.    No, I didn't see it, at that time
 8   I didn't see it.
 9      Q.    Okay, let me ask you this.
10            At the time of the impact, did any
11   portion of your body hit any portion of the
12   car, and if so, which one?
13      A.    What happened when the driver hit
14   me, I had the belt on, but what happened my
15   head went toward the wheel (indicating).
16      Q.    The steering wheel?
17      A.    The steering wheel, and I came
18   back also to my seat, that's what happened
19   (indicating).
20      Q.    Did your head at any point hit the
21   steering wheel?
22      A.    At that time I don't know what
23   happened to me because right there I lost my
24   mind.
25      Q.    Did you lose your consciousness as
```

Page 30

```
                        Jalloh
 1
 2   a result of the impact?
 3      A.    I lost my consciousness.
 4      Q.    Mr. Jalloh, do you remember when
 5   you again gained consciousness following the
 6   impact?
 7      A.    After a while.
 8      Q.    Can you tell me approximately
 9   when, if you know?
10      A.    After like one hour.
11      Q.    Were you still in the car when you
12   gained consciousness?
13      A.    Yes.
14      Q.    Once you gained consciousness,
15   what do you remember, what do you recall
16   seeing?
17      A.    I see people were there
18   surrounding the cars all over.
19      Q.    How many people did you see
20   approximately?
21      A.    That I cannot count.
22      Q.    Did you see any ambulance?
23      A.    No.
24      Q.    Did you see any police cars?
25      A.    Yes, I did see.
```

Page 31

```
                        Jalloh
 1
 2      Q.    How many police cars did you see?
 3      A.    If I'm not mistaken, it was one.
 4      Q.    How many police officers do you
 5   remember were at the scene?
 6      A.    If I am not mistaken, if I still
 7   have a good memory, it was two of them.
 8      Q.    Do you know whether your windows,
 9   your car windows were open or whether they
10   were shut?
11      A.    That I don't recall.
12      Q.    Once you gained consciousness and
13   you recall that you saw two police officers,
14   what did you do?
15      A.    I didn't do anything, I stayed in
16   my car.
17      Q.    Did anyone talk to you after you
18   gained consciousness?
19      A.    The police people.
20      Q.    Did you first talk to them or did
21   they talk to you?
22      A.    They are the ones who talk to me.
23      Q.    What did they tell you?
24      A.    They asked me if I need an
25   ambulance.
```

Page 32

```
                        Jalloh
 1
 2      Q.    Were you still in the vehicle, in
 3   your seat when the police talked to you or
 4   were you outside the vehicle?
 5      A.    I was sitting put in my car.
 6      Q.    You mentioned you don't remember
 7   whether your window was shut or open.
 8            When the police started talking to
 9   you was your door open, was your window open,
10   how were they able to talk to you?
11      A.    The door was open, the door of the
12   car.
13      Q.    Who opened the door?
14      A.    If I am not mistaken, the police
15   people are the ones who opened it.
16      Q.    Which door was it?
17      A.    The door where I was sitting.
18      Q.    The driver's side door?
19      A.    Yes.
20      Q.    Could you tell me again, I think I
21   asked you this question before, if you
22   remember what was the first question the
23   police officer asked you while you were in the
24   car?
25      A.    They asked me if they were going
```

Page 33

```
 1                    Jalloh
 2   to send an ambulance for me.
 3        Q.   What did you respond to that
 4   question?
 5        A.   At that time I told him no, to
 6   leave it for now because at that time I didn't
 7   know something major had happened to me, I
 8   told them, "Leave it for now."
 9        Q.   So what happened next?
10        A.   After that I went home.
11        Q.   Did you go home or did you drive
12   home?
13        A.   Somebody took me home.
14        Q.   Who was it?
15        A.   Another driver.
16        Q.   Do you know his name?
17        A.   Yes.
18        Q.   What's his name?
19        A.   Ibrahma, I-b-r-a-h-m-a.
20        Q.   Is it his first name or his last
21   name?
22        A.   That's his first name.
23        Q.   What's his last name?
24        A.   B-a-h.
25        Q.   Did Mr. Bah at the time of the
```

Page 34

```
 1                    Jalloh
 2   accident also work for Family?
 3        A.   No.
 4        Q.   Do you know which company he was
 5   working for at the time of the accident?
 6        A.   I don't know.
 7        Q.   How did Mr. Bah know, how did you
 8   establish contact with Mr. Bah at the time of
 9   the accident?
10        A.   I called him.
11        Q.   On his cell phone?
12        A.   Yes.
13        Q.   Do you still have his cell phone
14   number?
15        A.   Yes.
16        Q.   Do you know what it is?
17        A.   Yes.
18        Q.   What is it?
19             MR. McCABE:  I'm going to object to
20        that.  Now you're getting into a question
21        of privacy.
22             MR. VANDAMME:  All right, that's
23        fine.
24             MR. McCABE:  Whether a person's
25        cell phone could be divulged.
```

Page 35

```
 1                    Jalloh
 2        Q.   Mr. Jalloh, you called Mr. Bah on
 3   his cell phone, how long did it take for Mr.
 4   Bah to come to the scene of the accident
 5   approximately?
 6        A.   I couldn't calculate, indicate how
 7   long it took him.
 8        Q.   Was it less than 30 minutes
 9   approximately, was it less 30 minutes, was it
10   more than 30 minutes if you can approximate
11   for me?
12        A.   It was more than 30 minutes.
13        Q.   Was it more than an hour?
14        A.   Yes.
15        Q.   Was it more than two hours?
16        A.   It was one hour and a few minutes,
17   it wasn't close to two hours.
18        Q.   Okay.
19             When you called Mr. Bah on his
20   cell phone, what did you tell him?
21        A.   I told him, I said, "Somebody hit
22   me so could you come and take me home?"
23        Q.   What did he say?
24        A.   He said yes.
25        Q.   Once Mr. Bah arrived at the scene
```

Page 36

```
 1                    Jalloh
 2   of the accident, were you still in the car?
 3        A.   Yes.
 4        Q.   At any time between the time of
 5   the incident and the time of Mr. Bah's
 6   arrival, did you at any point leave your
 7   vehicle?
 8        A.   I did not.
 9        Q.   Did you talk to anyone else apart
10   from those two or one police officer?
11        A.   No.
12        Q.   Okay.
13             Once Mr. Bah arrived, what did you
14   do?
15        A.   He took me to my place.
16        Q.   Did he help you get out of the car
17   or did you leave the car on your own?
18        A.   He's the one who helped me.
19        Q.   Did you at any point while you
20   were in the car talk to the driver of the
21   other vehicle who was also involved in the
22   incident?
23        A.   No, I don't recall.
24        Q.   Did you see the other driver?
25        A.   I don't think I saw him, I saw the
```

1                          Jalloh
2    driver (sic).
3          Q.    When you talked to the police
4    officer or police officers, did they ask you
5    any questions about this incident?
6          A.    They did ask me.
7          Q.    What did they ask you?
8          A.    They asked me, "How did the driver
9    of the other car hit you?"
10         Q.    What did you tell them?
11         A.    I told him, I said, "I was
12   stopping at the red light waiting for the
13   light to turn green and the other driver hit
14   me.  I mean its not like we are going one next
15   to another, I was just stopping and he hit
16   me."
17         Q.    Okay.
18               How would you describe the impact?
19         A.    I would say it was heavy.
20         Q.    Did you at any point see what part
21   of your car was hit by the other vehicle?
22         A.    At that time I didn't see.  When
23   he hit me right there, I didn't see where I
24   was hit.
25         Q.    When you left your car, what did

1                          Jalloh
2    you do?  Meaning did you go directly to Mr.
3    Bah's car or did you look at your car?
4          A.    I went directly to Mr. Bah's car.
5          Q.    Apart from those two police
6    officers, did you talk to anyone else?
7          A.    I don't recall.
8          Q.    Okay.
9                Once you were in Mr. Bah's car,
10   where did you go?
11         A.    I went to the place where I live,
12   where I used to live.
13         Q.    Where is that?
14         A.    108 East Clark Place.
15         Q.    Mr. Jalloh, when you were in Mr.
16   Bah's car did you feel any pain?
17         A.    I had pain.
18         Q.    Where?
19         A.    (Indicating) Here to the back,
20   head, and all the way to my back going to my
21   legs.
22         Q.    How long did it take you if you
23   can approximate for me, how long did it take
24   you to get home from the scene of the accident
25   and your place?  In other words, if you can

1                          Jalloh
2    tell me how long, how much time did you spend
3    in Mr. Bah's car?
4          A.    Did you say how long?
5          Q.    Approximately how long did it take
6    you to get home from the scene of the
7    accident?
8          A.    At that time I couldn't
9    approximate.
10         Q.    Would you know which route you
11   took while you were driving home?
12         A.    Yes.
13         Q.    Which route was that?
14         A.    Jerome.
15         Q.    Are you familiar with that area,
16   in other words, had you been to that area
17   before, prior to the accident?
18         A.    Yes, I know.
19         Q.    Once you got home, what happened
20   next, what did you do?
21         A.    I lay down.
22         Q.    Okay.
23               Now, at some point you went to see
24   a doctor, correct?
25         A.    Yes.

1                          Jalloh
2          Q.    When was it?
3          A.    The next day of that, the next day
4    in the morning.
5          Q.    Why did you go see a doctor?
6          A.    Because I was feeling pains, a lot
7    of pains.
8                MR. McCABE:  Can we take a short
9          break for one minute.
10               (Whereupon, an off-the-record
11         discussion was held.)
12               (Time noted:  11:49 a.m.)
13               (Time noted:  11:56 a.m.)
14         Q.    Mr. Jalloh, at some point the next
15   day you went to see a doctor, correct?
16         A.    Yes.
17         Q.    Do you remember the name of that
18   doctor?
19         A.    No.
20         Q.    Okay.
21               If I told you that it was Dr.
22   Greenfield, would that refresh your
23   recollection?
24         A.    No, I don't recall the doctor's
25   name.

## Page 41

```
 1                    Jalloh
 2      Q.    Was it Dr. Crystal?
 3      A.    I have seen a lot of doctors.
 4            What's happening is they are going
 5   to tell me their names, but its very difficult
 6   for me to remember or memorize their names.
 7      Q.    Let me ask you this way.
 8            How did you find out about this
 9   doctor?
10      A.    One of my friends told me about
11   the doctor.
12      Q.    Who was that friend?
13      A.    It was Mamadou Diallo.
14      Q.    In other words, it was a
15   recommendation, correct?
16      A.    Yes.
17      Q.    In other words, you asked your
18   friend if he knows any doctor and he gave you
19   this number, correct?
20      A.    Yes.
21      Q.    You called this doctor and you
22   asked him if you can come for an appointment,
23   correct?
24      A.    Yes.
25      Q.    Okay.
```

## Page 42

```
 1                    Jalloh
 2            Where was the doctor located at
 3   the time?
 4      A.    Grand Concourse.
 5      Q.    How did you get there?
 6      A.    I took a taxi.
 7      Q.    Once you got there, what did the
 8   examination consist of?
 9      A.    Lots of things was done for me
10   over there.  I remember they put some hot pad
11   here (indicating) to the back and to the neck
12   here, and --
13      Q.    What else?
14            THE INTERPRETER:  I don't know that
15      name in Fulani.
16      A.    Something like a needle they put
17   in there.
18            THE INTERPRETER:  Sorry.
19      Q.    Mr. Jalloh, did you receive any
20   medication while you were examined?
21      A.    That day like I told you what they
22   did for me was to put things on my body, the
23   hot pad, and in particular the needle.  And
24   also I was given like a Tylenol and something
25   was prescribed for me.
```

## Page 43

```
 1                    Jalloh
 2      Q.    Do you know, would you recall the
 3   name of the prescription drug?
 4      A.    I don't recall.
 5      Q.    Okay.
 6            Did you see the doctor again
 7   following this first examination?
 8      A.    Yes, many times.
 9      Q.    Would you know approximately how
10   many times?
11      A.    Three months complete I'm seeing
12   this doctor, I was even put, I even had an MRI
13   for that.
14      Q.    When you say three months, does it
15   mean three months following your first visit?
16      A.    Three months total I was seeing
17   this doctor.
18      Q.    Okay.
19            During those three months how
20   often did you see your doctor, was it once a
21   week, once a month, every other day?
22      A.    I used to see the doctor like
23   three times a week.
24      Q.    Do you remember whether the doctor
25   was a female or a male?
```

## Page 44

```
 1                    Jalloh
 2      A.    Female, some of the time.
 3      Q.    The first time you went to see
 4   that particular doctor, do you remember
 5   whether the doctor was a female or a male?
 6      A.    It was a female.
 7      Q.    Okay.
 8            If I told you that her name was
 9   Dina Nelson, would that refresh your
10   recollection?
11      A.    If you tell me that's her name I'm
12   not going to argue, but --
13      Q.    All right.
14            During those three months, did you
15   see any other doctors except for those you
16   visited at Grand Concourse?
17      A.    You mean from a different
18   hospital?
19      Q.    Did you go to any different
20   providers or did you always go to the same
21   place at Grand Concourse?
22      A.    Grand Concourse, that's where I
23   went to and where I had also the MRI.
24      Q.    Okay.
25            Mr. Jalloh, would you recall
```

Page 45

```
 1                    Jalloh
 2   whether you were recommended to have any
 3   rehabilitation by those doctors?
 4        A.   I was recommended to go somewhere
 5   that was in Tremont, but that appointment did
 6   not happen.
 7        Q.   Okay.
 8             Did you participate in any
 9   rehabilitation therapy following the accident?
10        A.   Yes, I did, at Grand Concourse.
11        Q.   What did this therapy consist of?
12        A.   For the therapy it is something
13   that they bring, they put around my neck and
14   also my back and I'm laying down.  So after
15   that also they use a needle to press those
16   areas of my back and also my neck, and also
17   they massage me.
18        Q.   Following the therapy did you feel
19   that your health condition started to improve?
20        A.   Just a little bit.  It was better
21   than the day it first happened to me, but not
22   completely.
23        Q.   So was there any reason why you
24   stopped seeing your doctors and why you
25   stopped participating in the rehabilitation
```

Page 46

```
 1                    Jalloh
 2   therapy?
 3        A.   Because I had been there a lot of
 4   times, many times.
 5        Q.   Okay.
 6             When was the last time that you
 7   participated in therapy, if you know
 8   approximately?
 9        A.   I don't recall.
10        Q.   As of now how, do you feel?
11        A.   To the present time I have pain.
12        Q.   Where do you have pain?
13        A.   The place I had pain before is
14   still the same place.
15        Q.   If you can tell us again where
16   that was?
17        A.   (Indicating).
18             MR. McCABE:  The neck and upper
19        back.
20        A.   The neck and upper back, the
21   middle of the back --
22             THE INTERPRETER:  And pointing to
23        the legs, everything.
24        Q.   Are you currently taking any
25   prescription medication?
```

Page 47

```
 1                    Jalloh
 2        A.   Right now Ben Gay, that's the only
 3   thing I'm putting on those areas.
 4        Q.   How often do you take Ben Gay?
 5        A.   Every day before I go to bed I use
 6   that.
 7        Q.   What is Ben Gay for?
 8        A.   Its because of the pain.
 9        Q.   Are you currently participating in
10   any therapy?
11        A.   No.
12        Q.   Okay.
13             Are there any activities that you
14   were able to do prior to the incident that you
15   are unable to do now?
16        A.   Yes.
17        Q.   What are those activities?
18        A.   Like for example, I used to like
19   bend my knees and sit on like if when I pray,
20   but now I can't do that.
21        Q.   Anything else?
22        A.   That's all.
23             And also if I'm walking, I walk a
24   little bit gingerly, I cannot walk straight.
25             MR. McCABE:  Can you read that
```

Page 48

```
 1                    Jalloh
 2        back, please.
 3             (Record read.)
 4             MR. McCABE:  Thank you.
 5        Q.   Have you ever met a person called
 6   Thomas Wendel?
 7        A.   It is possible that I met somebody
 8   and that happened to be the name, but I don't
 9   recall the name.
10        Q.   Do you know, Mr. Jalloh, that Mr.
11   Wendel is the defendant in this action?
12        A.   I don't understand, what do you
13   mean, the accident?
14        Q.   No, I'm talking about, do you
15   know -- let me ask you this.
16             Have you ever spoken to the
17   defendant in this action?  In other words,
18   have you ever spoken to the driver of the
19   other vehicle that's --
20        A.   No, I have never.
21        Q.   Never ever?
22        A.   No.
23        Q.   That's all I need to know.
24             I'll ask you some follow up
25   questions.  At the time of the incident when
```

```
1                    Jalloh
2   you were working for Family, how much were you
3   making?
4       A.     That's depends how lucky you are,
5   ever day is different how much.
6       Q.     Were you getting paid an hourly
7   rate or were you getting paid based on how
8   many customers you drove that particular day?
9       A.     For a taxi driver it depends how
10  many customers you get per day, that's how
11  much money you're going to get.
12      Q.     Let's take an average day.
13             If you can approximate for me on
14  an average day, not a good day, not a bad day,
15  on an average day how much would you make?
16      A.     You mean how many customers?
17      MR. McCABE:  No, how much money.
18      Q.     It doesn't have to be precise.
19             I'm not asking for an X number,
20  I'm not asking if you have no customers, I
21  understand you would make nothing, on an
22  average day how much would you make?
23      A.     Like $90.
24      MR. McCABE:  I'll just for the
25      record point out that there is no claim
```

```
1                    Jalloh
2       for lost earnings in this action.
3       MR. VANDAMME:  Okay.
4       Q.     Mr. Jalloh, I'm going to ask you
5   one more question.
6              Do you know what happened to the
7   vehicle once you left the scene of the
8   incident with Mr. Bah?
9       A.     Yes.
10      Q.     What happened?
11      A.     It was taken to the garage.
12      Q.     Do you know who towed it away?
13      A.     My friend is the one who talked
14  with the tow people.
15      Q.     Do you know whether someone drove
16  the car to the garage or whether the car was
17  towed away?
18      A.     If I am not mistaken, he was the
19  one who drove it.
20      Q.     What was the name of your friend,
21  if you recall?
22      A.     Mamadou Diallo, that's his name.
23      Q.     Do you know what happened to the
24  car once the car was brought to the garage?
25      A.     They repaired it.
```

```
1                    Jalloh
2       Q.     Do you know the name of the garage
3   which repaired the vehicle?
4       A.     Yes.
5       Q.     What's the name of the garage?
6       A.     No, I only know the name of the
7   street.
8       Q.     If you can give me the name of the
9   street.
10      A.     137th between Third and, I don't
11  know, between Third and Canal Place, something
12  like that.
13      Q.     Okay.
14      A.     I do know for sure its on 137th
15  Street.
16      MR. McCABE:  Off the record.
17      (Whereupon, an off-the-record
18      discussion was held.)
19             (Time noted:  12:18 p.m.)
20             (Time noted:  12:19 p.m.)
21      Q.     Did you take any photographs of
22  the scene of the accident?
23      A.     You mean where the accident
24  happened?
25      Q.     Yes.
```

```
1                    Jalloh
2       A.     No, I didn't.  At that time I was
3   not thinking about that.
4       Q.     Okay.
5       MR. VANDAMME:  I have no more
6       questions.
7       MR. McCABE:  All right.
8       Off the record.
9              (Whereupon, an off-the-record
10      discussion was held.)
11             (Time noted:  12:20 p.m.)
12
13      _____
14              ABOUBACAR JALLOH
15
16  Subscribed and sworn to before me
17  this ____ day of _____, 2008.
18
19  _____
20
21
22
23
24
25
```

Page 53

```
 1                    Jalloh
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK      )
 4                          : ss.
 5   COUNTY OF NEW YORK     )
 6
 7        I, Jeremy Frank, a Notary Public
 8   within and for the State of New York, do
 9   hereby certify:
10        That ABOUBACAR JALLOH, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by the witness.
14        I further certify that I am not related
15   to any of the parties to this action by blood
16   or marriage, and that I am in no way
17   interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereby
19   set my hand on the 8th day of February, 2008.
20
21
22            JEREMY FRANK, MFM
23
24
25
```

Page 54

```
 1                    Jalloh
 2            *** ERRATA SHEET ***
 3
     NAME OF CASE: JALLOH v. WENDEL
 4   DATE OF DEPOSITION:  February 8th, 2008
     NAME OF WITNESS:   JALLOH
 5   PAGE   LINE       FROM        TO
 6   ____|_____|_____|_____
 7   ____|_____|_____|_____
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18
             _____
19              ABOUBACAR JALLOH
20   Subscribed and sworn to before me
     this ____ day of _____, 2008.
21
     _____    _____
22   JEREMY FRANK     My Commission Expires:
23
24
25
```

| A | appointment | A-l-i-m-o-u | buckle 28:21 | 20:18,25 |
|---|---|---|---|---|

**A**
**able** 17:15 32:10 47:14
**Aboubacar** 1:5 1:13 2:5 7:4,6 12:7 52:14 53:10 54:19
**accident** 5:16 16:25 17:2 21:6,19 23:22 23:25 24:14 25:25 26:3 27:14 34:2,5 34:9 35:4 36:2 38:24 39:7,17 45:9 48:13 51:22 51:23
**accommodate** 6:20
**accurately** 6:4
**action** 48:11,17 50:2 53:15
**activities** 47:13 47:17
**address** 7:9,13 7:18 11:14 17:21 21:20
**ago** 9:15 11:12
**AGREED** 4:2,7 4:11
**air** 29:3,5
**alcohol** 22:7,10
**Alimou** 8:2
**alleged** 17:2
**allegedly** 5:16
**Alpha** 13:17
**ambulance** 30:22 31:25 33:2
**Amsterdam** 19:2
**answer** 5:23 6:22 9:5,10 10:11
**answering** 6:7
**answers** 5:4
**apart** 36:9 38:5

**appointment** 41:22 45:5
**approaching** 25:6
**approximate** 26:3 35:10 38:23 39:9 49:13
**approximately** 11:12 15:19 15:23,24 16:3 16:5 23:2 25:10,12 26:12,25 30:8 30:20 35:5,9 39:5 43:9 46:8
**area** 25:17 39:15,16
**areas** 45:16 47:3
**argue** 44:12
**arrival** 36:6
**arrived** 35:25 36:13
**asked** 31:24 32:21,23,25 37:8 41:17,22
**asking** 5:15 15:5 17:19,20 23:2 49:19,20
**assigned** 19:17
**attorney** 5:14 15:14
**Attorneys** 3:6 3:12
**August** 5:17 17:2,5 18:7 18:15 19:8 20:8,14 22:2 26:24
**Avenue** 2:7 3:7 11:16,17 21:25 24:3,5 24:9,21,22 25:18
**average** 49:12 49:14,15,22

**A-l-i-m-o-u** 7:25
**a.m** 2:3 18:5,6 40:12,13

**B**
**B** 5:2,6,6
**B-a-h** 8:2 33:24
**B1** 10:3
**B2** 10:3,5,6,12
**back** 10:23 24:17 29:18 38:19,20 42:11 45:14 45:16 46:19 46:20,21 48:2
**bad** 49:14
**bag** 29:3,5
**Bah** 8:2 13:17 33:25 34:7,8 35:2,4,19,25 36:13 50:8
**Bah's** 36:5 38:3 38:4,9,16 39:3
**based** 49:7
**bed** 47:5
**belt** 28:10,12 28:14,18,19 29:14
**Ben** 47:2,4,7
**bend** 47:19
**Bernstein** 2:7 3:4
**better** 45:20
**birth** 8:25 22:9
**bit** 16:23 26:21 45:20 47:24
**blood** 53:15
**body** 29:11 42:22
**born** 8:20,22
**brake** 28:6
**brakes** 28:2,3
**break** 6:18 40:9
**bring** 45:13
**Broad** 3:13
**Bronx** 7:10 11:18 19:3
**Brooklyn** 16:18
**brought** 50:24

**buckle** 28:21
**Budin** 2:6 3:4
**business** 10:16 10:22 11:3,6 11:8
**buy** 10:19
**B-a-h** 8:2 33:24
**B1** 10:3
**B2** 10:3,5,6,12

**C**
**C** 3:2 5:6 53:2,2
**cab** 13:11 18:18
**calculate** 35:6
**call** 18:13,14
**called** 5:6 34:10 35:2,19 41:21 48:5
**Canal** 51:11
**car** 13:12,19,24 14:3,4 19:14 19:16,17,18 19:20,22,25 20:2,4,6,11 20:14,16 21:4 21:11,16 24:13 28:25 29:3,12 30:11 31:9,16 32:5 32:12,24 36:2 36:16,17,20 37:9,21,25 38:3,3,4,9,16 39:3 50:16,16 50:24,24
**cars** 13:13,16 25:20,22 30:18,24 31:2
**CASE** 54:3
**cell** 27:22,24 34:11,13,25 35:3,20
**certification** 4:5
**certify** 53:9,14
**change** 19:18
**check** 20:17,17

**checked** 21:11
**citizen** 9:3
**city** 8:22
**Civ** 1:7
**claim** 49:25
**Clark** 7:10 38:14
**clear** 22:20,21 25:21
**client** 19:19
**close** 9:17 35:17
**collision** 21:16
**color** 20:4
**come** 9:12,18 35:4,22 41:22
**Commission** 54:22
**company** 13:11 18:13,14,20 34:4
**complete** 43:11
**completely** 27:11 45:22
**Conakry** 8:24
**Concourse** 42:4 44:16,21 44:22 45:10
**condition** 45:19
**conditions** 22:17
**conducted** 16:20
**consciousne...** 29:25 30:3,5 30:12,14 31:12,18
**consist** 42:8 45:11
**consume** 22:7 22:11
**contact** 34:8
**corporation** 11:7
**correct** 7:6

10:7 19:3
23:23 26:8,18
39:24 40:15
41:15,19,23
**counsel** 3:9 4:3
15:5,12
**count** 17:16
25:4 30:21
**country** 9:23
**COUNTY** 53:5
**court** 1:2 4:15
5:21 6:3
**Crystal** 41:2
**current** 7:9 9:7
12:14,15
**currently** 46:24
47:9
**customer** 23:9
23:9
**customers**
23:17,20 49:8
49:10,16,20
**C-o-n-a-k-r-y**
8:24

**D**

**D** 5:2,2
**date** 8:25 15:20
54:4
**Davidson**
11:16,17
**day** 17:4,17,22
19:10 22:17
25:16,25
26:14 40:3,3
40:15 42:21
43:21 45:21
47:5 49:5,8
49:10,12,14
49:14,14,15
49:22 52:17
53:19 54:20
**days** 21:18
**defendant** 1:9
3:12 48:11,17
**depends** 49:4
49:9
**deploy** 29:5

**deposition**
1:13 2:5 4:5
4:12 5:20
6:19 53:11,12
54:4
**describe** 37:18
**designated**
19:13
**Diallo** 41:13
50:22
**difference**
15:15
**different** 15:13
44:17,19 49:5
**difficult** 41:5
**Dina** 44:9
**direction** 23:12
23:14 24:7
**directly** 38:2,4
**discussion**
18:4 40:11
51:18 52:10
**DISTRICT** 1:2,3
**divulged** 34:25
**doctor** 39:24
40:5,15,18
41:9,11,18,21
42:2 43:6,12
43:17,20,22
43:24 44:4,5
**doctors** 41:3
44:15 45:3,24
**doctor's** 40:24
**doing** 17:5
18:16 27:14
**door** 32:9,11
32:11,13,16
32:17,18
**DOUMBOUYA**
3:19
**Downtown**
23:13 24:8
**Dr** 40:21 41:2
**drank** 22:9
**drive** 13:14
33:11
**driver** 18:18
19:13 23:7

28:5 29:13
33:15 36:20
36:24 37:2,8
37:13 48:18
49:9
**driver's** 14:7,9
14:12,20 15:3
16:3 32:18
**driving** 13:9
39:11
**drove** 19:18
23:15 49:8
50:15,19
**drug** 43:3
**drugs** 22:12
**dry** 22:20,21
**duly** 5:2,7
53:11

**E**

**E** 3:2,2 10:3
53:2,2
**Early** 18:9
**earnings** 50:2
**easier** 6:3
**East** 7:10 38:14
**eat** 26:21
**education**
11:20,23,25
**effect** 4:14
**eight** 11:22
27:2
**English** 5:3,5
16:21,22 20:5
**entered** 9:21
9:23 10:23
11:13
**ERRATA** 54:2
**ESQ** 3:9,15
**establish** 15:3
34:8
**evening** 26:7
**exactly** 17:15
19:12
**examination**
5:10 42:8
43:7
**examined** 5:8

42:20
**example** 47:18
**Expires** 54:22

**F**

**F** 53:2
**familiar** 39:15
**Family** 18:22
18:23,25 19:9
19:15 34:2
49:2
**far** 25:10
**February** 1:15
2:2 53:19
54:4
**feel** 27:5 38:16
45:18 46:10
**feeling** 40:6
**female** 43:25
44:2,5,6
**filing** 4:4
**find** 23:9,17
41:8
**fine** 34:23
**finish** 6:7
**first** 7:6 11:14
11:15 14:18
16:2,6 25:7
31:20 32:22
33:20,22 43:7
43:15 44:3
45:21
**five** 19:11
21:18
**fixed** 21:12
**follow** 48:24
**following** 30:5
43:7,15 45:9
45:18
**follows** 5:9
**foot** 28:6,7,8,9
**force** 4:13
**forgot** 14:19
16:10,11
**form** 4:8 10:10
**forth** 53:11
**four** 19:11
**Frank** 1:22 2:9

53:7,22 54:22
**Friday** 1:15
**friend** 41:12,18
50:13,20
**friends** 8:5
13:13,15
41:10
**front** 25:4,22
**Fulani** 5:4,4
21:10 42:15
**further** 4:7,11
53:14

**G**

**gained** 30:5,12
30:14 31:12
31:18
**garage** 50:11
50:16,24 51:2
51:5
**Gay** 47:2,4,7
**gentleman**
15:14
**getting** 34:20
49:6,7
**gingerly** 47:24
**give** 5:19 13:13
13:16,19,25
17:20 21:20
51:8
**given** 19:16
42:24 53:13
**go** 12:2 17:11
20:15 23:4,6
23:11,13,13
26:20 33:11
38:2,10 40:5
44:19,20 45:4
47:5
**going** 8:18
14:22 20:25
32:25 34:19
37:14 38:20
41:4 44:12
49:11 50:4
**good** 5:12 8:15
8:17 12:20
21:2 22:22

31:7 49:14
**Grand** 42:4
44:16,21,22
45:10
**green** 20:5
27:16 37:13
**Greenfield**
40:22
**ground** 5:20
**guess** 20:19
**Guinea** 8:21,23
10:23 11:21
**guy** 21:10

---

**H**

**H** 5:6
**hand** 53:19
**hands** 27:18
**happen** 23:8
24:15 45:6
**happened**
29:13,14,18
29:23 33:7,9
39:19 45:21
48:8 50:6,10
50:23 51:24
**happening**
41:4
**head** 5:24
29:15,20
38:20
**heading** 23:2
24:7
**health** 8:15,17
12:20 45:19
**heavy** 25:19
37:19
**held** 2:5 18:4
40:11 51:18
52:10
**help** 8:11 36:16
**helped** 36:18
**Hendrick** 3:15
5:13
**hereinbefore**
53:11
**hereto** 4:4
**higher** 11:24

**highest** 11:19
**hit** 24:17 27:10
28:5 29:11,13
29:20 35:21
37:9,13,15,21
37:23,24
**hold** 14:6
**home** 18:8
33:10,11,12
33:13 35:22
38:24 39:6,11
39:19
**hospital** 44:18
**hot** 42:10,23
**hour** 30:10
35:13,16
**hourly** 49:6
**hours** 17:6,22
22:8,12 26:18
26:23 27:2
35:15,17
**house** 18:10
22:8,13,25
23:10 26:12
26:14

---

**I**

**Ibrahma** 33:19
**illegally** 15:2
**immediately**
27:13
**immigration**
9:7
**impact** 27:6,8
29:10 30:2,6
37:18
**important** 5:22
6:5
**improve** 45:19
**incident** 20:8
28:4,25 29:6
36:5,22 37:5
47:14 48:25
50:8
**indicate** 35:6
**indicating**
28:16,22
29:15,19

38:19 42:11
46:17
**individuals** 8:4
**interested**
53:17
**interpret** 5:3
**interpreter**
3:19 5:9
42:14,18
46:22
**intersection**
24:22 25:11
25:17 27:4
**involved** 10:17
24:14 36:21
**involving** 23:22
**issued** 14:15
14:16,17 15:5
15:7,8
**l-b-r-a-h-m-a**
33:19

---

**J**

**J** 3:11 5:6
**Jalloh** 1:5,13
2:5 5:1,12 6:1
6:10 7:1,4,5
8:1,3,20 9:1
10:1 11:1,19
12:1,7 13:1
14:1,6 15:1
16:1 17:1,4
18:1,7 19:1
20:1 21:1
22:1,2,25
23:1 24:1
25:1,24 26:1
27:1 28:1
29:1 30:1,4
31:1 32:1
33:1 34:1
35:1,2 36:1
37:1 38:1,15
39:1 40:1,14
41:1 42:1,19
43:1 44:1,25
45:1 46:1
47:1 48:1,10

49:1 50:1,4
51:1 52:1,14
53:1,10 54:1
54:3,4,19
**Jeremy** 1:22
2:8 53:7,22
54:22
**Jerome** 24:2,5
24:6,9,21,22
25:17 39:14
**JOB** 1:23
**June** 9:2

---

**K**

**knees** 47:19
**know** 5:21 6:20
10:13 14:3,14
14:25 15:4,8
19:12,24 20:6
20:10 21:10
21:21 23:6
24:20,23 25:2
25:3,10 29:22
30:9 31:8
33:7,16 34:4
34:6,7,16
39:10,18
42:14 43:2,9
46:7 48:10,15
48:23 50:6,12
50:15,23 51:2
51:6,11,14
**known** 12:6
**knows** 16:4
41:18
**Kupferberg** 2:6
3:4

---

**L**

**L** 5:6,6
**language** 12:4
16:19
**lap** 28:13,13,13
28:17
**LAW** 3:11
**lay** 39:21
**laying** 45:14
**learning** 12:4

**leave** 22:3 33:6
33:8 36:6,17
**leaving** 22:8,13
**left** 22:25 23:10
26:11,13 28:7
37:25 50:7
**legs** 38:21
46:23
**let's** 13:2 16:25
26:15 49:12
**level** 11:20
15:13
**license** 14:7,9
14:12,14,17
14:21 15:2,4
15:5,7,7,8
16:3,7,14
**light** 24:16 25:7
25:8,9,11
27:5,15 37:12
37:13
**lights** 24:21,24
24:25 25:3,5
**Lincoln** 14:2
19:23 20:2
**LINE** 54:5
**listening** 27:20
**little** 16:23
26:20 45:20
47:24
**live** 7:19,21
38:11,12
**lived** 7:11
**livery** 18:18
**lives** 7:17
**living** 12:17,18
18:16
**LLP** 2:7 3:5
**located** 18:25
21:22 25:17
42:2
**long** 7:11 14:13
19:8 35:3,7
38:22,23 39:2
39:4,5
**look** 38:3
**looking** 27:9
**lose** 29:25

lost 29:23 30:3
  50:2
lot 40:6 41:3
  46:3
Lots 42:9
lucky 49:4

**M**

M 5:2,2,2
Madison 2:7
  3:7
maintenance
  20:11
major 33:7
making 49:3
male 43:25
  44:5
MALONEY
  3:11
Maloney's 5:14
Mamadou 3:19
  8:2 41:13
  50:22
Manhattan
  19:6
marriage 53:16
massage 45:17
matter 53:17
McCABE 3:9
  9:4,9 10:8
  12:16,24 13:4
  14:22 15:9,12
  15:18,24 16:2
  16:8 17:25
  19:6 20:19
  21:25 34:19
  34:24 40:8
  46:18 47:25
  48:4 49:17,24
  51:16 52:7
mean 8:8 20:23
  24:24 37:14
  43:15 44:17
  48:13 49:16
  51:23
Meaning 38:2
means 20:8
mechanic 21:5

21:9,11,21
medication
  42:20 46:25
memorize 41:6
memory 31:7
mentioned
  27:3 32:6
merchandises
  10:19,20
merchant 9:24
  9:24 10:16
merchant's
  10:7
messed 27:12
met 48:5,7
middle 46:21
mind 27:11
  29:24
minute 18:2
  40:9
minutes 35:8,9
  35:10,12,16
mistaken 10:5
  31:3,6 32:14
  50:18
money 49:11
  49:17
month 15:21
  43:21
months 13:3,4
  13:5,6,8
  19:11 43:11
  43:14,15,16
  43:19 44:14
morning 5:12
  17:6,7,8,9,22
  18:8,9,12
  20:15,16 22:3
  40:4
Mouhamadou
  7:25
MPM 1:22
  53:22
MRI 43:12
  44:23
M-a-m-a-d-o-u
  7:25
M-o-u-h-a-m-...

7:24

**N**

N 3:2
name 5:13 7:2
  7:5,6 10:2
  11:2 12:7
  21:8,13,14
  33:16,18,20
  33:21,22,23
  40:17,25
  42:15 43:3
  44:8,11 48:8
  48:9 50:20,22
  51:2,5,6,8
  54:3,4
names 13:15
  41:5,6
nature 11:6
neck 42:11
  45:13,16
  46:18,20
need 6:18
  31:24 48:23
needle 42:16
  42:23 45:15
Nelson 44:9
never 22:9,14
  48:20,21
New 1:3,14,14
  2:7,8,9 3:8,14
  14:9,11 53:3
  53:5,8
nice 22:18
Nickname
  12:10,11
nicknames
  12:9
nod 5:23
noon 26:16,17
Notary 2:9 4:13
  5:7 53:7
Note 9:4 10:9
noted 18:5,6
  40:12,13
  51:19,20
  52:11
noticed 25:8

NRB 1:7
number 14:4
  34:14 41:19
  49:19
NY 3:8,14

**O**

O 5:2,2,2,6,6
oath 6:11
object 14:22
  34:19
objection 9:4,9
  10:9
objections 4:8
obtain 14:11
  14:20 16:13
occur 23:25
occurred 5:17
  17:2 25:25
  26:4
office 5:14
officer 32:23
  36:10 37:4
officers 31:4
  31:13 37:4
  38:6
offices 2:6 3:11
official 12:3
off-the-record
  18:3 40:10
  51:17 52:9
oil 20:17,24
okay 5:18 6:8,9
  6:13,21 7:8
  8:19 9:25
  10:14 11:10
  12:5,13 13:4
  13:20 16:12
  16:24 17:10
  18:11,19
  19:21 22:6,15
  22:23 23:5,16
  24:12,18
  25:15,23
  26:10,22
  27:17 28:23
  29:9 35:18
  36:12 37:17

38:8 39:22
  40:20 41:25
  43:5,18 44:7
  44:24 45:7
  46:5 47:12
  50:3 51:13
  52:4
once 30:14
  31:12 35:25
  36:13 38:9
  39:19 42:7
  43:20,21 50:7
  50:24
ones 13:13
  31:22 32:15
one-way 24:10
open 31:9 32:7
  32:9,9,11
opened 32:13
  32:15
Order 2:8
outcome 53:17
outside 32:4

**P**

P 1:8 3:2,2
pad 42:10,23
PAGE 54:5
paid 49:6,7
pain 38:16,17
  46:11,12,13
  47:8
pains 40:6,7
part 37:20
participate
  45:8
participated
  46:7
participating
  45:25 47:9
particular
  13:10 17:4,22
  19:14 26:14
  42:23 44:4
  49:8
parties 4:4
  53:15
pass 28:20

passed 17:17
17:20
passengers
28:24
Patrick 3:11
5:14
pay 8:18
pays 8:9,10
people 7:19,20
7:21,22,23
30:17,19
31:19 32:15
50:14
period 12:24
13:5
person 13:21
48:5
person's 34:24
pertaining 5:16
PETER 3:9
phone 18:13
27:22,24
34:11,13,25
35:3,20
photographs
51:21
pick 19:19
place 7:10,12
7:15,18 11:15
17:21 21:12
36:15 38:11
38:14,25
44:21 46:13
46:14 51:11
Plaintiff 1:6 3:6
please 6:6,15
6:19 7:2 48:2
point 18:12
23:21 24:13
27:5 29:20
36:6,19 37:20
39:23 40:14
49:25
pointing 46:22
police 30:24
31:2,4,13,19
32:3,8,14,23
36:10 37:3,4

38:5
portion 29:11
29:11
possible 48:7
pray 47:19
preceding
27:14
precise 25:13
26:2,25 49:18
prepared 6:22
prescribed
42:25
prescription
22:12 43:3
46:25
present 3:18
46:11
Presently
12:19 13:12
21:23
press 45:15
prior 19:8
20:14 21:5
22:8,12 28:4
39:17 47:14
privacy 34:21
profession
12:14
professional
21:5
proprietor 11:7
providers
44:20
Public 2:9 4:13
5:8 53:7
purpose 23:3
pursuant 2:8
put 20:16 32:5
42:10,16,22
43:12 45:13
putting 47:3
p.m 26:5,7,17
51:19,20
52:11

**Q**

question 4:9
6:7 9:5,10

10:8,11 15:6
15:20 17:24
20:20 32:21
32:22 33:4
34:20 50:5
questions 5:3
5:15 6:15,23
37:5 48:25
52:6

**R**

R 3:2 5:6 53:2
radio 27:20
rarely 12:20,22
rate 49:7
read 47:25 48:3
ready 23:8
reason 6:6
45:23
recall 14:5
16:10 25:14
30:15 31:11
31:13 36:23
38:7 40:24
43:2,4 44:25
46:9 48:9
50:21
receive 11:24
18:13 42:19
received 11:20
recollection
40:23 44:10
recommenda...
41:15
recommended
45:2,4
record 6:4 7:3
17:25 28:15
48:3 49:25
51:16 52:8
53:13
red 24:16 25:8
27:5 37:12
reflect 28:16
refresh 40:22
44:9
registration
14:3

regularly 20:7
rehabilitation
45:3,9,25
Reisman 2:6
3:4
related 53:14
relationship
8:4
relax 26:20
remember
22:16 24:19
24:20 25:2,18
25:24 26:12
26:24 27:13
30:4,15 31:5
32:6,22 40:17
41:6 42:10
43:24 44:4
rent 8:9,10,10
8:13,18
renting 7:14,16
repair 21:21
repaired 50:25
51:3
rephrase 6:16
Reported 1:21
reporter 5:21
6:4
request 6:20
reserved 4:9
respective 4:3
respond 33:3
responsible
20:10
result 30:2
returned 13:18
right 6:17
12:20 13:18
13:23 19:7
28:8,9 29:23
34:22 37:23
44:13 47:2
52:7
roads 17:17,19
roommates 8:7
route 39:10,13
rules 5:20

**S**

S 3:2
saw 31:13
36:25,25
scene 31:5
35:4,25 38:24
39:6 50:7
51:22
school 12:2,3
sealing 4:4
seat 28:10,12
28:14,18,19
29:18 32:3
see 21:2 27:10
29:7,8 30:17
30:19,22,24
30:25 31:2
36:24 37:20
37:22,23
39:23 40:5,15
43:6,20,22
44:3,15
seeing 30:16
43:11,16
45:24
seen 41:3
selling 11:4
send 33:2
series 5:15
serviced 20:7
20:14 21:4,16
28:3
set 53:11,19
shake 5:24
share 8:10,12
8:16
SHEET 54:2
shining 22:19
shop 21:21
short 40:8
shoulder 28:13
28:17
shut 31:10 32:7
sic 37:2
side 32:18
signed 4:12,14
simple 15:6
16:9

sit 47:19
sitting 32:5,17
six 12:25 13:3
   13:4,5,8
   19:11
sole 11:6
somebody
   8:16 33:13
   35:21 48:7
Sorry 42:18
SOUTHERN
   1:3
Sow 7:25 21:14
   21:17
Sow's 21:21
speak 16:22,23
specific 15:20
   15:23
spend 39:2
spoken 48:16
   48:18
ss 53:4
standing 27:4
start 5:19 21:3
started 32:8
   45:19
state 2:9 7:2
   53:3,8
stated 10:15
   11:11 26:11
statement 10:9
States 1:2 9:3
   9:13,19,22
   10:18,24
   11:13,25
status 9:8,11
stayed 11:15
   31:15
steering 29:16
   29:17,21
STIPULATED
   4:2,7,11
stomach 28:21
stopped 24:16
   45:24,25
stopping 27:15
   37:12,15
straight 47:24

street 3:13
   24:4,5,9,10
   25:18 51:7,9
   51:15
streets 17:16
Subscribed
   52:16 54:20
Suite 3:13
sure 6:15 51:14
surrounding
   30:18
sworn 4:14 5:3
   5:7 52:16
   53:12 54:20
S-o-w 7:24
   21:14

---

**T**

T 53:2,2
take 6:18 16:13
   16:17 22:11
   23:9,14 28:19
   35:3,22 38:22
   38:23 39:5
   40:8 47:4
   49:12 51:21
taken 50:11
talk 6:5 16:25
   31:17,20,21
   31:22 32:10
   36:9,20 38:6
talked 32:3
   37:3 50:13
talking 27:22
   32:8 48:14
taxi 13:9 23:7
   42:6 49:9
tell 6:15 17:15
   22:24 23:12
   25:19 26:2,13
   30:8 31:23
   32:20 35:20
   37:10 39:2
   41:5 44:11
   46:15
test 16:13,16
   16:17,19
testified 5:8

testimony
   53:13
Thank 48:4
therapy 45:9
   45:11,12,18
   46:2,7 47:10
thing 47:3
things 15:21
   21:2 42:9,22
think 17:23
   32:20 36:25
thinking 52:3
Third 51:10,11
Thomas 1:8
   48:6
three 19:11
   43:11,14,15
   43:16,19,23
   44:14
time 4:10 6:19
   12:24 14:13
   14:16,18 18:5
   18:6,17,21
   19:18 20:7,13
   21:5,15 22:3
   25:7,25 26:3
   26:13 27:8,11
   28:3,4,6,25
   29:6,7,10,22
   33:5,6,25
   34:5,8 36:4,4
   36:5 37:22
   39:2,8 40:12
   40:13 42:3
   44:2,3 46:6
   46:11 48:25
   51:19,20 52:2
   52:11
times 26:20
   43:8,10,23
   46:4,4
tires 20:25
today 5:15 6:11
   6:23
told 33:5,8
   35:21 37:11
   40:21 41:10
   42:21 44:8

total 25:2 26:24
   43:16
tow 50:14
towed 50:12,17
Town 20:2
traffic 24:20,25
   25:7,16,19,21
traveled 23:15
Tremont 45:5
trial 4:10
trip 23:3
true 53:12
trying 15:2
turn 27:16
   37:13
turned 25:12
two 7:22 13:6
   24:11,12 31:7
   31:13 35:15
   35:17 36:10
   38:5
two-lane 24:9
Tylenol 42:24
type 9:22 10:3
   10:16,20 11:8
   13:7,24 19:22
   28:12,14
T-shirt 10:21

---

**U**

U 5:2,2,2,6
unable 47:15
understand
   5:25 6:10,12
   6:14 10:6
   11:5 15:11,16
   15:25 17:23
   23:11 48:12
   49:21
understands
   15:19
United 1:2 9:3
   9:12,18,21
   10:17,23
   11:13,25
upper 46:18,20
Uptown 17:13
   17:14,15

23:13,15
use 13:24
   45:15 47:5

---

**V**

v 54:3
Vandamme
   3:15 5:11,13
   13:2 14:24
   15:11,16,22
   15:25 19:7
   28:15 34:22
   50:3 52:5
vehicle 23:22
   24:14,17 32:2
   32:4 36:7,21
   37:21 48:19
   50:7 51:3
visa 9:20,22,24
   10:2,3,4,7,12
   10:12,16
visit 43:15
visited 44:16
visitor's 10:12
vs 1:7

---

**W**

wait 6:6
waiting 37:12
waived 4:6
walk 47:23,24
walking 47:23
want 5:19
   15:20
wasn't 35:17
water 20:25
way 16:4 22:4
   23:18 38:20
   41:7 53:16
ways 24:11,12
wearing 28:10
   28:13,17
weather 22:16
   22:18
Webster 21:23
   21:25
week 43:21,23
weeks 12:25

Page 7

Wendel 1:8
  48:6,11 54:3
went 17:9,15
  17:17,21
  23:11,13
  29:15 33:10
  38:4,11 39:23
  40:15 44:3,23
wheel 27:19
  29:15,16,17
  29:21
wheels 20:18
  20:24
WHEREOF
  53:18
window 32:7,9
windows 31:8
  31:9
witness 5:7
  15:10 16:6
  28:16 53:10
  53:13,18 54:4
words 5:23
  8:12 38:25
  39:16 41:14
  41:17 48:17
work 12:19,23
  13:6,7,10
  17:9,12,18
  23:4,8,11
  26:23 34:2
worked 19:10
working 8:16
  8:17 11:9
  15:13 18:17
  18:20 19:9,14
  21:3 26:18,19
  34:5 49:2

_____
          X
_____
X 49:19

_____
          Y
_____
Y 5:2
year 15:21
  19:24
years 9:15
  11:12,22

yellow 25:9,12
York 1:3,14,14
  2:7,8,10 3:8
  3:14 14:9,11
  53:3,5,8

_____
          $
_____
$90 49:23

_____
          0
_____
07 1:7

_____
          1
_____
10 9:15 11:12
10:41 2:3
10004 3:14
10016 3:8
108 7:10 38:14
11 22:4 26:18
11-something
  26:15
11:00 26:5,7,17
11:03 18:5
11:04 18:6
11:49 40:12
11:56 40:13
112 2:7 3:7
12 22:5 26:16
  26:17
12:18 51:19
12:19 51:20
12:20 52:11
137th 51:10,14
170th 21:24
181st 19:2
182nd 24:2,5
  24:22 25:18

_____
          2
_____
2000 7:13
2006 5:17 17:3
  17:5 18:7,15
  19:8 20:8,14
  22:2 26:24
2008 1:15 2:2
  52:17 53:19
  54:4,20
2202 3:13
24 22:8,12

_____
          3
_____
30 35:8,9,10,12

_____
          4
_____
4091 1:7

_____
          5
_____
5th 9:2

_____
          6
_____
63 9:2
672356a 1:23

_____
          7
_____
7th 5:17 17:2,5
  18:7,15 19:8
  20:8,14 22:2
  26:24

_____
          8
_____
8th 1:15 2:2
  53:19 54:4

_____
          9
_____
90 3:13
97 20:2,3

EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

ABOUBACAR JALLOH,

                             Plaintiff,

           -against-

THOMAS P. WENDEL,

                            Defendant.

--------------------------------------------------------------X

**RADIOLOGIST'S
AFFIRMATION**

Index No.: 07 Civ. 4091/(NRB)

I, ALAN GREENFIELD, M.D., affirm the following under the penalties of perjury:

1.      I am a Radiologist, duly licensed by the State of New York to practice medicine.

2.      I am affiliated with U.S. Diagnostic, whose offices are located at 1963 Grand Concourse, Suite #LL, Bronx, New York 10453.

3.      I took or supervised the taking of the MRIs of the cervical spine and lumbar spine of ABOUBACAR JALLOH, the plaintiff in this action.

4.      Upon review of the MRI of the cervical spine taken on August 16, 2006, my findings were as follows:

          a)     **Straightening of cervical lordosis;**

          b)     **Central disc herniations at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord; and**

          c)     **Bulging disc at C4-C5 with flattening of the dural sac.**

5.      Upon review of the MRI of the lumbar spine taken on September 6, 2006, my findings were as follows:

          a)     **Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.**

6.      If I am called upon to testify in Court, my testimony will reflect the statements listed above.

7.    I, the undersigned, certify that the foregoing report is true to the best of my knowledge. I am a duly licensed Board Certified Radiologist in the State of New York and I hereby affirm under the penalties of perjury the contents of this report to be true.

Dated: New York, New York
       May 20, 2008

ALAN GREENFIELD, M.D.



# U.S. DIAGNOSTIC

1963 GRAND CONCOURSE SUITE 8LL • BRONX, NY 10453 • OFF: (718) 731-2500 / FAX: (718) 731-5100

SERVING HEALTH CARE NEEDS OF YOUR FAMILY

Dr. Monagan                                    8/16/2006

RE: Jalloh, Aboubacar
DOB: 5/3/1963
File #:2400
DOS: 8/16/2006

Dear Doctor:

The following is a report on the above patient who was examined on 8/16/2006.

## MRI OF THE CERVICAL SPINE:

**Technique:** Sagittal T1 and either gradient echo T2* or FSE T2 sagittal, T1 and T2 axial angled through disc spaces.

**Findings:** There is straightening of cervical lordosis. Central disc herniations are present at C3-C4 and C5-C6 indenting the dural sac. There is near contact with the cord at C5-C6. A bulging disc at C4-C5 is seen with flattening of the dural sac. The cord is normal in position and signal. There is no central spinal stenosis. No fracture, bone marrow edema, or replacement is demonstrated. The neural foramina are patent on both sides. There is no fracture or paraspinal mass.

## IMPRESSION:
1. Straightening of cervical lordosis.
2. Central disc herniations are present at C3-C4 and C5-C6, deforming the dural sac, with the latter nearly in contact with the cervical cord.
3. Bulging disc at C4-C5 with flattening of the dural sac.

Thank you for the courtesy of this referral.
***** Electronically Signed *****
08/20/06 09:48
Alan Greenfield, MD
Diplomate, American Board of Radiology

# U.S. DIAGNOSTIC

SERVING HEALTH CARE NEEDS OF YOUR FAMILY

1963 GRAND CONCOURSE SUITE #LL • BRONX, NY 10453 • OFF: (718) 731-2500 / FAX: (718) 731-5100

9/6/2006

Dr. Monagan
334 Grand Concourse
Bronx, NY 10451
718-590-5900
718-590-6399

RE: Jalloh, Aboubacar
DOB: 5/3/1973
File #:2747
DOS: 9/6/2006

Dear Doctor:

The following is a report on the above patient who was examined on 9/6/2006.

## MRI OF THE LUMBAR SPINE:

**Technique:** T1 sagittal, fast spin T2 sagittal, T1 axial angled through disc spaces.

**Findings:** There is a bulging disc at L4-L5 with flattening of the dural sac and right greater than left foraminal encroachment. A bulging disc is also seen at L5-S1 with flattening of epidural fat. The conus is unremarkable. There is no central spinal stenosis. No disc herniations are seen. There is no sign of fracture. Anterior spondylosis at L4-L5 is seen. There is no sign of paraspinal mass.

## IMPRESSION:

Bulging discs from L4 through S1, associated with bilateral foraminal narrowing at L4-L5.

Thank you for the courtesy of this referral.
***** Electronically Signed *****
09/06/06 18:16
Alan Greenfield, MD
Diplomate, American Board of Radiology

EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABOUBACAR JALLOH,

------------------------------------------X

Plaintiff,

**PHYSICIAN'S
AFFIRMATION**

-against-

Index No.: 07 Civ. 4091/(NRB)

THOMAS P. WENDEL,

Defendant.

------------------------------------------X

I, DINA NELSON, M.D., affirm the following under the penalties of perjury:

1. I am a physician duly licensed to practice medicine in the State of New York.

2. My offices are located at Med Care Health & Rehabilitation Services, P.C., 334 Grand Concourse, Bronx, NY 10451.

3. ABOUBACAR JALLOH sustained personal injuries when he was involved in a motor vehicle accident on August 6, 2006. He received physical therapy treatments at my facility from August 10, 2006 through December 7, 2006. Physical therapy treatments consisted of electrical stimulation, massages, and the application of hot and cold packs, all to the lower back and neck.

4. On initial physical examination on August 10, 2006, patient presented with complaints of neck pain, and mild to low back pain, and frontal headaches. The patient was 42 years old and has no history of prior injuries.

5. Examination of the cervical spine revealed severe limitation in all planes with diffuse muscle spasm in the upper trapezius muscles, levator scapulae, and SCM and tenderness in the cervical paraspinal.

6. Examination of the thoracolumbar spine revealed tenderness in the lower thoracic spinous processes up to the upper lumbar spine. Flexion was limited to 50 degrees (90 degrees is normal[1]) and lateral flexion was limited to 10 degrees (25 degrees is normal).

7. I diagnosed: (1) cervical sprain/strain; (2) thoracolumbar sprain/strain; and (3) post traumatic headaches. I began the patient on a course of physical therapy treatments three times per week.

---

[1] American Academy of Orthopedic Surgeons Standards

8.     On examination of September 21, 2006, patient had continued complaints of neck pain and low back pain with complaints of sharp pain radiating down both legs. At that time, he had not returned to work as a taxi driver due to his neck and lower back pain.

9.     Examination of the cervical spine revealed moderate restrictions in range of motion in all planes and bilateral trapezius and cervical paraspinal muscle spasm.

10.     Examination of the lumbar spine revealed moderate restriction and flexion bilateral lumbar paravertebral spasm, and a positive straight leg raise bilaterally.

11.     I reviewed x-ray films of the cervical spine which revealed straightening of lordosis. I reviewed an MRI of the cervical spine which revealed central disc herniations at C3-C4 and C5-C6 and bulging disc at C4-C5. I reviewed x-ray films of the lumbar spine, which revealed mild degenerative changes at L2 and bulging disc at L4 through S1 and bilateral foraminal narrowing at L4-L5 and possible lumbosacral radiculopathy.

12.     On November 2, 2006, the patient presented to me with complaints of cramping in his calf with severe sharp burning pain. This could be evidence of intermittent self-claudication. Examination of the cervical spine revealed a decrease in lateral rotation to 60 degrees bilaterally (80 degrees is normal), and lateral flexion to 20 degrees bilaterally (45 degrees is normal). There was also mild bilateral upper trapezius muscle spasm. There was also tenderness in the lower lumbar paravertebrals.

13.     Based on a reasonable degree of medical certainty, as well as on the patient's history and clinical examinations, it is my opinion that a direct causal relationship exists between Mr. Jalloh's injuries as described above and the accident of August 6, 2006.

14.     I, the undersigned, certify that the foregoing report is true to the best of my knowledge. I am a duly licensed physician in the State of New York and I hereby affirm under the penalties of perjury the contents of this report to be true.

Dated: New York, New York.
      May 20, 2008

DINA NELSON, M.D.

<u>AFFIRMATION OF MAILING</u>

I am an attorney at law in the State of New York and am associate with the law firm of Budin, Reisman, Kupferberg & Bernstein, LLP, attorneys for the plaintiff in the above-captioned matter. I hereby affirm under oath that a true and correct copy of the within Notice of Cross Motion for Summary Judgment; Affirmation in Support of Cross-Motion and in Opposition to Defendant's Motion for Summary Judgment; Rule 56.1 Statement of Facts; Rule 56.1 Opposition to Movant's Statement of Facts; and Memorandum of Law in Support of Cross-Motion for Summary Judgment on the Issue of Liability and in Opposition to Defendant's Motion for Summary Judgment on the Issue of Threshold, were furnished on June 3, 2008 to opposing counsel by forwarding same by Federal Express Overnight Delivery, addressed as follows:


      Law Offices of Harvey & Vandamme
      90 Broad Street
      Suite 2202
      New York, NY 10004
      (646) 428-2650


                                  *Christina M Rieker*
                                CHRISTINA M. RIEKER

Index No. 07 Civ. 4091(NRB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

                    Plaintiff,

     -against-

THOMAS P. WENDEL,

                    Defendant.

---

## NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT AFFIRMATION IN SUPPORT OF CROSS-MOTION AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ABOUBACAR JALLOH,

                        Plaintiff,

        -against-

THOMAS P. WENDEL,

                       Defendant.

-------------------------------------------------------------------X

Index No.: 07 Civ. 4091/(NRB)

ECF CASE

**RULE 56.1 STATEMENT OF FACTS**

**Hon. Judge Naomi R. Buchwald**

       Pursuant to Local Civil Rule 56.1(b) of the United States District Court for the Southern District of New York, the plaintiff, ABOUBACAR JALLOH, submits that there are no genuine issues of fact as to liability requiring a trial of the following material facts:

       1.     This is an action for personal injuries sustained by Aboubacar Jalloh in a motor vehicle accident on August 7, 2006.

       2.     The accident occurred at nearly midnight at the intersection of Jerome Avenue and West 182nd Street in the Bronx, New York.  Both vehicles were traveling southbound on Jerome Avenue at the time of the accident (See Exhibit "B").

       3.     It is undisputed that Mr. Wendel's vehicle struck Mr. Jalloh's vehicle in the rear while Mr. Jalloh's vehicle was stopped at a red traffic light at the aforementioned intersection.

       4.     Mr. Wendel was coming from a concert on Roosevelt Island immediately prior to the accident, and on his way home to Connecticut, took a detour through his old neighborhood around the location of the accident (See Exhibit "D", pgs. 10-11).

       5.     Mr. Wendel told the responding police officers that he "rear ended the other car". (Exhibit "D", pg. 19).

6.     Mr. Wendel further told the responding police officers "I took my eyes off the road and I didn't see the car" (Ex. "D", pg. 19).

7.     Mr. Wendel testified that, at the time of the accident, and immediately before, he "was just looking around." And was distracted by "the change in scenery since the last time I had been there." (Ex. "D", pg. 21).

8.     Plaintiff asserts that there are no genuine issues of fact requiring a trial in this matter on the issue of liability based upon defendant, Thomas P. Wendel's statements, and plaintiff is therefore entitled to summary judgment on the issue of liability.

Dated:  New York, New York
        June 3, 2008

                                        Yours, etc.,
                                        Budin, Reisman, Kupferberg & Bernstein, LLP

                                   By: *Christina M. Rieker*
                                        CHRISTINA M. RIEKER, ESQ. (1566)


TO:    Law Offices of Harvey & Vandamme
       Attorneys for Defendant
       THOMAS P. WENDEL
       90 Broad Street, Suite 2202
       New York, NY 10004
       (646) 428-2650

SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

> Plaintiff,

    -against-

THOMAS P. WENDEL,

> Defendant.

---

## RULE 56.1 STATEMENT OF FACTS

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ABOUBACAR JALLOH,

                         Plaintiff,

       -against-

THOMAS P. WENDEL,

                     Defendant.

--------------------------------------------------------------------X

Index No.: 07 Civ. 4091/(NRB)

ECF CASE

**RULE 56.1 OPPOSITION TO
MOVANT'S STATEMENT OF
FACTS**

**Hon. Judge Naomi R. Buchwald**

Pursuant to Local Civil Rule 56.1(b) of the United States District Court for the Southern District of New York, the plaintiff, ABOUBACAR JALLOH, submits that there are genuine issues of fact as to the severity of plaintiff's injuries requiring a trial of the following material facts:

1.     This is an action for personal injuries sustained by Aboubacar Jalloh in a motor vehicle accident on August 7, 2006.

2.     Mr. Jalloh was asked by the police who responded to the accident if he wanted to leave the scene in an ambulance. He responded, 'leave it for now'. (See plaintiff's EBT transcript, annexed to plaintiff's moving papers as Exhibit "G"). He was in pain, but did not appreciate the severity of his injuries. He also wanted to just go home and lie down (See plaintiff's Affidavit, annexed to plaintiff's papers as Exhibit "F").

3.     There are no reported injuries to Aboubacar Jalloh in the Police Accident Report.

4.     Aboubacar Jalloh received medical treatment from his treating physician, Dina Nelson, M.D. on August 10, 2006 and received physical therapy treatments three times per week for four months. Defendant offers the inadmissible, unaffirmed one page medical record indicating

that Mr. Jalloh told Dr. Nelson that he was working eight hours a day as a taxi driver. Plaintiff explains his work situation in his Affidavit. Mr. Jalloh states that he works only when he feels healthy enough to. He has not returned to work on a regular basis since the accident, but would like to when he feels able (See Exhibit "F"). Further, on February 8, 2008, he testified that in the last six months, he only worked about two months, total (See Exhibit "G", pgs. 12-13).

5.    As of February 8, 2008, Mr. Jalloh testified that he could not kneel to pray, which he did five times per day, every day, prior to the accident. Mr. Jalloh must rub Ben-Gay on his neck and back every night before bed, so as not to wake up with severe pain and stiffness. He still suffers from severe neck and back pain and has yet to return to work on a regular basis. He looks forward to returning to work as soon as he feels able. However, Dr. McMahon found Mr. Jalloh's condition to be permanent and offered a poor prognosis for recovery. He found him unable to work (Ex. "E"). Mr. Jalloh is negatively affected by his injuries, as prayer is the most important thing in his life, and because of the pain with kneeling, he is distracted while doing so (Ex. "F" and "G").

6.    On April 2, 2008, Aboubacar Jalloh was examined by Robert S. April, M.D.

7.    Plaintiff asserts that Aboubacar Jalloh did sustain a medically determined "serious injury" pursuant to New York Insurance Law §5102 that is causally related to the subject motor vehicle accident, and that defendant is not entitled to summary judgment dismissing the complaint.

8.    On May 14, 2008, Aboubacar Jalloh was examined by Mark S. McMahon, M.D.

Dated:  New York, New York
        June 3, 2008

                                  Yours, etc.,
                                  Budin, Reisman, Kupferberg & Bernstein, LLP

                          By: _Christina M. Rieker_
                              CHRISTINA M. RIEKER, ESQ. (1566)

TO:    Law Offices of Harvey & Vandamme
        Attorneys for Defendant
        THOMAS P. WENDEL
        90 Broad Street, Suite 2202
        New York, NY 10004
        (646) 428-2650

Index No. 07 Civ. 4091(NRB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABOUBACAR JALLOH,

               Plaintiff,

    -against-

THOMAS P. WENDEL,

               Defendant.

---

## RULE 56.1 OPPOSITION TO MOVANT'S STATEMENT OF FACTS

---

**Budin, Reisman, Kupferberg & Bernstein, LLP**
**Attorneys for Plaintiff**
**112 Madison Avenue**
**New York, New York 10016**
**212-696-5500**